No. 23-1890

# In the United States Court of Appeals for the Fourth Circuit

TAMER MAHMOUD and ENAS BARAKAT; JEFF and SVITLANA ROMAN; CHRIS and MELISSA PERSAK, in their individual capacities and ex rel. their minor children; and KIDS FIRST, an unincorporated association,

Plaintiff-Appellants,

v.

MONIFA MCKNIGHT, MONIFA B. MCKNIGHT, in her official capacity as Superintendent of the Montgomery County Board of Education; THE MONTGOMERY COUNTY BOARD OF EDUCATION; and SHEBRA EVANS, LYNNE HARRIS, GRACE RIVERA-OVEN, KARLA SILVESTRE, REBECCA SMONDROWSKI, BRENDA WOLFF, AND JULIE YANG, in their official capacities as members of the Board of Education,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Maryland,
Case No. 8:23-cv-1380—Judge Deborah L. Boardman

**BRIEF OF *AMICI CURIAE* PARENTS NICHOLAS BROWN, ZEINA EL DEBS, TIMOTHY JANSS, DAGMAR JANSS, AND STEPHANIE PATE IN SUPPORT OF THE EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL**

Paul R. Rivera
Paul R. Rivera, Attorney at Law
P.O. Box 394
Rockville, Md. 20848
(301) 949-6367
law.rivera@gmail.com

Steven W. Fitschen
James A. Davids
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org
jdavids@nationallegalfouondation.org

Frederick W. Claybrook, Jr.
   (Counsel of Record)
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(202) 250-3833
rick@claybrooklaw.com

# CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, *Amici Curiae* **PARENTS NICHOLAS BROWN, ZEINA EL DEBS, TIMOTHY JANSS, DAGMAR JANSS, AND STEPHANIE PATE** make these disclosures:

1. Is party a publicly held corporation or other publicly held entity? **No**.

2. Does party have any parent corporations? **No**.

3. Is 10% or more of the stock of a party owned by a publicly held corporation or other publicly held entity? **No**.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? **No**.

5. Is party a trade association? **No**.

6. Does this case arise out of a bankruptcy proceeding? **No**.

7. Is this a criminal case in which there was an organizational victim? **No**.


/s/ Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr.
    *Counsel of Record for Amici Curiae*
DATED: September 1, 2023

Table of Contents

Table of Authorities...................................................................................... iii

Statement of Interests...................................................................................1

Statement of Compliance with FRAP 29(a)(4)(E).......................................1

Argument........................................................................................................1

I.  Maryland Law Cabins LGBTQ+ Instruction to One, Specific Part of Its
    Curriculum and Provides an Opt-Out for Parents ............................................2

II. The State Has Already Balanced the Relevant Interests in Favor of the
    Parental Opt-Out ........................................................................................3

Conclusion ....................................................................................................10

ii

Table of Authorities

Cases

*Elrod v. Burns,* 427 U.S. 347 (1976) ...........................................................7

*Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507 (4th Cir. 2002).........................5-6

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't,*
  2 F.4th 330 (4th Cir. 2021)...........................................................7

*Patton v. United States*, 281 U.S. 276 (1930) ...........................................4

*Roman Cath. Dio. of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ...........................7

*Servotronics, Inc. v. Boeing Co.*, 954 F.3d 209 (4th Cir. 2020) ................................4

*United States v. Gaubert*, 499 U.S. 315 (1991) ................................4

Statutes and Regulations

Code of Md. Regs. (COMAR)
  § 13a.04.18.01 ...........................................................2

  § 13a.04.18.01.D(2)(e) ...........................................................3

  § 13a.04.18.01.D(2)(e)(i) ...........................................................5

Montgomery Co. Board of Ed. (MCBE) Regulation IGP-RA
  § III.E.2 [second].............................................................3

Md. Code Educ. Art.
  § 2-205(c)(2)...........................................................4

<u>Other Authorities</u>

E. Abbruzzese, Stephen B. Levine & Julia W. Mason, "The Myth of 'Reliable Research' in Pediatric Gender Medicine: A critical evaluation of the Dutch Studies—and research that has followed," 49:6 J. of Sex & Marital Therapy 673-99 (2023), DOI: 10.1080/0092623X.2022.2150346, summarized at https://segm.org/Dutch-studies-critically-flawed ...................................................9

http://www.marylandpublicschools.org/programs/ Pages/ELA/frameworks.aspx ................................................................................3

https://en.wikipedia.org/wiki/Montgomery_County_Public_ Schools_(Maryland) ...........................................................................................2

https://marylandpublicschools.org/about/Documents/DCAA/ Health/Health_Education_Framework _July_2022.pdf.....................................3-4

Mayer & McHugh, "Sexuality and Gender," 50 *The New Atlantis* 8 (Fall 2016), https://www.thenewatlantis.com/issues/no-50-fall-2016 .......................................9

## Statement of Interests

The *amici curiae* are all parents of school children currently enrolled in the Montgomery County Public Schools ("MCPS"). They have each requested and been denied an opt-out for their children from MCPS's recent decisions to infuse instruction about LGBTQ+ matters ("LGBTQ+ instruction") throughout the curriculum, most notably by requiring "LGBTQ-Inclusive Texts" to be read in classes starting in kindergarten, purportedly as part of the English and Language Arts curriculum. The *amici* parents retain a strong interest in the outcome of this appeal, as their children are at risk of being instructed with respect to LGBTQ+ issues in what they believe is an inappropriate manner considering their children's ages, personalities, and circumstances. For most of the *amici curiae*, the stated purpose of MCPS's LGBTQ+ instruction to normalize and valorize alternative sexual behavior is also in violation of their sincerely held religious beliefs.

## Statement of Compliance with FRAP 29(a)(4)(E)

No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than *Amici Curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief.

## Argument

While agreeing with the Plaintiff-Appellants' position on the merits, the

*amici curiae* limit their remarks here to discussion of the relevant interests to be considered by the Court in deciding whether to grant a stay pending appeal.

I.     Maryland Law Cabins LGBTQ+ Instruction to One, Specific
       Part of Its Curriculum and Provides an Opt-Out for Parents

For 150 years, the public schools in Montgomery County did not teach its elementary school students, as a regular part of the curriculum, about alternative lifestyles, such as engaging in homosexual behavior, same-sex marriage, and exhibiting as transgender.[1]  In 2019, the Maryland Legislature decreed that the public schools should begin to teach about alternative lifestyles, and the State Board of Education followed up with regulations requiring the same, starting with prekindergarten.  The State Board, however, realizing that many parents would object to such instruction for a variety of religious, cultural, social, and scientific reasons, (a) limited such instruction to the "Family Life and Human Sexuality" ("FLHS") portion of the Health Education curriculum and (b) provided that parents could review the instructional materials before they were used in the classroom and could opt out their child from the FLHS instruction, no questions asked.  *See* Code of Md. Regs. ("COMAR") § 13a.04.18.01.

The State Board flowed down this requirement to its "Health Education

---

[1]    Montgomery County began public schooling in 1860.  *See* https://en.wikipedia
.org/wiki/Montgomery_County_Public_Schools_(Maryland).

Framework," which sets out objectives for the teaching of health for different grades. *See* https://maryland publicschools.org/about/Documents/DCAA/Health/ Health_Education_Framework _July_2022.pdf.  That framework restricts LGBTQ+-related objectives to the FLHS unit.  Instruction about LGBTQ+ matters is not made an objective in any other part of the Health Education Framework.  *Id.* Nor is it made an objective (or even mentioned) in the State Board's more expansive frameworks for English and Language Arts curricula.  *See* http://www.marylandpublicschools.org/programs/ Pages/ELA/frameworks.aspx.

The State Board's regulation requiring notice to parents and the right to opt out also directs local school districts like MCPS to establish implementing policies. *See* COMAR § 13a.04.18.01.D(2)(e).  The Montgomery County Board of Education ("MCBE") did so in its Regulation IGP-RA (found at https://ww2. montgomeryschoolsmd.org/departments/policy/detail.aspx?recID=211&policyID= IGP-RA&sectionID=9).  Recognizing that, if FLHS objectives were taught in any other part of the curriculum it would frustrate the right of parents to opt out their children, that regulation instructs that FLHS objectives will not be taught in any other curriculum.  *Id.* § III.E.2[second].

II.      The State Has Already Balanced the Relevant
         Interests in Favor of the Parental Opt-Out

In this context, all the interests involved support the issuance of the stay

pending appeal.  We make the following summary points in that regard.

First, the State has already informed this Court where the balance of interests lies:  it lies with the parents.  The public interest is defined, first and foremost, by a State's laws.  *See Patton v. United States*, 281 U.S. 276, 306 (1930) (holding that public policy is normally tethered to constitutional or statutory provisions); *Servotronics, Inc. v. Boeing Co.*, 954 F.3d 209, 214 (4th Cir. 2020) (relying on public policy specified in statute); *cf. United States v. Gaubert*, 499 U.S. 315 (1991) (determining public policy of FTCA provision by analyzing the purpose of the law).  Here, the State Board's regulation giving parents an opt-out when the public schools teach about sexual orientation, gender identity, and other alternative sexual lifestyles has the "force of law."  *See* Md. Code, Educ. Art., § 2-205(c)(2).  Thus, the balancing of interests that it strikes is the public policy as defined by law.  As elaborated by the State Board in its Health Framework (at 6), "The opt-out provision reflects the State Board's and MSDE's respect for individual parents' values and beliefs concerning family life and human sexuality instruction." https://marylandpublicschools.org/about/Documents/DCAA/Health/Health_ Education_Framework_July_2022.pdf.

Obviously, when the State Board began in 2019 to require FLHS instruction to represent those of alternative sexual orientation and gender identity, it was advancing the interests of such persons, as it understood them.  But it knew that

introduction to school children of material regarding alternative lifestyles was a contentious matter, with parents and others in the school community having differing views as to the wisdom of such an approach. The State balanced those competing interests, and it required, as a matter of law, that parents who did not wish their children to receive instruction about LGBTQ+ matters, for whatever reason, would have the last say. Neither MCPS nor this Court may properly second-guess that resolution.

Nor can MCBE legitimately advance as a significant interest that, because many parents may avail themselves of the opt-out, it will cause teachers additional administrative burdens to provide alternative lessons to those students who are opting out. The State Board when requiring the opt-out was well aware of that burden, but required teachers to provide alternative instruction anyway. *See* COMAR § 13a.04.18.01.D(2)(e)(i). Thus, the regulation provides, as a matter of law, that any such administrative burden is outweighed by the interests served in providing the opt-out.

Second, because the State has already spoken on how to balance the interests as a matter of law, this brings directly into play the corresponding principles that no party has a valid interest in violating the law and the public interest always lies with conforming to the law. "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to

be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002) (internal quotation marks omitted). "[U]pholding constitutional rights surely serves the public interest." *Id.* MCPS has no cognizable interest in circumventing the decision already made by the State as a matter of law that parents must be given an opt-out from instruction about LGBTQ+ matters for their own children. Nor does it have the authority. It does not suffice for MCBE to argue that violating the law, in its view, would benefit others, such as LGBTQ+ students.

Third, even taken on their own terms, the interests pressed by MCBE and MCPS in support of the No-Opt-Out Policy are not substantial, at least when compared to the competing interests of objecting parents and their children. For over 150 years public school children were not taught as part of the curriculum about homosexual and transsexual behavior. It cannot be deemed to be compelling to do so in the schools now.

In this regard, the suggestion of the district court that parental rights are not burdened by the school's teaching on these subject matters because parents can give their children contrary or complimentary instruction on the topics at home has things exactly backwards. Elementary school students are not ready for a liberal arts approach to complicated sexual issues, and many parents believe any such discussions should be reserved for later ages. But the school teaching on the

subject in an "affirming" way takes that option out of the parents' hands. Parents

who do not object to the school beginning such instruction with their children,

even in prekindergarten, are not similarly disadvantaged. If parents believe that

their children are ready for such instruction at such ages, those children certainly

will not experience "trauma" or "rejection" when other children are excused from

the classroom for a short period of time. To the extent they have questions about

that occurrence, those are the type of questions that *can* appropriately be answered

by the children's own parents at home, without teacher preconditioning, and in

whatever way those parents believe appropriate for them.

Fourth, parents and children who are denied the opt-out are irreparably

harmed. It is axiomatic, of course, that the deprivation or infringement of a

constitutional liberty is irreparable injury that supports a stay. *See Roman Catholic

Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020); *Elrod v. Burns,* 427 U.S.

347, 373 (1976); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th

330, 346 (4th Cir. 2021).

But the injuries here are real, not just theoretical. When, prior to 2019, the

State did not require instruction to include material on alternative lifestyles, no

student was denied the opportunity to learn about them, as parents were free to

instruct their own children about them whenever they thought their own child was

ready due to their child's maturity or the particular circumstances in their child's

life.  By inserting such instruction into the curriculum (with MCPS now doing so from prekindergarten forward), the State has radically changed the dynamics. Realizing this, the State provided the opt-out as its solution to honor the parents' right to determine whether their child will participate.  Without the opt-out, the issue is forced on all students and, whether parents wish it or not, the topics are put front and center before their child.  As the Plaintiff-Appellants aptly state, innocence lost cannot be regained.  That irreparable harm should not, and need not, occur.  A stay is needed to preserve the State's own solution provided by the parental opt-out.

Fifth, MCPS's own policy demonstrates that its articulated interests have no immediacy, and so neither MCPS nor LGBTQ+ students will be injured by a stay pending appeal.  Although teachers are now required to insert the LGBTQ-Inclusive Texts into their lesson plans, they do not need to do so right away.  The policy provides that teachers may decide for themselves when to do so at any time throughout the school year.  Moreover, if LGBTQ+ instruction is limited (as Maryland law provides) to the FHLS part of the curriculum, then parents have an opt-out in any event.  And, of course, instruction not provided for over a century and a half cannot suddenly become compelling overnight.  If MCPS has waited this long, it can wait a little longer.

A final word about the interests involved.  In the world of MCBE and

MCPS, those who consider homosexual and transsexual behavior unhealthy or

unethical are benighted, if not bigoted, and certainly unworthy of serious

consideration in the balancing of competing interests.  Putting religious and other

considerations to one side, a substantial and growing body of evidence and

professional opinion outlines the deleterious physical and mental effects of such

behavior and the lack of scientifically valid studies in its support.[2]  Parents are not

shutting their eyes to reality when they have a different viewpoint than MCBE and

---

[2] *See, e.g.*, Mayer & McHugh, "Sexuality and Gender," 50 *The New Atlantis* 8
(Fall 2016), https://www.thenewatlantis.com/issues/no-50-fall-2016 (analyzing
social science studies on homosexuality and transgenderism and noting that
there is limited evidence that social stressors such as discrimination and stigma
contribute to the elevated risk of poor mental health outcomes for transgender
populations and calling for more high-quality, longitudinal studies to examine
the relationship between social stressors and poor mental health results for
transgendered individuals); E. Abbruzzese, Stephen B. Levine & Julia W.
Mason, "The Myth of 'Reliable Research' in Pediatric Gender Medicine: A
critical evaluation of the Dutch Studies—and research that has followed," 49:6
J. of Sex & Marital Therapy 673-99 (2023), DOI: 10.1080/0092623X.2022.
2150346, summarized at https://segm.org/Dutch-studies-critically-flawed
(analyzing transgender studies and finding that "a false narrative has taken root.
It is that 'gender-affirming' medical and surgical interventions for youth are as
benign as aspirin, as well-studied as penicillin and statins, and as essential to
survival as insulin for childhood diabetes—and that the vigorous scientific
debate currently underway is merely 'science denialism' motivated by
ignorance, religious zeal, and transphobia . . . .  This highly politicized and
fallacious narrative, crafted and promoted by clinician-advocates, has failed to
withstand scientific scrutiny internationally, with public health authorities in
Sweden, Finland, and most recently England doing a U-turn on pediatric gender
transitions in the last 24 months . . .").

.

MCPS (or the State of Maryland, for that matter) about the appropriateness and wisdom of alternative sexual lifestyles or when their children should be exposed to them. The State, to its credit, has recognized parental rights in this regard and has protected them by requiring local schools to provide parents with an opt-out for instruction about LGBTQ+ matters. That conclusively balances the interests in favor of a stay for the parents here.

<u>Conclusion</u>

All relevant interests support a stay pending appeal. It should be granted.

Respectfully submitted,

<u>/s/ Frederick W. Claybrook, Jr.</u>
Frederick W. Claybrook, Jr.
  (Counsel of Record)
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(202) 250-3833
Rick@claybrooklaw.com

Paul R. Rivera
Paul R. Rivera, Attorney at Law
P.O. Box 394
Rockville, Md. 20848
(301) 949-6367
Law.rivera@gmail.com

Steven W. Fitschen
James A. Davids
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org
jdavids@nationallegalfoundation.org

Attorneys for *Amici Curiae*

September 1, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to Fed. R. App. P. 32(a)(5)(A) and

32(a)(7)(B)(i) and the corresponding local rules, the attached Brief *Amici Curiae*

has been produced using 14-point Times New Roman font which is proportionately

spaced and contains 2,222 words, excluding those portions not required to be

counted, as calculated by Microsoft Word 365.

/s/ Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr.
        (Counsel of Record)
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(202) 250-3833
Rick@claybrooklaw.com

DATED: September 1, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2023, the foregoing brief was filed

electronically with the Clerk of the Court for the United States Court of Appeals

for the Fourth Circuit through the Court's CM/ECF system. I certify that all

participants in the case are registered CM/ECF users and will be served by the

appellate CM/ECF system.


/s/ Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr.
          (Counsel of Record)
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(202) 250-3833
Rick@claybrooklaw.com