No. 23-1890

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

TAMER MAHMOUD, ET AL.,

*Plaintiffs-Appellants,*

*v.*

MONIFA B. MCKNIGHT, IN HER OFFICIAL CAPACITY AS SUPERINTENDENT OF THE MONTGOMERY COUNTY BOARD OF EDUCATION, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland, No. 8:23-cv-01380-DLB
Before the Honorable Judge Deborah L. Boardman

## OPPOSITION OF DEFENDANTS-APPELLEES
## TO MOTION FOR INJUNCTION PENDING APPEAL

BRUCE M. BERMAN
JEREMY W. BRINSTER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

ALAN E. SCHOENFELD
EMILY BARNET
CASSANDRA A. MITCHELL
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
alan.schoenfeld@wilmerhale.com

September 5, 2023

## CORPORATE DISCLOSURE STATEMENT

None of the Defendants-Appellees is a nongovernmental corporation.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .....................................................i

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ............................................................................1

BACKGROUND ..............................................................................3

      A.     MCPS's Curriculum Reflects Its Diverse Community .........................3

      B.     MCPS Introduces LGBTQ-Inclusive Storybooks.................................3

      C.     Parents Cannot Opt Children Out Of Instruction Using The Storybooks For Any Reason .........................5

      D.     Decision Below .........................................................................6

STANDARD OF REVIEW ...............................................................9

ARGUMENT ..............................................................................10

I.     PLAINTIFFS HAVE NOT MADE A STRONG SHOWING THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS ...................................10

      A.     The Policy Does Not Burden Plaintiffs' Religious Practice ................10

      B.     The Policy Is Neutral And Generally Applicable .............................15

      C.     Plaintiffs' Free Exercise Claims Fail Under Any Standard Of Review.................................................20

II.    PLAINTIFFS CANNOT SATISFY THE REMAINING *Nken* FACTORS .....................22

CONCLUSION ..............................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### CASES

Page(s)

*Association of American Publishers, Inc. v. Frosh*,
    586 F. Supp. 3d 379 (D. Md. 2022)................................................................23

*Bauchman v. West High School*,
    132 F.3d 542 (10th Cir. 1997) .......................................................................10

*Canaan Christian Church v. Montgomery County*,
    29 F.4th 182 (4th Cir. 2022) ...................................................................16, 17

*Carson ex rel. O.C. v. Makin*,
    142 S.Ct. 1987 (2022).....................................................................................14

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)..................................................................................17, 18

*Coble v. Lake Norman Charter School, Inc.*,
    2021 WL 1109360 (W.D.N.C. Mar. 23, 2021) ............................................11

*D.L. ex rel. K.L. v. Baltimore Board of School Commissioners*,
    706 F.3d 256 (4th Cir. 2013) .........................................................................13

*Espinoza v. Montana Department of Revenue*,
    140 S.Ct. 2246 (2020).....................................................................................14

*Fleischfresser v. Directors of School District 200*,
    15 F.3d 680 (7th Cir. 1994) ...........................................................................10

*Fulton v. City of Philadelphia*,
    141 S.Ct. 1868 (2021)................................................................2, 15, 17, 18

*Grimm v. Gloucester County School Board*,
    972 F.3d 586 (4th Cir. 2020) .........................................................................21

*Grove v. Mead School District No. 354*,
    753 F.2d 1528 (9th Cir. 1985) .......................................................................10

*Herndon by Herndon v. Chapel Hill-Carrboro City Board of
    Education*, 89 F.3d 174 (4th Cir. 1996)..........................................................9

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ........................................................1, 10

*Jones v. Boulder Valley School District RE-2*,
2021 WL 5254188 (D. Colo. Oct. 4, 2021) ............................................10, 14

*Kennedy v. Bremerton School District*,
142 S.Ct. 2407 (2022) ....................................................................................15

*Leaders of a Beautiful Struggle v. Baltimore Police Department*,
2 F.4th 330 (4th Cir. 2021) ............................................................................23

*League of United Latin American Citizens v. Perry*,
548 U.S. 399 (2006) ........................................................................................21

*Lee v. Weisman*, 505 U.S. 577 (1992) ...................................................................14

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
138 S.Ct. 1719 (2018) ..................................................................2, 15, 18, 19

*Mozert v. Hawkins County Board of Education*,
827 F.2d 1058 (6th Cir. 1987) ......................................................................10

*New York v. Ferber*,
458 U.S. 747 (1982) ........................................................................................21

*Nken v. Holder*,
556 U.S. 418 (2009) ....................................................................................9, 23

*Parker v. Hurley*,
514 F.3d 87 (1st Cir. 2008) ..............................................................10, 12, 13

*Pierce v. Society of Sisters*,
268 U.S. 510 (1925) ........................................................................................20

*Respect Maine PAC v. McKee*,
562 U.S. 996 (2010) ..........................................................................................9

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
141 S.Ct. 63 (2020) ........................................................................................16

*Saxe v. State College Area School District*,
240 F.3d 200 (3d Cir. 2001) ..........................................................................21

*Sherbert v. Verner*,
    374 U.S. 398 (1963)..................................................................17

*Tandon v. Newsom*,
    141 S.Ct. 1294 (2021)......................................................2, 15, 16

*Taylor v. Freeman*,
    34 F.3d 266 (4th Cir. 1993) ......................................................7

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017)..................................................................14

*Walz v. Tax Commission City of New York*,
    397 U.S. 664 (1970)..................................................................19

*We The Patriots USA, Inc. v. Connecticut Office of Early
    Childhood Development*,
    2023 WL 4982325 (2d Cir. Aug. 4, 2023) ..........................18, 19

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)..............................................................2, 11

**INTRODUCTION**

Last year, Montgomery County Public Schools ("MCPS") added storybooks featuring LGBTQ characters to its elementary school English Language Arts ("ELA") curriculum to better reflect the diversity of the county's families. Teachers and principals initially tried to accommodate parents' requests (whether made on religious or other grounds) to opt their children out of reading and instruction involving the books. But last March, after determining that opt outs were disrupting the classroom environment and undermining its educational mission, MCPS announced it would not permit opt outs in the new school year, which began last week.

Plaintiffs sued, claiming that the Constitution requires MCPS to excuse their children from the classroom whenever any of these books is read or discussed. They later sought a preliminary injunction based on their free-exercise and due-process claims. In a 60-page opinion, the district court denied them that relief.

Plaintiffs now fall far short of the "strong showing" necessary to justify an injunction pending appeal. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The district court correctly held that their free-exercise claims are unlikely to succeed because—as every court to consider the question has concluded—children's exposure at public school to ideas that conflict with their parents' religious beliefs does not burden the parents' religious freedom. The district court also correctly

1

held that Plaintiffs' failure to establish such a burden dooms their free-exercise claims, under not only *Wisconsin v. Yoder*, 406 U.S. 205 (1972), but also *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021); *Tandon v. Newsom*, 141 S.Ct. 1294 (2021) (per curiam); and *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S.Ct. 1719 (2018). And even if Plaintiffs were not required to establish a burden under *Tandon*, *Fulton*, or *Masterpiece*, their free-exercise claims still would fail because MCPS's opt-out policy is neutral and generally applicable. Finally, Plaintiffs do not even argue here that they are likely to succeed on their due-process claims.

Plaintiffs nevertheless request emergency relief, proposing a sweeping new constitutional rule: that public schools must accommodate parents' requests to pull their children from any instruction that "expose[s] them to ideas … in conflict with their religious beliefs." Plfs.' Emerg. Mot. Inj. Pending Appeal ("Mot.") 11. But adopting that rule would require this Court to hold that recent decisions on unrelated issues have silently rewritten the law governing parental rights in public-school classrooms. Plaintiffs cannot possibly show (as they must to prevail here) that they are *likely* to persuade this Court to both break new constitutional ground and adopt such an implausible reading of recent case law. And because Plaintiffs

are not likely to succeed on the merits, the remaining factors weigh against injunctive relief.[1]

## BACKGROUND

### A.     MCPS's Curriculum Reflects Its Diverse Community

MCPS is Maryland's largest school district, serving more than 160,000 students of many different backgrounds.  Mot. Ex. 1 ("Op.") 2.  MCPS seeks to ensure its classes reflect the County's wide range of families by "provid[ing] a culturally responsive … curriculum that promotes equity, respect, and civility." Op.2.  "Representation in the curriculum creates and normalizes a fully inclusive environment for all students" and "supports a student's ability to empathize, connect, and collaborate with diverse peers and encourages respect for all."  Op.3.

### B.     MCPS Introduces LGBTQ-Inclusive Storybooks

Last year, MCPS supplemented its ELA curriculum with books featuring characters who are lesbian, gay, bisexual, transgender, or queer (the "Storybooks"). Op.3.  MCPS undertook this effort after determining the existing books did not represent many students and families because they included no LGBTQ characters. Op.3.  A committee of six reading and instructional specialists participated in

---

[1] Plaintiffs' suggestion (Mot.1 n.1) that this case should be resolved by the same panel that recently decided a case involving some of the same defendants and "similar issues" is meritless.  There is no reason to depart from the Court's ordinary procedures.

multiple rounds of evaluations to determine whether each book would be a suitable addition.  Op.3.  The committee recommended the Storybooks because they "supported MCPS content standards and performance indicators, contained narratives and illustrations that would be accessible and engaging to students, and featured characters of diverse backgrounds whose stories and families students could relate to."  Op.3.

"[T]he storybooks are … a small subset of many books used in the MCPS [ELA] curriculum."  Op.43.  Teachers can fold them into the ELA curriculum as they would any other book.  For example, they can put the books on shelves for students to find themselves, recommend a particular book to a student who would enjoy it, read the books aloud, or offer them as an option for reading groups. Op.11.  "While the School Board expects 'that teachers use the LGBTQ-Inclusive Books as part of instruction,' as with all curriculum resources, teachers have a choice 'regarding which MCPS-approved materials to use and when to use them through each unit.'"  Op.11-12.

As MCPS made clear to teachers, use of the books involves no instruction on sexual orientation or gender identity.  Op.12.  MCPS also offered a professional-development session on the books that drew more than 130 participants before the books were added to the curriculum.  Op.12.  MCPS provided proposed, but not required, responses to potential questions from

students.  Op.12, 43.  "Generally, the suggested responses focus on tolerance,

empathy, and respect for different views."  Op.15.

### C.  Parents Cannot Opt Children Out Of Instruction Using The Storybooks For Any Reason

For the 2022-2023 school year, MCPS's "Guidelines for Respecting

Religious Diversity" stated that, "[w]hen possible, schools should try to make

reasonable and feasible adjustments to the instructional program to accommodate

requests" that students "be excused from specific classroom discussions or

activities that they believe would impose a substantial burden on their religious

beliefs."  Op.5 (quoting Mot. Ex. 3 at 60-61).  The Guidelines further stated that,

"if such requests become too frequent or too burdensome, the school may refuse to

accommodate the[m]."  Op.5.

After the Storybooks were introduced, some parents asked teachers,

principals, and staff that their children be excused from instruction using the

Storybooks.  Op.16.  Many of these requests were not religion-based.  Some

parents, for example, opposed what they believed was an effort to teach students

about sex or LGBTQ issues, or to use materials that were not age-appropriate.

Op.16.  Individual teachers and principals sought to accommodate these requests

by allowing students (including Plaintiffs' children) to be excused when the books

were read in class.  Op.16-18.

Last March, the growing number of opt-out requests led principals to raise concerns centering on three issues.  Op.17.  "First, high student absenteeism.  In one instance, … parents sought to excuse dozens of students in a single elementary school from instruction."  Op.17.  "Second, the infeasibility of managing numerous opt-outs" across classrooms and across schools.  Op.17.  Third, "permitting some students to leave the classroom whenever books featuring LGBTQ characters were used would expose students who believe the books represent them and their families to social stigma and isolation.'"  Op.17-18.  MCPS therefore determined it was not feasible or consistent with its curricular goals to permit opt outs.  Op.18.

On March 23, MCPS informed parents, teachers, and principals that no opt outs from instruction using the Storybooks would be granted.  Op.18.

### D.    Decision Below

Plaintiffs brought this action and moved for a preliminary injunction on their free-exercise and due-process claims.  They sought to "enjoin Defendants from denying [Plaintiffs] notice and opportunity to opt their children out of reading, listening to, or discussing" the Storybooks.  Plfs.' Mot. Prelim. Inj. 1, Dist. ECF 23.  Plaintiffs later amended their complaint to add Plaintiff Kids First, "an unincorporated association of parents and teachers," Mot. Ex. 3 at 7-8 (¶¶32-33), which has not sought a preliminary injunction.

The district court denied Plaintiffs' motion, holding that Plaintiffs failed to show they were likely to succeed on the merits of any claim. Op.51, 59.[2]

*First*, the court held that Plaintiffs' free-exercise claims, whether articulated under *Yoder*, *Tandon*, *Fulton*, or *Masterpiece*, were foreclosed by their failure to establish a burden on their religious exercise.

The court reviewed decades of binding and persuasive authority cementing the requirement that free-exercise plaintiffs establish some coercive effect—either direct or indirect—on their religious exercise. Op.29-31. It then described the uniform body of case law holding that exposure to a public-school curriculum does not amount to such coercion. Op.31-39. The court explained that "[e]very court that has addressed the question has concluded that the mere exposure in public school to ideas that contradict religious beliefs does not burden the religious exercise of students or parents." Op.31-32. The court read those cases to establish "that the mere exposure to ideas in public school did not burden religious exercise because (1) students were not required to behave contrary to their faiths or affirm

---

[2] Although Plaintiffs seek to change the status quo—which permits no opt outs—the district court applied the standard for prohibitory injunctions rather than "[t]he heightened standard for a mandatory preliminary injunction," which is "'warranted only in the most extraordinary circumstances.'" Op.26 (quoting *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1993)).

any views contrary to their religious beliefs, and (2) parents were not prevented from discussing and contextualizing any contrary views at home."  Op.32.

The court then rejected each of Plaintiffs' theories of burden.  Op.40-45. The court found the record did not support Plaintiffs' argument that their children would "be pressured to change their religious views"—effectively indoctrinated— "by being forced to read and discuss the storybooks."  Op.41.  Plaintiffs had "not shown that the no-opt-out policy likely will result in the indoctrination of their children" because the challenged books were "a small subset of many books used in the MCPS [ELA] curriculum," students were not required to "agree with or affirm" any book's views, and MCPS "threatens no punishment if they refuse to do so."  Op.42-43.  Moreover, "[e]ven if one or two of the suggested answers to possible student questions in the School Board's guidance could be interpreted to promote a particular view as correct, they are not required answers, and they are outliers."  Op.43.  Lastly, the court concluded that "parents' inability to opt their children out of reading and discussion of the storybooks does not coerce them into violating their religious beliefs," which they were free to discuss at home.  Op.46. Because Plaintiffs thus had "not shown the no-opt-out policy likely coerces them to violate their religious beliefs," their free-exercise claim was not likely to succeed.  Op.51.

*Second*, the court held Plaintiffs were not likely to succeed on their due-process claims, whether viewed as standalone or "hybrid" claims. Op.52-58 (discussing *Herndon by Herndon v. Chapel Hill-Carrboro City Bd. of Educ.*, 89 F.3d 174 (4th Cir. 1996)).

The court held that it did not need to analyze the remaining preliminary-injunction factors because they were, as Plaintiffs conceded, inextricable from the likelihood-of-success factor. The court nonetheless analyzed the remaining factors and concluded they were not met. Op.59.

## STANDARD OF REVIEW

An injunction pending appeal is an extraordinary remedy warranted only if the movant (1) "has made a strong showing" that they are "likely to succeed on the merits," and has established (2) that they "will be irreparably injured" absent injunctive relief, (3) that an injunction will not "substantially injure the other parties interested in the proceeding," and (4) that the "public interest lies" in granting an injunction. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Because an injunction pending appeal "does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts," a request for an injunction "'demands a significantly higher justification' than a request for a stay." *Respect Maine PAC v. McKee*, 562 U.S. 996 (2010).

# ARGUMENT

## I. PLAINTIFFS HAVE NOT MADE A STRONG SHOWING THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS

### A. The Policy Does Not Burden Plaintiffs' Religious Practice

1. Plaintiffs do not make the required "strong showing," *Hilton*, 481 U.S. at 776, that the district court erred in holding that they failed to establish a cognizable burden on their religious practice—a fundamental defect that forecloses their free-exercise claims.[3]

It is "well recognized" that, having chosen to send a child to public school, a parent has no constitutional right to "direct *how* a public school teaches their child." *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008). "Every court that has addressed the question has concluded that the mere exposure in public school to ideas that contradict religious beliefs does not burden the religious exercise of students or parents." Op.31 (citing, among other cases, *Parker*, 514 F.3d at 107; *Bauchman v. West High Sch.*, 132 F.3d 542, 557 (10th Cir. 1997); *Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 690 (7th Cir. 1994); *Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1065 (6th Cir. 1987); *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1542-1543 (9th Cir. 1985); *Jones v. Boulder Valley Sch.*

---

[3] Plaintiffs have not sought a stay based on their due-process claims, which the district court correctly held will fail. *See* Op.51-59. Plaintiffs hint at a "hybrid [rights]" claim, but do not advance any argument under that theory, and hence have not properly raised it. Mot.9.

*Dist. RE-2*, 2021 WL 5264188, at *14 (D. Colo. Oct. 4, 2021); and *Coble v. Lake Norman Charter Sch., Inc.*, 2021 WL 1109360, at *7 (W.D.N.C. Mar. 23, 2021)).

Plaintiffs thus cannot establish a free-exercise violation based on their children's mere "expos[ure]" to materials about which Plaintiffs have sincerely held religious views.  Mot.9-10.  Relying on *Yoder*, Plaintiffs argue that the policy burdens their religious exercise because "[t]hey believe it is wrong to expose their elementary-age children to instruction that promotes values 'in marked variance with [their] values and [their] way of life.'"  Mot.10.  But *Yoder* is inapposite for two reasons.

*First*, unlike the *Yoder* parents, Plaintiffs have not argued, let alone made a "strong showing," that exposure to the Storybooks is irreconcilable with their desire to raise their children consistent with their religious faith.  In *Yoder*, parents faced criminal convictions for refusing to send their children to school based on their belief that "attendance at high school, public or private, was contrary to the Amish religion and way of life," and would "result in the destruction" of their religious community.  406 U.S. at 209, 211-212.  Here, Plaintiffs offer no evidence that the challenged policy would "gravely endanger if not destroy the free exercise of [their] religious beliefs."  *Id.* at 219.  They argue that the children they choose to send to public school could be exposed to ideas at odds with their values.  As the district court concluded, such exposure alone is not a burden on their religious

11

exercise.  It does not "prevent[] the[m] from freely discussing the topics raised in the storybooks with their children or teaching their children as they wish."  Op.46. Nor does it "pressure the[m] to refrain from teaching their faiths, to engage in conduct that would violate their religious beliefs, or to change their religious beliefs."  Op.49.

Contrary to the assertions of Plaintiffs and amici, Mot.10; Professors Amicus Br.3 (Dkt. 13), the Supreme Court has never held that *Yoder* extends beyond situations where parents are coerced into conduct that violates their religious beliefs.  As the district court recognized, "*Yoder* is *sui generis*" because those parents proved that the Amish way of life was at odds with *any* high-school education—and "[t]he Supreme Court itself said as much, anticipating few groups could match the Amish parents' claims."  Op.51.  Plaintiffs, who make no claim that exposure to the Storybooks would "automatically and irreversibly prevent" them from raising their children with their religious beliefs, or that they lack "legal alternatives to public school," certainly have not done so.  Op.50 (quoting *Parker*, 514 F.3d at 100).  The district court thus held—without questioning Plaintiffs' "sacred obligations to raise their children in their faiths"—that Plaintiffs' inability to opt their children out of exposure to "religiously offensive" ideas did not coerce them into violating their religious beliefs.  Op.46 (quoting *Parker*, 514 F.3d at 106).  That holding does not "license denominational favoritism," Mot.10, or

question the "centrality of religious beliefs," Professors Amicus Br.4. It follows every court to have applied *Yoder* in similar circumstances.

*Second*, unlike in *Yoder*, Plaintiffs do not wish to withdraw their children from public school but instead seek to dictate the elements of their children's public-school curriculum. *Yoder* established no such right. As this Court and many others have recognized, "[t]he right to a religious education does not extend to a right to demand that public schools accommodate [parents'] educational preferences." *D.L. ex rel. K.L. v. Baltimore Bd. of Sch. Comm'rs*, 706 F.3d 256, 264 (4th Cir. 2013); *see also* Op.31.[4]

2.    Plaintiffs' and amici's novel arguments for casting aside the authorities just discussed are meritless, and certainly do not establish a strong showing of likelihood of success.

*First*, the First Circuit's decision in *Parker v. Hurley* did not improperly "reduc[e] the Free Exercise trigger to 'direct coercion.'" Mot.12; *see also* Professors Amicus Br. 9. *Parker* discussed a number of forms of coercion that have been characterized as indirect coercion in other cases, including "denial of benefits" and "indoctrination." 514 F.3d at 105. The district court here squarely

---

[4] Plaintiffs assert (Mot.12) that it bolsters their claim that they seek individual opt outs rather than across-the-board curriculum changes. That is wrong. Each case they cite, whether it involved a curricular challenge or an opt-out request, found no free-exercise violation. *Id.*

13

considered and correctly rejected Plaintiffs' claim of indirect coercion. *See* Op.30, 42 n.9.

*Second*, the Supreme Court has never held that requiring public-school students to sit through classroom discussions "against their religious convictions" coerces them to violate their religious beliefs. Mot.11 (citing *Lee v. Weisman*, 505 U.S. 577 (1992)). *Lee* did not address a free-exercise claim; it held that the Establishment Clause prohibited "formal religious exercise at promotional and graduation ceremonies for secondary schools." 505 U.S. at 586, 599.

*Third*, the decades of consistent holdings discussed by the district court are not "outdated." Mot.12; Professors Amicus Br.9. Plaintiffs rely on cases holding that "a State 'punishe[s] the free exercise of religion' by disqualifying the religious from government aid." *Espinoza v. Montana Dep't of Rev.*, 140 S.Ct. 2246, 2256 (2020); *see also Carson ex rel. O.C. v. Makin*, 142 S.Ct. 1987, 1998 (2022); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017). But "disqualifying the religious from government aid" is a far cry from what Plaintiffs point to here, which is, at most, "action that reduces [parents'] likelihood of meeting a sacred obligation." Op.48. And courts have continued in recent years to hold that parents are not constitutionally entitled to notice or opt outs from public-school instruction on concepts contrary to their religious faith. *See Jones*, 2021 WL 5264188, at *12.

14

**B.    The Policy Is Neutral And Generally Applicable**

1.    Because Plaintiffs cannot establish any burden on their religious practice, they cannot "show[] that a government entity has burdened [their] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"  *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421-2422 (2022). The district court thus concluded correctly it need not reach Plaintiffs' arguments for applying strict scrutiny under *Tandon*, *Fulton*, or *Masterpiece*.  Op.51 n.14.

Plaintiffs are wrong to suggest that they need not establish any burden to trigger strict scrutiny if the policy is not neutral or generally applicable.  *See* Mot.13 & n.2.  As the court observed, the burdens plaintiffs faced in *Tandon*, *Fulton*, and *Masterpiece* were "obvious."  Op.30 n.8.  Those plaintiffs were prohibited from holding religious gatherings, *Tandon*, 141 S. Ct. at 1297, or forced to take affirmative steps plaintiffs viewed as endorsing same-sex relationships in violation of their religious beliefs, *Fulton*, 141 S.Ct. at 1876; *Masterpiece*, 138 S.Ct. at 1726.  And the district court never required Plaintiffs to prove a "substantial" burden.  *See* Mot.13, n.2.  It correctly held that their free-exercise claims failed, under any theory, because Plaintiffs could not identify any cognizable burden at all.

2.    Even if Plaintiffs did not need to establish any burden, the policy still would be subject to rational-basis review as "a facially neutral and generally

15

applicable regulation." *Canaan Christian Church v. Montgomery Cnty.*, 29 F.4th 182, 198 (4th Cir. 2022), *cert. denied*, 143 S.Ct. 566 (2023).

*Tandon.* The no-opt-out policy is generally applicable and neutral under *Tandon* because it treats secular and religious activity the same.

Plaintiffs' *Tandon* argument fails at the outset because they do not point to disparate treatment between "secular activity" and "religious exercise." *Tandon*, 141 S.Ct. at 1296. Plaintiffs concede that *all* opt outs are allowed from the health education curriculum while *all* opt outs are prohibited from the ELA curriculum. Mot.14. Religious opt-out requests are thus not "single[d] out … for especially harsh treatment." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 66 (2020) (per curiam). Like secular opt-out requests, they are always honored for health education and never allowed for ELA. The *Tandon* inquiry ends there.

Regardless, opt outs from these distinct curricula are not "comparable for purposes of the Free Exercise Clause" because "the asserted government interest that justifies" them is not the same. *Tandon*, 141 S.Ct. at 1296. MCPS implemented the no-opt-out policy for the Storybooks due to high student absenteeism, the infeasibility of accommodating opt-out requests, and the risk of exposing other students to social stigma and isolation. Decl. of Niki T. Hazel ("Hazel Decl.") ¶¶36-39, Dist. ECF 43. Plaintiffs adduced no evidence that allowing opt outs from the health curriculum (adopted by Maryland over a decade

ago) creates those same risks.  Recent *state-level* changes to the health-education curriculum to promote educational equity do not alter the analysis.  Mot.14-15. Again, Plaintiffs did not introduce any evidence that the specific interests motivating the challenged policy are undermined by permitting the opt outs from health education that Maryland law has long required.  Hazel Decl. ¶43.

**Fulton**.  Plaintiffs' reliance on *Fulton* is misplaced.  "*Fulton* is inapplicable" because the challenged policy prohibits opt outs from Storybook-related instruction for any reason, "without exception."  *Canaan*, 29 F.4th at 199; Hazel Decl. ¶¶40, 42.

Under *Fulton* and the precedent on which it relied, a policy lacks general applicability when it "'invites' the government to consider the particular reasons for a person's conduct."  141 S.Ct. at 1877.  The policy in *Fulton*, which offered exemptions subject to an official's "sole discretion," was therefore unlawful.  *Id.* at 1878.  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah* likewise involved a law whose application "require[d] an evaluation of the particular justification" given for noncompliance.  508 U.S. 520, 537 (1993).  And in *Sherbert v. Verner*, the law excused noncompliance only for "good cause," a subjective standard susceptible to being implemented in a way that discriminated against religion.  374 U.S. 398, 400, 407 n.7 (1963).  MCPS's policy, by contrast, does not permit a decisionmaker to deny opt outs because they are based on religion.

17

The Religious Diversity Guidelines, moreover, are not an impermissible "reservation of the authority to grant" exemptions to the no-opt-out policy. *Fulton*, 141 S. Ct. at 1879. In *Fulton*, a contract purported to prohibit sexual-orientation discrimination while reserving the authority to grant exemptions, in the city's "sole discretion," to service providers that refused same-sex families. *Id.* at 1878-1879. MCPS's Guidelines nowhere suggest that schools may override the blanket no-opt-out policy, let alone evaluate the motives for opt-out requests. Rather, they assume all requests for religious accommodation are legitimate and permit schools to evaluate whether those requests can be accommodated based on neutrally applicable criteria. Mot. Ex. 3 at 61-62. Any accommodations the Guidelines envision thus satisfy *Fulton* because they "do not allow 'the government to decide which reasons for not complying with the policy are worthy of solicitude.'" *We The Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 2023 WL 4982325, at *13 (2d Cir. Aug. 4, 2023).

**Masterpiece and Lukumi**. MCPS's policy is also neutral. It is not intended to "infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. Nor was it enacted with "clear and impermissible hostility" toward religious beliefs. *Masterpiece*, 138 S.Ct. at 1729.

*First*, the no-opt-out policy was not implemented to "target[] religious conduct." Mot.17. Only a subset of the opt-out requests MCPS received cited

religious motivations, Hazel Decl. ¶ 34, and Plaintiffs provide no evidence that opt

outs were ended to target those particular requests.  To the extent Plaintiffs claim

MCPS could not "allow[] opt-outs" and then "withdraw[]" them, Mot.17, they are

wrong.  The Second Circuit recently rejected the argument that "repealing any

existing religious exemption is hostile to religion per se," upholding the repeal of a

longstanding religious exemption from student vaccination requirements while

retaining medical exemptions.  *We The Patriots*, 2023 WL 4982325, at *12.  As

that court explained, "the Supreme Court has long described religious exemptions

as part of a mutually beneficial 'play in the joints' between the Establishment

Clause and Free Exercise Clause," and "Plaintiffs' argument, which would make

every exemption permanent once granted, threatens to distort the relationship

between the Clauses." *Id.* (quoting *Walz v. Tax Comm'n City of N.Y.*, 397 U.S.

664, 669 (1970)).

*Second*, none of the statements Plaintiffs quote—without context—suggests

religious hostility motivated the policy.  *Masterpiece* prohibits a government body

from subjecting a requested religious accommodation to a "negative normative

'evaluation of the particular justification' for [the] objection and the religious

grounds for it."  138 S.Ct. at 1731.  MCPS did no such thing here.  Board member

Lynne Harris, responding to a comment that the Storybooks "go against religious

rights, family values, and core beliefs," made clear she opposed opt outs for *any* of

19

those reasons, not religious opt outs alone. Op.21. She similarly objected to the idea of curricular opt-out requests rooted in non-religious motives such as xenophobia. Op.23. And neither she nor anyone else "accused the Parents of … promoting a 'dehumanizing form of erasure.'" Mot.17. Those words, cited in a presentation about the Storybooks, come from a letter to Congress by authors protesting "[w]hen books are removed or flagged as inappropriate." Mot. Ex. 3 at 339.

Similarly, while Harris "wondered whether" a student who spoke out against the policy "was 'parroting dogma' learned from her parents," Op.23, she never suggested the student's—or anyone's—opt-out request would be judged by its religious nature. Moreover, as the district court found, Harris commented as part of an argument that if parents "want their child to receive an education that strictly adheres to their religious dogma, they can send their kid to a private religious school." Op.23. That is not unconstitutional—it is what the Supreme Court held nearly a century ago in *Pierce v. Society of Sisters*, 268 U.S. 510 (1925).

### C. Plaintiffs' Free-Exercise Claims Fail Under Any Standard Of Review

As the district court held, the no-opt-out policy easily satisfies rational-basis review—a conclusion Plaintiffs do not contest. Op.58-59. But even if strict scrutiny applied, the policy would survive.

*First*, the policy serves compelling interests.  It is justified by MCPS's compelling interest in providing all students—including LGBTQ students—"an educational environment that is safe and conducive to learning." *Saxe v. State Coll. Area Sch. Dist*., 240 F.3d 200, 217 (3d Cir. 2001).  The interest in protecting minors from harm is not "imponderable," Mot.19—it is instead "evident beyond the need for elaboration." *New York v. Ferber*, 458 U.S. 747, 756 (1982).  A safe learning environment is especially critical for LGBTQ students, including transgender students who "frequently experience" harassment and physical assault at school.  *Grimm v. Gloucester Cnty. Sch. Bd*., 972 F.3d 586, 612 (4th Cir. 2020); *see also 2019-2020 Guidelines for Student Gender Identity* 4, Dist. ECF 42-6 (MCPS document noting that "LGBTQ+ students have a higher incidence of being bullied and harassed" and a far higher rate of suicide attempts).  And the policy serves an equally compelling interest in "compliance with federal antidiscrimination laws." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 518 (2006) (Scalia, J., concurring).  This includes MCPS's obligations under federal law to ensure students are not "treat[ed] … worse than others" based on their sexual orientation or gender identity in violation of Title IX.  *See Grimm*, 972 F.3d at 618.

*Second*, the policy is narrowly tailored because the interests it advances are served by the very actions Plaintiffs seek to enjoin—exposing students to

instructional materials that represent characters of diverse backgrounds.  The Board cannot serve its compelling interests if it is forced to rid the ELA curriculum of books featuring LGBTQ characters, and it cannot feasibly accommodate the opt outs that Plaintiffs seek.  Hazel Decl. ¶¶ 36-39.

Plaintiffs' counterarguments fail.  They advance no support for the argument that there is no compelling interest in the policy because it was adopted recently. Mot.19.  *Fulton* did not reach that conclusion, which would hamstring the government from adopting and adapting policies to advance its compelling interests.  Nor do Plaintiffs establish that the specific policy at issue is an outlier in historical or modern-day terms.[5]

## II.    PLAINTIFFS CANNOT SATISFY THE REMAINING *NKEN* FACTORS

The remaining *Nken* factors tip sharply against awarding an injunction pending appeal.

*First*, Plaintiffs have not shown likely irreparable harm.  The only harm Plaintiffs assert is suffering from purported constitutional violations.  But for all

---

[5] Amici Parents suggest that Maryland law decides this case, Parents Amicus Br., Dkt. 11-1, but that argument is waived because Plaintiffs did not argue that Maryland law resolves any balance-of-interests inquiry.  In any event, the presence of diverse characters in ELA materials aimed at teaching reading comprehension does not render those materials part of the "Family Life and Human Sexuality" curriculum.  For that same reason, the "nationwide history and practice" of opt outs from sex education does not bear on whether MCPS's policy here, which pertains to the ELA curriculum, survives strict scrutiny.  States Amicus Br.10, Dkt. 17-1.

the reasons stated in Part I, Plaintiffs have not shown "a likely constitutional violation." *Cf. Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

*Second*, "the harm to the opposing party" and "the public interest"—which merge when the government is a party, *Nken*, 556 U.S. at 435—militate against injunctive relief. The school year has begun with the no-opt-out policy in effect. Forcing MCPS to change policy now would substantially harm the MCPS community by disrupting lesson planning and sowing confusion over how teachers can or should run their classrooms in the delicate first weeks of the school year. "[T]he public consequences in employing the extraordinary remedy of an injunction" therefore weigh sharply against granting Plaintiffs' motion. *Association of Am. Publishers, Inc.*, 586 F. Supp. 3d 379, 397 (D. Md. 2022).

## CONCLUSION

The motion should be denied.

Respectfully submitted.

/s/ Alan E. Schoenfeld

BRUCE M. BERMAN
JEREMY W. BRINSTER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

September 5, 2023

ALAN E. SCHOENFELD
EMILY BARNET
CASSANDRA A. MITCHELL
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
alan.schoenfeld@wilmerhale.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this document complies with the type-volume limitation of Fed. R. App. P. 27(d)(2).

1.     Exclusive of the exempted portions of the document, as provided in Fed. R. App. P. 32(f), the document contains 5,092 words.

2.     The document has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Alan E. Schoenfeld
ALAN E. SCHOENFELD

September 5, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of September, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Alan E. Schoenfeld
ALAN E. SCHOENFELD