No. 23-1890

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

TAMER MAHMOUD, *ET AL.*,

*Plaintiffs-Appellants,*

v.

MONIFA B. MCKNIGHT, IN HER OFFICIAL CAPACITY AS SUPERINTENDENT OF THE MONTGOMERY COUNTY BOARD OF EDUCATION, *ET AL.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
District of Maryland, Southern Division
Case No. 8:23-cv-1380 – Judge Deborah L. Boardman

## REPLY IN SUPPORT OF EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

Eric S. Baxter
William J. Haun
Michael J. O'Brien* (admission pending)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. N.W., Ste. 400
Washington, DC 20006
(202) 955-0095
ebaxter@becketlaw.org

*Counsel for Plaintiffs-Appellants*

*Not a member of the DC Bar; admitted in Louisiana. Practice limited to cases in federal court.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ..................................................................................................... 1

ARGUMENT .............................................................................................................. 2

    I.   The Parents are likely to succeed on the merits. .......................... 2

        A. The opt-out ban imposes a religious burden. .............................. 2

        B. The opt-out ban is not neutral or generally applicable. ............. 5

            1. Allowing some opt-outs but not others triggers strict scrutiny. ........................................................ 5

            2. Discretion to provide notice and opt-outs triggers strict scrutiny. ........................................................ 7

            3. Religious targeting and animosity trigger strict scrutiny. .................................................................... 8

        C. The opt-out ban fails strict scrutiny .......................................... 9

            1. The Board lacks a compelling interest. ................................ 9

            2. The policy is not the least restrictive means. ..................... 10

    II.  The Parents easily satisfy the remaining injunction factors. ....... 11

CONCLUSION ........................................................................................................ 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*303 Creative LLC v. Elenis*,
    143 S. Ct. 2298 (2023) ................................................................................ 10

*Brown v. Hot, Sexy and Safer Prods., Inc.*,
    68 F.3d 525 (1st Cir. 1995) ......................................................................... 4

*Church of the Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (1993) ............................................................................. 6, 7

*Espinoza v. Mont. Dep't of Revenue*,
    140 S. Ct. 2246 (2020) ................................................................................ 3

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ..................................................................... *passim*

*M.A. ex rel. H.R. v. Rockland Cnty. Dep't of Health*,
    53 F.4th 29 (2d Cir. 2022) ..................................................................... 8-9

*Holt v. Hobbs*,
    574 U.S. 352 (2015) ............................................................................ 10, 11

*Jones v. Boulder Valley Sch. Dist. RE-2*,
    No. 20-cv-3399, 2021 WL 5264188 (D. Colo. 2021) ............................... 4

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022) .......................................................................... 5, 9

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
    138 S. Ct. 1719 (2018) ................................................................................ 9

*New York v. Ferber*,
    458 U.S. 747 (1982) .................................................................................... 9

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) .................................................................................. 11

*Saxe v. State Coll. Area Sch. Dist.*,
   240 F.3d 200 (3d Cir. 2001) ................................................................ 10

*Tandon v. Newsom*,
   141 S. Ct. 1294 (2021) ........................................................................ 5

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ...................................................................... 9, 10

*We The Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*,
   No.22-cv-249, 2023 WL 4982325 (2d Cir. 2023) ............................... 7, 8

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ............................................................................ 3

**Statutes**

Md. Code Educ. §§7-301 ........................................................................ 2

# INTRODUCTION

The Board's brief is creative writing—it invents facts and distorts the law. The Pride Storybooks are not stories that just happen to "feature[e] LGBTQ characters," Opp.1, as if this case were about *Harry Potter* "featuring" Dumbledore. The Board's own elementary school principals observed that the Pride Storybooks "center around sexual orientation and gender identity." Ex.9 at 9. And the Board's guidance to teachers concedes that the books are intended to "disrupt[]" "heteronormativity" and "either/or thinking" on gender and sexuality, beginning at age four. Ex.10 at 2; Ex.12 at 4. Nor are the books simply "on shelves," Opp.4, or "aimed at teaching reading comprehension," Opp.22 n.5. Indeed, the Board "do[es]n't dispute" that the books must be read and "there will be discussion that ensues." Tr.55; Ex.3 at 6 ¶15, 25 ¶157.

The Board contorts the law too. Its argument that *mandatory* readings impose no religious burden defies basic logic. Parents often limit their children's access to material that violates their faith. Forcing exposure as a condition of attending public school is a quintessential burden on religion. *Yoder* itself makes this clear, as does the long line of Supreme Court cases addressing indirect coercion. And *Fulton* and *Tandon* further hold that disparate treatment of religion—or just its possibility—is *independently* sufficient to trigger heightened scrutiny. Add the Board's undisguised disdain for the Parents' religious beliefs and strict scrutiny is inescapable.

1

The Parents do not seek "to dictate" curriculum, Opp.13, or impose a "sweeping new constitutional rule," Opp.2. They seek only to restore the notice and opt-outs that exist everywhere else in the curriculum, but were recently taken away *only for the Pride Storybooks*. With the Parents under mandatory attendance laws and many lacking options outside public schooling, the notion that denying them opt-outs is not even "indirect coercion," Opp.13-14, is fantastical.

At minimum, this appeal raises a "serious legal question on the merits." The Parents should not lose their rights, and the children their innocence, while the Court considers this appeal.

## ARGUMENT

### I. The Parents are likely to succeed on the merits.[1]

#### A. The opt-out ban imposes a religious burden.

The Board claims this Court can skip the free exercise analysis. Opp.10. "Once professional educators [adopt] curriculum," there's no "free exercise claim." Tr.59:7-17. If that's right, longstanding free exercise law is wrong. Mot.10-12; Scholars Br.3-8.

But the religious burden is obvious. Parents who cannot afford private school or homeschooling are "guilty of a misdemeanor" if their children fail to "attend a public school." Md. Code Educ. §§7-301(a-1)(1), (e)(1)-(2). Denying Parents opt-outs from instruction that violates their religious

---

[1] A heightened standard should be rejected for the reasons offered by the District Court. Op.26.

2

beliefs forces them to choose—under threat of government penalties—between their faith and a government benefit. That is an archetypical religious burden. *See* Mot.10-12 (*Thomas* standard); Scholars Br.4-8 (*Yoder*, *Sherbert*, and *Smith*).

The Board dismisses *Yoder* as "*sui generis.*" Opp.12. But that extreme view belies the Supreme Court's continuing embrace of *Yoder*. *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020); Mot.9 (*Smith*), 13 n.2 (*Danville*); Scholars Br.3-4, States Br.4-10. Nor does *Yoder* say that instruction burdens religion only if it would "automatically and irreversibly prevent" parents from conveying their beliefs to their children. Opp.12. Rather, limiting opt outs to such extreme circumstances is akin to the "parens patriae claim of such all-encompassing scope and with such sweeping potential for broad and unforeseeable application" that *Yoder* rejected. *Wisconsin v. Yoder*, 406 U.S. 205, 234 (1972). "In the fact of [the Supreme Court's] consistent emphasis on the central values underlying the Religion Clauses," *id.*, the Board's sweeping claim of authority here should be rejected too.

Even without *Yoder*, the Board's theory is inconsistent with long-established precedent. Mot.10. The Board selectively identifies some of those cases as involving more coercion. Opp.14-15. But *Thomas*, *Sherbert*, and *Carson* all involved *indirect* pressure to forgo religious exercise as a condition of getting a government benefit. Mot.10; Scholars Br.4-8. In *Fulton*, it was no defense that the agency could continue serving children

3

in other ways—exclusion from traditional foster care was a burden. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021). Here, there are government-imposed burdens (criminal sanctions or financial burdens of alternative schooling) if the Parents do not put their children in public school. The Board offers no principled means for distinguishing these Supreme Court cases, and no logical argument that the analogous burden here is not a burden.

The Board is left to rely on out-of-circuit, out-of-date rulings that adopt its "government knows best" approach. Opp.10-11. But those cases all labor under the same errors, marginalizing *Yoder* and the cases addressing indirect coercion. And they lead to troubling results. Parents with a contrary religious perspective unquestionably suffer a religious burden when their children are compelled to sit through classroom chants that "[w]ho we are in the inside is who we are" and instruction that disagreement is "mean" and "confused." *Jones v. Boulder Valley Sch. Dist. RE-2*, No. 20-cv-3399, 2021 WL 5264188, at *4-5 (D. Colo. 2021) (cleaned up). Likewise, a religious burden exists when parents' children are exposed to "sexually explicit monologues" and "skits," "profane, lewd, and lascivious language," "simulated masturbation," and students and adults together "lick[ing] an oversized condom." *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 529 (1st Cir. 1995). But the Board says parents have no right to object if they want to use the public schools.

4

There is no reason for a different coercion standard for public schools than for every other government entity.[2] At minimum, these are "serious legal question[s]." Mot.9.

### B. The opt-out ban is not neutral or generally applicable.

Under long-established Free Exercise precedent, religion is also burdened by laws that are not generally applicable and neutral toward religion. Mot.13 & n.2.

#### 1. Allowing some opt-outs but not others triggers strict scrutiny.

General applicability is lacking whenever government treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). The Board admits that students can opt out of LGBTQ-inclusivity instruction during health class for secular reasons. Ex.3 at 25-26 ¶160; Ex.1 at 21-22. That's fatal.

The Board responds by touting its consistency across health classes, where all opt-outs are allowed, and across Pride story time, where all opt-outs are denied. But "[i]t is no answer" that some secular opt-outs may be treated "as poorly as" some "religious" opt-outs. *Tandon*, 141 S. Ct. at 1296. Rather, courts must look to the government's underlying interest—

---

[2] Nor does the Board explain why coercion that violates the Establishment Clause is permissible under the Free Exercise Clause. Opp.14 (addressing *Lee*); *see also Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2426 (2022) (Clauses have "'complementary' purposes").

5

here, instruction that promotes LGBTQ inclusivity—not artificial categories such as in which class the instruction is presented. Mot.14.

The Board doesn't dispute that the LGBTQ-inclusivity instruction required in health class and the Pride Storybooks result from the same Equity Regulation and have the same instructional goals. Mot.14-15. Instead, the Board tries to obscure this similarity by describing concerns that prompted the Storybook opt-out ban. Opp.16. But changing stories doesn't change reality. The same parents of fifth graders who object to one-sided ideology on gender and sexuality during story hour will object during health class, leading to the same concerns about "high student absenteeism," "infeasibility," and "the risk of … social stigma and isolation." *Id*. The continued existence of opt-outs to the same instruction elsewhere shows that opt-outs do not threaten the Board's substantive interests. Mot.14.

The Board argues there is "no evidence" the risks are the same, noting that Maryland mandated health class opt-outs "over a decade ago." Opp.16-17. Yet it admits that the changes to "promote educational equity" are "[r]ecent." Opp.17. Nor does it matter, as the Board suggests, that health class opt-outs are mandated at the "*state-level*." *Id*. The Supreme Court rejected that reasoning in *Church of the Lukumi Babalu Aye v. City of Hialeah*, where it held a city law regulating the killing of animals lacked general applicability even though its exceptions accord with state law. 508 U.S. 520, 544-45 (1993). The continued presence of

6

opt-outs in health education and throughout the curriculum confirms the opt-out ban is not generally applicable.

### 2. Discretion to provide notice and opt-outs triggers strict scrutiny.

The Board made a discretionary decision—to deny the Parents opt-outs and notice—by carving out the Pride Storybooks from its general Religious Diversity Guidelines. Ex.3 at 61-62. The Board let parents opt out of the Pride Storybooks throughout last school year until March 23, 2023, then it changed its mind, and it could reverse course tomorrow. That reflects a pattern of discretionary decision-making that alone "renders a policy not generally applicable, regardless of whether any exceptions have been," or currently are being, "given." *Fulton*, 141 S. Ct. at 1879.

To avoid that conclusion, the Board plays two games. First, it pretends the Storybook opt-out ban exists in a vacuum: it applies to the Storybooks uniformly. Opp.17. But the limited opt-out ban is just one application of the Guidelines, which broadly allow "adjustments to the instructional program" based on students' religion. Ex.3 at 52, 61; Mot.17. The Board cannot exercise discretion to carve out the religious objections it doesn't like and then ignore the larger policy. *See* Mot.16 (citing *Fulton*); *Lukumi*, 508 U.S. at 544-45 (rejecting this argument).

Context also makes *We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development* inapplicable. No. 22-cv-249, 2023 WL

7

4982325 (2d Cir. 2023). That case involved a statutory regime with non-discretionary exemptions. *Id.* at *13. By contrast, the Guidelines provide significant discretion—saying schools "should try to make" accommodations that are "reasonable and feasible" unless "too frequent or too burdensome." Ex.3 at 61-62. That's not to mention the Board's apparent discretion to carve out entire curricula. That violates general applicability.

Second, the Board argues the "Guidelines nowhere suggest that schools may override the blanket no-optout." Opp.18. But the key policymaker is the Board—and it can, and did, change its mind in its "sole discretion." *Fulton*, 141 S. Ct. at 1879; *see also* Ex.6 ¶¶18-19, Ex.3 at 25-26 ¶160. That discretion requires strict scrutiny.

**3. Religious targeting and animosity trigger strict scrutiny.**

The Board's overnight about-face is also tainted because it "proceed[ed] in a manner intolerant of religious beliefs." *Fulton*, 141 S. Ct. at 1877. Its cleanup efforts fall short.

First, the Board again invokes *Patriots*. Opp.19. But there, "[f]ar from expressing hostility" toward religion, the "legislators accommodated religious objectors" by expanding and tailoring religious opt-outs. *Patriots*, 2023 WL 4982325, at *11. Quite the opposite here.

Second, the Board minimizes its members' public hostility. Mot.17-18 (statements); Opp.20 (trivializing). Yet religious animus can be found on a single official's hostility. *See M.A. ex rel. H.R. v. Rockland Cnty. Dep't*

8

*of Health*, 53 F.4th 29, 37-38 (2d Cir. 2022); *see also Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,* 138 S. Ct. 1719, 1729 (2018). What matters is that the Parents' beliefs were singled out "at least in part because of their religious character." *Kennedy*, 142 S. Ct. at 2422. The Board's failure to later "object[]" to or "disavow[]" such comments cements the lack of "neutral and respectful consideration." *Masterpiece,* 138 S. Ct. at 1729-30.

## C. The opt-out ban fails strict scrutiny.

### 1. The Board lacks a compelling interest.

The Board devotes one paragraph to supposed compelling interests (Opp.21)—never proving "the asserted harm of granting specific exemptions." *Fulton*, 141 S. Ct. at 1881; Mot.18-20. Instead, the Board bizarrely equates mandating the Storybooks with protecting children from appearing in pornography. Opp.21 (citing *New York v. Ferber*, 458 U.S. 747 (1982)). The Board never explains how teaching these books promotes safety. *Cf. W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943) ("As governmental pressure toward unity becomes greater, so strife becomes more bitter as to whose unity it shall be."). In fact, the Board's own cited authority *invalidated*, not upheld, a school policy partly because its censorial reach "could include much 'core' political and

9

religious speech." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001).

"[T]he First Amendment does not tolerate" forced uniformity "about a question of political and religious significance." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2318 (2023) (citing *Barnette*, 319 U.S. at 634). Allusions to complying with antidiscrimination law (Opp.21) are not compelling either. No such law requires excluding parents from knowing when the Pride Storybooks will be read and categorically refusing opt out requests.

## 2. The policy is not the least restrictive means.

If "a less restrictive means is available," the Board "*must* use it." *Holt v. Hobbs*, 574 U.S. 352, 365 (2015) (emphasis added). Instead, the Board attacks a strawman. This suit does not "force[]" the Board "to rid the ELA curriculum of books featuring LGBTQ characters." Opp.22.

More revealing is what's left unsaid. The Board does not contest its burden to show that "no alternative" would work. Mot.20-21. Citing a declaration about the "one instance" of "dozens" of opt-out requests at one school—in a school district of "160,000 students of many different backgrounds"—doesn't suffice. ECF 43 ¶37; Opp.3, 6, 22. The Board ignores that other Maryland school districts permit ELA opt-outs for LGBTQ storybooks—having perceived state law to require them. Mot.19-20. And it doesn't attempt to explain why its "system is so different from

10

the many" others permitting opt-outs. *Holt*, 574 U.S. at 367; Mot. 20. Preferring a policy is not the same as needing it.

## II. The Parents easily satisfy the remaining injunction factors.

***Irreparable harm.*** The School Board demurs, recycling its merits arguments. Opp.22-23. But "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). That is doubly so for young children "in the delicate first weeks of the school year." Opp.23.

***Substantial harm and public interest.*** On this point, the School Board dissembles. It asserts that because the "school year has begun with the no-opt-out policy in effect," an injunction pending appeal would leave MCPS listless. Opp.23. But it can't be that an injunction would substantially "disrupt[]" or "confus[e]" teachers—particularly since they already operate under opt-out regimes throughout the curriculum. Opp.23.

## CONCLUSION

The Board's use of alternative facts and alternative law is an implicit concession that it cannot prevail when the real facts and law are applied.

The Court should grant the motion.

11

Dated: September 6, 2023

Respectfully submitted,

/s/ Eric S. Baxter
Eric S. Baxter
William J. Haun
Michael J. O'Brien* (admission pending)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. N.W., Ste. 400
Washington, DC 20006
(202) 955-0095
ebaxter@becketlaw.org

*Counsel for Plaintiffs-Appellants*

*Not a member of the DC Bar; admitted in Louisiana. Practice limited to cases in federal court.

## CERTIFICATE OF SERVICE

    I hereby certify that on September 6, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record, in compliance with Federal Rule of Appellate Procedure 25 and Local Rule 25(a)(4).

/s/ Eric S. Baxter
Eric S. Baxter

13

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

This document complies with type-volume limits because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 2,422 words.

This document complies with the typeface requirements because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: September 6, 2023         /s/ Eric S. Baxter
                                 Eric S. Baxter