No. 23-1890

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TAMER MAHMOUD; ENAS BARAKAT; JEFF ROMAN; SVITLANA ROMAN; CHRIS PERSAK, IN HIS INDIVIDUAL CAPACITY AND EX REL. HIS MINOR CHILDREN; MELISSA PERSAK, IN HER INDIVIDUAL CAPACITY AND EX REL. HER MINOR CHILDREN; KIDS FIRST, AN UNINCORPORATED ASSOCIATION,

*Plaintiffs-Appellants,*

v.

MONIFA B. MCKNIGHT; SHEBRA EVANS; LYNNE HARRIS; GRACE RIVERA-OVEN; KARLA SILVESTRE; REBECCA SMONDROWSKI; BRENDA WOLFF; JULIE YANG; MONTGOMERY COUNTY BOARD OF EDUCATION,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Maryland, Southern Division
Case No. 8:23-cv-1380 – Hon. Deborah L. Boardman

## APPELLANTS' OPENING BRIEF

Eric S. Baxter
William J. Haun
Michael J. O'Brien*
Colten L. Stanberry
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. N.W., Ste. 400
Washington, DC 20006
(202) 955-0095
ebaxter@becketlaw.org

*Counsel for Plaintiffs-Appellants*

*Not a member of the DC Bar; admitted in Louisiana. Practice limited to cases in federal court.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iv

JURISDICTIONAL STATEMENT ........................................... 1

STATEMENT OF ISSUES ......................................................... 1

INTRODUCTION ........................................................................ 2

STATEMENT OF THE CASE ................................................... 6

    A. The Pride Storybooks. ..................................................... 6

    B. The principals' and parents' objections. ....................... 10

    C. The Board's no-notice/no-opt-out policy. ................... 14

    D. The consensus on parental notice and opt-outs. ........... 15

    E. The district court proceedings. ..................................... 18

SUMMARY OF ARGUMENT ................................................... 19

STANDARD OF REVIEW ........................................................ 23

ARGUMENT ............................................................................... 23

    I. The Parents are likely to succeed on the merits. ........... 23

        A. The Storybook Mandate triggers strict scrutiny
           under *Yoder*. .............................................................. 24

           1. *Yoder* applies. ..................................................... 24

           2. Dismissing *Yoder* as "*sui generis*" is wrong. ......... 27

           3. Applying *Yoder* upholds Free Exercise principles. ............... 30

        B. Mandating the Pride Storybooks as a condition
           of attending public schools independently
           triggers strict scrutiny. ............................................... 33

ii

C. Lack of neutrality and general applicability
   triggers strict scrutiny................................................ 37

   1. Allowing some opt-outs but not others
      triggers strict scrutiny under *Tandon*. ................... 38

   2. The Board's discretion to provide notice and
      opt-outs triggers strict scrutiny under *Fulton*....................... 40

   3. Religious targeting and animosity trigger strict
      scrutiny under *Lukumi* and require setting the
      opt-out ban aside under *Masterpiece*.................................... 42

D. The Parents' liberty interest under the Due
   Process Clause requires strict scrutiny. ................................... 44

E. The no-notice/no-opt-out policy cannot survive
   strict scrutiny.................................................................. 45

   1. The School Board lacks a compelling interest. .................... 45

   2. The opt-out ban is not the least restrictive means.............. 49

II. The Parents satisfy the remaining
    injunction factors........................................................... 51

A. The ongoing harm is irreparable. .............................................. 51

B. There is no harm to the public interest. .................................... 52

CONCLUSION ................................................................................... 53

CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION .............................................................. 55

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ................................................................ 49

*Ass'n of Cmty. Cancer Ctrs. v. Azar,*
  509 F. Supp. 3d 482 (D. Md. 2020) .................................... 52

*Bauchman v. W. High Sch.,*
  132 F.3d 542 (10th Cir. 1997) .............................................. 28

*Bose Corp. v. Consumers Union of U.S., Inc.,*
  466 U.S. 485 (1984) ................................................................ 23

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) ................................................................ 47

*C.N. v. Ridgewood Bd. of Educ.,*
  430 F.3d 159 (3d Cir. 2005) .................................................. 30

*Cal. Parents for Equalization of Educ.
  Materials v. Torlakson,*
  267 F. Supp. 3d 1218 (N.D. Cal. 2017) ............................... 28

*Canaan Christian Church v. Montgomery County,*
  29 F.4th 182 (4th Cir. 2022) ................................................ 39

*Carson v. Makin,*
  142 S. Ct. 1987 (2022) .................................................. *passim*

*Centro Tepeyac v. Montgomery County,*
  722 F.3d 184 (4th Cir. 2013) ................................................ 51

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ...................................................... *passim*

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ................................................................ 45

iv

*Coble v. Lake Norman Charter Sch., Inc.*,
    No. 20-cv-596, 2021 WL 1109360
    (W.D.N.C. Mar. 23, 2021) .................................................................. 28

*Dahl v. Bd. of Trs. of W. Mich. Univ.*,
    15 F.4th 728 (6th Cir. 2021) ............................................................ 40

*Danville Christian Acad., Inc. v. Beshear*,
    141 S. Ct. 527 (2020) ........................................................................ 25

*dmarcian, Inc. v. dmarcian Eur. BV*,
    60 F.4th 119 (4th Cir. 2023) ........................................................... 23

*Employment Div. v. Smith*,
    494 U.S. 872 (1990) ................................................................... *passim*

*Espinoza v. Mont. Dep't of Revenue*,
    140 S. Ct. 2246 (2020) .............................................................. *passim*

*Fellowship of Christian Athletes v.*
    *San Jose Unified Sch. Dist.*,
    No. 22-15827, 2023 WL 5946036
    (9th Cir. Sept. 13, 2023) ........................................................... 37, 41

*Firewalker-Fields v. Lee*,
    58 F.4th 104 (4th Cir. 2023) ........................................................... 48

*Fleischfresser v. Directors of Sch. Dist. 200*,
    15 F.3d 680 (7th Cir. 1994) ............................................................ 28

*Florey v. Sioux Falls Sch. Dist. 49-5*,
    619 F.2d 1311 (8th Cir. 1980) ....................................................... 30

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) .............................................................. *passim*

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) .......................................................... 53

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
546 U.S. 418 (2006) ............................................................... 50

*Grimmett v. Freeman*,
59 F.4th 689 (4th Cir. 2023) ............................................... 23

*Grove v. Mead Sch. Dist. No. 354*,
753 F.2d 1528 (9th Cir. 1985) ............................................ 28

*Gruenke v. Seip*,
225 F.3d 290 (3d Cir. 2000) ................................................ 30

*Hardwick v. Bd. of Sch. Trs.*,
205 P. 49 (Cal. Dist. Ct. App. 1921) ................................... 31

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.*,
725 F.3d 293 (3rd Cir. 2013)............................................... 33

*Herndon by Herndon v. Chapel Hill-Carrboro City Bd. of Educ.*,
89 F.3d 174 (4th Cir. 1996) ................................................ 25

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
480 U.S. 136 (1987) ............................................................. 35

*Holt v. Hobbs*,
574 U.S. 352 (2015) ............................................................. 50

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*,
78 F.4th 622 (4th Cir. 2023) ............................................... 44

*Jones v. Boulder Valley Sch. Dist. RE-2*,
No. 20-cv-3399, 2021 WL 5264188 (D. Colo. Oct. 4, 2021)................ 28

*State ex rel. Kelley v. Ferguson*,
144 N.W. 1039 (Neb. 1914) ................................................. 31

*Kennedy v. Bremerton Sch. Dist.*,
142 S. Ct. 2407 (2022) ................................................... 37, 44

*L.W. v. Skrmetti*,
   No. 23-5600, 2023 WL 6321688
   (6th Cir. Sept. 28, 2023) ...................................................................... 29

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
   2 F.4th 330 (4th Cir. 2021) .................................................................. 52

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
   138 S. Ct. 1719 (2018) ............................................................... *passim*

*Minersville Sch. Dist. v. Gobitis*,
   310 U.S. 586, 599 (1940) .................................................................... 32

*Miranda v. Garland*,
   34 F.4th 338 (4th Cir. 2022) ............................................................... 51

*Morrow v. Wood*,
   35 Wis. 59 (Wis. 1874) ....................................................................... 31

*Morse v. Frederick*,
   551 U.S. 393 (2007) ........................................................................ 32-33

*Mozert v. Hawkins Cnty. Bd. of Educ.*,
   827 F.2d 1058 (6th Cir. 1987) ............................................................ 28

*New Hope Family Servs., Inc. v. Poole*,
   966 F.3d 145 (2d Cir. 2020) ............................................................... 42

*NIFLA v. Becerra*,
   138 S. Ct. 2361 (2018) ........................................................................ 48

*Obergefell v. Hodges*,
   576 U.S. 644 (2015) ............................................................................ 49

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020) ........................................................................ 32

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*,
   No. 22-2927, 2023 WL 6330394 (8th Cir. Sept. 29, 2023) ............ 46-47

*Parker v. Hurley*,
   514 F.3d 87 (1st Cir. 2008) ........................................................ *passim*

*Pierce v. Society of Sisters*,
  268 U.S. 510 (1925) ..................................................... 24

*Ramirez v. Collier*,
  595 U.S. 411 (2022) .................................................. 48-49

*Redeemed Christian Church of God v.*
  *Prince George's County*,
  17 F.4th 497 (4th Cir. 2021) ........................................ 45

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) ............................................. 38, 51-52

*Rulison v. Post*,
  79 Ill. 567 (Ill. 1875) .................................................. 31

*Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*,
  479 F. Supp. 3d 808 (D. Ariz. 2020) .............................. 28

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ........................................... *passim*

*Students for Fair Admissions, Inc. v. President*
  *and Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) .............................................. 46, 47

*Tandon v. Newsom*,
  141 S. Ct. 1294 (2021) ........................................ *passim*

*Tatel v. Mt. Lebanon Sch. Dist.*,
  637 F. Supp. 3d 295 (W.D. Pa. 2022) ............................. 30

*Thomas v. Rev. Bd.*,
  450 U.S. 707 (1981) .............................................. 33, 35

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) ............................................ 6, 35, 36

*People ex rel. Vollmar v. Stanley*,
  255 P. 610 (Colo. 1927) ............................................. 31

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ...................................................................... 47

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ...................................................................... 44

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .......................................................................... 23

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ................................................................ *passim*

**Statutes and Regulations**

22 Pa. Code § 4.29 .............................................................................. 17

28 U.S.C. § 1292 ................................................................................... 1

28 U.S.C. § 1331 ................................................................................... 1

28 U.S.C. § 1343 ................................................................................... 1

28 U.S.C. § 1367 ................................................................................... 1

Ala. Code § 16-41-6 ........................................................................... 16

Alaska Stat. § 14.30.355 .................................................................... 16

Alaska Stat. § 14.30.356 .................................................................... 16

Ariz. Rev. Stat. § 15-711 ................................................................... 17

Ariz. Rev. Stat. § 15-716 ................................................................... 17

Ark. Code § 6-16-1006 ...................................................................... 16

Cal. Educ. Code § 51937 ................................................................... 16

Colo. Rev. Stat. § 22-1-128 .............................................................. 16

Colo. Rev. Stat. § 22-25-104 ............................................................ 16

COMAR § 13A.01.06.01 ................................................................... 38

COMAR § 13A.01.06.03 ................................................................ 38

COMAR § 13A.04.18.01 .......................................................... 15, 43

Conn. Gen. Stat. § 10-16e ........................................................... 16

D.C. Mun. Regs. subtit. 5, § E2305.5 ......................................... 17

Fla. Stat. § 1002.20 .................................................................... 16

Fla. Stat. § 1003.42 .................................................................... 16

Ga. Code § 20-2-143 ................................................................... 16

Haw. Dep't of Educ., Bd. of Educ. Policy 101-13 ..................... 16

Haw. Dep't of Educ., Bd. of Educ. Policy 103-5 ....................... 16

Haw. Dep't of Educ. Reg. No. 2210.1 .................................. 16-17

Idaho Code § 33-1608 ................................................................ 16

Idaho Code § 33-1611 .................................................................. 1

105 Ill. Comp. Stat. 5/27-9.1a .................................................. 17

Ind. Code § 20-30-5-17 .............................................................. 17

Iowa Code § 256.11 .................................................................... 17

Kan. Admin. Regs. § 91-31-35 ................................................... 17

Ky. Rev. Stat. § 158.1415 ........................................................... 17

La. Stat. § 17:281 ....................................................................... 17

Mass. Gen. Laws ch. 71, § 32A .................................................. 17

Md. Code Educ. § 7-301 ....................................................... 26, 34

Md. Const. art. VIII Sec. 1 ........................................................ 33

Me. Rev. Stat. tit. 22, § 1911 ..................................................... 17

Mich. Comp. Laws § 380.1507 ................................................ 17

Minn. Stat. § 120B.20 ......................................................... 17

Miss. Code § 37-13-173 ....................................................... 17

Mo. Stat. § 170.015 ............................................................ 17

Mont. Code § 20-7-120 ........................................................ 17

N.C. Gen. Stat. § 115C-81.30 ................................................ 17

N.H. Rev. Stat. § 186:11 ...................................................... 17

N.J. Stat. § 18A:35-4.7 ........................................................ 17

N.M. Code R. § 6.29.6.11 ...................................................... 17

N.Y. Comp. Codes R. & Regs. tit. 8, § 135.3 ............................ 17

Neb. Rev. Stat. § 79-532 ...................................................... 18

Nev. Rev. Stat. § 389.036 ..................................................... 17

Ohio Rev. Code § 3313.60 ..................................................... 17

Okla. Stat. tit. 70, § 11-103.3 ............................................... 17

Ore. Dep't of Educ. Admin. R. 581-021-0009 .......................... 17

Ore. Dep't of Educ. Admin. R. 581-022-2050 .......................... 17

Or. Rev. Stat. § 336.035 ....................................................... 17

Or. Rev. Stat. § 336.465 ....................................................... 17

R.I. Gen. Laws § 16-22-17 ..................................................... 17

R.I. Gen. Laws § 16-22-18 ..................................................... 17

R.I. Gen. Laws § 16-22-24 ..................................................... 17

S.C. Code § 59-32-50 ........................................................... 17

S.D. Codified Laws § 13-33-6.1 ................................................. 16

Tenn. Code § 49-6-1305 .......................................................... 17

Tenn. Code § 49-6-1307 .......................................................... 17

Tenn. Code § 49-6-1308 .......................................................... 17

Tex. Educ. Code § 28.004 ........................................................ 17

Utah Code § 53E-9-203............................................................ 17

Utah Code § 53G-10-205 ......................................................... 17

Utah Code § 53G-10-403 ......................................................... 17

Va. Code § 22.1-207.2 .............................................................. 17

Vt. Stat. tit. 16, § 134 .............................................................. 17

W. Va. Code § 18-2-9............................................................... 17

Wash. Rev. Code § 28A.230.070.............................................. 17

Wash. Rev. Code § 28A.300.475.............................................. 17

Wis. Stat. § 118.019................................................................. 17

Wyo. Stat. § 21-9-104.......................................................... 16, 17

## Other Authorities

*Approval of Family Life Advisory Committee Opt-Out
    Recommendations for Grades PreK through 5 Family Life
    Unit,* Carroll County Public Schools (Jan. 11, 2023)................... 16, 50

Bertolt Brecht, *The solution* (1953) ......................................... 53

Catechism of the Catholic Church .................................... 11, 13

*Elementary Health Education Frequently Asked Questions
    (FAQ),* Frederick County Public Schools ........................... 16

Em Espey, *Parents, students, doctors react to MCPS lawsuit targeting LGBTQ+ storybooks*, MoCo360 (June 2, 2023) ................... 44

Eric A. DeGroff, *Parental Rights and Public School Curricula: Revisiting* Mozert *After 20 Years*, 38 J.L. & Educ. 83 (2009) ...................................................... 31

*Fatwa Regarding Transgenderism*, FIQH Council of North America (June 17, 2022) ....................................................... 12

*Health Education Frequently Asked Questions: Baltimore County Public Schools (BCPS) System* ..........................................15-16

Kansas Dep't of Educ., *Frequently Asked Questions about Health Education in Kansas* ................................................. 17

Kansas Dep't of Educ., *Kansas Model Curricular Standards for Health Education 2018* ..................................................... 17

Keith T. Hayashi, Superintendent, Haw. Dep't of Educ., Annual Memorandum: Notice on Board of Education Policy 101-13 Controversial Issues (June 23, 2023) ............................ 1

Lynne Harris, Remarks at the MCPS Board Meeting (Mar. 28, 2023) ............................................................. 43

Mem. from State Superintendent to Members of State Board of Education (June 25, 2019) ........................................38-39

MCPS Business Meeting (Jan. 12, 2023) ............................... 44

*Navigating Differences: Clarifying Sexual and Gender Ethics in Islam* (May 23, 2023) ...........................................12-13, 26

Pontifical Council for the Family, *The Truth and Meaning of Human Sexuality: Guidelines for Education within the Family* (Dec. 8, 1995) ....................................................13-14

Pope Francis, Apostolic Exhortation *Amoris Laetitia* (2016) ..... 13, 14, 26

Pope Saint John Paul II, Apostolic Exhortation *Familiaris Consortio* (1981) .................................................... 13

*Sex Ed State Law and Policy Chart*, SIECUS (July 2022)...................... 16

Stephanie Ramirez, *MCPS revises policy on LGBTQ-friendly books*, Fox5 DC (Mar. 22, 2023) ........................................................ 43

Wyo. Dep't of Educ., HIV/AIDS Model Pol'y for Wyo. Pub. Schs. (Sept. 1998)................................................................... 16

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Appellants' federal claims under 28 U.S.C. §§ 1331 and 1343. It had supplemental jurisdiction over their state-law claims under 28 U.S.C. § 1367.

This Court has appellate jurisdiction to review the district court's denial of Appellants' motion for a preliminary injunction under 28 U.S.C. § 1292(a)(1). The district court denied that motion on August 24, 2023. JA785. Appellants appealed on August 25, 2023. JA786.

## STATEMENT OF ISSUES

Whether Appellants—the parents of children in the Montgomery County Public Schools—are entitled to a preliminary injunction that restores the status quo ante, allowing notice and opt-outs from ideological instruction for children as young as four on sexuality and gender transitioning that violates the parents' religious beliefs.

## INTRODUCTION

This case strikes at the heart of parents' right to direct the religious upbringing of their children. The Appellee School Board and officials (the "Board") argue—and the district court agreed—that once parents drop their children off at school, they have no right to know what is taught inside. Appellants (the "Parents") disagree. When it comes to teaching their elementary-age children about sexuality and gender transitioning, they want to know. And they want the opportunity to opt their children out if the instruction violates their religious beliefs or is age-inappropriate.

That's already the law. Maryland requires schools to provide notice and opt-outs for *any* "instruction on family life and human sexuality." And the Board's Religious Diversity Guidelines allow opt-outs from *any* "discussions or activities" that "impose a substantial burden on … religious beliefs." Indeed, that's the law not only in Maryland, but also in nearly every state in the Nation. This case arose only because the Board flouted that consensus, Maryland state law, and its own guidelines by making certain ideological books on sexuality and gender transitioning (the "Pride Storybooks") mandatory reading for kids beginning in pre-kindergarten (the "Storybook Mandate").

The Pride Storybooks were adopted last fall specifically to "[d]isrupt students' either/or thinking" on sexuality and gender transitioning. One of the books, for four-year-olds in pre-K, is about Pride parades. It

encourages students to search, among other things, for an "intersex [flag]," a "[drag] queen," "leather," a "lip ring," "underwear," and an image of "Marsha P. Johnson," a self-described LGBTQ activist and sex worker. Another invites first graders to "rewrite the norms" on pronouns. One has fourth graders discuss a same-sex playground romance and what it's like to fall in love. The book for fifth graders teaches that sex and gender don't "*need*[] to make sense." The Board has the answer: doctors only "guess about our gender" at birth and it's "hurtful" to say a child is born a boy or a girl.

The Parents' religious beliefs forbid them from exposing their children to the Pride Storybooks and related instruction. As recently explained by Muslim scholars and preachers—and underscored in a 2022 *fatwā* (a legal ruling on Islamic law)—Tamer Mahmoud and Enas Barakat's Islamic faith directs them to "reject" such instruction because it "subvert[s] the agency of Muslim parents" and portends "detrimental spiritual consequences." Similarly, as emphasized by Pope Francis in *Amoris Laetitia*, the Romans' and Persaks' beliefs direct them to reject "the ideology of gender" and employ only sex education that "help[s] young people to accept their own bodies and to avoid the pretension to cancel out sexual difference[s]." Over 300 Jewish, Islamic, and Christian parents who are members of Appellant Kids First similarly object.

They aren't the only ones. The Board's own elementary school principals protested that the Storybooks are "not [age] appropriate" and

that it's always "problematic to portray elementary school children falling in love with other children, regardless of sexual preferences." They further warned that the Pride Storybooks are "dismissive of religious beliefs," seek[] to "sham[e]" students who disagree, and "[s]tate[] as … fact" things many "would not agree" are fact.

In response, the Board promised parents would be notified and could opt their kids out when the books were read. On March 22, 2023, it said so publicly. That must have drawn attention, because the next day, the Board reversed course. The new, operative policy—for the Pride Storybooks only—would be no further notice or opt-outs. Thus, as the Board concedes, highschoolers can still opt out of such ideological instruction when presented during sex-ed, but kindergartners must sit through it when presented during story time.

Parents objected. The Board responded by accusing them of promoting "hate" and comparing them to "white supremacists" and "xenophobes." The district court remained unfazed. It rejected all the Parents' claims, because—in its view—exposing the Parents' children to religiously forbidden instruction imposes no religious burden. The district court reasoned that parents could counter the instruction afterwards, send their kids to private school, or homeschool. It minimized the Supreme Court's ruling in *Wisconsin v. Yoder*, which allowed the Amish to remove their children from high school entirely to avoid exposure to "worldly" ideas against their faith. It disregarded the Supreme Court's holdings in

4

*Thomas v. Review Board*, *Sherbert v. Verner*, and *Carson v. Makin*, that the Free Exercise Clause is triggered whenever government pressures individuals to abandon their religious beliefs to access government programs. And in a one-sentence footnote, the district court dismissed three "bedrock" principles from *Fulton v. City of Philadelphia*, *Tandon v. Newsom*, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, and *Masterpiece Cakeshop v. Colorado Human Rights Commission*, all of which independently require strict scrutiny of policies that—as here—are not neutral and generally applicable.

It cannot be right that, by using public schools, parents give government officials unfettered discretion to freely indoctrinate their children, beginning at age four, on issues of sexuality and gender transitioning. Nothing in the text, history, or tradition of the Free Exercise Clause—or the precedent of either this Court or the Supreme Court—requires that extreme result. At minimum, the Board's decision to strip opt-out rights for only the Pride Storybooks triggers strict scrutiny, a demanding standard the Board comes nowhere close to satisfying.

\* \* \*

The Storybook Mandate has real consequences. At least one couple has had to remove their daughter from public school at significant personal expense because her Down Syndrome and Attention Deficit Disorder leave her especially impressionable and impair her ability to distinguish

instruction from her teachers and parents. Other parents have no realistic option to disenroll their children and so are left to an impossible choice between educating their children and following their faith. Putting the Parents "to the choice between being [religious] and receiving a government benefit" is "odious to our Constitution." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 465, 467 (2017). This Court should reverse the ruling below and grant the Parents a preliminary injunction to restore the status quo ante.

## STATEMENT OF THE CASE

### A. The Pride Storybooks.

In fall 2022, the Board introduced new "LGBTQ+-inclusive" storybooks. JA727. Teachers are required to read the books to their students. JA728; JA735-736; JA074-080. The Board "do[es]n't dispute" that the books must be read and admits "there will be discussion that ensues." JA665; JA012 ¶ 15; JA031 ¶ 157. The books focus on issues surrounding sexual orientation and gender transitioning. They are replete with lessons that encourage children, beginning at age four, to question their sexuality and gender identity, to focus on romantic feelings, and to accept the concept of gender transitioning. *See* JA735; JA003-012; JA022-028.

A book called *Pride Puppy*, for four-year-olds, focuses on a pride



parade and what a child might find there, such as an "intersex [flag]," a "[drag] king" and "queen," "leather," a "lip ring," "underwear," and an image of "Marsha P. Johnson,"
an LGBTQ activist and



sex worker. JA082-099, JA371.

*Intersection Allies*, read by first graders, JA136-186, invites children to ponder what it means to be "transgender" or "non-binary" and asks "[w]hat pronouns fit you?" JA026 ¶¶ 135-36; JA180. By "standing together," the book claims, we will "rewrite the norms." JA175.

The storybook *What Are Your Words* is about a child who changes pronouns based on how he feels at any given moment. To that end, an uncle visits to comfort "their" nephew, whose pronouns are "like the weather. They change depending on how I feel." JA423. Feeling "HAPPY! CREATIVE! FUNNY!" suggests "HE/HIM." JA422. Feeling




7

"THOUGHTFUL! ATHLETIC! SILLY!" suggests "SHE/HER." JA422. And feeling "SLEEPY! CALM! HONEST!" suggests "EY/EM." JA422. The child is in angst throughout the story trying to figure out "which pronouns fit today." JA424. It's not until late in the evening, while at fireworks with the uncle, that the child finally finds the right pronouns: "Those are my words! I'm like fireworks! … My words finally found me! They and them feel warm and snug to me" … for "today." JA433.

Another, *Love, Violet*, for fourth graders, JA221-240, is about a same-sex playground romance and encourages teachers to ask students how it feels when they  "don't just 'like'" but "like like" someone. JA104; JA221-240. Another, *Born Ready*, read in fifth grade, JA241-276, focuses on a biological girl named Penelope who identifies as a boy. JA242-276. When Penelope's brother questions how someone can "become" a boy, his mother chides that "[n]ot everything *needs* to make sense. *This is about love.*" JA259. Teachers are told to instruct students that, at birth, doctors only "guess about our gender," but "[w]e know ourselves best." JA028 ¶ 144; JA105; JA596.

8



Finally, *Jacob's Room to Choose* is about a transgender boy and girl who appear to be in pre-K or kindergarten. During a break, they each run to the bathroom that corresponds with their biological sex but are "chased out" by other students. JA441. A teacher uses a game to persuade her class that "[a] lot of you don't look like the signs" on the bathroom door.



JA447. "I wonder," she asks, "if there is another way?" JA448. Soon the students come up with their own ideas and stage a bathroom demonstration. JA450. The doors are relabeled

to welcome multiple genders and to indicate "with" or "without a urinal."
JA450. The children post signs and parade in front with placards that
proclaim, "bathrooms are for every bunny" and "I have to pee so let me
be." JA450.

The Board takes pains to ensure this content is transmitted to
students. Employees responsible for selecting the books were told to look
through an "LGBTQ+ Lens" and ask whether "stereotypes,"
"cisnormativity," and "power hierarchies" are "reinforced or disrupted."
JA578; *see also* JA575. The Board requires teachers to emphasize
ideological viewpoints—for example, that "Harry Styles wears dresses,"
that "not everyone is a boy or girl" and that "[s]ome people identify with
both, sometimes one more than the other and sometimes neither," so
students "shouldn't" "guess" but instead solicit "pronouns." JA597;
JA596. The Board directs teachers to frame disagreement with these
ideas as "hurtful," JA595; JA597; JA739, and to "[d]isrupt the either/or
thinking," JA595; JA597; JA738. The Board admits that "[a]ny
child … may come away from [the] instruction with a new perspective not
easily contravened by their parents." JA591.

**B. The principals' and parents' objections.**

In November 2022, the Board's own elementary school principals
objected to the Pride Storybooks. JA738. They expressed concern that the
Storybooks "support the explicit teaching of gender and sexuality
identi[t]y," are "dismissive of religious beliefs," invite "shaming

comment[s]" toward students who disagree, and "[s]tate[] as … fact" things that "[s]ome would not agree" are facts. JA574; JA576. The principals also found it "problematic to portray elementary school age children falling in love with other children, regardless of sexual preferences." JA574.

The Parents objected for religious reasons. They teach their children that, as God's creations, everyone has equal dignity before God and is entitled to love, kindness, and respect. JA015 ¶ 50; JA402 ¶ 3 (citing *Surah al-Israa* 17:70); JA407 ¶¶ 4-5 (citing *Genesis* 1:26-27, Catechism of the Catholic Church § 1700, 1 *Corinthians* 3:16, 1 *John* 4:7-12, 16, *Matthew* 22:37-39); JA414 ¶ 8; JA586 ¶ 7. They believe sexuality is a sacred gift to be expressed in marriage between a man and a woman for creating life and strengthening the marital union. JA403 ¶¶ 6-8; JA408 ¶¶ 7-9; JA414 ¶¶ 6-7; JA586 ¶¶ 5-6. They also believe that biological sex is a God-given, immutable reality integral to each individual. JA403 ¶¶ 5-6, 9-12; JA408-409 ¶¶ 6-7, 10-11; JA413-JA414 ¶¶ 5, 7; JA586 ¶ 7.

The Parents have a religious obligation to teach these principles to their children. JA402 ¶ 4; JA404 ¶ 14; JA409-410 ¶ 12; JA414 ¶ 7; JA586 ¶ 7. The Parents also believe that some of what is taught via the Pride Storybooks is false. JA403-405 ¶¶ 9, 19; JA410 ¶ 14; JA413-415 ¶¶ 5, 15-16; JA586 ¶ 8. They disagree that a child's sex can be separated from his or her biology and that "gender" is a separate form of identity. JA403 ¶ 9; JA410 ¶ 14; JA413 ¶ 5; JA586 ¶ 5.

The Parents also believe that directing teachers to talk to children about sexuality, to invite children to question their gender identity, or to encourage young children to embrace gender transitioning is spiritually and emotionally harmful. Tamer Mahmoud and Enes Barakat are Muslim. JA402 ¶ 3. "Islam specifically prohibits public discussion of such private matters and discourages public disclosure of sexual behavior." JA404 ¶ 17 (citing *Quran, al-Hujurat*: 12 and *al-Noor*: 19); *see also* JA404-405 ¶¶ 16-20. A recent statement by Muslim scholars and preachers makes clear that classroom instruction on such matters would "subvert the agency of Muslim parents to teach their children their religiously grounded sexual ethics." JA405 ¶ 21 (citing *Navigating Differences: Clarifying Sexual and Gender Ethics in Islam* (May 23, 2023), https://perma.cc/U2U6-XNZQ). This position is underscored by a 2022 *fatwā* (a formal religious ruling in Islam) issued by the Fiqh Council of North America. *See Fatwa Regarding Transgenderism,* FIQH Council of North America (June 17, 2022), https://perma.cc/6A6F-T9TZ (stating that the "default is that a Muslim does not mention" sexual orientation or gender identity except in seeking to "become more observant of Islamic norms"). Attempting to conform Islamic teachings on human sexuality and gender to the viewpoints of the Pride Storybooks raises "detrimental spiritual consequences" that "cannot [be] overstate[d]." *See Navigating Differences* ("intentionally reject[ing], advocat[ing] the rejection of, or

misrepresent[ing] the will of God … endanger[s] their status as believers" (citing *Qur'an*, *al-An'ām*: 21)).

For the Romans and the Persaks, their Catholic and Ukrainian Orthodox faiths likewise require them to reject "the ideology of gender" that "denies the difference and reciprocity in nature of a man and a woman," including "educational programs … that promote a personal identity and emotional intimacy radically separated from the biological difference between male and female." Pope Francis, Apostolic Exhortation *Amoris Laetitia*, ¶ 56 (2016), https://perma.cc/7PJY-QSAE; *see also* JA408-409 ¶¶ 10-13 (quoting *Amoris Laetitia*); JA413 ¶ 4 ("[W]e believe matters regarding family life and human sexuality should be taught in a way that is consistent with the Catholic teaching."); JA413-414 ¶¶ 5-6, 11-12; JA586 ¶¶ 5, 7. The Romans and Persaks "have a God-given responsibility to raise [their] children in accordance with the tenets of [their] faith." JA414 ¶ 7 (citing *Proverbs* 22:6; *Deuteronomy* 6:6-7); JA409 ¶ 12 (citing Catechism of the Catholic Church §§ 2221-26). This includes protecting "a time of innocence," free from a "detailed understanding of issues surrounding human sexuality, especially where that information is 'dissociated from moral principles.'" JA410 ¶ 13 (citing Pope Saint John Paul II, Apostolic Exhortation *Familiaris Consortio*, ¶ 37 (1981), https://perma.cc/DAU8-C2R3; *Proverbs* 22:6; *Colossians* 3:21; Pontifical Council for the Family, *The Truth and Meaning of Human Sexuality: Guidelines for Education within the*

*Family* 78, 83 (Dec. 8, 1995)). As Pope Francis explained in *Amoris Laetitia,* when there is sex education, it "should help young people to accept their own bodies and to avoid the pretension 'to cancel out sexual difference because one no longer knows how to deal with it." *Amoris Laetitia* at ¶ 285; *see also* JA411 ¶ 15; JA414 ¶¶ 11-13. The Romans and Persaks have a religious obligation to shield their children from discussions inconsistent with these teachings while at such a young and impressionable age. JA404-405 ¶¶ 17-20; JA409-412 ¶¶ 12-15, 20; JA414-415 ¶¶ 7, 10-16; JA586-587 ¶¶ 7-9, 13-14. Hundreds of parents in Kids First share these beliefs. JA013-014 ¶¶ 32-33; JA017-018 ¶¶ 72-75.

### C. The Board's no-notice/no-opt-out policy.

Throughout most of last school year, the Board honored parental opt-outs. JA405 ¶ 27; JA411 ¶¶ 16-17; JA415 ¶¶ 17-18; JA032-033 ¶¶ 164-174; JA326. Indeed, on March 22, 2023, the Board issued a public statement that "[i]f a parent chooses to opt out, a teacher can find a substitute text for that student that … aligns with curriculum." JA741. But the next day, it reversed course, announcing that, as of the school year beginning August 28, 2023, no further notice would be provided and no opt-outs tolerated. JA741. Still, the Board reaffirmed that students could continue to opt out of the "Family Life and Human Sexuality Unit of Instruction," JA741—*i.e.*, sex-ed—even though it includes the same type of instruction, for the same "inclusivity" reasons, JA386; JA558-559; JA580-582; JA605.

14

In fact, the Board's no-opt-out policy applies *only* to the Pride Storybooks. Students are permitted to opt out of any other instruction that violates their religious beliefs. JA012 ¶ 18; JA067-068. When the Parents protested such disparate treatment, Board members responded by accusing the Parents of promoting "hate" and "a dehumanizing form of erasure," and by comparing them to "white supremacists" and "xenophobes." JA745; JA747; JA033 ¶ 176.

**D. The consensus on parental notice and opt-outs.**

The Board's own Religious Diversity Guidelines allow parental and student opt-outs from any "specific classroom discussions or activities that they believe would impose a substantial burden on their religious beliefs." JA013; *see also* JA065-069. Maryland's "Health Education" regulation independently requires all local school systems to establish "procedures for student opt-out[s] regarding" any "instruction related to family life and human sexuality objectives" other than "menstruation." COMAR §§ 13A.04.18.01(D)(2)(e)(*i*), (*iii*).

Counties throughout Maryland understand that this regulation applies just as it says: the opt-out guarantee applies to instruction "*related to* family life and human sexuality *objectives*." *Id.* (emphases added). For example, Baltimore County Public Schools acknowledges that such objectives are "integrated" throughout its curriculum, so opt-outs apply in whatever class they appear. *See Health Education Frequently Asked Questions: Baltimore County Public Schools (BCPS)*

15

*System*, https://perma.cc/F45S-2FVL. A similar understanding underlies policies in Frederick and Carroll Counties. *See Elementary Health Education Frequently Asked Questions (FAQ),* Frederick County Public Schools, https://perma.cc/45LL-P7HF; *Approval of Family Life Advisory Committee Opt-Out Recommendations for Grades PreK through 5 Family Life Unit*, Carroll County Public Schools (Jan. 11, 2023), https://perma.cc/A7BB-R35Y.

Maryland law reflects a national consensus. All states either require or permit public schools to provide some instruction on human sexuality.[1] Like Maryland, thirty-five other states and the District of Columbia require opt-outs.[2] Four states go beyond and require parental *opt-in*

---

[1] *See Sex Ed State Law and Policy Chart*, SIECUS (July 2022), https://perma.cc/EM89-GU4C (recording 47 states and the District of Columbia as requiring some type of sexual health education); Idaho Code § 33-1608 (the "local school board" may decide "whether or not any program in family life and sex education is to be introduced in the schools"); S.D. Codified Laws § 13-33-6.1 (requiring "character development instruction" including "sexual abstinence" unless the appropriate body chooses otherwise); Wyo. Stat. § 21-9-104 (authorizing instruction on child sexual abuse in health class); Wyo. Dep't of Educ., HIV/AIDS Model Pol'y for Wyo. Pub. Schs. (Sept. 1998) (contemplating HIV instruction at school).

[2] *See* Ala. Code § 16-41-6; Alaska Stat. §§ 14.30.355(b)(7), 14.30.356(b)(6); Ark. Code § 6-16-1006(c); Cal. Educ. Code § 51937; Colo. Rev. Stat. §§ 22-25-104(6)(d), 22-1-128(3)(a) & (4) & (5); Conn. Gen. Stat. § 10-16e; Fla. Stat. §§ 1002.20(3)(d), 1003.42(5); Ga. Code § 20-2-143(d); Haw. Dep't of Educ., Bd. of Educ. Policy 103-5; Haw. Dep't of Educ., Bd. of Educ. Policy 101-13; Haw. Dep't of Educ. Reg. No. 2210.1,

before children receive human sexuality instruction.[3] Six additional states feature a combination of opt-out and opt-in rights.[4] And one state, without mandating human sexuality instruction or an opt-out specific to it, broadly requires school districts to develop and adopt policies for parents to "ask that their children be excused from testing, classroom

---

https://perma.cc/6QAT-B6EL; Keith T. Hayashi, Superintendent, Haw. Dep't of Educ., Annual Memorandum: Notice on Board of Education Policy 101-13 Controversial Issues (June 23, 2023), https://perma.cc/T6DS-XSWP; Idaho Code § 33-1611; 105 Ill. Comp. Stat. 5/27-9.1a(d); Iowa Code § 256.11(6)(a); La. Stat. § 17:281(D); Mass. Gen. Laws ch. 71, § 32A; Me. Rev. Stat. tit. 22, § 1911; Mich. Comp. Laws § 380.1507(4); Minn. Stat. § 120B.20; Mo. Stat. § 170.015(5)(2); Mont. Code § 20-7-120; N.C. Gen. Stat. § 115C-81.30(b); N.H. Rev. Stat. § 186:11(IX-c); N.J. Stat. § 18A:35-4.7; N.M. Code R. § 6.29.6.11; N.Y. Comp. Codes R. & Regs. tit. 8, § 135.3; Ohio Rev. Code § 3313.60(A)(5)(c), (d), (f); Okla. Stat. tit. 70, § 11-103.3(C); Or. Rev. Stat. §§ 336.035(2), 336.465(1)(b); Ore. Dep't of Educ. Admin. R. 581-022-2050(5); Ore. Dep't of Educ. Admin. R. 581-021-0009; 22 Pa. Code § 4.29(c); R.I. Gen. Laws §§ 16-22-17(c), 16-22-18(c), 16-22-24(b); S.C. Code § 59-32-50; Va. Code § 22.1-207.2; Vt. Stat. tit. 16, § 134; Wash. Rev. Code §§ 28A.230.070(4), 28A.300.475(7); Wis. Stat. §§ 118.019(3) & (4); W. Va. Code § 18-2-9(c); D.C. Mun. Regs. subtit. 5, § E2305.5.

[3]   *See* Ky. Rev. Stat. § 158.1415(1)(d), (e); Miss. Code § 37-13-173; Nev. Rev. Stat. § 389.036(4); Wyo. Stat. § 21-9-104(b).

[4]   *See* Ariz. Rev. Stat. §§ 15-711(B), 15-716(E); Ind. Code § 20-30-5-17(c), (d); Kan. Admin. Regs. § 91-31-35(a)(5)(b); Kan. Dep't of Educ., *Frequently Asked Questions about Health Education in Kansas*, https://perma.cc/JTW9-8FUH; Kan. Dep't of Educ., *Kansas Model Curricular Standards for Health Education 2018*, Appendix A, https://perma.cc/TNA9-8ENE; Tenn. Code §§ 49-6-1305, 49-6-1307, 49-6-1308; Tex. Educ. Code § 28.004(i), (i-2); Utah Code §§ 53E-9-203(3), 53G-10-205, 53G-10-403.

instruction, and other school experiences the parents may find objectionable."[5]

Altogether, fully forty-seven states and the District of Columbia provide parental opt-out or opt-in protections related to human sexuality instruction; only three states (Delaware and the Dakotas) are silent on the matter. No state has expressly barred such accommodations.

**E. The district court proceedings.**

Seeking to restore the consensus, the Parents sued and moved for a preliminary injunction. JA001; JA003; JA007-056. After a hearing, the district court denied the Parents' motion. JA725-784; JA785. It determined the Parents were unlikely to succeed because they cannot show "that the no-opt-out policy burdens their religious exercise." JA753. The district court asserted that the Supreme Court's ruling in "*Yoder* is *sui generis*" and applies only when a school "automatically and irreversibly prevent[s]" the parents from raising their children in their religious beliefs. JA774-775. The district court concluded the Parents could not make this showing.

The district court further held that compelling the Parents' children—as a condition of attending public school—to remain in class against their faith for the Pride Storybooks and ensuing instruction is not even "indirect coercion" as articulated in Supreme Court cases such as

---

[5]  Neb. Rev. Stat. § 79-532(3).

*Sherbert*, *Thomas*, *Trinity Lutheran*, *Fulton*, and *Carson*. JA753-754. The district court based this ruling primarily on the First Circuit's ruling in *Parker v. Hurley*, buttressed by selected decisions that similarly limit *Yoder* and understand the Free Exercise Clause as only prohibiting "direct coercion." *See* JA773-774 (quoting *Parker v. Hurley*, 514 F.3d 87, 100 (1st Cir. 2008)); JA755-782 (citing *Parke*r over twenty times); JA770 ("guided by *Parker* and the other circuit-level cases").

Finding no burden under either *Yoder* or the Supreme Court's indirect coercion cases, the district court presumed it did not need to address the Parents' other arguments. Accordingly, in a single-sentence footnote it rejected the Parents' *Fulton*, *Tandon*, *Lukumi*, and *Masterpiece* free exercise claims. JA775 n.14; *see also* JA636:6-7 (calling *Tandon* "a short but curious decision"). For the same reasons, the district court declined to restore notice and opt-outs pending appeal, denying the Parents' motion for a preliminary injunction. JA783-784. This appeal followed.

## SUMMARY OF ARGUMENT

The Parents are entitled to a preliminary injunction. They are likely to prevail on the merits of their claims. As important, interfering with the religious upbringing of the Parents' children for any amount of time causes irreparable harm. And because a preliminary injunction would simply restore the status quo ante—that is, the same notice and opt-outs that existed last school year, without halting the Board's use of the Pride Storybooks generally—the equities also favor an injunction.

As to the merits, there are at least six independent reasons why the Board's no-notice/no-opt-out policy for the Pride Storybooks is subject to strict scrutiny. And once strict scrutiny is triggered, the Board cannot meet that demanding standard.

First, strict scrutiny is triggered under *Yoder*. There, the Supreme Court drew upon the "enduring American tradition" of parental control over children's religious upbringing, allowing Amish parents to opt their children out entirely from public high school. The Court accepted the parents' concerns that public school instruction would expose their children to values that conflicted with their religious beliefs. The same should apply here. The Storybook Mandate interferes with the Parents' religious obligations to shield their children from any teaching that would harm their formation into men and women who understand and accept their bodies, marriage, and family in accordance with the Parents' religious beliefs. As in *Yoder*, this warrants strict scrutiny.

Second, strict scrutiny is independently triggered by pressuring the Parents to violate their religious beliefs as a condition of using the public schools. Many of the Parents have no realistic alternative to public schools. Thus they are forced either to subject their children to religiously violative instruction or to withdraw their children from public school on pain of criminal penalties or self-financing an alternative education. From *Sherbert v. Verner* in 1963 through *Carson v. Makin* in 2022, such

"indirect discouragements" are religious burdens that trigger strict scrutiny.

Third, under *Tandon*, the no-notice/no-opt-out policy is not generally applicable. *Tandon* held that a government policy is not generally applicable when "any" comparable secular activity is treated better than religious exercise. The Board admits that's what happens here. A child can receive an opt-out from discussions on gender transitioning during health class, but not when the same topic is discussed during story hour. This disparate treatment triggers strict scrutiny.

Fourth, the opt-out ban also lacks general applicability under *Fulton*. There, the Supreme Court held that a government's use of individualized discretion in deciding whether to grant religious accommodations triggers strict scrutiny. And here, the Board not only possesses—it exercised and retains—discretion on whether to depart from its general policy of religious accommodation. Its discretion not to extend accommodations for the Pride Storybooks triggers strict scrutiny.

Fifth, under *Lukumi* and *Masterpiece*, the opt-out ban is not neutral. Under *Lukumi*, that's because the Board singled out objections to the Pride Storybooks, making them the only course of instruction where parents cannot receive notice and opt-outs. A policy designed to avoid religious accommodation requires strict scrutiny. And under *Masterpiece*, even without strict scrutiny, the Board's policy should be set aside based on the Board's open hostility to the Parents' religious beliefs.

Sixth and finally, substantive due process also requires strict scrutiny, because the right of parents to control their children's upbringing is coupled with a religious interest.

The Board cannot satisfy strict scrutiny's demanding standard. Interests in providing "an inclusive educational environment" and "reducing stigmatization," while laudable, lack the specificity required by the First Amendment. With no way to measure when such goals are met, they invite endless suppression of religious exercise. The Board has not even shown that a one-sided ideological approach will promote the asserted interests, as opposed to increasing strife and disagreement.

Furthermore, the Board must explain why a compelling interest in mandating the Pride Storybooks appeared on March 23, 2023. But it can't because the Board said otherwise *the day before*. It also provided notice and opt-outs all last school year. And the Board has never explained how its interests require such a different approach from the myriad school districts nationwide (and in Maryland) that require notice and opt-outs. Nor can the Board explain how it is compelled to mandate the Storybooks, but still retains discretion to provide opt-outs in the future. Finally, the Board cannot show—also, as it must—that it has no other way to promote kindness and civility among students except by mandating the Pride Storybooks.

No U.S. Supreme Court decision or precedent of this Court requires shutting the schoolhouse door to the Parents here. Rather, all support

the Parents' rights to notice and opt-outs. The Court should draw upon the enduring American tradition of parental religious liberty, reverse the district court, and grant the Parents' motion for a preliminary injunction.

## STANDARD OF REVIEW

Preliminary injunctions are required "where the plaintiff has established 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 138 (4th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)). This Court reviews "the denial of a preliminary injunction for abuse of discretion, while reviewing legal conclusions de novo." *Grimmett v. Freeman*, 59 F.4th 689, 692 (4th Cir. 2023) (cleaned up). Here, because "the district court's order turned on its assessment" of whether the Board's no-notice/no-opt-out policy "is constitutional," the Court must "analyze the parties' positions with fresh eyes." *Id.*; *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 508 n.27 (1984).

## ARGUMENT

### I.  The Parents are likely to succeed on the merits.

The Board's Storybook Mandate burdens the Parents' religious exercise in at least six ways. Each opens an independent path to strict scrutiny, and the Board comes nowhere close to meeting that demanding standard.

23

### A. The Storybook Mandate triggers strict scrutiny under *Yoder*.

Mandatory reading of, and instruction on, the Pride Storybooks burdens the Parents' religious exercise because it compels them and their children to participate in instruction prohibited by their faith. Under *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972), this interference triggers strict scrutiny.

### 1. *Yoder* applies.

*Yoder* upheld the "right of parents … to direct the [religious] education of their children." *Employment Div. v. Smith*, 494 U.S. 872, 881 & n.1 (1990) (citing, *inter alia*, *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)). In *Yoder*, the Supreme Court allowed Amish parents to opt their children out of high school *entirely* to comply with the dictates of their faith. 406 U.S. at 214, 233. "Long before there was general acknowledgment of the need for universal formal education, the Religion Clauses had specifically and firmly fixed the right to free exercise of religious beliefs." *Id.* at 214. And that free exercise right, *Yoder* explained, encompassed the right of parents to direct "the religious upbringing and education of their children in their early and formative years." *Id.* at 213-14. Because this right has "a high place in our society," *id.*, the fact that public schooling ranked "at the very apex" of state power, *id.* at 213, was insufficient to override the parents' concerns about the "exposure of their children to a 'worldly' influence in conflict with their beliefs," *id.* at 211. Because that "expos[ure]" could "substantially interfer[e]" with their children's

24

religious development "at the crucial adolescent stage," the Court applied—and Wisconsin failed—strict scrutiny. *Id.* at 218.

The Supreme Court has continued to address *Yoder* as "[d]rawing on 'enduring American tradition.'" *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020); *id.* at 2284 (Breyer, J., dissenting) ("[T]he Free Exercise Clause draws upon a history that places great value upon the freedom of parents to teach their children the tenets of their faith.") (citing *Yoder*). Indeed, *Smith* specifically carved out an exception from its general rule for Free Exercise claims asserting parental rights. *Smith* described this as a "hybrid situation," where "the Free Exercise Clause [was] in conjunction with … the right of parents … to direct the education of their children." 494 U.S. at 881-82 (cleaned up); *see also Danville Christian Acad., Inc. v. Beshear*, 141 S. Ct. 527, 528 (2020) (per curiam) (calling *Yoder* an "alternative *Smith* argument"); *Herndon by Herndon v. Chapel Hill-Carrboro City Bd. of Educ.*, 89 F.3d 174, 179 (4th Cir. 1996) ("Where parents make a 'free exercise claim,' … the State's action must be measured by a stricter test, the test developed under the Free Exercise Clause."). The rule of *Yoder* and *Smith* thus holds that, when parental rights to direct their children's education are at stake, the Free Exercise Clause requires strict scrutiny.

The Parents have the same objection as the Amish parents in *Yoder*, they just seek more modest relief. They believe it is wrong to expose their elementary-age children to instruction that promotes values "in marked

25

variance with [their] values and [their] way of life." *Yoder*, 406 U.S. at 210-11. Indeed, their respective religious traditions require that they teach their children differently than what is presented in the Pride Storybooks. Not doing so in Islam "endangers their status as believers." *Supra* 12 (citing *Navigating Differences*). Not doing so for the Romans and the Persaks contravenes longstanding Catholic and biblical teaching about the purpose of sex education and the role of parents. *Supra* 13-14 (citing, *inter alia*, *Amoris Laetitia*). And, as in *Yoder*, the pressure on the Parents to abandon these beliefs is backed by criminal penalties. *See* 406 U.S. at 207-08. Parents who cannot afford private school or homeschooling are "guilty of a misdemeanor" if their children fail to "attend a public school." Md. Code Educ. §§ 7-301(a-1)(1), (e)(1)-(2).

Also as in *Yoder*, the government justifies its refusal to accommodate by claiming it is necessary to prevent the Parents from "foreclosing their [children's] opportunity to make an intelligent choice between [their religion's] way of life and that of the outside world." 406 U.S. at 232; *see also* JA727 (Pride Storybooks are to "create[] and normalize[] a fully inclusive environment"); JA782-783 (refusing opt-outs is to "ensur[e] all MCPS students are exposed to inclusive and representative instructional materials"). In *Yoder*, the claim was that the state is empowered "to extend the benefit of [primary] education to children regardless of the wishes of their parents." 406 U.S. at 229. Here, the Board uses different words to say the same thing: "Once professional educators make a

26

decision to include this in the curriculum," parents have no "free exercise claim," even in pre-K. JA669:7-17. But *Yoder* rejected that "*parens patriae* claim of such all-encompassing scope" as inconsistent with "the central values underlying the Religion Clauses." 406 U.S. at 234. The same result should follow here.

**2. Dismissing *Yoder* as "*sui generis*" is wrong.**

Agreeing with the Board, the district court held that *Yoder* "is *sui generis*." JA775. But the "persuasive evidence" the Amish introduced about their way of life, 406 U.S. at 234, does not mean that free exercise protection is available only when public schools "automatically and irreversibly prevent" parents from conveying their beliefs to their children, JA774. *Yoder* says no such thing, nor does any Supreme Court decision discussing *Yoder*. Rather, *Yoder* rested its holding "on the central values underlying the Religion Clauses." 406 U.S. at 234. That understanding is reflected in the subsequent discussion of *Yoder* by *Smith*, the various opinions in *Espinoza*, and the reference to *Yoder* in *Danville. Supra* 25.

The district court attempted to buttress its marginalization of *Yoder* by looking at out-of-circuit decisions that, to the district court, "conclude[] that the mere exposure in public school to ideas that contradict religious beliefs does not burden the religious exercise of students or parents." JA755. Even if those cases bound this Court (and they don't), none involves what is at issue here: religious-based opt-out requests to specific

27

instruction. Rather, the claimants there either rejected available opt-outs (*Bauchman*), had opt-outs and thus no claim (*Grove*, *Coble*), or challenged the general use of curriculum (*Mozert*, *Fleischfresser*, *Jones*, *Sabra*, *Torlakson*).[6] Here, by contrast, the Parents' narrow assertion of their right to notice and opt-outs is not a categorical attack on "mandatory public-school curriculum." JA756. There is no effort to "require the

---

[6] *See Bauchman v. W. High Sch.*, 132 F.3d 542, 557 (10th Cir. 1997) (rejecting student's argument that she "must be allowed to participate in a Choir that only performs songs of the nature she demands"); *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1531 (9th Cir. 1985) (no free exercise violation when claimant "was given permission to leave during classroom discussion … but chose to remain"); *Coble v. Lake Norman Charter Sch., Inc.*, No. 20-cv-596, 2021 WL 1109360, at *7 (W.D.N.C. Mar. 23, 2021) ("LNC worked to ensure that students would not be forced to read a book that violated their religious beliefs."); *Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1069 (6th Cir. 1987) (Plaintiffs admitted "that any value-laden reading curriculum that did not affirm the truth of their beliefs would offend their religious convictions."); *Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 683 (7th Cir. 1994) ("action to enjoin the directors of the school district from continuing to use [books]"); *Jones v. Boulder Valley Sch. Dist. RE-2*, No. 20-cv-3399, 2021 WL 5264188, at *16 (D. Colo. Oct. 4, 2021) ("other than organic discussions that arise in class, the children in this case were to be given notice of, and permitted to opt out of, instructional events involving transgender concepts"); *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 479 F. Supp. 3d 808, 812-13 (D. Ariz. 2020) ("alleging that [professor's] teachings violate the Establishment Clause and Free Exercise Clause"); *Cal. Parents for Equalization of Educ. Materials v. Torlakson*, 267 F. Supp. 3d 1218, 1222, 1225-26 (N.D. Cal. 2017) ("alleging discrimination against Hinduism in the California public school curriculum" when there was no allegation "that students ever read or even s[aw]" the curriculum).

Government *itself* to behave in ways" the Parents prefer. JA762-763. The Parents can prevail, and the Pride Storybooks can still be taught.

The remaining case used by the district court to minimize *Yoder*—*Parker v. Hurley*—is legally wrong and factually afield. There, two families sought to excuse their elementary-aged children from books that depicted homosexual couples and celebrated a gay marriage. 514 F.3d at 90. One of the students "was never required to read [the books] or have them read to him." *Id.* at 106. And the book read to the other student only "describe[d]," rather than "endorse[d]," gay marriage. *Id.* Also, unlike here, there was no evidence that the teacher's accompanying discussion materials prodded the student to affirm gay marriage in any way. *Id.* Finally, in rejecting the parents' claims, *Parker* held that religious parents lack opt-out rights because "there is no claim of direct coercion." *Id.* at 105. But the Free Exercise Clause doesn't require direct coercion. *Infra* 33-36.

Other courts have not been so quick to discard *Yoder* as an Amish one-off. Rather, multiple circuits accept that "[p]arents usually do know what's best for their children and in most matters (where to live, how to live, what to eat, *how to learn*, *when to be exposed to mature subject matter*) their decisions govern until the child reaches 18." *L.W. v. Skrmetti*, No. 23-5600, 2023 WL 6321688, at *9 (6th Cir. Sept. 28, 2023) (emphasis added).

Addressing "materials that may offend … religious sensibility," the Eighth Circuit has concluded that "forcing any person to participate in an activity that offends his religious or nonreligious beliefs will generally contravene the Free Exercise Clause." *Florey v. Sioux Falls Sch. Dist. 49-5*, 619 F.2d 1311, 1318-19 (8th Cir. 1980) (citing *Yoder*, 406 U.S. at 205). The Third Circuit similarly recognizes "the primacy of the parents' authority," holding it should "yield only where the school's action is tied to a compelling interest." *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000). It is "parents, not schools" who have "primary responsibility" to instill religious beliefs, and "introducing a child to sensitive topics before a parent might have done so herself can complicate and even undermine parental authority." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005); *see also Tatel v. Mt. Lebanon Sch. Dist.*, 637 F. Supp. 3d 295, 302, 335 (W.D. Pa. 2022) (finding violation of parental rights from transgender education "without notice and opt out rights").

But the district court sidelined these cases and leaned on *Parker. See, e.g.*, JA765-766 & n.9 (attempting to reconcile *Tatel* and *Parker* before acknowledging that *Tatel* "seems to find indirect coercion based on the pressure either to 'submit to' indoctrination or abandon a public education").

### 3. Applying *Yoder* upholds Free Exercise principles.

By marginalizing *Yoder*, the district court invited a conflict with other Free Exercise principles. Upholding those principles requires reversal.

First, limiting *Yoder* as "*sui generis*" defies the historical tradition that *Yoder* itself drew on. *See Espinoza*, 140 S. Ct. at 2261 (*Yoder* "[d]raw[s] on" an "enduring American tradition"). That tradition is one of "reluctan[ce] to directly force instruction of children 'in opposition to the will of the parent.'" *Yoder*, 406 U.S. at 226 n.14 (quoting Thomas Jefferson); *see also* Eric A. DeGroff, *Parental Rights and Public School Curricula: Revisiting* Mozert *After 20 Years*, 38 J.L. & Educ. 83, 110 & n.178 (2009) (collecting cases). This tradition is rooted in English common law and embodied in ubiquitous state laws ensuring parents can opt their children out of objectionable instruction—laws upheld by multiple courts after the spread of public schools during the 19th Century. *See id.* at 110 & n.178.

Such decisions upheld the right of Catholic parents to excuse their children from readings of the King James Bible, *People ex rel. Vollmar v. Stanley*, 255 P. 610, 613-14 (Colo. 1927); religious objections to dancing exercises, *Hardwick v. Bd. of Sch. Trs.*, 205 P. 49, 54 (Cal. Dist. Ct. App. 1921); and parental prerogatives over even core classes like "domestic science," "grammar," and "rhetoric," *State ex rel. Kelley v. Ferguson*, 144 N.W. 1039, 1041 (Neb. 1914). Courts understood "there is a great and fatal error in" concluding that "the parent, by the very act of sending his child to school, impliedly undertakes to submit all questions in regard to study to the judgment of the teacher." *Morrow v. Wood*, 35 Wis. 59, 63-64 (Wis. 1874); *accord Rulison v. Post*, 79 Ill. 567, 574 (Ill. 1875). *Yoder* said

31

this "enduring American tradition" was "beyond debate." 406 U.S. at 232. Today, forty-seven states and D.C. provide opt-outs or require opt-ins for various instruction on human sexuality (with three states simply not addressing the issue). *Supra* 17-18. Thus *Yoder* is the rule, not the exception.

Second, testing whether other religious "groups could match the Amish parents' claims," JA775, invites courts to discriminate among religious beliefs based on how "central" the burdened religious exercise is to one's faith. Under *Smith*, that's forbidden. *See* 494 U.S. at 886-87. Courts lack a standard by which to decide whether a Muslim parent's beliefs about sexuality "match" an Amish parent's beliefs about work. "Deciding such questions would risk judicial entanglement in religious issues." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2069 (2020).

Third, under the Free Exercise Clause, it is irrelevant whether the Parents "remain free" to keep teaching their children at home. JA772; *see also* JA770-771 & nn.11, 12. Rather, that claim echoes the long-rejected argument that "the vital aspect of religious toleration" is limited to parents' "right to counteract by their own persuasiveness" what "the state's educational system is seeking to promote.*" Minersville Sch. Dist. v. Gobitis*, 310 U.S. 586, 599 (1940), *overruled by W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). If that were the rule, governments could do anything they wanted to students, as long as parents could say

different things in the home. "It is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school authorities." *Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring).[7] *Yoder* applies and so does strict scrutiny.

## B. Mandating the Pride Storybooks as a condition of attending public schools independently triggers strict scrutiny.

The Storybook Mandate also triggers the Free Exercise Clause's "protect[ion] against indirect coercion or penalties on the free exercise of religion." *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022) (cleaned up). Here, the Parents' free exercise is "infringed by the … placing of conditions upon a benefit or privilege." *Sherbert v. Verner*, 374 U.S. 398, 404 (1963). To use the public schools, the Parents are compelled to forgo their religious practice of shielding their elementary-school children from ideology around sexuality and gender transitioning that violates their religious beliefs. This "substantial pressure" on the Parents to modify their religious practices as a condition of public education demands strict scrutiny. *See Thomas v. Rev. Bd.*, 450 U.S. 707, 718 (1981).

As Maryland residents, the Parents are entitled to "Free Public Schools." Md. Const. art. VIII Sec. 1; *see also* JA772 ("Certainly, public

---

[7]   Justice Alito's concurrence in *Morse* is the controlling opinion. *See B.H. ex rel. Hawk v. Easton Area Sch. Dist.,* 725 F.3d 293, 312-13 & n.17 (3rd Cir. 2013) ("every court of appeals to address this question (other than the Seventh Circuit)" agrees) (citations omitted).

education is a valuable public benefit."). And there are government-imposed burdens if the Parents withhold their children from public school: criminal penalties, Md. Code Educ. §§ 7-301(a-1)(1), (e)(1)-(2); the financial burdens of alternative schooling that "many families cannot afford," JA772; Dkt. 49; and the inability to access needed educational resources, JA586-587 ¶¶ 8-10, 14. At the same time, the Parents object to their children's *presence* in situations that prematurely expose them to ideas about sexuality and gender in conflict with their religious beliefs. JA404 ¶¶ 14-18; JA409-410 ¶¶ 12-13; JA414 ¶¶ 10-12; JA586 ¶¶ 7-9. In Islam, this is specifically prohibited. JA404 ¶ 17. The "detrimental spiritual consequences" to Muslims "cannot [be] overstate[d]." JA404 ¶ 17 (citing *Quran, al-Hujurat*: 12 and *al-Noor*: 19); *see also* JA404-405 ¶¶ 16-20 (citing *Navigating Differences*); *supra* 12 (citing 2022 *fatwā*). For the Romans and the Persaks, this instruction violates the Bible, multiple papal encyclicals, and the teachings of the U.S. Catholic Bishops. *Supra* 13-14.

If the mandate persists, conflict with these beliefs is inescapable. The Board "do[es]n't dispute" that the Pride Storybooks must be read and "there will be discussion that ensues." JA665:10-11. Nor is there any dispute that, in such discussions, the Board is seeking to "disrupt[]" "heteronormativity" and "either/or thinking" on gender and sexuality, beginning at age four. JA577; JA597. The Pride Storybooks prematurely introduce human sexuality and gender identity to pre-K and elementary

school children, exposing them to concepts that are intended to "force[] [the Parents] to choose between following the precepts of [their] religion and forfeiting benefits," on the one hand "and abandoning one of the precepts of [their] religion in order to accept [public education], on the other hand." *Sherbert*, 374 U.S. at 404. "The pressure upon [them] to forego th[eir religious objection] is unmistakable." *See id.*

The pressure to abandon the Parents' religious exercise does not disappear, as the Board reasons, just because the Parents are free to teach their religious beliefs at home. Pressure existed on Sherbert's religious exercise even though "she expressed a willingness to accept employment" elsewhere. *Sherbert*, 374 U.S. at 399 n.2. Pressure existed on Thomas's religious exercise even though he voluntarily quit his job. *Thomas*, 450 U.S. at 718. Pressure existed on Hobbie's religious exercise even though she received only a "limited disqualification" from unemployment benefits, one that expired after a "fixed term." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 143 (1987). Similarly, the *Carson* parents were not prohibited from giving their children the religious education of their choice simply because Maine limited its tuition subsidy for students attending secular schools—just like "Trinity Lutheran remained 'free to continue operating as a church.'" *Carson,* 142 S. Ct. at 1996 (quoting *Trinity Lutheran*, 582 U.S. at 462). But the *Carson* parents were still "forced to choose between fidelity to religious belief" and "the forfeiture of [public] benefits." *Hobbie*, 480 U.S.

35

at 144. Such "indirect 'discouragements'" are what triggered the Free Exercise Clause in those cases. *See Sherbert*, 374 U.S. at 404 n.5. It does so here as well.

Here, the opt-out ban "inevitably deters or discourages the exercise of First Amendment rights." *Espinoza*, 140 S. Ct. at 2256. In the Board's words, it has banned opt-outs from the Pride Storybooks because the forced reading and discussion is meant to "create[] and normalize[]" a certain "environment for all students," and "ensur[e] all MCPS students are exposed to" the Board's preferred mode of "social integration." JA727; JA782-783. It is implausible to conclude that no religious burden exists on parents being compelled to submit their children to such "normaliz[ing]" contrary to their religious beliefs. *See, e.g.*, JA410-411 ¶¶ 14-18 (discussing Islamic prohibition on such discussions). "[H]aving to disavow … religious exercise" to "participate in a government benefit program" is a quintessential burden on religious exercise, and it triggers strict scrutiny. *Trinity Lutheran*, 582 U.S. at 463; *see also Carson*, 142 S. Ct. at 2000; *Espinoza*, 142 S. Ct. at 2261. This is true "even [for] a gratuitous benefit." *Trinity Lutheran*, 582 U.S. at 463; *see also Carson*, 142 S. Ct. at 1997 ("A state need not subsidize private education."). It is therefore true for one of the chief benefits a society can offer its children— a public education.

## C. Lack of neutrality and general applicability triggers strict scrutiny.

"The Free Exercise Clause protects religious observers against unequal treatment." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993) (cleaned up). Thus, a plaintiff may show a free exercise violation if a policy "is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022).

The Supreme Court has set forth "three bedrock requirements of the Free Exercise Clause" necessary to establish that a law is neutral and generally applicable. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, No. 22-15827, 2023 WL 5946036, at *16 (9th Cir. Sept. 13, 2023) (en banc). First, a government restriction must not treat comparable activities differently. *Id.* at *17 (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67-68 (2020) (per curiam)). Second, a law or policy must not use "a system of individual exemptions," "regardless [of] whether any exceptions have been given." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877, 1879 (2021); *see also FCA*, 2023 WL 5946036, at *15. And third, "the government may not act in a manner 'hostile to … religious beliefs' or inconsistent with the Free Exercise Clause's bar on even 'subtle departures from neutrality.'" *FCA*, 2023 WL 5946036, at *16 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) and *Lukumi*, 508 U.S. at 534). The

district court failed to address these "bedrock requirements," dismissing them in a single footnote. *See* JA754 n.8. That was reversible error.

### 1. Allowing some opt-outs but not others triggers strict scrutiny under *Tandon*.

"[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (citing *Diocese of Brooklyn*, 141 S. Ct. at 67-68). "[W]hether two activities are comparable" is "judged against the asserted government interest that justifies the regulation at issue." *Id*. This ensures that courts do not miss disparate treatment by focusing on the government's (possibly self-serving) "categorizations." *Diocese of Brooklyn*, 141 S. Ct. at 66-67.

Here, the Board's opt-out policy is not generally applicable. Opt-outs are banned for the Pride Storybooks but permitted for comparable instruction in the sex-ed portion of health class. JA741. The Board concedes the Pride Storybooks were adopted to comply with Maryland's 2019 "Equity Regulation," JA460, which seeks to ensure "educational equity" despite "[g]ender identity" or "[s]exual orientation." COMAR §§ 13A.01.06.01(B); 13A.01.06.03(B)(2), (5). That same regulation prompted "[i]nclusiv[ity]" updates to the unit on Family Life and Human Sexuality in Health Education. Mem. from State Superintendent to Members of State Board of Education at 2, 12 (June 25, 2019),

https://perma.cc/6JCX-B7RC; *see also* JA579-584 (detailing Board's inclusivity metrics for Health Education). Though justified by the same interest, the Board admits that it allows secular opt-outs for the Family Life and Human Sexuality in Health Education curriculum. *See* JA478-479; JA066-069.

That is just one example of an exception that cuts against the justification of the no-opt-outs policy, and under *Tandon*, that's sufficient. *See* 141 S. Ct. at 1296 ("*any* comparable secular activity") (emphasis in original); *Canaan Christian Church v. Montgomery County*, 29 F.4th 182, 205 (4th Cir. 2022) (Richardson, J., concurring) ("Once you have even a single exception … religious exercise must get that same treatment.") (citing *Fraternal Ord. of Police v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) (Alito, J.) (a no-beard policy was not generally applicable where a medical exception cut against the City's purported interest in making police easily identifiable)). Indeed, the Board recognizes that its inclusivity standards apply to all "[i]nstructional materials used in MCPS schools," JA496, and that students can have opt-outs anywhere *except* for the Pride Storybooks.

When the real-world application of this policy is considered, calling it generally applicable is nonsensical. For example, parents are entitled to opt their fifth grader out of instruction on "male and female stereotypes" during sex-ed, JA580, but that same family cannot opt their first grader

out of story hour, even when teachers are encouraged to "[d]isrupt" traditional views on gender and sexuality, JA597.

The Board's only response thus far has been that the Storybook opt-out ban applies to both "religious and secular" requests, while opt-outs from sex-ed are available for both. JA478-479. But "[i]t is no answer that [the Board] treats some comparable secular" opt-outs "as poorly as" some "religious" opt-outs, or vice versa. *Tandon*, 141 S. Ct. at 1296. Disparate treatment requires strict scrutiny. *Id.*

### 2. The Board's discretion to provide notice and opt-outs triggers strict scrutiny under *Fulton*.

*Fulton* separately requires strict scrutiny because the no-opt-out policy results from the Board's "sole discretion." *Fulton*, 141 S. Ct. at 1878. This rule applies whenever the government uses "a mechanism for individualized exemptions" and even when such discretion merely exists—"regardless [of] whether any exceptions have been given." *Id.* at 1877, 1879. Discretion—the power to make an exception—is the trigger: "it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id.* at 1879 (quoting *Smith*, 494 U.S. at 884). "Accordingly, where a state extends discretionary exemptions to a policy, it must grant exemptions for cases of 'religious hardship' or present compelling reasons not to do so." *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 733 (6th Cir. 2021).

40

The Board's discretion is apparent in its Religious Diversity Guidelines—applicable to all instruction except (now) the Pride Storybooks. JA058. For example, students "who do not want to participate" may even be excused when schools teach about religious holidays or events "in a factual manner" or hold secular events that "may be viewed by others as having religious overtones." JA068. "[E]ach situation must be addressed on a case-by-case basis[.]" JA066. The very existence of this discretionary system triggers strict scrutiny. *Fulton*, 141 S. Ct. at 1879; *see also FCA*, 2023 WL 5946036, at *15, *17 ("mere existence of government discretion is enough").

The Board's discretion is also apparent from the history of the Storybook opt-out ban. For almost the entire last school year, opt-outs were permitted. JA740-742. Then, after saying so publicly on March 22, 2023, the Board reversed itself the next day. The overnight about-face alone warrants strict scrutiny. *Fulton*, 141 S. Ct. at 1882 (exceptions "undermine[] the [government's] contention that its … policies can brook no departures").

To evade *Fulton*, the Board claims the Storybook opt-out ban itself has "no exceptions." JA475. But *Fulton* rejected attempts to obscure discretion by shifting the baseline. There, the government parsed its contractual policy to claim one exemption did "not apply" and another "on its face" did "not … allow for exceptions." *Fulton*, 141 S. Ct. at 1878-79. The Court rejected those arguments, because the overall contract showed

41

"the City's reservation of the authority to grant such an exception." *Id*. at 1879. Here too, the Religious Diversity Guidelines uphold a "foundational" commitment to accommodation. JA060. Denying opt-outs for the Storybooks while keeping them for sex-ed proves that discretion.

### 3. Religious targeting and animosity trigger strict scrutiny under *Lukumi* and require setting the opt-out ban aside under *Masterpiece*.

By allowing opt-outs, then withdrawing them only for the Pride Storybooks after parents raised religious objections, the Board unlawfully "target[ed] religious conduct for distinctive treatment." *Lukumi*, 508 U.S. at 546. "The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 534). "[M]ere compliance with the requirement of facial neutrality" is not sufficient. *Lukumi*, 508 U.S. at 534. "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Id.* Even a "slight suspicion" of religious animosity by government actors is enough to trigger strict scrutiny. *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020) (quoting *Lukumi*, 508 U.S. 547; *Masterpiece*, 138 S. Ct. at 1731). Here, the School Board's targeted creation of a Pride-Storybooks-only exception to its Religious Diversity Guidelines—and to the requirements of Maryland law on family life and human sexuality—displays impermissible intolerance toward the Parents' religious beliefs. That alone triggers strict scrutiny. *Lukumi*, 508 U.S. at 546.

First, the School Board has specifically targeted religious opt-outs. As the School Board's implementation shows, the Pride Storybooks assume that traditional religious views regarding family life and sexuality—ones supported by sound science and common sense—are bigoted. The Board has long granted parental opt-outs from a wide variety of school activities. *See, e.g.*, JA066-068 (*e.g.*, books, band, Halloween). As required by Maryland law, this has always included opt-outs from "instruction related to family life and human sexuality objectives." COMAR § 13A.04.18.01; Stephanie Ramirez, *MCPS revises policy on LGBTQ-friendly books,* Fox5 DC (Mar. 22, 2023), https://perma.cc/8L5G-XQ9X. The Board's overnight decision to withdraw opt-outs for the Pride Storybooks only—and only after parents began raising religious objections—is alone sufficient to trigger strict scrutiny for lack of neutrality. Such targeting of religion is "not neutral … and therefore trigger[s] strict scrutiny under the Free Exercise Clause." *Tandon*, 141 S. Ct. at 1296.

Second, in justifying the no-opt-out policy, multiple School Board members made hostile remarks to dissenting parents reflecting religious animus. Defendant Harris accused the Parents of finding "another reason to hate another person," JA745; Lynne Harris, Remarks at the MCPS Board Meeting, at 1:48:00-1:48:15 (Mar. 28, 2023), https://shorturl.at/fAET6. An MCPS presentation on the Pride Storybooks echoed these remarks, accusing parents of promoting a

"dehumanizing form of erasure." JA033. Harris later accused a student supporting opt-outs of "parroting" his parents' "dogma," JA747; Em Espey, *Parents, students, doctors react to MCPS lawsuit targeting LGBTQ+ storybooks*, MoCo360 (June 2, 2023), https://perma.cc/5GD9-2YVQ, and compared a group of mostly Muslim and Ethiopian Orthodox parents to "white supremacists" and "xenophobes." *Id.* Another Board member added that, "yes, ignorance and hate does exist within our community." JA744; MCPS Business Meeting, at 38:34-40:40 (Jan. 12, 2023), https://perma.cc/T234-559Q. No members disavowed these statements, casting doubt on the Board's "neutral and respectful consideration." *Masterpiece*, 138 S. Ct. at 1729-30.

When religious exercise is the object of government action, that at least requires strict scrutiny. But in the face of government hostility, a policy must be "'set aside' … without further inquiry"—that is, without strict scrutiny. *Kennedy*, 142 S. Ct. at 2422 n.1 (quoting *Masterpiece*, 138 S. Ct. at 1732).

## D. The Parents' liberty interest under the Due Process Clause requires strict scrutiny.

The Due Process Clause also has long guaranteed parents' right to direct the upbringing of their children. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). And when "coupled with a religious element," that liberty interest triggers heightened scrutiny. *See John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 628 n.3 (4th Cir. 2023)

(citing *Herndon*, 89 F.3d at 179). This is consistent with the history and tradition of parental rights at the time of ratification and continuing through the rise of public schools. *Supra* 31-32. But citing a lack of "Fourth Circuit guidance," the district court wrongly failed to undertake this historical inquiry. JA781-782.

### E. The no-notice/no-opt-out policy cannot survive strict scrutiny.

Strict scrutiny obligates the Board to satisfy "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). "A government policy can survive … only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881 (cleaned up); *see also Redeemed Christian Church of God v. Prince George's County*, 17 F.4th 497, 510 (4th Cir. 2021) (similar). This happens only in "rare cases." *Lukumi*, 508 U.S. at 546. This isn't one of them.

#### 1. The School Board lacks a compelling interest.

The first step in strict scrutiny "obligate[s]" the School Board to show "that it had a compelling interest in" withdrawing opt-outs for the Pride Storybooks. *Redeemed Christian Church*, 17 F.4th at 510. The Board cannot do this "at a high level of generality," but must prove "the asserted harm of granting specific exemptions to particular religious claimants." *Fulton*, 141 S. Ct. at 1881.

45

Here, the Board asserts three "compelling" reasons for its Storybook Mandate: "fostering an inclusive educational environment," "reducing stigmatization," and providing a "learning environment free of discrimination." JA465; JA483; JA488; JA782-783. None of these interests have been asserted except "at a high level of generality." That is insufficient. *Fulton*, 141 S. Ct. at 1881.

As the Supreme Court held last Term, such educational goals, while "commendable," are also "imponderable" and "not sufficiently coherent for purposes of strict scrutiny." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 214-15 (2023). Because "it is unclear how courts are supposed to measure any of these goals," schools would be free to continue burdening religion with no end in sight. *See id.* at 2166. Vague, undefined objectives to provide "an inclusive educational environment" or "reduc[e] stigmatization" are "standardless," *id.* at 214, and thus invite the censoring of religious and political speech. "A school district cannot avoid the strictures of the First Amendment simply by defining certain speech as 'bullying' or 'harassment.'" *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, No. 22-2927, 2023 WL 6330394, at *4 (8th Cir. Sept. 29, 2023). The same logic applies to the unadorned goals of "inclusion," reduced "stigmatization," or "antidiscrimination." *See also id.* at *8 (Kelly, J., concurring) (requiring "respect" for students' gender identity, without

46

"meaningful guidance as to what falls within the scope of the word 'respect'" is a "constitutional problem").

Nor has the Board "articulate[d] a meaningful connection between the means [it] employ[s] and the goals [it] pursue[s]." *Students for Fair Admissions*, 600 U.S. at 215. Far from achieving the Board's abstract goals, the Board's coercion may frustrate them. Pressuring students to embrace ideology that conflicts with their religious beliefs—and sound science—potentially engenders greater discord as students feel compelled to defend their religious and scientific anthropologies. *See Barnette*, 319 U.S. at 641 ("As governmental pressure toward unity becomes greater, so strife becomes more bitter as to whose unity it shall be."). The Board has thus failed to meet its heavy burden to "show a direct causal link" demonstrating that its chosen means actually advances its asserted ends. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011); *see also id*. at 803 n.9 ("[T]he government does not have a compelling interest in each marginal percentage point by which its goals are advance.").

The Board's claimed compelling interests also fail because the Board allowed opt-outs to the Pride Storybooks through the end of last school year. Granting exemptions, inexplicably withdrawing them, and retaining discretion over what instruction is subject to notice and opt-outs "undermines the [Board's] contention that its [no-opt-out-policy] can brook no departures." *Fulton*, 141 S. Ct. at 1882.

47

Moreover, when religious accommodations are denied in the name of "relatively recent" regulatory interests, those interests can only be compelling if they have longstanding historical analogues. *See Yoder*, 406 U.S. at 226-30 (analyzing the "historical origin" of "compulsory education and child labor laws" and finding them insufficiently compelling to deny opt-outs); *see also Espinoza*, 140 S. Ct. 2258-59 (refusing to credit "a tradition *against* state support for religious schools [that] arose in the second half of the 19th century"); *NIFLA v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (cleaned up) ("persuasive evidence of a long … tradition" required for government to justify new speech restrictions); *Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.7 (4th Cir. 2023) ("[W]here the Supreme Court has directed that historical tradition defines an exception …the burden falls on the defendant to establish the exception."). Accordingly, there can be no compelling interest in asserting "a categorical ban" on a religious exercise that possesses a "long history" and is upheld by "longstanding [regulatory] practice." *Ramirez v. Collier*, 595 U.S. 411, 428-35 (2022); *see also Firewalker-Fields*, 58 F.4th at 122 n.7.

Yet here, the Board purports a compelling interest in upending longstanding, ubiquitous practice. The Board's categorical refusal to notify parents about instruction on family life and human sexuality, or to allow opt-outs, does not comport with the "long history" and "continue[d]" practice of most states, Maryland included, which allow for opt-outs (or require opt-ins) on all such instruction. *See Ramirez*, 595 U.S.

48

at 428; *see also id*. at 443-46 (Kavanaugh, J., concurring) (history and longstanding practice anchor the compelling interest inquiry). The Board can show no historically rooted basis for stepping outside the longstanding national consensus on opt-outs—a consensus with roots that run deeper than the Founding.

"[T]he First Amendment does not tolerate" forced uniformity "about a question of political and religious significance." *303 Creative LLC v. Elenis*, 600 U.S. 570, 596 (2023) (citing *Barnette*, 319 U.S. at 634). Rather, it protects the full spectrum of viewpoints, whether "sensible and well intentioned" or "deeply 'misguided.'" *Id*. at 586. And even views that may be "likely to cause 'anguish' or 'incalculable grief.'" *Id*. Here, the Parents are compelled to shield their impressionable children from ideology that conflicts with their "decent and honorable" religious views concerning sexuality and gender identity. *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015). The Board has failed to identify compelling interests sufficient to suppress the Parents' religious exercise.

## 2. The opt-out ban is not the least restrictive means.

Finally, the Board also cannot show its obstinacy is narrowly tailored to achieve its alleged interests. "[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881. The Board fails that test here for three principal reasons.

49

First, the government cannot show it uses the least restrictive means if it cannot explain why its "system is so different" from other jurisdictions that accommodate religious exercise. *Holt v. Hobbs*, 574 U.S. 352, 367 (2015). Here, almost all states allow for opt-outs or require an opt-in for instruction on sexuality. Other Maryland school districts acknowledge that state law requires opt-outs on such instruction even when "integrated" throughout the curriculum—not just Health Ed. JA563 & n.2.

Second, the Board has not even attempted to show it cannot promote its interests in inclusivity and antidiscrimination without pushing a one-sided, ideological perspective on sexuality and gender transitioning. Maryland's Carroll County, for example, focuses on teaching the importance of "treat[ing] all people with dignity and respect," without delving into "all gender identities and expressions." *Approval of Family Life Advisory Committee Opt-Out Recommendations for Grades PreK through 5 Family Life Unit*, at 3-11, Carroll County Public Schools (Jan. 11, 2023), https://perma.cc/A7BB-R35Y.

Third, the Board's prior claims of administrative inconvenience in affording opt outs reflect the unsubstantiated "rejoinder of bureaucrats throughout history," not a credited reason to claim that burdening religion is the only way to achieve a compelling interest. *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 436 (2006); *see also* JA465. So even if the Board's claimed administrative burdens

50

had substance, it would still be "incumbent upon the [Board] to demonstrate that no alternative forms of regulation would combat such abuses without infringing First Amendment rights." *Sherbert*, 374 U.S. at 407. The Board has not done so.

## II. The Parents satisfy the remaining injunction factors.

Because their First Amendment and due process claims are "likely to prevail," the Parents are entitled to a preliminary injunction if they also show that denying relief "would lead to irreparable injury, and that granting relief would not harm the public interest." *Diocese of Brooklyn*, 141 S. Ct. at 66; *see also Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (last two preliminary injunction factors—the balance of the equities and the public interest—"merge when the Government is the opposing party") (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### A. The ongoing harm is irreparable.

"There can be no question" that forcing the Parents' children—including the children of parents in Kids First—to read and discuss the Pride Storybooks without their Parents' knowledge "will cause irreparable harm." *Diocese of Brooklyn*, 141 S. Ct. at 67. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.*; *see also Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) (same).

Here, depriving children of their innocence and never telling the Parents when their religious teachings will be contradicted "strike[s] at

51

the very heart of the First Amendment's guarantee of religious liberty." *Diocese of Brooklyn*, 141 S. Ct.at 68; *see also Yoder*, 406 U.S. at 213-14 ("The values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society."). Indeed, the Board wants to change the children's religious beliefs by "disrupt[ing]" their "thinking," JA595, and teaching them principles that may "not [be] easily contravened by their parents," JA591. This is especially concerning where, as here, the Parents are seeking to introduce their elementary-school children to concepts of gender, sex, and sexuality on their own terms and timeline. Where "there is a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

### B. There is no harm to the public interest.

Here, "the government's interest *is* the public interest." *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (quoting *Pursuing Am. Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). "The court must balance the significant irreparable harms identified above against the harms th[e] [government] asserts will arise from temporarily enjoining enforcement of the challenged rule." *Id.* As this Court has repeatedly held, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to

52

be found unconstitutional." *Leaders*, 2 F.4th at 346. "If anything, the system is improved by such an injunction." *Id.*

Also, it is "well-established that the public interest favors protecting constitutional rights." *Id.*; *see Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[U]pholding constitutional rights surely serves the public interest."). Because the Board's policy violates the Parents' rights under the Free Exercise and Due Process Clauses, the balance of equities and the public interest strongly supports granting a preliminary injunction.

Finally, the Board cannot claim that it suffers any harm simply by being required to return to the status quo ante by applying its own Religious Diversity Guidelines to the Pride Storybooks—just as it did all last school year. JA750-751.

## CONCLUSION

Conscientious objectors are often inconvenient for those in power. The powerful demand absolutism, while the objectors seek accommodation. In a pluralistic society, the correct response to dissenters is not to double down, attack them, or "replace the People,"[8] but to work in good faith toward a solution that allows the government to reach its goals *and* allows the dissenters to follow the commands of conscience. That solution is possible here—and is required by the First Amendment. The Parents

---

[8] Bertolt Brecht, *The solution* (1953), *reprinted in* The Penguin Book of Socialist Verse 240 (Michael Hamburger trans., Alan Bold ed. 1970).

are entitled to a preliminary injunction restoring their notice and opt-out rights.

Dated: October 10, 2023

Respectfully submitted,

/s/ Eric S. Baxter
Eric S. Baxter
William J. Haun
Michael J. O'Brien*
Colten L. Stanberry
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. N.W., Ste. 400
Washington, DC 20006
(202) 955-0095
ebaxter@becketlaw.org

*Counsel for Plaintiffs-Appellants*

*Not a member of the DC Bar; admitted in Louisiana. Practice limited to cases in federal court.

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

This document complies with type-volume limits because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 12,159 words.

This document complies with the typeface requirements because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.


Dated: October 10, 2023          /s/ Eric S. Baxter
                                 Eric S. Baxter