No. 23-1890

# United States Court of Appeals for the Fourth Circuit

———————————

TAMER MAHMOUD, ET AL.,
PLAINTIFFS-APPELLANTS,

*v.*

MONIFA B. MCKNIGHT, ET AL.,
DEFENDANTS-APPELLEES.

———————————

*APPEAL FROM THE U.S. DISTRICT COURT FOR THE DISTRICT OF MARYLAND,
NO. 23-CV-1380, HON. DEBORAH L. BOARDMAN, PRESIDING*

———————————

**BRIEF OF PROFESSORS DOUGLAS LAYCOCK, RICHARD W.
GARNETT, HELEN M. ALVARÉ, THOMAS C. BERG, AND
MICHAEL W. MCCONNELL AS *AMICI CURIAE*
SUPPORTING PLAINTIFFS-APPELLANTS AND REVERSAL**

———————————

CHRISTOPHER MILLS
*Spero Law LLC
557 East Bay Street #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law*

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................... ii

Interest of *Amici Curiae* .............................................................................1

Introduction ................................................................................................5

Argument ....................................................................................................5

    I.    The Supreme Court has clarified free exercise doctrine. ......................5

    II.   The district court's old, out-of-circuit authority no longer holds. ......12

Conclusion ................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49 (2d Cir. 2001) ...............................9

*Brown v. Borough of Mahaffey*, 35 F.3d 846 (3d Cir. 1994).....................................8

*Cal. Parents for Equalization of Educ. Materials v. Torlakson*, 267 F. Supp. 3d 1218 (N.D. Cal. 2017) .........................................14

*Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010 (9th Cir. 2020) ..........................................14

*Carson v. Makin*, 142 S. Ct. 1987 (2022) ........................................... 7, 11

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ....8

*D.L. v. Baltimore Bd. of Sch. Comm'rs*, 706 F.3d 256 (4th Cir. 2013) ...................15

*Edwards v. Aguillard*, 482 U.S. 578 (1987) ...........................................10

*Emp. Div., Dep't of Hum. Res. of Ore. v. Smith*, 494 U.S. 872 (1990) .. 6, 7, 8, 9, 13

*Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020)................ 6, 11, 15

*Fleischfresser v. Dirs. of Sch. Dist.* 200, 15 F.3d 680 (7th Cir. 1994)....................14

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021).......................................9, 10

*Hartmann v. Stone*, 68 F.3d 973 (6th Cir. 1995) ..........................................9

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012) ..........................................1

*KDM ex rel. WJM v. Reedsport Sch. Dist.*, 196 F.3d 1046 (9th Cir. 1999) .............9

*Lee v. Weisman*, 505 U.S. 577 (1992) ........................................... 10, 12

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020)..........................................7

*Morris Cnty. Bd. of Chosen Freeholders v. Freedom From Religion Found.*, 139 S. Ct. 909 (2019) ..........................................8

*Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058 (6th Cir. 1987)...................13

*Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008)................................................. 12, 13

*Sherbert v. Verner*, 374 U.S. 398 (1963) ....................................................11

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) ............................................9

*Tenafly Eruv Ass'n, Inc. v. Tenafly*, 309 F.3d 144 (3d Cir. 2002)...........................8

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449
 (2017)........................................................................ 7, 8, 11

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ................................. 6, 7, 9, 13

*World Outreach Conf. Ctr. v. City of Chicago*, 591 F.3d 531 (7th Cir. 2009).........9

## STATUTES

Md. Code Ann., Educ. § 7-301 ..............................................................12

## OTHER AUTHORITIES

Laycock, *The Religious Exemption Debate*, 11 Rutgers J. L. & Religion 139
 (2009)..........................................................................................7

## INTEREST OF *AMICI CURIAE*

*Amici* are constitutional law scholars whose scholarship and teaching have a particular focus on the First Amendment Free Exercise and Establishment Clauses. For decades, these professors have closely studied constitutional law and religious liberty, published many books and scholarly articles on the topic, and addressed it in litigation. The *amici* bring to this case a deep theoretical and practical understanding of the Supreme Court's First Amendment jurisprudence.[1]

Douglas Laycock is the Robert E. Scott Distinguished Professor of Law Emeritus at the University of Virginia and the Alice McKean Young Regents Chair in Law Emeritus at the University of Texas. He is one of the nation's leading authorities on the law of religious liberty, having taught and written about the subject for more than four decades at the University of Texas, the University of Virginia, the University of Chicago, and the University of Michigan. He has testified many times before Congress and the Texas legislature and has argued many religious freedom cases in the courts, including the U.S. Supreme Court. He was lead counsel for petitioner in *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012). His many writings on religious liberty have been republished in a five-volume collection under the overall title *Religious Liberty*.

---

[1] No party's counsel authored this brief, and no one other than *amici* or their counsel contributed money for it. All parties consented to this brief.

Richard W. Garnett is the Paul J. Schierl/Fort Howard Corporation Professor at Notre Dame Law School. He teaches and writes about the freedoms of speech, association, and religion, and constitutional law more generally. He is a leading authority on the role of religious believers and beliefs in politics and society. He has published widely on these matters, and is the author of dozens of law review articles and book chapters. He is the founding director of Notre Dame Law School's Program on Church, State, and Society, an interdisciplinary project that focuses on the role of religious institutions, communities, and authorities in the social order.

Helen M. Alvaré is the Robert A. Levy Endowed Chair in Law and Liberty at Antonin Scalia Law School, George Mason University, where she teaches Family Law, Law and Religion, and Property Law. She publishes on matters concerning marriage, parenting, non-marital households, and the First Amendment religion clauses. She is faculty advisor to the law school's *Civil Rights Law Journal*, and the Latino/a Law Student Association, a Member of the Holy See's Dicastery for Laity, Family and Life (Vatican City), a board member of Catholic Relief Services, a member of the Executive Committee of the AALS' Section on Law and Religion, and an ABC news consultant. She cooperates with the Permanent Observer Mission of the Holy See to the United Nations as a speaker and a delegate to various United Nations conferences concerning women and the family.

Thomas C. Berg is the James L. Oberstar Professor of Law and Public Policy at the University of St. Thomas School of Law. He combines advocacy with scholarship as one of the nation's leading experts on religious liberty and law and religion. He is the author of six books, including a leading casebook, *Religion and the Constitution* (with Michael McConnell and Christopher Lund, Aspen Publishing); *The State and Religion in a Nutshell* (West); and the recently released *Religious Liberty in a Polarized Age* (Eerdmans Publishing 2023). He has written approximately 75 book chapters and journal articles and dozens of op-eds and shorter pieces on religious freedom, constitutional law, and the role of religion in law, politics and society. His work has been cited multiple times by the U.S. Supreme Court and federal courts of appeals.

Michael W. McConnell is the Richard and Frances Mallery Professor and Director of the Constitutional Law Center at Stanford Law School, and a Senior Fellow at the Hoover Institution. From 2002 to 2009, he served as a Circuit Judge on the United States Court of Appeals for the Tenth Circuit. He was nominated by President George W. Bush, a Republican, and confirmed by a Democratic Senate by unanimous consent. McConnell has previously held chaired professorships at the University of Chicago and the University of Utah, and visiting professorships at Harvard and NYU. He teaches courses on constitutional law, constitutional history, First Amendment, and interpretive theory. He has published widely in the fields of

3

constitutional law and theory, especially church and state, equal protection, and sep-aration of powers. His book, "The President Who Would Not Be King: Executive Power Under the Constitution," was published by Princeton University Press in 2020, based on the Tanner Lectures in Human Values, which he delivered at Prince-ton in 2019. His latest book, co-authored with Nathan Chapman, "Agreeing to Dis-agree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience," was published by Oxford University Press in mid-2023. McConnell has argued sixteen cases in the United States Supreme Court, most recently *Carney v. Adams* (2020). defending a provision of the Delaware Constitution requiring po-litical balance on that state's courts.

**INTRODUCTION**

Over the past 20 years, the U.S. Supreme Court has substantially refined Free Exercise Clause doctrine. It has made clear that parents have a broad right to direct the religious upbringing of their children; that religious claimants have the best understanding of the importance of their own religious beliefs; that indirect coercion is a burden on free exercise; and that the government cannot evade constitutional limits by casting its benefit programs as a voluntary "choice" by the religious claimants. Yet the district court flouted these binding refinements. Instead, it relied on outdated, out-of-circuit authority that is largely irrelevant and otherwise no longer persuasive given developments in free exercise doctrine.

Whether to protect free exercise rights in this case is not a close call. Even the district court agreed that the point of the Defendants' mandatory (and covert) readings is to "influence" children. JA767. Especially given the topics of these readings, that influence comes at the expense of the moral and religious instruction of many believers across many faiths. The Court should reverse and remand for issuance of a preliminary injunction.

**ARGUMENT**

## I.    The Supreme Court has clarified free exercise doctrine.

Because the district court's opinion—and the old, out-of-circuit authorities it relies on—largely do not account for the Supreme Court's recent Free Exercise Clause jurisprudence, we start with first principles. Contrary to the court's repeated

suggestion that *Wisconsin v. Yoder* provides only a "*sui generis*" right "inexorably linked to the Amish community[]"  to opt out of public schools (JA761–62, 775), the Supreme Court recently explained that, "[d]rawing on 'enduring American tradition,' we have long recognized the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 213–214 (1972)).

Quoting a conclusory sentence from *Yoder*, the Defendants have argued that the "Plaintiffs have offered no evidence that the challenged policy would 'gravely endanger if not destroy the free exercise of [the parents'] religious beliefs.'" ECF No. 42, at 11 (quoting *Yoder*, 406 U.S. at 219). The district court adopted a similar approach. JA773–74. But *Yoder* did not establish some extremely high floor for presumptively impermissible burdens on religious exercise. The relevant section of the Court's opinion merely analyzed whether the plaintiffs' claims were "rooted in religious belief." *Yoder*, 406 U.S. at 215. Even the Defendants do not appear to dispute that the Plaintiffs' claims here are "rooted in religious belief." And strict scrutiny applies to government action that infringes the *Yoder* right no matter the action's neutrality or general applicability. *See Emp. Div., Dep't of Hum. Res. of Ore. v. Smith*, 494 U.S. 872, 881 (1990).

Next, the Defendants have argued that their mandatory indoctrination "does not impose any constitutionally significant burden" because it "does not coerce

6

Plaintiffs to refrain from raising their children in their preferred religious faith or penalize them for their religious conduct." ECF No. 42, at 9–10. The district court agreed. JA770–71. But this argument fails whether analyzed under *Yoder* or under *Smith*'s neutral/generally applicable framework.

*First*, under *Yoder* (and *Smith*), "[t]he Free Exercise Clause of the First Amendment protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022) (cleaned up); *see Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017) (same). And judges should not "determine the 'centrality' of religious beliefs" as a threshold requirement for a free exercise claim—yet the Defendants' reference to "'[c]onstitutionally significant burden' would seem to be 'centrality' under another name." *Smith*, 494 U.S. at 887 & n.4. Any "inquiry into 'severe impact' is no different from inquiry into centrality." *Id.* at 887 n.4. "Such a threshold requirement would wholly deny protection . . . when religious significance is somewhat underestimated." Laycock, *The Religious Exemption Debate*, 11 Rutgers J. L. & Religion 139, 151 (2009). Courts should hesitate before telling religious claimants that "the connection between what [they must do] and the end that they find to be morally wrong is simply too attenuated." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (cleaned up).

*Second*, under the framework of *Smith* and *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), "there is no substantial burden requirement when government discriminates against religious conduct." *Tenafly Eruv Ass'n, Inc. v. Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002). As the Supreme Court "has repeatedly held, governmental discrimination against religion—in particular, discrimination against religious persons, religious organizations, and religious speech—violates the Free Exercise Clause." *Morris Cnty. Bd. of Chosen Freeholders v. Freedom From Religion Found.*, 139 S. Ct. 909, 909 (2019) (Kavanaugh, J., respecting the denial of certiorari). For instance, in *Trinity Lutheran*, the Court held that "express discrimination against religious exercise" violates the First Amendment regardless of whether the government's policy "meaningfully burden[s]" that exercise. 582 U.S. at 462–63; *see also Lukumi*, 508 U.S. at 533 ("a law targeting religious beliefs as such is never permissible").

"Because government actions intentionally discriminating against religious exercise *a fortiori* serve no legitimate purpose, no balancing test" between other religious burdens and "legitimate, secular purposes" "is necessary" or appropriate. *Brown v. Borough of Mahaffey*, 35 F.3d 846, 850 (3d Cir. 1994). And adding a separate "substantial burden" test "to non-neutral government actions would make petty harassment of religious institutions and exercise immune from the protection of the First Amendment." *Id.* at 849–50.

The Plaintiffs have shown that the Defendants' actions are not neutral or generally applicable in multiple respects—especially under the recent standards adopted by the Supreme Court in *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021), and *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877–79 (2021). *See* Opening Br. 37–44. Thus, the Defendants have necessarily burdened religious exercise by discriminating against it. *See Hartmann v. Stone*, 68 F.3d 973, 979 n.4 (6th Cir. 1995) (explaining that plaintiffs in such cases "need not demonstrate a substantial burden on the practice of their religion"); *World Outreach Conf. Ctr. v. City of Chicago*, 591 F.3d 531, 534 (7th Cir. 2009) (similar); *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 79 (2d Cir. 2001) (similar); *KDM ex rel. WJM v. Reedsport Sch. Dist.*, 196 F.3d 1046, 1056 (9th Cir. 1999) (Kleinfeld, J., dissenting) ("The government cannot discriminate against people because of their religion, even where the burden it imposes for that reason is only what the majority considers a slight inconvenience."); *contra* JA754 n.8 (suggesting that discrimination is not enough).

On either basis—*Yoder* or *Smith*—strict scrutiny applies. The district court's focus on whether the Plaintiffs "still may instruct their children on their religious beliefs" (JA770) elides the nature of the Plaintiffs' claims, which are that the government's forced indoctrination burdens their religious exercise by contradicting their religious upbringing of their children. This burden easily amounts to (at least) indirect coercion. The government is using the inherently coercive environment of

9

the public schools for instruction at odds with the Plaintiffs' religious beliefs—telling children in front of their peers that their beliefs are "hurtful" and "negative." JA576; *see Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools."); *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) ("The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.").

The district court's and the Defendants' suggestion that "use of the books involves no instruction on sexual orientation or gender identity per se" (ECF No. 42, at 6; *see* JA766–67) is as convincing as suggesting that reading *The Boy Who Cried Wolf* involves no lesson on lying "per se." The Defendants do not appear to dispute the sincerity of the Plaintiffs' beliefs, and the Plaintiffs "believe[] that [use of these books] is tantamount to endorsement." *Fulton*, 141 S. Ct. at 1876. "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id.* (cleaned up). Even the district court agreed that the Defendants are "us[ing]" the books to "influence" children. JA767. And the Defendants could scarcely pretend to pass strict scrutiny if they thought that their mandatory reading had no effects on students. Likewise, the district court's suggestion that the Defendants do not use *enough* religiously offensive books to

10

burden the Plaintiffs (*id.*) is nothing more than a second-guessing of the Plaintiffs' religious beliefs.

Last, a centerpiece of the district court's analysis was that "no case" "has recognized a free exercise claim based on government action that reduces the likelihood of meeting a sacred obligation." JA772. This was apparently meant to characterize the Plaintiffs' claim "merely" as a reduced chance of successfully raising their children in their faith. An underlying premise seemed to be that the First Amendment analysis changes because the Plaintiffs "chose[]" "a public education." JA772–74. All this is wrong.

As the Supreme Court has said, citizens have "a right to participate in a government benefit program without having to disavow [their] religious [exercise]," for "[t]he imposition of such a condition upon even a gratuitous benefit inevitably deters or discourages the exercise of First Amendment rights." *Trinity Lutheran*, 582 U.S. at 463; *see, e.g.*, *Carson*, 142 S. Ct. at 2000; *Espinoza*, 140 S. Ct. at 2261 (similar).

What was *Sherbert v. Verner*, if not "based on government action" (a denial of unemployment benefits) "that reduce[d] the likelihood of meeting a sacred obligation" (observing the Sabbath)? JA772; *see* 374 U.S. 398, 404 n.5 (1963) ("indirect discouragement[]" (cleaned up)). What was *Trinity Lutheran*, if not "based on government action" (a denial of playground funds) "that reduce[d] the likelihood of

11

meeting a sacred obligation" (operating a robust ministry)? 582 U.S. at 463 ("It is true the Department has not criminalized the way Trinity Lutheran worships").

This right against indirect coercion in government programs is particularly compelling in the context of public schools, given that states generally require attendance at either a public school or some costly alternative. *See* Md. Code Ann., Educ. § 7-301. Indeed, the Supreme Court has repeatedly rejected tying First Amendment rights to the "choice" to go to public school. For instance, it rejected the argument in *Lee* that prayers at school graduations were permissible because of "the option of not attending the graduation." 505 U.S. at 595. The Court said that "[i]t is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance." *Id.* at 596. "[S]ubtle and indirect" "pressure" "can be as real as any overt compulsion." *Id.* at 593.

## II.    The district court's old, out-of-circuit authority no longer holds.

These free exercise principles recently articulated by the Supreme Court largely supersede the district court's outdated and out-of-circuit authority.

Start with the decision that "guided" the district court (JA770), *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008). There, parents "assert[ed] that they must be given prior notice by the [public] school and the opportunity to exempt their young children from exposure to books they find religiously repugnant." *Id.* at 90. *Parker* did

12

not address a *Smith* claim of lack of neutrality or general application. Instead, holding that the Free Exercise Clause and the *Yoder* right were not implicated, *Parker* first emphasized that "there is no claim of direct coercion." *Id.* at 105. As shown, "direct coercion," whatever exactly that means, is never required.

Second, *Parker* said that "the mere fact that a child is exposed on occasion in public school to a concept offensive to a parent's religious belief does not inhibit the parent from instructing the child differently." *Id.* The court did not explain what this point has to do with any question relevant to the free exercise analysis, nor is such a connection apparent. Countermanding a parent's religious instruction with "religiously repugnant" instruction (*id.* at 90)—especially without *ever* providing the parent notice of this instruction (*id.* at 106)—burdens the parent's religious upbringing of their children. Of course the parent can still try to "instruct[] the child differently," but the state may not make that burden more difficult by actively countering the parents' teaching.

The two other out-of-circuit cases relied on by the district court also deviate from recent precedent. The Sixth Circuit's opinion in *Mozert v. Hawkins County Board of Education* limited *Yoder* to its "singular set of facts," saying that it did not "announce a general rule." 827 F.2d 1058, 1067 (6th Cir. 1987). *Mozert* also dismissed the parental burden on the ground that the "plaintiff parents can either send their children to church schools or private schools, as many of them have done, or

teach them at home." *Id.* Both points are inconsistent with current jurisprudence, as explained. Likewise in error was the court's limitation of a religious burden to "compulsion to affirm or deny a religious belief or to engage or refrain from engaging in a practice forbidden or required in the exercise of a plaintiff's religion." *Id.* at 1069. Those are burdens; so is indoctrinating young schoolchildren in a way contrary to the beliefs their parents are seeking to impart.

The Seventh Circuit in *Fleischfresser v. Directors of School District 200* dismissed the "burden to the parents" as "at most, minimal" because the parents "are not preclud[ed]" "from meeting their religious obligation to instruct their children." 15 F.3d 680, 690 (7th Cir. 1994). As discussed, that red herring does not alter the burden on parents whose religious instruction is being covertly undermined by government officials.

Finally, the court cited the Ninth Circuit's decision in *California Parents for the Equalization of Educational Materials v. Torlakson*, but that case did not consider "any burden on [parents'] religious exercise or practice" from curriculum because the issue was not raised on appeal. 973 F.3d 1010, 1019 (9th Cir. 2020). Indeed, it barely involved a free exercise claim, as the plaintiffs included it only "'as a catch-all,'" and "the complaint [did] not allege that students ever read or even s[aw] the" challenged material. *Cal. Parents for Equalization of Educ. Materials v. Torlakson*, 267 F. Supp. 3d 1218, 1225–26 (N.D. Cal. 2017).

Below, the Defendants quoted out-of-context dicta from this Court's decision in *D.L. v. Baltimore Board of School Commissioners*, 706 F.3d 256 (4th Cir. 2013). The district court rightly disregarded that case, for it is irrelevant. It involved a claim that federal disability services provided in public schools must also be provided in private schools. This Court held that the "policy does not substantially infringe on Appellants' right to attend a private religious school" because not every "economic disadvantage on individuals who choose to practice their religion in a specific manner" gives rise to a free exercise claim. *Id.* at 263. This holding merely anticipates the Supreme Court's recent holding in *Espinoza*: "A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." 140 S. Ct. at 2261.

Here, the burden on the Plaintiffs' free exercise stems from the government's efforts to contradict their religious upbringing via mandatory indoctrination. As confirmed by recent Supreme Court precedents, this burden implicates parents' fundamental right to opt their children out of mandatory education contrary to their religious beliefs.

## CONCLUSION

For these reasons, the Court should reverse and remand for entry of a preliminary injunction.

Respectfully submitted,

s/ Christopher Mills
CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay Street #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amici Curiae*

OCTOBER 17, 2023

16

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 3,447 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated:  October 17, 2023

/s Christopher Mills
Christopher Mills

## CERTIFICATE OF SERVICE

I, Christopher Mills, an attorney, certify that on this day the foregoing Brief

was served electronically on all parties via CM/ECF.

Dated:  October 17, 2023

s/ Christopher Mills
Christopher Mills
