No. 23-1890

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

TAMER MAHMOUD ET AL.,

*Plaintiffs-Appellants*,

*v.*

MONIFA B. MCKNIGHT, IN HER OFFICIAL CAPACITY AS SUPERINTENDENT OF THE
MONTGOMERY COUNTY BOARD OF EDUCATION, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland, No. 8:23-cv-01380-DLB
Before the Honorable Judge Deborah L. Boardman

## BRIEF OF DEFENDANTS-APPELLEES

BRUCE M. BERMAN
JOSEPH M. MEYER
JEREMY W. BRINSTER
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

ALAN SCHOENFELD
EMILY BARNET
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
alan.schoenfeld@wilmerhale.com

October 24, 2023

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF ISSUES ................................................................1

INTRODUCTION ...........................................................................1

STATEMENT OF THE CASE...........................................................4

    A.    MCPS Curricula Aim To Reflect Students' Varied Backgrounds...........................................................4

    B.    MCPS Introduces The Storybooks As Part Of Its ELA Curriculum...............................................................6

    C.    MCPS Clarifies That Parents Cannot Opt Children Out Of Instruction Using The Storybooks For Any Reason ...........9

    D.    District Court Proceedings .................................................12

SUMMARY OF ARGUMENT ..........................................................15

STANDARD OF REVIEW ..............................................................17

ARGUMENT .................................................................................18

I.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR FREE-EXERCISE CLAIMS .................19

    A.    The Policy Does Not Burden Religious Exercise ................19

        1.    Courts have uniformly held that exposure to ideas in public school does not burden religious exercise ....................20

        2.    *Yoder* does not support Plaintiffs.............................26

        3.    Plaintiffs' remaining cases do not support their claims............32

    B.    The Lack Of Any Cognizable Burden Dooms Plaintiffs' Free-Exercise Claims.................................................38

    C.    In Any Event, The Policy Is Neutral And Generally Applicable .......41

        1.    The policy does not favor secular over religious conduct ........41

        2.    The policy does not permit discretionary exemptions..............44

        3.    The policy was not enacted out of religious hostility...............47

    D.    The Policy Survives Rational-Basis Review And Strict Scrutiny ......49

        1.    The policy serves compelling interests ....................................50

      2.     The policy is narrowly tailored ..................................................54

II.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR DUE-PROCESS CLAIMS.....................55

III.   THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS COULD NOT SATISFY THE REMAINING PRELIMINARY-INJUNCTION FACTORS ..........................................................................................................57

CONCLUSION ....................................................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page

*Andrews v. Webber*,
    8 N.E. 708 (Ind. 1886) .................................................................35

*Bailey v. Virginia High School League, Inc.*,
    488 F.App'x 714 (4th Cir. 2012)..................................................56

*Bauchman v. West High School*,
    132 F.3d 542 (10th Cir. 1997) .....................................................20

*Blau v. Fort Thomas Public School District*,
    401 F.3d 381 (6th Cir. 2005) .......................................................30

*Boring v. Buncombe County Board of Education*,
    136 F.3d 364 (4th Cir. 1998) .......................................................31

*Brown v. Hot, Sexy & Safer Productions, Inc.*,
    68 F.3d 525 (1st Cir. 1995)...................................................28, 32

*C.N. v. Ridgewood Board of Education*,
    430 F.3d 159 (3d Cir. 2005) ........................................................29

*California Parents for the Equalization of Educational Materials v.
    Torlakson,* 973 F.3d 1010 (9th Cir. 2020)...................................22

*Canaan Christian Church v. Montgomery County*,
    29 F.4th 182 (4th Cir. 2022) ............................................41, 44, 49

*Carson v. Makin*,
    142 S.Ct. 1987 (2022).............................................................19, 33

*Centro Tepeyac v. Montgomery County*,
    722 F.3d 184 (4th Cir. 2013) ................................................17, 55

*Christian v. Jones*,
    100 So. 99 (Ala. 1924).................................................................35

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993).............................................16, 40, 45, 47, 48

*D.L. ex rel. K.L. v. Baltimore Board of School Commissioners*,
706 F.3d 256 (4th Cir. 2013) ..................................................31, 34

*Dewhurst v. Century Aluminum Co.*,
649 F.3d 287 (4th Cir. 2011) ........................................................18

*Doe v. Settle*,
24 F.4th 932 (4th Cir. 2022) ........................................................56

*Donahoe v. Richards*,
38 Me. 379 (1854) ......................................................................35

*Edwards v. Aguillard*,
482 U.S. 578 (1987)....................................................................31

*Epperson v. Arkansas*,
393 U.S. 97 (1968)......................................................................32

*Espinoza v. Montana Department of Revenue*,
140 S.Ct. 2246 (2020)...........................................................33, 54

*Firewalker-Fields v. Lee*,
58 F.4th 104 (4th Cir. 2023) ........................................................54

*Fleischfresser v. Directors of School District 200*,
15 F.3d 680 (7th Cir. 1994) .....................................................20, 22

*Florey v. Sioux Falls School District 49-5*,
619 F.2d 1311 (8th Cir. 1980) ......................................................29

*Frudden v. Pilling*,
877 F.3d 821 (9th Cir. 2017) ...................................................50, 51

*Fulton v. City of Philadelphia*,
141 S.Ct. 1868 (2021)................................... 16, 19, 39, 40, 44, 45, 46, 47, 55

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)....................................................................51

*Grimm v. Gloucester County School Board*,
972 F.3d 586 (4th Cir. 2020) ........................................................51

*Gruenke v. Seip,*
225 F.3d 290 (3d Cir. 2000) ...........................................................29

*Hardwick v. Board of School Trustees,*
205 P. 49 (Cal. App. 1921) ..............................................................36

*Hartmann v. Stone,*
68 F.3d 973 (6th Cir. 1995) .............................................................40

*Henderson for National Labor Relations Board v. Bluefield Hospital
Co.*, 902 F.3d 432 (4th Cir. 2018) ...................................................58

*Herndon by Herndon v. Chapel Hill-Carrboro City Board of
Education*, 89 F.3d 174 (4th Cir. 1996) ......................................56, 57

*Hines v. South Carolina Department of Corrections,*
148 F.3d 353 (4th Cir. 1998) ...........................................................47

*Hobbie v. Unemployment Appeals Commission of Florida,*
480 U.S. 136 (1987)..........................................................................33

*Illinois ex rel. McCollum v. Board of Education of School District No.
71*, 333 U.S. 203 (1948) .............................................................28, 32

*John and Jane Parents 1 v. Montgomery County Board of Education,*
78 F.4th 622 (4th Cir. 2023) ............................................................57

*Kennedy v. Bremerton School District,*
142 S.Ct. 2407 (2022)................................................................39, 50

*Kidder v. Chellis,*
59 N.H. 473 (1879)......................................................................35, 36

*Kidwell v. Transportation Communications International Union,*
946 F.2d 283 (4th Cir. 1991) ...........................................................52

*Kim v. Board of Education of Howard County,*
641 F.Supp.3d 223 (D. Md. 2022).....................................................38

*Kowalski v. Berkeley County Schools,*
652 F.3d 565 (4th Cir. 2011) .....................................................50, 51

*L.W. v. Skrmetti*,
  2023 WL 6321688 (6th Cir. Sept. 28, 2023) ...................................29

*League of United Latin American Citizens v. Perry*,
  548 U.S. 399 .......................................................................................51

*Lee v. Weisman*,
  505 U.S. 577 (1992) ......................................................................23, 27

*Leebaert v. Harrington*,
  332 F.3d 134 (2d Cir. 2003) .......................................................56, 57

*Locke v. Davey*,
  540 U.S. 712 (2004) ..........................................................................54

*Lowery v. Euverard*,
  497 F.3d 584 (6th Cir. 2007) ............................................................51

*Lyng v. Northwest Indian Cemetery Protective Association*,
  485 U.S. 439 (1988) ..........................................................................34

*Masterpiece Cakeshop v. Colorado Civil Rights Commission*,
  138 S.Ct. 1719 (2018) ...............................................16, 40, 47, 49

*Meyer v. Nebraska*,
  262 U.S. 390 (1923) ..........................................................................31

*Miranda v. Garland*,
  34 F.4th 338 (4th Cir. 2022) .............................................................58

*Morrow v. Wood*,
  35 Wis. 59 (1874) ..............................................................................37

*Mozert v. Hawkins County Board of Education*,
  827 F.2d 1058 (6th Cir. 1987) ..............................20, 22, 24, 29

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
  142 S.Ct. 2111 (2022) .......................................................................53

*Parents for Privacy v. Barr*,
  949 F.3d 1210 (9th Cir. 2020) ..........................................................52

*Parker v. Hurley,*
514 F.3d 87 (1st Cir. 2008).......................... 20, 21, 23, 24, 25, 28, 30, 38, 56

*People ex rel. Vollmar v. Stanley,*
255 P. 610 (Colo. 1927)..........................................................36, 37

*Pierce v. Society of Sisters,*
268 U.S. 510 (1925)....................................................................30

*Redeemed Christian Church of God v. Prince George's County,*
17 F.4th 497 (4th Cir. 2021) ......................................................50

*Reynolds v. Middleton,*
779 F.3d 222 (4th Cir. 2015) ................................................54, 55

*Roe v. Department of Defense,*
947 F.3d 207 (4th Cir. 2020) ................................................17, 18

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
141 S.Ct. 63 (2020)....................................................................42

*Roswell v. Mayor & City Council of Baltimore,*
2023 WL 3158728 (D. Md. Apr. 28, 2023).............................38, 58

*Rulison v. Post,*
79 Ill. 567 (1875) ......................................................................37

*Santa Fe Independent School District v. Doe,*
530 U.S. 290 (2000)...................................................................27

*Saxe v. State College Area School District,*
240 F.3d 200 (3d Cir. 2001) ......................................................50

*School District of Abington Township v. Schempp,*
374 U.S. 203 (1963)........................................................19, 20, 27

*Sherbert v. Verner,*
374 U.S. 398 (1963)..............................................................33, 45

*Speech First, Inc. v. Sands,*
69 F.4th 184 (4th Cir. 2023) ......................................................18

*Spiller v. Inhabitants of Woburn,*
    94 Mass. 127 (1866) ....................................................................37

*State v. Ferguson,*
    144 N.W. 1039 (Neb. 1914) .....................................................36, 37

*State v. Minzer,*
    50 Iowa 145 (1878)......................................................................35

*State v. School District No. 1 of Dixon County,*
    48 N.W. 393 (Neb. 1891) ...........................................................36

*Swanson v. Guthrie Independent School District No. I-L,*
    135 F.3d 694 (10th Cir. 1998) ....................................................31

*Tandon v. Newsom,*
    141 S.Ct. 1294 ...............................................16, 39, 41, 42, 54

*Tatel v. Mt. Lebanon School District,*
    2023 WL 3740822 (W.D. Pa. May 31, 2023) .........................34, 35

*Taylor v. Freemen,*
    34 F.3d 266 (4th Cir. 1994) ........................................................19

*Taylor v. Roswell Independent School District,*
    713 F.3d 25 (10th Cir. 2013) .................................................50, 51

*Tenafly Eruv Association, Inc. v. Borough of Tenafly,*
    309 F.3d 144 (3d Cir. 2002) .......................................................40

*Thomas v. Review Board of Indiana Employment Security Division,*
    450 U.S. 707 (1981)....................................................................33

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017)....................................................................33

*Walsh v. Vinoskey,*
    19 F.4th 672 (4th Cir. 2021) ..................................................18, 19

*We The Patriots USA, Inc. v. Connecticut Office of Early Childhood
    Development,* 76 F.4th 130 (2d Cir. 2023)..............................47, 48

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943).................................................................27, 34

*Whole Woman's Health v. Jackson*,
    141 S.Ct. 2494 (2021)...........................................................................20

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008).......................................................18, 26, 38, 58

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)...................................... 26, 27, 28, 30, 32, 34

*Workman v. Mingo County Board of Education*,
    419 F.App'x 348 (4th Cir. 2011)...............................................57

*Yellowbear v. Lampert*,
    741 F.3d 48 (10th Cir. 2014) .......................................................48

## CONSTITUTIONAL PROVISION

U.S. Const. amend. I ................................................................39

## STATUTES, RULES, AND REGULATIONS

COMAR §13A.04.18.01 .........................................................11, 43, 44

1865 Md. Laws 278 .....................................................................37

1868 Md. Laws 185 .....................................................................37

1870 Md. Laws 544 .....................................................................37

## OTHER AUTHORITIES

*Health Education Frequently Asked Questions: Baltimore County*
    *Public Schools (BCPS) System*, https://perma.cc/F45S-2FVL.....................11

Steiner, Bernard Christian, History of Education in Maryland (1894) ..................37

## STATEMENT OF ISSUES

Whether the district court acted within its discretion when it concluded that Plaintiffs were not entitled to a preliminary injunction requiring Montgomery County Public Schools to excuse their children from language-arts instruction when storybooks featuring lesbian, gay, bisexual, transgender, or queer (LGBTQ) characters are read or discussed, where those storybooks are not used to indoctrinate students and neither students nor parents are coerced into violating their religious beliefs.

## INTRODUCTION

Every day, thousands of elementary school students in Montgomery County Public Schools (MCPS) read storybooks as part of the English Language Arts (ELA) curriculum.  In years past, these storybooks did not represent the lives of many MCPS students and families.  A handful now do:  MCPS has worked to incorporate more diverse reading materials into its ELA curriculum, and recently has added books with LGBTQ characters.  Like all other books in the ELA curriculum, the storybooks featuring LGBTQ characters (the Storybooks) impart critical reading skills through engaging, age-appropriate stories.  MCPS adheres to a careful selection process to ensure those criteria are met.  And that process, followed here, welcomes and incorporates feedback from parents.

The record before the district court on Plaintiffs' motion for preliminary injunction establishes that the Storybooks are literacy tools geared toward an elementary school language arts classroom. They do not belong in the Family Life and Human Sexuality Unit of the health-education curriculum, and MCPS did not incorporate them there. The record also shows that the Storybooks are not the prurient caricatures that Plaintiffs paint. They do not prompt children to explore romantic feelings or question their sexual orientation or gender identity. They are language arts instructional materials—approved by specialists for use in the ELA curriculum—that reflect the communities in which MCPS students live. Nor are the Storybooks used to indoctrinate students. Some students may see themselves and their families in the Storybooks. Others may be introduced to new concepts and perspectives. Optional guidance helps teachers manage any classroom discussions surrounding the books while teaching mutual respect; teachers are not permitted to demand fealty to a state-sanctioned view of LGBTQ issues.

And the record confirms that MCPS responded to parental concerns evenhandedly, imposing a blanket no-opt-out policy only after experience proved that the alternative was practically infeasible and disruptive to instruction. When the Storybooks were introduced, some parents objected, and some teachers and principals tried to accommodate them by allowing their children to leave class when the books were read. But that proved so unworkable and damaging to

MCPS's ability to fulfill its educational mission that principals approached MCPS for assistance. In collaboration with those principals, MCPS adopted a policy prohibiting opt-opts, both secular and religious—a policy to which MCPS has consistently adhered.

The district court did not abuse its discretion in finding that the no-opt-out policy was not likely to result in indoctrination of Plaintiffs' children, prevent Plaintiffs from raising their children in accordance with their religious views, or coerce Plaintiffs or their children to violate or change their religious beliefs. The court's findings foreclose Plaintiffs' free-exercise and due-process claims under decades of uniform caselaw defining the parameters of a free-exercise burden, outlining the State's broad discretion over the design of a public-school curriculum, and more generally circumscribing the bounds of parental rights in the public-school environment.

Unable to prevail on this record, Plaintiffs push this Court to overhaul longstanding law, including by holding that mere "exposure" to contrary views burdens religious exercise. Unable to establish a fundamental conflict between their religious beliefs and public education, they ask this Court to hold that the Constitution entitles them to pick which aspects of a public education their children will experience. Unable to point to any court that has required a school district to provide parents notice and opt-out rights from an official curriculum,

they ask this Court to be the first. And should the Court find they cannot establish any cognizable burden on their religious exercise, Plaintiffs ask this Court to hold that the State can violate the Free Exercise Clause without burdening free exercise. Plaintiffs' plea to reinvent the relevant law falls far short of establishing a likelihood of success on the merits. Nor have Plaintiffs established the remaining preliminary-injunction factors. This Court should affirm.

## STATEMENT OF THE CASE

### A. MCPS Curricula Aim To Reflect Students' Varied Backgrounds

MCPS is Maryland's largest school district. JA534 ¶2. It operates over 200 schools and serves more than 160,000 students of many different backgrounds. *Id.* To serve those students effectively, MCPS endeavors to provide an educational experience that represents the wide range of families that call Montgomery County home. MCPS is committed to "foster[ing] a positive learning environment that embraces all unique and individual differences" and to "ensur[ing] compliance with all federal, state, and local nondiscrimination laws." JA492-493.

A key component of this commitment is curriculum design. MCPS seeks to "provide a culturally responsive … curriculum that promotes equity, respect, and civility." JA496. MCPS also believes that "[r]epresentation in the curriculum creates and normalizes a fully inclusive environment for all students" and

"supports a student's ability to empathize, connect, and collaborate with diverse peers and encourages respect for all." JA539 ¶22.

MCPS thus expects that "[i]nstructional materials used in [its] schools will reflect the diversity of the global community[.]" JA496-497. For example, the ELA curriculum is designed to "promote[] instruction that," among other goals, "create[s] literate, thoughtful communicators, capable of controlling language effectively as they negotiate an increasingly complex and information-rich world"; "nurtures appreciation and understanding of diverse individuals, groups, and cultures"; and teaches students to "[t]hink[] critically about diverse points of view" and "[s]ynthesiz[e] evidence to formulate independent conclusions." JA503-504, JA509. Teachers are expected to engage students in "core learning practices," including "[s]electing from a range of diverse texts to understand and appreciate multiple perspectives." JA509.

MCPS also follows Regulation IIB-RA, a longstanding written policy under which proposed instructional materials must be evaluated by a committee of professional staff members and subject-area experts based on a number of criteria, including whether the materials are "age/grade appropriate[]," "support … student achievement toward MCPS curriculum standards," and, of particular relevance here, are "relevant to and reflective of the multicultural society and global community." JA513-514; JA521, JA523. Once the committee approves books for

potential inclusion, the books are made available for community review and input, including examination in person by parents and staff for 30 calendar days, and their titles are posted on an MCPS website.  JA514; JA537-538 ¶¶16-17.  The coordinator of the evaluation and selection process reviews and considers parent feedback before MCPS makes a final decision to approve a book for instructional use.  JA537-538 ¶17.

MCPS seeks to ensure that its pre-K through 12th grade curriculum reflects Montgomery County families.  To that end, MCPS has purchased books for use as part of the ELA curriculum that feature people and characters from traditionally underrepresented races and cultures.  JA539 ¶21.  These books include the *March* trilogy, the autobiography of civil rights icon Congressman John Lewis, and *The Leavers*, a novel about an Asian-American immigrant family.  MCPS also recently updated the social studies curriculum to include materials focused on local history and historically underrepresented groups.  *Id.*

### B. MCPS Introduces The Storybooks As Part Of Its ELA Curriculum

Last year, after determining the existing books in the elementary school ELA curriculum included no LGBTQ characters and thus did not represent many MCPS students and families, MCPS supplemented its ELA curriculum with the Storybooks.  JA539 ¶22; JA540 ¶27.  In selecting the Storybooks, MCPS followed the process outlined in MCPS Regulation IIB-RA.  JA539 ¶24.  A committee of six

reading and instructional specialists participated in multiple rounds of evaluations to determine whether each book would be a suitable addition. JA513. The committee recommended the Storybooks because they "supported MCPS content standards and performance indicators, contained narratives and illustrations that would be accessible and engaging to students, and featured characters of diverse backgrounds whose stories and families students could relate to." JA540.

The Storybooks tell everyday tales of characters who experience adventure, confront new emotions, and struggle to make themselves heard. They include stories about a family attending a Pride parade, JA082-099, a niece meeting her uncle's husband-to-be, JA108-135, a prince falling in love with a knight as they battle a dragon in a mythical kingdom, JA277-316, a girl feeling nervous about giving a valentine to her crush, JA222-240, and a transgender boy sharing his gender identity with his family, JA242-276. These are archetypal stories about family, love, and self-exploration, the same themes introduced to children in classic books like Snow White, Cinderella, and Peter Pan. In addition to helping students explore sentence structure, word choice, and style, the Storybooks support students' ability to empathize, connect, and collaborate with diverse peers and encourage respect for all. JA539 ¶22; JA541 ¶30.

The Storybooks are "a small subset of many books used in the MCPS [ELA] curriculum." JA767. Teachers can fold them into the ELA curriculum as they

would any other book: they can put the books on shelves for students to find themselves, recommend a particular book to a student who would enjoy it, read the books aloud, or offer them as an option for reading groups. JA540-541 ¶29. MCPS expects that teachers will use the Storybooks, but as with all curriculum resources, teachers can choose "which MCPS-approved materials to use and when to use them through each unit." JA541 ¶31.

As MCPS made clear to teachers, use of the Storybooks involves no instruction on sexual orientation or gender identity. JA541 ¶30; JA600-602. Contrary to Plaintiffs' suggestion, the Storybooks do not "encourage children … to question their sexuality and gender identity, to focus on romantic feelings, [or] to accept the concept of gender transitioning." Br.6. Nor do the Storybooks take a side in religious or scientific debates surrounding these issues. Teachers are not permitted to enforce a particular viewpoint: "No child who does not agree with or understand another student's gender, expression, or their sexual identity is asked to change how they feel about it." JA602. Before the Storybooks were introduced, MCPS offered a professional-development session that drew more than 130 participants. JA540 ¶28. MCPS provided proposed, but not required, responses to potential questions from students. JA736-739. "Generally, the suggested responses focus on tolerance, empathy, and respect for different views." JA739. MCPS in no way directs teachers to frame disagreement with any ideas as

"hurtful." Br.10. MCPS instead suggests that if a student describes another person as "weird," a teacher might respond, "That comment is hurtful; we shouldn't use negative words to talk about people's identities." JA595.

### C. MCPS Clarifies That Parents Cannot Opt Children Out Of Instruction Using The Storybooks For Any Reason

During the 2022-2023 school year, MCPS's "Guidelines for Respecting Religious Diversity" provided that, "[w]hen possible, schools should try to make reasonable and feasible adjustments to the instructional program to accommodate requests" that students "be excused from specific classroom discussions or activities that they believe would impose a substantial burden on their religious beliefs." JA067. The Guidelines further stated that, "if such requests become too frequent or too burdensome, the school may refuse to accommodate the[m]." JA068.

After the Storybooks were introduced, some parents requested that their children be excused from class when the Storybooks were read or discussed. JA542 ¶33. These requests were not all religion-based. Some parents, for example, opposed a perceived effort to teach students about sex or LGBTQ issues, or to use materials they considered not age-appropriate. JA542 ¶34. In some instances, teachers and principals sought to accommodate these requests by allowing students (including Plaintiffs' children) to be excused when the books were read in class. JA542 ¶35.

Last March, the growing number of opt-out requests led principals to raise concerns centering on three related issues. JA741; JA542-543 ¶¶36-39. "First, high student absenteeism. In one instance, … parents sought to excuse dozens of students in a single elementary school from instruction." JA741; JA543 ¶37. "Second, the infeasibility of managing numerous opt-outs," as "[t]eachers would have to track and accommodate opt-out requests for their students, and other staff who spent time in multiple classrooms would have to do so across an entire school." JA741; JA543 ¶38. Third, "permitting some students to leave the classroom whenever books featuring LGBTQ characters were used would expose students who believe the books represent them and their families to social stigma and isolation.'" JA741-742; JA543 ¶39. These consequences would "defeat [MCPS's] 'efforts to ensure a classroom environment that is safe and conducive to learning for all students' and would risk putting MCPS out of compliance with state and federal nondiscrimination laws." JA742; JA543 ¶39.

MCPS therefore determined that it was not feasible or consistent with its curricular goals to permit opt-outs. JA543 ¶40. On March 23, MCPS announced that no opt-outs from instruction using the Storybooks would be granted "for any reason." JA544 ¶41. If schools already had granted opt-out requests, those accommodations would continue through the end of the school year, but no new requests would be granted. *Id.*

As instructional materials integrated into ELA lessons throughout the school day, JA540-541 ¶29, the Storybooks are not subject to opt-outs under Maryland law. This differs from the procedures applicable to the Family Life and Human Sexuality Unit of Instruction, a discrete unit within the health-education curriculum. State regulations require that each school district provide "an instructional program in comprehensive health education" under which students are taught to "comprehend concepts" including "[f]amily life and human sexuality." COMAR §13A.04.18.01(A)(1), (C)(1)(d). Within this health-education curriculum, schools must "establish policies, guidelines, and/or procedures for student opt-out regarding instruction related to family life and human sexuality objectives." *Id.*§ 13A.04.18.01(D)(2)(e)(i). Instructional materials "to be used in direct classroom instruction in the family life and human sexuality education program" are subject to specialized evaluation by the "health education curriculum advisory committee" and are "placed in a designated area of the school accessible to staff only." JA515. MCPS provides for opt-outs from its Family Life and Human Sexuality Unit of Instruction as required by law. JA544 ¶43.

Maryland law does not require, and MCPS does not provide, opt-outs from instructional materials used in the ELA curriculum. That is consistent with the practice of other Maryland school districts and other states. Baltimore County

Public Schools, for instance, states that family life and human sexuality objectives are "integrated into" quintessential health-class units such as "developing healthy relationships and healthy forms of communication"—not any ELA-related instruction. *Health Education Frequently Asked Questions: Baltimore County Public Schools (BCPS) System*, https://perma.cc/F45S-2FVL. Nowhere does BCPS suggest that parents can excuse their kids from ELA lessons, or from books featuring LGBTQ characters, "in whatever class they appear." Br.15.

### D. District Court Proceedings

The individual plaintiffs—parents of children attending MCPS schools—brought this action on behalf of themselves and their minor children against the Montgomery County Board of Education, its members, and the Superintendent of Schools. They asserted violations of the Free Exercise, Free Speech, and Due Process Clauses of the federal constitution and a violation of Maryland law. JA748. Plaintiffs moved for a preliminary injunction on their free-exercise and due-process claims, seeking to enjoin MCPS from denying them notice and the opportunity to opt their children out of class when the Storybooks are read or discussed. JA725. Plaintiffs later amended their complaint to add Plaintiff Kids First, "an unincorporated association of parents and teachers," JA013-014 ¶¶32-33, which has not sought a preliminary injunction.

The district court concluded that Plaintiffs were not likely to succeed on their free-exercise or due-process claims.

*First*, the court held that Plaintiffs' free-exercise claims were foreclosed by their failure to establish any burden on their religious exercise. The court reviewed decades of binding and persuasive authority cementing the requirement that free-exercise plaintiffs establish some coercive effect—either direct or indirect—on their religious exercise. JA753-755. It then described the uniform body of caselaw holding that exposure to ideas contrary to religious beliefs as part of a public-school curriculum does not constitute coercion. JA755-763.

The court next rejected Plaintiffs' remaining theories of burden. JA764-769. It found the record did not support Plaintiffs' argument that their children would "be pressured to change their religious views" "by being forced to read and discuss the storybooks." JA765. Plaintiffs had "not shown that the no-opt-out policy likely will result in the indoctrination of their children" because the Storybooks are "a small subset of many books used in the MCPS [ELA] curriculum," students are not required to "agree with or affirm" any book's views, and MCPS "threatens no punishment if they refuse to do so." JA766-767. Moreover, the court considered Plaintiffs' argument that the optional sample responses MCPS provided to teachers would indoctrinate their children, finding that "[e]ven if one or two of the suggested answers … could be interpreted to promote a particular view as correct,

- 13 -

they are not required answers, and they are outliers." JA767. The court took particular care to examine Plaintiffs' arguments that a child with Down Syndrome and Attention Deficit Disorder would be "unable to understand how or why her parents disagree with the ideas presented in the storybooks," concluding that the record failed to establish that "the use of the storybooks will result in [her] indoctrination. JA767-768.

Lastly, the court concluded that "parents' inability to opt their children out of reading and discussion of the storybooks does not coerce them into violating their religious beliefs." JA770. The court found that Plaintiffs were free to "instruct their children on their religious beliefs regarding sexuality, marriage, and gender, and … place contrary views in its religious context." JA770 & n.11. The court also found that MCPS would not require students to divulge or discuss private information; "[w]hile some instructional guidance seems to encourage student introspection, none encourages students to share their personal experiences or discuss their or their families' romantic relationships, gender identities, or sexuality." JA769. Because Plaintiffs thus had "not shown the no-opt-out policy likely coerces them to violate their religious beliefs," their free-exercise claim would not likely succeed. JA775.

*Second*, the court held Plaintiffs were not likely to succeed on their due-process claims, whether viewed as standalone or "hybrid" due-process/free-

exercise claims. JA776-783. Examining decades of precedent from this Court and the Supreme Court, as well as decisions of other circuits, the district court concluded that Plaintiffs' "asserted due process right to direct their children's upbringing by opting out of a public-school curriculum that conflicts with their religious views is not a fundamental right." JA782.

As the court noted, Plaintiffs "d[id] not dispute the no-opt-out policy would survive rational basis review." JA782. Still, it found that "the policy serves the School Board's legitimate interests in "providing a safe and supportive learning environment for its students, protecting LGBTQ students' health and safety, and complying with anti-discrimination laws." JA783.

The court held that it did not need to analyze the remaining preliminary-injunction factors because they were, as Plaintiffs conceded, inextricable from the likelihood-of-success factor. The court nonetheless analyzed the remaining factors and concluded none was met. JA783.

## SUMMARY OF ARGUMENT

Plaintiffs are unlikely to succeed on the merits, unlikely to be irreparably injured without the disruptive injunction they seek, and unable to establish that the equities or public interest favor them.

I.      The district court correctly held that Plaintiffs' free-exercise claims fail at the threshold, as Plaintiffs do not allege any constitutionally cognizable

burden on their religious practice. That holding flows from uniform judicial consensus that mere exposure in public school to ideas that contradict religious beliefs does not burden religious exercise. No case stands for the outcome Plaintiffs seek, nor does history or tradition support it.

The absence of any cognizable burden on Plaintiffs' religious practice is fatal to their free-exercise claims. Plaintiffs' contrary suggestion contravenes the text of the Free Exercise Clause and decades of precedent interpreting it.

Even if the no-opt-out policy burdened Plaintiffs' religious exercise, it would be subject to rational-basis review as a neutral and generally applicable law—a standard it satisfies easily. Plaintiffs cannot establish that the policy targets religious practice in violation of *Tandon v. Newsom*, 141 S.Ct. 1294 (2021); *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); or *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 138 S.Ct. 1719 (2018). The policy treats secular and religious opt-out requests identically, satisfying *Tandon*. It applies across-the-board, without exception, in compliance with *Fulton*. And unlike the law in *Lukumi* or proceeding in *Masterpiece*, the policy was not enacted with religious animus.

Regardless, the no-opt-out policy would survive strict scrutiny. The policy, enacted only after MCPS schools tried and failed to accommodate opt-out requests,

is narrowly tailored to MCPS's compelling interests in (1) ensuring an educational environment that is safe and conducive to learning—meaning one that minimizes disruptions to the work and discipline of the school, fosters achievement by all students, and protects the school's educational mission; and (2) meeting MCPS's obligations under antidiscrimination law.

II.     Rational-basis review applies to, and forecloses, Plaintiffs' due-process claims.  Parents have no fundamental right to direct the education of their children by opting them out of exposure to instructional materials they oppose. Nor has this Court endorsed the application of strict scrutiny to due-process challenges under a "hybrid" theory.

III.     Plaintiffs concede that the remaining preliminary injunction factors are inextricably tied to the merits.  Because they cannot establish a likely constitutional violation, they cannot demonstrate a likely irreparable injury, or show that the equities or public interest demand reversal of the district court.

## STANDARD OF REVIEW

The denial of a preliminary injunction is reviewed for abuse of discretion. *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc).  "'Abuse of discretion is a deferential standard,' and [this Court] may not reverse 'so long as the district court's account of the evidence is plausible in light of the record viewed in its entirety.'"  *Roe v. Department of Defense*, 947 F.3d 207,

219 (4th Cir. 2020). "Securing reversal of a denial of preliminary relief is an uphill battle." *Speech First, Inc. v. Sands*, 69 F.4th 184, 202 (4th Cir. 2023) (alteration omitted). "Indeed, because the law places a thumb on the scale against the issuance of preliminary injunctions, [this Court's] deference should be even greater when the district court *denies* a preliminary injunction." *Id.* Only a "clear error in factual findings or a mistake of law is grounds for reversal." *Roe*, 947 F.3d at 219. And "'[c]lear error' is a 'very deferential standard of review.'" *Walsh v. Vinoskey*, 19 F.4th 672, 677 (4th Cir. 2021).

## ARGUMENT

The district court acted well within its discretion in denying a preliminary injunction. "A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Most importantly, "a party seeking a preliminary injunction … must 'clear[ly] show[]' that it is likely to succeed on the merits." *Id.* The movant must also establish that it is "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* The district court determined that Plaintiffs failed to make these showings, finding that the policy does not burden Plaintiffs' religious exercise or

infringe their right to direct their children's upbringing, and that Plaintiffs were thus unlikely to succeed.  JA775, JA782-783.  Because the court methodically applied the correct legal standards and reached its conclusions based on a "permissible view[] of the evidence," its findings must stand.  *Walsh*, 19 F.4th at 677.  In fact, the court ruled against Plaintiffs even while applying the less demanding standard for a prohibitory injunction.  JA750-751.  Plaintiffs now seek to halt a policy that was fully implemented months ago; such an injunction is "warranted only in the most extraordinary circumstances," *Taylor v. Freemen*, 34 F.3d 266, 270 n.2 (4th Cir. 1994), which are not present here.

## I.  THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR FREE-EXERCISE CLAIMS

### A.    The Policy Does Not Burden Religious Exercise

To state a free-exercise claim, plaintiffs must "[a]s an initial matter" demonstrate that the government has "burdened [their] religious exercise."  *Fulton*, 141 S.Ct. at 1876.  The government burdens religious exercise when it "prohibit[s]," "penal[izes]," or "coerc[es]" religious conduct.  *Carson v. Makin*, 142 S.Ct. 1987, 1996 (2022).  Thus, "it is necessary in a free exercise case … to show the coercive effect of the" challenged action.  *School District of Abington Township v. Schempp*, 374 U.S. 203, 223 (1963).  The district court correctly held that Plaintiffs failed to establish coercion here because MCPS's policy does not

prohibit or penalize Plaintiffs' religious practice or coerce Plaintiffs into not raising their children according to their religious values.

**1. Courts have uniformly held that exposure to ideas in public school does not burden religious exercise**

a. "Every court that has addressed the question has concluded that the mere exposure in public school to ideas that contradict religious beliefs does not burden the religious exercise of students or parents." JA755 (citing, among others, *Parker v. Hurley*, 514 F.3d 87, 107 (1st Cir. 2008); *Bauchman v. West High School*, 132 F.3d 542, 557 (10th Cir. 1997); *Fleischfresser v. Directors of School District 200*, 15 F.3d 680, 690 (7th Cir. 1994); *Mozert v. Hawkins County Board of Education*, 827 F.2d 1058, 1065 (6th Cir. 1987)). Each of these cases found that the required "coercive effect," *Schempp*, 374 U.S. at 223, was missing "because (1) students were not required to behave contrary to their faiths or affirm any views contrary to their religious beliefs, and (2) parents were not prevented from discussing and contextualizing any contrary views at home," JA756. The same is true here. Because preliminary injunctive relief is inappropriate where movants are not "likely to succeed … under existing precedent," *Whole Woman's Health v. Jackson*, 141 S.Ct. 2494, 2495 (2021), it cannot be that the district court abused its discretion in finding no likelihood of success here. Success would require this Court to become the first ever to approve a free-exercise claim under the circumstances presented.

Each of the cases the district court discussed, like this case, involved a public school's refusal to alter, or excuse students from, curricular instruction. *Parker* is particularly instructive. There, parents "whose religious beliefs [were] offended by gay marriage and homosexuality" brought free-exercise and due-process claims "assert[ing] that they must be given prior notice by the school and the opportunity to exempt their young children from exposure to books they find religiously repugnant." 514 F.3d at 90. Accepting "plaintiffs' assertion that their sincerely held religious beliefs were deeply offended," the First Circuit found that the parents "ha[d] not described a constitutional burden on their rights" because the parents did "not allege coercion in the form of a direct interference with their religious beliefs, nor of compulsion in the form of punishment for their beliefs." *Id.* at 99, 105. And like here, the parents there were aware the challenged books would be used in classroom instruction and thus "retained their ability to discuss the material and subject matter with their children." *Id.* at 106. The court accordingly held that the parents' free-exercise rights were not burdened because "the mere fact that a child is exposed on occasion in public school to a concept offensive to a parent's religious belief does not inhibit the parent from instructing the child differently." *Id.* at 105.

Other courts uniformly agree, rejecting arguments that public-school administrators' curricular choices impose constitutionally cognizable burdens on

parents' free-exercise rights.  In *Mozert*, for instance, the Sixth Circuit rejected a claim for exemption from a school district's assignment of a book "that involved mental telepathy" because "mere exposure to materials that offend one's religious beliefs" does not place "an unconstitutional burden on the free exercise of religion."  827 F.2d at 1060, 1067.  In *Fleischfresser*, the Seventh Circuit similarly concluded that a school's use of reading materials featuring "supernatural beings" neither "preclud[ed] the parents from meeting their religious obligation to instruct their children" nor "compel[led] the parents or children to do or refrain from doing anything of a religious nature."  15 F.3d at 683, 689-690.  Because there was "no coercion," the court held that the parents' free exercise of religion was not burdened.  *Id* at 690.  And in *California Parents for the Equalization of Educational Materials v. Torlakson*, the Ninth Circuit affirmed dismissal of a free-exercise claim challenging the depiction of Hinduism in California's model curriculum on the ground that parents' religious exercise is not burdened just because a "public school curriculum conflicts with their religious beliefs."  973 F.3d 1010, 1020 (9th Cir. 2020).

As in all these cases, "[w]hat is absent from this case is the critical element of compulsion to affirm or deny a religious belief or to engage or refrain from engaging in a practice forbidden or required in the exercise of a plaintiff's religion."  *Mozert*, 827 F.2d at 1069.  Plaintiffs instead take issue with their

children's *exposure* to ideas inconsistent with their religious beliefs. But the

Supreme Court has deemed it *virtuous*—not unconstitutional coercion—for public-

school students to be "required to attend classes and assemblies and to complete

assignments exposing them to ideas they find distasteful or immoral or absurd."

*Lee v. Weisman*, 505 U.S. 577, 591 (1992). Exposure to "offensive content," the

Court explained, "is part of learning how to live in a pluralistic society, a society

which insists upon open discourse towards the end of a tolerant citizenry." *Id*. at

590.

While subjecting students to a "constant stream" of "many books" that "put

pressure on [them] to endorse an affirmative view" contrary to their religious

upbringing might amount to indirect coercion sufficient to state a free-exercise

claim, *Parker*, 514 F.3d at 105-106, that is not this case. The Storybooks are "a

small subset of many books used in the MCPS English language arts curriculum,"

and MCPS "imposes no requirement" that any student "agree with or affirm" the

books. JA767. Based on these findings, which are reviewed for clear error, the

district court found that "plaintiffs have not shown that MCPS's use of the

storybooks crosses the line from permissible influence to potentially impermissible

indoctrination." *Id.*

    b.    Plaintiffs' contrary arguments are meritless.

*First*, Plaintiffs' assertion that "none" of the cases discussed above "involves what is at issue here: religious-based opt-out requests to specific instruction," Br.27-28, is irrelevant and wrong. It is irrelevant because, regardless of whether they involved opt-outs, the cases hold that "mere exposure in public school to ideas that contradict religious beliefs does not burden the religious exercise of students or parents." JA755. And Plaintiffs' assertion is wrong because the parents in *Parker* sought exactly what Plaintiffs seek: "the opportunity to exempt their young children from exposure to books they find religiously repugnant." 514 F.3d at 90. Even putting *Parker* aside, moreover, Plaintiffs' assertion is false. Plaintiffs represent that *Mozert* did not involve "religious-based opt-out requests" but rather "challenged the general use of curriculum." Br.27-28. In fact, *Mozert* reversed an "injunction which required … schools to excuse objecting students from participating in reading classes where [religiously objectionable] textbooks [we]re used," i.e., requiring a right to "opt out of the school district's reading program" on religious grounds. 827 F.2d at 1059, 1063.

*Second*, *Parker* is neither "legally wrong" nor "factually afield." Br.29. Plaintiffs (and amici) contend *Parker* is "legally wrong" because, according to them, the First Circuit limited its analysis to "direct coercion," *id.*; *see also* Dkt.69 at 13. Not so. Upon finding "no claim of direct coercion," *Parker* discussed the parents' claim of *indirect* coercion in the form of "indoctrination"—i.e., the claim

"that the state has put pressure on their children to endorse an affirmative view of gay marriage and has thus undercut the parents' efforts to inculcate their children with their own opposing religious views." 514 F.3d at 105. Putting aside that the Supreme Court "has never utilized an indoctrination test under the Free Exercise Clause, much less in the public school context," the First Circuit found that there was "no viable claim of 'indoctrination'" because, as noted, "the mere fact that a child is exposed on occasion in public school to a concept offensive to a parent's religious belief does not inhibit the parent from instructing the child differently." *Id*. at 105-106.

Plaintiffs are also wrong that *Parker* is "factually afield," Br.29. Plaintiffs' first purported distinction—that "[o]ne of the students" in *Parker* "was never required to read [the challenged books] or have them read to him," Br.29—ignores both that another student in *Parker* "*was* required to sit through a classroom reading" of a challenged book, and *Parker*'s holding that "*[r]equiring a student to read a particular book* is generally not coercive of free exercise rights," 514 F.3d at 106 (emphases added). Plaintiffs' second purported distinction—that "there was no evidence" in *Parker* that students were "prodded … to affirm gay marriage," Br.29—fails because the same is true here. Students are not required to "agree with or affirm" any book's views. JA766-767. That finding was not clear error; it is supported by MCPS guidance stating that "[n]o child who does not agree … is

asked to change how they feel," JA602.  Similarly, if a student says that something in the Storybooks "is wrong and not allowed in my religion," MCPS suggests teachers respond that "we'll always find people with beliefs different from our own and that is okay—we can still show them respect."  JA595.  MCPS's policy, in other words, is that different beliefs—including those of Plaintiffs and their children—are "okay" and should be respected.

## 2. *Yoder* does not support Plaintiffs

Plaintiffs argue that MCPS's policy burdens their religious exercise because it restricts parents' right, recognized by the Supreme Court in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), to direct their children's religious upbringing.  Br.24-33. *Yoder* is inapposite for two reasons.

*First*, unlike the Amish parents in *Yoder*, Plaintiffs have not argued—let alone made a "clear showing," *Winter*, 555 U.S. at 22—that the challenged policy will "gravely endanger if not destroy the free exercise of [their] religious beliefs," *Yoder*, 406 U.S. at 219.  The *Yoder* parents challenged criminal convictions under a law requiring them to send their children to high school, based on their sincere belief that "attendance at high school, public or private, was contrary to the Amish religion and way of life" and would "result in the destruction" of their religious community.  *Id*. at 209, 212.  The mere act of "sending their children to high school" would "endanger their own salvation and that of their children."  *Id.* at

208.  The "coercive effect," *Schempp*, 374 U.S. at 223, of Wisconsin's compulsory school-attendance law on the Amish parents was clear: they were forced to either "abandon belief and be assimilated into society" or "migrate to some other and more tolerant region," *Yoder*, 406 U.S. at 218.

Here, Plaintiffs identify *no* "coercive effect," *Schempp*, 374 U.S. at 223; they argue merely that the children they choose to send to public school could be exposed to ideas at odds with their religious views.  As the district court concluded, such exposure alone does not burden their religious exercise.  It does not "pressure the[m] to refrain from teaching their faiths, to engage in conduct that would violate their religious beliefs, or to change their religious beliefs."  JA773. Nor does it "prevent[] the[m] from freely discussing the topics raised in the storybooks with their children or teaching their children as they wish."  JA770. Plaintiffs are wrong to suggest that courts have "long-rejected" the principle that coercion is absent where parents are free to impart their religion at home.  Br.32. On the contrary, the case they cite *approved* policies in which students were "merely made acquainted with" material to which parents objected.  *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 631 (1943).  The Supreme Court, moreover, has repeatedly affirmed that the "transmission of religious beliefs … is a responsibility … committed to the private sphere," *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 310 (2000) (quoting *Lee*, 505 U.S. at 589); in

other words, that "indoctrination in the faith of [one's] choice" should be "le[ft] to the individual's church and home," *Illinois ex rel. McCollum v. Board of Education of School District No. 71*, 333 U.S. 203, 217 (1948).

The district court's interpretation of *Yoder* does not "invite courts to discriminate among religious beliefs." Br.32. It simply reflects that Plaintiffs failed to make the "convincing showing" that *Yoder* predicted "few other religious groups or sects could make": that the challenged policy will "gravely endanger if not destroy the free exercise of [their] religious beliefs," *Yoder*, 406 U.S. at 219, 235-236. It is unsurprising that "the unique facts of *Yoder*," *Parker*, 514 F.3d at 98, are inapposite here. As the district court recognized, "*Yoder* is *sui generis*," JA775; *see also Parker*, 514 F.3d at 100 ("*Yoder* emphasized that its holding was essentially sui generis."); *Brown v. Hot, Sexy & Safer Productions, Inc.*, 68 F.3d 525, 539 (1st Cir. 1995) (finding *Yoder* inapplicable because "plaintiffs [did] not allege that [their children's] compulsory attendance" at a sex-education program "threatened their entire way of life"). Plaintiffs' extraordinarily broad "rule of *Yoder*"—that any time "parental rights to direct their children's education are at stake, the Free Exercise Clause requires strict scrutiny," Br.25—is impossible to square with the opinion's own language.

Relatedly, Plaintiffs are wrong that "[o]ther courts have not been so quick to discard *Yoder* as an Amish one-off." Br.29. Again, Plaintiffs ignore that the cases

discussed above interpreted *Yoder* as "rest[ing] on … a singular set of facts." *Mozert*, 827 F.2d at 1067. And even the cases Plaintiffs cite do not support their assertion. Plaintiffs first point to the statement in *L.W. v. Skrmetti*, 2023 WL 6321688 (6th Cir. Sept. 28, 2023)—a case citing *Yoder* only in dissent—that "[p]arents usually do know what's best for their children, and in most matters … their decisions govern until the child reaches 18," Br.29 (quoting *L.W.*, 2023 WL 6321688, at *9). But the court's point was that that is true only at a high "level of generality," and that "[l]evel of generality is everything in constitutional law." *L.W.*, 2023 WL 6321688, at *9. As in *L.W.*, Plaintiffs "overstate the parental right by climbing up the ladder of generality to a perch … that the case law and our traditions simply do not support." *Id.*

Plaintiffs' remaining cases offer no better support for their imagined "rule of *Yoder*." Br.25. In *Florey v. Sioux Falls School District 49-5*, 619 F.2d 1311 (8th Cir. 1980), the court held that "public schools are *not* required to delete from the curriculum all materials that may offend any religious sensibility," *id*. at 1318 (emphasis added). And in both *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000), and *C.N. v. Ridgewood Board of Education*, 430 F.3d 159 (3d Cir. 2005)—which involved challenges to a mandatory pregnancy test and a survey seeking students' personal information—the Third Circuit likewise rejected parents' First Amendment claims.

*Second*, unlike in *Yoder*, Plaintiffs seek not to withdraw their children from public school but instead to choose the elements of the public-school curriculum their children will experience. *Yoder* established no such right. It addressed only how to resolve parents' claims that their "unique and demanding religious way of life" was "incompatible with *any* schooling system," *Parker*, 514 F.3d at 100. That is why *Yoder* drew on *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), which likewise considered a compulsory school-attendance statute and questioned only the "general power of the State to standardize its children by forcing them to accept instruction *from public teachers only*." 406 U.S. at 233 (quoting *Pierce*, 268 U.S. at 535) (emphasis added). Plaintiffs elide this distinction by asserting that they "seek more modest relief" than the parents in *Yoder*. Br.25. But *Yoder* in fact disapproves of the relief Plaintiffs seek, emphasizing that its holding "in no way alter[ed] [the Court's] recognition of the obvious fact that courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education." 406 U.S. at 234-235.

Plaintiffs "have chosen to place their children in public schools." *Parker*, 514 F.3d at 100. And it is "well recognized" that, having done so, they have no constitutional right to "'direct *how* a public school teaches their child.'" *Id*. at 102 (quoting *Blau v. Fort Thomas Public School District*, 401 F.3d 381, 395 (6th Cir.

2005)).  Indeed, noting that parents "retain full discretion over which school" their children attend, this Court has held "[t]he right to a religious education does not extend to a right to demand that public schools accommodate [parents'] educational preferences."  *D.L. ex rel. K.L. v. Baltimore Board of School Commissioners*, 706 F.3d 256, 263-264 (4th Cir. 2013).

Thus, like any other school district, MCPS "need not serve up its publicly funded services like a buffet from which [Plaintiffs] can pick and choose," but instead has "the right to allocate resources and control curriculum as it s[ees] fit." *D.L.*, 706 F.3d at 264 (citing *Swanson v. Guthrie Independent School District No. I-L*, 135 F.3d 694, 699-700 (10th Cir. 1998)); *see also Boring v. Buncombe County Board of Education*, 136 F.3d 364, 371 (4th Cir. 1998) ("the makeup of the curriculum" of public schools is generally "entrusted to the local school authorities").  That latitude is backed by a wall of Supreme Court authority, *see, e.g.*, *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987) ("States and local school boards are generally afforded considerable discretion in operating public schools."); *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923) (recognizing "the state's power to prescribe a curriculum for institutions which it supports")—including *Yoder*, which cautioned that "courts must move with great circumspection in performing the … delicate task of weighing a State's legitimate social concern

when faced with religious claims for exemption from generally applicable education requirements," 406 U.S. at 235.

The contrary approach Plaintiffs advocate would be not just unprecedented but also impracticable. The Supreme Court has long recognized that "[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). That is especially so here; there are hundreds of "separate and substantial religious bodies" in this country, and requiring schools to permit opt-outs from "everything that is objectionable to any of" them would "leave public education in shreds," *McCollum*, 333 U.S. at 235 (Jackson, J., concurring). Indeed, the right Plaintiffs assert—"to dictate individually what the schools teach their children" based on "moral disagreements with the school's choice of subject matter," *Brown*, 68 F.3d at 534—would balkanize public education on topics ranging from history and literature to evolution and climate. As courts have uniformly concluded, it "cannot [be] that the Constitution imposes such a burden on state educational systems." *Id.*

### 3. Plaintiffs' remaining cases do not support their claims

a. Far from supporting Plaintiffs' free-exercise claims, other cases in which religious-freedom claims have succeeded expose what is *missing* here: any cognizable burden on religious exercise.

First, this case is unlike those Plaintiffs and amici cite in which individuals'

free exercise was "'infringed by the … placing of conditions upon a benefit or

privilege,'" Br.33 (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)); *see also*

Dkt.69 at 11.  In those cases, the government either (1) denied unemployment

benefits to individuals fired or unable to find work for religious reasons, *see*

*Sherbert*, 374 U.S. at 399-400; *Thomas v. Review Board of Indiana Employment*

*Security Division*, 450 U.S. 707, 709 (1981); *Hobbie v. Unemployment Appeals*

*Commission of Florida*, 480 U.S. 136, 137 (1987), or (2) "disqualif[ied] the

religious from government aid," *Espinoza v. Montana Department of Revenue*, 140

S.Ct. 2246, 2256 (2020); *see also Carson*, 142 S.Ct. at 1998; *Trinity Lutheran*

*Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017).  Government

conduct "forc[ing]" an individual to "abandon[] one of the precepts of her religion

in order to accept work," *Sherbert*, 374 U.S. at 404, and "disqualifying otherwise

eligible recipients from a public benefit solely because of their religious character,"

*Espinoza*, 140 S.Ct. at 2255 (quotation marks omitted), are far cries from what

Plaintiffs allege here: at most, "action that reduces [their] likelihood of meeting a

sacred obligation," JA772.  Indeed, the Supreme Court has explained that the

caselaw Plaintiffs cite "does not and cannot imply that incidental effects of

government programs, which may make it more difficult to practice certain

religions but which have no tendency to coerce individuals into acting contrary to

their religious beliefs, require government to bring forward a compelling justification." *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439, 450-451 (1988). And again, binding precedent affords public schools the latitude Plaintiffs reject. *See Yoder*, 406 U.S. at 234-235; *D.L.*, 706 F.3d at 264.

*Barnette* likewise highlights the lack of coercion here—and thus the absence of any cognizable burden on religion. In holding that students cannot be compelled to salute the flag, *Barnette* distinguished that coercive requirement—"a compulsion of students to declare a belief" on a particular topic—with the type of educational requirement here: a practice under which students are "acquainted with" a topic. 319 U.S. at 631.

Finally, the case the district court identified as coming "closest" to "recognizing a free exercise violation based on indoctrination," JA765—*Tatel v. Mt. Lebanon School District*, 2023 WL 3740822 (W.D. Pa. May 31, 2023)— provides another useful contrast. *Tatel* considered parents' allegations that a teacher "pursued her own non-curricular agenda in which [she] attempted to inculcate in the first-grade children in her class the teacher's beliefs about a child's gender identity and to initiate and engage in discussions with the first-graders … about the children's *own* gender identity." *Id.* at *3. Central to the court's finding that this burdened the parents' religious exercise was the fact that the parents sought "relief from a teacher's *noncurricular* transgender agenda, not the

published curriculum." *Id.* at *10 (emphasis added). Here, Plaintiffs take issue with the published curriculum. Moreover, the teacher in *Tatel* was allegedly "telling the children to keep the teacher's discussions about gender topics secret from their parents," and allegedly "targeted one child for repeated approaches about gender dysphoria despite, or because of, the parents' beliefs." *Id*. There are no such allegations of secrecy or targeting here. As the district court concluded, "[t]he students" in *Tatel* "were not just exposed to ideas"; "[t]hey were being pressured by their teacher to change their religious views on gender identity." JA766. *Tatel*, in other words, rested on coercive elements not present here.

b.     Plaintiffs are wrong that the decision below "defies the historical tradition that *Yoder* … drew on." Br.31. Since the dawn of public education in America, courts have routinely approved public schools' denial of opt-out requests. In 1854, for example, Maine's highest court rejected a parent's lawsuit seeking to excuse his daughter from instruction using the Protestant Bible "as a reading book." *Donahoe v. Richards*, 38 Me. 379, 399 (1854). Courts nationwide followed suit, holding that parents could not demand opt-outs from lessons in algebra, *State v. Minzer*, 50 Iowa 145 (1878), public speaking, *Kidder v. Chellis*, 59 N.H. 473, 475-476 (1879), or music, *Andrews v. Webber*, 8 N.E. 708, 712-713 (Ind. 1886); *Christian v. Jones*, 100 So. 99, 99 (Ala. 1924). These courts recognized that "the power of each parent to decide … what studies the scholars

should pursue, or what exercises they should perform, would be a power of disorganizing the school, and practically rendering it substantially useless." *Kidder*, 59 N.H. at 476.

Plaintiffs (and amici) identify just one decision—*Hardwick v. Board of School Trustees*, 205 P. 49 (Cal. App. 1921)—allowing parents to excuse their children from an activity that clashed with their religious beliefs. *See* Br.31; Dkt.70-1 at 8. There, a school expelled children whose parents refused to let them participate in couples dancing in physical-education class. *Hardwick*, 205 P. at 49-50. The court held the school should have honored the parents' wishes because, unlike here, doing so would not have "tend[ed] … to interfere with the established discipline of the school," as it was feasible to provide substitute physical exercises for the students whose parents objected. *Id.* at 54. *Hardwick* alone establishes no tradition of opt-outs, let alone where, like here, experience proves opt-outs infeasible. JA542-543 ¶¶36-40. And in any event, *Hardwick* was not about mere exposure to ideas, but rather about compulsory physical activity.

Plaintiffs' and amici's remaining cases recognize only a limited common-law right of parents to choose the subjects their children pursue in school. *See People ex rel. Vollmar v. Stanley*, 255 P. 610 (Colo. 1927); *State v. Ferguson*, 144 N.W. 1039 (Neb. 1914); *State v. School District No. 1 of Dixon County*, 48 N.W. 393 (Neb. 1891); *Rulison v. Post*, 79 Ill. 567 (1875); *Morrow v. Wood*, 35 Wis. 59

(1874); *Spiller v. Inhabitants of Woburn*, 94 Mass. 127 (1866). In none of these cases was the parental right grounded in the Free Exercise Clause. Moreover, even the courts that granted parents the most control disclaimed any parental right to insist that children "use text-books different from those required" by the school, *Ferguson*, 144 N.W. at 1042, and recognized that parents could not opt children out of lessons "essential to good citizenship," *Stanley*, 255 P. at 613-614.

Finally, Plaintiffs cite *no* authority indicating that opt-outs have historically been permitted in Maryland public schools. Nor could they, as history shows that any common-law parental opt-out right was extinguished by the statutory establishment of Maryland's public-school system in 1865. *See* Steiner, History of Education in Maryland 66-67 (1894). From then on, it was left to the state legislature, relying on advice from county school commissioners, to determine what "shall be taught" in each school, including not only subjects such as reading and writing, but also "good behavior." 1865 Md. Laws 278, 282; *see also* 1868 Md. Laws 185; 1870 Md. Laws 544. Maryland's history thus belies any claimed constitutional right of parents to excuse their children from aspects of a curriculum they find objectionable.

\* \* \*

Caselaw and history support the district court's conclusion that MCPS's policy imposes no cognizable burden on Plaintiffs' religious exercise. Plaintiffs'

free-exercise claims thus are not likely to succeed.  At a minimum, Plaintiffs have not made the required "clear showing" otherwise.  *Winter*, 555 U.S. at 22.  That alone requires affirmance.

**B.    The Lack Of Any Cognizable Burden Dooms Plaintiffs' Free-Exercise Claims**

Plaintiffs cannot prevail on their free-exercise claims if they have not established any cognizable burden.  They (and amici) argue that a challenged policy's non-neutrality or lack of general applicability may "*independently* require strict scrutiny."  Br.5 (emphasis added); *see also* Dkt.69 at 8-9.  That is wrong. Courts in this circuit have correctly held (including here) that "the Free Exercise Clause only applies when the government burdens religious exercise," *Roswell v. Mayor*, 2023 WL 3158728, at *8 (D. Md. Apr. 28, 2023), *appeal docketed*, No. 23-1567 (4th Cir. May 25, 2023)—that is, that "the Free Exercise Clause does *not* apply when the government does *not* burden religious exercise," *Kim v. Board of Education of Howard County*, 641 F.Supp.3d 223, 236 (D. Md. 2022) (emphases added; quotation marks and alterations omitted).  As *Parker* explained, "the standard constitutional threshold question" in any free-exercise case is "whether the plaintiff's free exercise is interfered with at all."  514 F.3d at 99.

Plaintiffs' contrary view lacks any basis in law.  For one thing, it "cannot be squared with the text of the Free Exercise Clause."  JA754 n.8.  The text encompasses only government action "prohibiting the free exercise" of religion.

U.S. Const. amend. I. Hence, "[t]he Free Exercise Clause, importantly, is not a general protection of religion or religious belief," but rather "has a more limited reach of protecting the *free exercise* of religion." *Parker*, 514 F.3d at 103.

Plaintiffs' view also inverts well-established free-exercise doctrine. Government action that does not burden religious exercise cannot nevertheless violate the Free Exercise Clause on the ground that it is not neutral or generally applicable; rather, neutrality and general applicability may *defeat* a free-exercise claim *despite* some burden on religious practice. *See Fulton*, 141 S.Ct. at 1876. If Plaintiffs cannot establish any burden, they obviously cannot "show[] that a government entity has burdened [their] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable,'" *Kennedy v. Bremerton School District*, 142 S.Ct. 2407, 2421-2422 (2022).

The district court correctly concluded that Plaintiffs' backward theory finds no support in *Tandon*, *Fulton*, *Masterpiece*, or *Lukumi*. *See* JA775 n.14. Each of those cases involved a clear burden on religious practice. *Fulton* deemed it "plain that the City's actions ha[d] burdened [the plaintiff's] religious exercise." 141 S.Ct. at 1876. The burdens in *Tandon* and *Masterpiece* were "equally obvious," JA754 n.8, as the plaintiffs there were prohibited from holding religious gatherings, *Tandon*, 141 S.Ct. at 1297, or forced to take affirmative steps they viewed as endorsing same-sex relationships in violation of their religious beliefs,

*Masterpiece*, 138 S.Ct. at 1726.  And *Lukumi* repeatedly recognized "the burden of the ordinance[s]" challenged there, 508 U.S. at 536; *id*. at 544 (noting "the burden of the ordinances"); *id.* at 546 (holding that the government's "interests could be achieved by narrower ordinances that burdened religion to a far lesser degree").

Nor does Plaintiffs' theory find support in the cases amici cite stating that "there is no *substantial* burden requirement" for challenges to "non-neutral government actions," *Tenafly Eruv Association, Inc. v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002) (emphasis added), or that plaintiffs challenging a non-neutral regulation "need not demonstrate a *substantial* burden on the practice of their religion," *Hartmann v. Stone*, 68 F.3d 973, 979 n.4 (6th Cir. 1995) (emphasis added).  *See* Dkt.69 at 8-9.  The district court never required Plaintiffs to establish a "substantial" burden.  And amici's cases did not hold or imply that a free-exercise claim can succeed absent *any* burden.  To the contrary, the cases identified clear burdens: Jewish plaintiffs' "inability to attend synagogue," *Tenafly*, 309 F.3d at 170, and a "restrict[ion] [on] the Hartmanns' practice of their own religion," *Hartmann*, 68 F.3d at 979 n.4.

In sum, to succeed on their free-exercise claims, Plaintiffs must "[a]s an initial matter" demonstrate that MCPS's policy has "burdened [their] religious exercise."  *Fulton*, 141 S.Ct. at 1876.  Because they have not done so, there is no

occasion "to decide whether the burden … is constitutionally permissible" on the ground that MCPS's policy is "neutral and generally applicable." *Id*.

## C.     In Any Event, The Policy Is Neutral And Generally Applicable

Even if Plaintiffs established a burden on their religious practice—or did not need to—they cannot make the required clear showing that they will likely succeed on their free-exercise claim because the policy is "a facially neutral and generally applicable regulation." *Canaan Christian Church v. Montgomery Cnty.*, 29 F.4th 182, 198 (4th Cir. 2022). Plaintiffs advance three arguments to portray the policy as targeting their religious practice, but each fails. The policy does not favor secular conduct over religious conduct, permits no exemptions, and was not enacted out of hostility toward religion. Because Plaintiffs cannot establish that the policy is anything but neutral and generally applicable, it is "subject only to rational basis review," *id.*, a standard it easily satisfies.

### 1.     The policy does not favor secular over religious conduct

The no-opt-out policy is generally applicable and neutral under *Tandon* because it treats secular and religious activity the same. Plaintiffs' *Tandon* argument fails at the outset because they do not point to disparate treatment between "secular activity" and "religious exercise." *Tandon*, 141 S.Ct. at 1296. In *Tandon*, California permitted large groups to gather during the COVID-19 pandemic for certain secular activities (e.g., moviegoing and indoor dining) but not

for at-home worship, and thus "treat[ed] some comparable secular activities more favorably than at-home religious exercise." *Id.* at 1297. Here, by contrast, Plaintiffs concede that *all* opt-outs are allowed from the health-education curriculum while *all* opt-outs are prohibited from the ELA curriculum. Br.40. Opt-out requests motivated by religious views are thus not "single[d] out … for especially harsh treatment." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 66 (2020) (per curiam). Like opt-out requests motivated by secular views, they are always honored for health-education but never for ELA. The *Tandon* inquiry ends there.

Plaintiffs independently fail to establish that MCPS has afforded disparate treatment to "comparable" secular and religious activities. Under *Tandon*, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." 141 S.Ct. at 1296. The thrust of Plaintiffs' argument is that MCPS cannot permit opt-outs from the health-education curriculum but deny opt-outs from the ELA curriculum because both curricula further MCPS's equity and inclusion goals. Plaintiffs are wrong.

Plaintiffs adduced no evidence that "the asserted government interest that justifies" the no-opt-out policy for the ELA curriculum is undermined by allowing opt-outs from health education. Br.38 In *Tandon*, California barred at-home

worship based on its interest in reducing the risk of transmitting COVID-19—a goal flagrantly at odds with allowing large groups to gather at restaurants and theaters. 141 S.Ct. at 1297. Here, MCPS implemented the no-opt-out policy for the Storybooks due to high student absenteeism, the infeasibility of accommodating opt-out requests, and the risk of exposing other students to social stigma and isolation, all of which imperiled MCPS's efforts to create a safe educational environment conducive to learning and to fulfill its obligations under antidiscrimination laws. JA542-543 ¶¶36-39. Plaintiffs offered no evidence that opt-outs from the health-education curriculum create these same risks.

Nor could they. Maryland law has long required schools to provide instruction related to family life and human sexuality objectives as part of the health-education curriculum, to permit student opt-outs from those lessons, and to arrange alternative learning activities for students opted out. *See* COMAR § 13A.04.18.01(D)(2)(e). Permitting opt-outs from those discrete lessons does not impose on teachers, principals, and media specialists the administrative burdens that would flow from implementing a system of opt-outs from instructional materials that are meant to be integrated seamlessly into the ELA curriculum. And unlike the opt-outs Plaintiffs seek, which would allow students to leave class whenever instructional materials acknowledge the existence of LGBTQ families, it does not jeopardize MCPS's educational mission or risk stigmatizing others to

excuse students from the health-education curriculum's unit on family life and human sexuality. Maryland law requires that the unit "represent all students regardless of ability, sexual orientation, gender identity, and gender expression," *id.* § 13A.01.18.01(D)(2)(a), but nowhere suggests that schools may permit students to opt out *only* when sexual orientation, gender identity, or gender expression are discussed.

### 2. The policy does not permit discretionary exemptions

Plaintiffs' reliance on *Fulton* also is misplaced because the no-opt-out policy is absolute. Under *Fulton*, a policy triggers strict scrutiny if it involves "[i]ndividualized assessments by the government with a mechanism for granting exceptions." *Canaan*, 29 F.4th at 198. A "mechanism for individualized exemptions" renders a policy "not generally applicable" because it "'invites' the government to consider the particular reasons for a person's conduct" and "decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 141 S.Ct. at 1877, 1879. But "*Fulton* is inapplicable" here because the challenged policy prohibits opt-outs from Storybook-related instruction "without exception." *Canaan*, 29 F.4th at 199; JA543-544 ¶¶40-42.

Indeed, MCPS's generally applicable policy offers a stark contrast with the policies that triggered strict scrutiny in *Fulton* and related precedent. *Fulton* involved a policy prohibiting discrimination by foster-care providers but allowing

a city official to grant exemptions in his "sole discretion." 141 S.Ct. at 1878.

Because this policy "incorporate[d] a system of individual exemptions," the city

could not "refuse to extend that exemption system to cases of 'religious hardship'

without compelling reason." *Id.* (quotation marks and alterations omitted).

*Lukumi* similarly involved a law whose application "require[d] an evaluation of the

particular justification" given for an otherwise unlawful animal killing, creating a

"system of … 'individualized exemptions from a general requirement.'" 508 U.S.

at 537. This framework threatened to "devalue[] religious reasons" for the

regulated conduct "by judging them to be of lesser import than nonreligious

reasons," and thus expose religious practice to discriminatory treatment. *See id.*

And in *Sherbert*, the government penalized unemployment-benefits applicants for

failing to accept suitable work absent "good cause," 374 U.S. at 407 n.7, a standard

permitting the government to grant discretionary exemptions, *Fulton*, 141 S.Ct. at

1877. The policy authorizing exemptions in each of those cases thus allowed—if

not encouraged—the decisionmaker to grant or deny exemptions based on the

reason the exemption was sought. MCPS's policy, by contrast, does not permit a

decisionmaker to deny opt-out requests because they are religion-based.

Plaintiffs are wrong that MCPS's Religious Diversity Guidelines

transformed the across-the-board no-opt-out policy into one that is riddled with

discretionary exemptions. Br.41-42.

First, while the Guidelines explained that teachers could plan alternatives for, and excuse students from, discrete "holiday activities" that may be viewed as "having religious overtones," the Guidelines did not provide the same options for "instructional activities" during which "students are taught about religion." *See* JA068.

Second, the Guidelines did not say that schools would consider objections to classroom instruction "on a case-by-case basis." The only "case-by-case" assessment occurred when teachers determined how long an extension to grant students who were making up work after missing class for a religious holiday. JA066.

Third, the Guidelines did not represent an impermissible "reservation of the authority to grant" exemptions to the no-opt-out policy. Br.41-42. In *Fulton*, the relevant contract purported to prohibit sexual-orientation discrimination while reserving the authority to grant exemptions, in the city's "sole discretion," to service providers that refused same-sex families. 141 S.Ct. at 1878-1879. MCPS's Guidelines nowhere suggested that schools could override the blanket no-opt-out policy, let alone evaluate the motives for opt-out requests. Rather, the Guidelines recognized that it may not be feasible to accommodate objections to instructional programs *at all*: if opt-out requests "bec[a]me too frequent or too burdensome, the school [could] refuse to accommodate the requests." JA068. The

Guidelines assumed all requests for religious accommodation were legitimate and permitted schools to evaluate whether those requests could be accommodated based on neutral and measurable criteria. JA067-068. Any accommodations the Guidelines envisioned thus satisfied *Fulton* because they "d[id] not allow 'the government to decide which reasons for not complying with the policy are worthy of solicitude.'" *We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, 76 F.4th 130, 151 (2d Cir. 2023).

Lastly, the decision to end *all* exemptions does not trigger strict scrutiny under *Fulton*. That result "would disincentivize States from accommodating religious practice in the first place" by cementing in place exemptions "that could not be repealed or changed if they no longer served the public good," like the unworkable Storybook opt-outs here. *We the Patriots*, 76 F.4th at 150.

### 3. The policy was not enacted out of religious hostility

MCPS's policy is also neutral because it "proscribes conduct without regard to whether that conduct is religiously motivated." *Hines v. South Carolina Dep't of Corrections*, 148 F.3d 353, 357 (4th Cir. 1998). The policy is not intended to "infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. Nor was it enacted with "clear and impermissible hostility" toward religious beliefs. *Masterpiece*, 138 S.Ct. at 1729.

*First*, the no-opt-out policy was not implemented to "target[] religious conduct." *Lukumi*, 508 U.S. at 546; Br.42. Only a subset of the opt-out requests MCPS received cited religious motivations, JA542 ¶34, and Plaintiffs provided no evidence that opt-outs were ended to target those requests. To the extent Plaintiffs claim MCPS could not "allow[] opt-outs" and "then withdraw[] them," Br.42, they are wrong. In *We The Patriots*, the Second Circuit rejected an argument under *Masterpiece* that "repealing any existing religious exemption is hostile to religion per se," upholding a statute repealing a longstanding religious exemption from student vaccination requirements while retaining medical exemptions. 76 F.4th at 149. As that court explained, "the Supreme Court has long described religious exemptions as part of a mutually beneficial 'play in the joints' between the Establishment Clause and Free Exercise Clause," and "Plaintiffs' argument, which would make every exemption permanent once granted, threatens to distort the relationship between the Clauses." *Id.* at 150. Indeed, "[s]urely the granting of a religious accommodation to some in the past doesn't bind the government to provide that accommodation to all in the future." *Yellowbear v. Lampert*, 741 F.3d 48, 58 (10th Cir. 2014) (Gorsuch, J.).

*Second*, none of the statements Plaintiffs quote—without context—suggests that opt-outs were denied due to hostility toward religion. *Masterpiece* prohibits government from subjecting a requested religious accommodation to a "negative

normative 'evaluation of the particular justification' for [the] objection and the religious grounds for it." 138 S.Ct. at 1731. No such thing occurred here. Board member Lynne Harris, responding to a comment that the Storybooks "go against religious rights, family values, and core beliefs," made clear she opposed opt-outs for *any* of those reasons, not religious opt-outs alone. JA745. She similarly objected to opt-out requests rooted in non-religious motives such as xenophobia. JA746. And neither she nor anyone else "accus[ed] the parents of promoting a 'dehumanizing form of erasure.'" Br.43-44. Those words come from a letter to Congress by authors protesting "[w]hen books are removed or flagged as inappropriate." JA345. Similarly, while Harris "wondered whether" a student who spoke out against the policy "was 'parroting dogma' learned from her parents," JA747, she never suggested the student's—or anyone's—opt-out request would be judged by its religious nature.

### D. The Policy Survives Rational-Basis Review And Strict Scrutiny

The no-opt-out policy is subject to rational-basis review because it does not burden religious exercise and because, even if it were to impose an incidental burden, it is neutral and generally applicable. *See Canaan*, 29 F.4th at 198. As Plaintiffs do not dispute, the policy easily satisfies rational-basis review. JA782-783. But even if strict scrutiny applied, the policy would survive because it

"serve[s] a compelling interest and [is] narrowly tailored to that end." *Kennedy*, 142 S.Ct. at 2426.

### 1.    The policy serves compelling interests

MCPS adopted the policy because its experience attempting to permit opt-outs had proven that opt-outs were so disruptive and unworkable that they threatened to defeat MCPS's "efforts to ensure a classroom environment that is safe and conducive to learning for all students" and put MCPS out of compliance with nondiscrimination laws. JA542-543 ¶¶36-40. The policy, the district court found, furthered those unquestionably legitimate goals. JA782-783. Caselaw confirms that the policy indeed serves compelling interests—interests "of the highest order" that are "particular to the specific case." *Redeemed Christian Church of God v. Prince George's County*, 17 F.4th 497, 510 (4th Cir. 2021).

a.    MCPS has a compelling interest in "provid[ing] a safe school environment conducive to learning." *Kowalski v. Berkeley County Schools*, 652 F.3d 565, 572 (4th Cir. 2011). This interest is firmly established and widely acknowledged. *See, e.g.*, *Frudden v. Pilling*, 877 F.3d 821, 829 (9th Cir. 2017); *Taylor v. Roswell Independent School District*, 713 F.3d 25, 38 (10th Cir. 2013); *Saxe v. State College Area School District*, 240 F.3d 200, 217 (3d Cir. 2001). This compelling interest is served by a school's efforts to create "an undisrupted school session conducive to the student's learning," *Grayned v. City of Rockford*, 408 U.S.

104, 119 (1972), and to minimize "disrupt[ions to] the work and discipline of the school," *Kowalski*, 652 F.3d at 572. As courts have recognized, to maintain a safe environment conducive to learning, schools "have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place." *Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007). Schools must also have leeway to pursue policies that "foster[] children's educational achievement," *Frudden*, 877 F.3d at 829, and "protect[] the educational mission of the school," *Taylor*, 713 F.3d at 38.

As the record reflects, attempts by individual schools to honor opt-outs caused significant disruptions, as teachers and principals grappled with widespread student absenteeism, tracking opt-out requests, and shuttling students in and out of classrooms. JA542-543 ¶¶36-40. And it did so at the risk of exposing students to social stigma and isolation. JA543 ¶39. The no-opt-out policy undoubtedly serves MCPS's compelling interest in a safe environment conducive to learning by minimizing these harmful interruptions.

b. MCPS also has a compelling interest in "compliance with federal antidiscrimination laws." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 518 (Scalia, J., concurring). Federal and state laws, including Title IX, obligate MCPS to ensure that its students are not "treat[ed] … worse than others" based on sexual orientation or gender identity. *Grimm v. Gloucester County*

*School Board*, 972 F.3d 586, 618 (4th Cir. 2020).  And LGBTQ students, including transgender students, "frequently experience" harassment and physical assault at school, *see id.* at 612—a devastating reality that the policy aims to combat, *see* JA543 ¶39; JA531-532; JA358.  MCPS's compelling interest thus encompasses its efforts to assure that students "do not suffer the stigmatizing injury of discrimination." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1238 n.21 (9th Cir. 2020).  "Eradicating discrimination provides a sufficiently compelling state interest" to satisfy strict scrutiny. *Kidwell v. Transportation Communications International Union*, 946 F.2d 283, 302 (4th Cir. 1991).

c.      Because Plaintiffs cannot rebut MCPS's compelling interests, they diminish them.  Plaintiffs attack the no-opt-out policy as motivated by "[v]ague, undefined objectives to provide 'an inclusive educational environment' or 'reduc[e] stigmatization.'"  Br.46.  But the no-opt-out policy vindicates MCPS's well-grounded, compelling interests in "ensur[ing] a classroom environment that is safe and conducive to learning for all" and meet[ing] its obligations under "nondiscrimination laws."  JA543 ¶¶37-40.

Plaintiffs' suggestion that MCPS lacks a compelling interest because the no-opt-out policy defies "the 'long history' and 'continue[d] practice of most states,'" Br.48, is unmoored from reality.  Plaintiffs identify no tradition or present practice of schools providing the kind of opt-outs from instructional materials in a

language-arts curriculum that Plaintiffs request. It makes no difference that nearly all States permit or require opt-outs from instruction on human sexuality. Br.16-18. MCPS introduced the Storybooks as part of the ELA curriculum from which no opt-outs are permitted. Plaintiffs cited no evidence that the mere presence of an LGBTQ character in a book requires a school board to quarantine that book within a sex-education curriculum. And Plaintiffs cite no law suggesting that parents may obtain an injunction against the school board if they second-guess the board's refusal to do so. Nor has MCPS adopted its no-opt-out policy based on "'relatively recent' regulatory interests," Br.48, as underscored by *decades* of precedent elaborating schools' compelling interest in ensuring a safe educational environment conducive to learning. A "historic and substantial" tradition of schools refusing parental opt-out requests bolsters MCPS's claim of compelling interest. *See supra* pp.35-37.

Regardless, no historical tradition of schools denying opt-outs is required to sustain the policy in the face of Plaintiffs' free-exercise claims. *New York State Rifle & Pistol Association, Inc. v. Bruen* enumerated the constitutional claims (not including free-exercise claims) that demand a historical analysis. 142 S.Ct. 2111, 2130 (2022). *Firewalker-Fields v. Lee* then applied historical analysis to an *Establishment Clause* claim. 58 F.4th 104, 122 n.7 (4th Cir. 2023). While *Locke v. Davey*, 540 U.S. 712 (2004), treated a history of denying public funding for

clerical studies as relevant to a free-exercise challenge, neither this Court nor the

Supreme Court has held that states *must* identify a similar tradition to establish a

compelling interest. *Espinoza*, which Plaintiffs cite, treated the existence or

nonexistence of history and tradition as *relevant* to a free-exercise claim, but never

said that such a tradition was *necessary* to satisfy strict scrutiny. *See* 140 S.Ct. at

2258-2259.

## 2. The policy is narrowly tailored

The no-opt-out policy is narrowly tailored to MCPS's compelling interests.

"[N]arrow tailoring requires the government to show that measures less restrictive

of the First Amendment activity could not address its interest." *Tandon*, 141 S.Ct.

1296-1297. The government "must 'show that it seriously undertook to address

the problem with less intrusive tools readily available…' and must 'demonstrate

that such alternative measures would fail to achieve the government's interest[.]'"

*Reynolds v. Middleton*, 779 F.3d 222, 231-232 (4th Cir. 2015) (citations and

alternations omitted).

MCPS did that here, adopting the no-opt-out policy only after experience

proved that schools "could not accommodate the growing number of opt out

requests without causing significant disruptions to the classroom and undermining

MCPS's education mission." JA741. MCPS thus attempted to address parents'

requests with "less intrusive tools" before determining that "alternative measures

would fail to achieve [its] interest." *Reynolds*, 779 F.3d at 231-232 (citations omitted). As noted, Plaintiffs point to no school system that has permitted the opt-outs from language-arts curriculum that MCPS found untenable. *See supra* p.12.

The no-opt-out policy is also narrowly tailored because "it targets and eliminates no more than the exact source" of the problem that opt-outs pose. *Centro Tepeyac*, 722 F.3d at 193. The compelling interests the policy advances are served by the very actions Plaintiffs seek to enjoin—exposing students to instructional materials with diverse characters. MCPS cannot ensure it is providing a classroom that is safe and conducive to learning for all students, and that meets its obligations under nondiscrimination laws, if students can be excused from class any time the Storybooks are read or discussed. To the extent the policy burdens religion, there is no way "the government can achieve its interests in a manner that does not burden religion." *See Fulton*, 141 S.Ct. at 1881. The policy must therefore stand.

## II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR DUE-PROCESS CLAIMS

Plaintiffs will not likely succeed on their due-process claims because, as the district court determined, they have not made a clear showing that the policy infringes a fundamental right. Because no court has recognized a fundamental right of parents to opt children out of a public-school curriculum that conflicts with

their religious views, rational-basis review applies. *See Doe v. Settle*, 24 F.4th 932, 953 (4th Cir. 2022). The policy satisfies that standard. *See* JA779-782.

Parents' rights to direct the education of their children generally is not fundamental under the Due Process Clause. In *Herndon by Herndon v. Chapel Hill-Carrboro City Board of Education*, this Court examined Supreme Court precedent and concluded that the state typically may engage in "*reasonable regulation*" that conflicts with parents' interest in "directing their children's schooling." 89 F.3d 174, 178-179 (4th Cir. 1996). Rational-basis review, rather than strict scrutiny, therefore applied when parents challenged such regulation. *Id.*

The purportedly fundamental right that Plaintiffs assert here rests on even weaker grounds. This Court has observed that parents' "right to control individual components of their [children's] education … is not constitutionally protected" as it "does not implicate a fundamental right." *Bailey v. Virginia High Sch. League, Inc.*, 488 F.App'x 714, 716 (4th Cir. 2012). Other courts have agreed, rejecting challenges to elements of a public-school curriculum under rational-basis review. *E.g.*, *Leebaert v. Harrington*, 332 F.3d 134, 142-143 (2d Cir. 2003); *see also Parker*, 514 F.3d at 90 (due-process challenge failed whether rational-basis review or heightened scrutiny applied).

Nor does strict scrutiny apply under a "hybrid" theory. *Herndon* observed that the Supreme Court had applied rational-basis review to all claims of a parental

right to control a child's public-school education, except for the challenge in *Yoder*, where "religious concerns were central." 89 F.3d at 178. *Herndon*, which "did not involve any free exercise concerns," cannot be read to adopt a "broad rule" requiring the application of strict scrutiny to "hybrid" claims. JA779-780. The same is true of this Court's footnote describing *Herndon* in *John and Jane Parents 1 v. Montgomery County Board of Education*, another case that involved no free-exercise claim. 78 F.4th 622, 628 n.3 (4th Cir. 2023). Moreover, this Court clarified long after *Herndon* that it has never applied strict scrutiny to "hybrid" claims. *See Workman v. Mingo Cnty. Bd. of Educ.*, 419 F.App'x 348, 353 (4th Cir. 2011). Indeed, the weight of authority holds that Plaintiffs cannot join a weak free-exercise claim with a weak due-process claim to create a viable "hybrid" claim triggering strict scrutiny. *See Leebaert*, 332 F.3d at 144; JA781-782 (collecting cases).

For the reasons noted above, *supra* Section I.D, the policy satisfies any standard of review, and Plaintiffs' due-process claims are thus unlikely to succeed.

## III. THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS COULD NOT SATISFY THE REMAINING PRELIMINARY-INJUNCTION FACTORS

This Court need not consider the remaining preliminary injunction factors because Plaintiffs have not established they will likely succeed on their free-exercise or due-process claims. *See Henderson for Nat'l Labor Relations Bd. v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018).

In any case, the remaining factors are not met.  Because Plaintiffs show no likely constitutional violation—and identify no other injury—they have not established irreparable harm.  *See Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022).  Nor do the balance of equities and public interest, which merge when the government is opposing injunctive relief, *id.*, favor an injunction where (as here) there is no cognizable injury, *Roswell*, 2023 WL 3158728, at *5.  On the other hand, "the public consequences in employing the extraordinary remedy of an injunction" are severe.  *Winter*, 555 U.S. at 24.  Requiring MCPS to permit opt-outs from lessons using the Storybooks would significantly disrupt classroom instruction, undermining MCPS's curricular goals and its efforts to foster a learning environment free of discrimination.  JA542-543 ¶¶36-40.

## CONCLUSION

This Court should affirm the denial of the preliminary injunction.

Respectfully submitted,

/s/ Alan Schoenfeld

<table>
<tr><td>Bruce M. Berman</td><td>Alan Schoenfeld</td></tr>
<tr><td>Joseph M. Meyer</td><td>Emily Barnet</td></tr>
<tr><td>Jeremy W. Brinster</td><td>Wilmer Cutler Pickering</td></tr>
<tr><td>Wilmer Cutler Pickering</td><td>   Hale and Dorr LLP</td></tr>
<tr><td>   Hale and Dorr LLP</td><td>7 World Trade Center</td></tr>
<tr><td>2100 Pennsylvania Avenue NW</td><td>250 Greenwich Street</td></tr>
<tr><td>Washington, DC 20037</td><td>New York, NY 10007</td></tr>
<tr><td></td><td>alan.schoenfeld@wilmerhale.com</td></tr>
</table>

October 24, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,968 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Alan Schoenfeld
ALAN SCHOENFELD

October 24, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of October, 2023, I electronically filed

the foregoing with the Clerk of the Court for the United States Court of Appeals

for the Fourth Circuit using the appellate CM/ECF system.  Counsel for all parties

to the case are registered CM/ECF users and will be served by the appellate

CM/ECF system.

/s/ Alan Schoenfeld
ALAN SCHOENFELD