# No. 23-1890

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TAMER MAHMOUD, *et al.*,
*Plaintiffs-Appellants*

v.

MONIFA B. MCKNIGHT, *et al.*,
*Defendants-Appellees*

On Appeal from the United States District Court
for the District of Maryland, Southern Division, No. 8:23-cv-1308
The Hon. Deborah L. Boardman, District Judge

## BRIEF OF THE NATIONAL EDUCATION ASSOCIATION, MARYLAND STATE EDUCATION ASSOCIATION, AND MONTGOMERY COUNTY EDUCATION ASSOCIATION AS AMICI CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES

Kristy K. Anderson
MARYLAND STATE EDUCATION
ASSOCIATION
140 Main Street
Annapolis, Maryland 21401
(443) 758-8395

Alice O'Brien
Jason Walta
Keira McNett
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, N.W.
Washington, DC 20036
(202) 822-7035
aobrien@nea.org

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>23-1890</u>      Caption: <u>Mahmoud v. McKight</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>National Education Association ("NEA"), Maryland State Education Association ("MSEA"),</u>
(name of party/amicus)

<u>and Montgomery County Education Association ("MCEA")</u>

who is <u>amici curiae</u>, make the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☒ NO

2.    Does party/amicus have any parent corporations?                ☐ YES ☒ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                ☐ YES ☒ NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☒NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☒NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☒NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☒NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____     Date: October 30, 2023

Counsel for: Amici NEA, MSEA, MCEA

# TABLE OF CONTENTS

Corporate disclosure statement.................................................. i

Table of contents ................................................................. iii

Table of authorities ............................................................. iv

Statement of Amici Curiae ..................................................... 1

Argument .............................................................................. 3

    A. MCPS's policies and practices of inclusivity are integral to
       its role in preparing students for good citizenship......................... 4

    B. Requiring schools and educators to honor individual opt-outs
       undermines the educational and safety benefits of inclusive
       curricula.................................................................................. 11

    C. Requiring schools and educators to honor individual opt-outs
       would embroil federal courts in the day-to-day operations of
       public schools and prove unworkable in practice ......................... 22

Conclusion............................................................................ 28

# TABLE OF AUTHORITIES

## Cases

*Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49 (2d Cir. 2001) ............ 26

*Ambach v. Norwick*, 441 U.S. 68 (1979) ................................................. 5

*Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) ........................................................................................................ 5

*Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) ............... 5, 18

*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) .......................... 26

*Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) ............................................ 4

*C.H. v. Sch. Dist. of the Chathams*, No. 18-cv-966, 2023 WL 6806177 (D.N.J. Oct. 16, 2023) ............................................................ 27

*Christian Legal Soc'y Chapter v. Martinez*, 561 U.S. 661 (2010) .......... 22

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ............... 9

*Endrew F. v. Douglas County Sch. Dist. RE-1*, 580 U.S. 386 (2017) ............................................................................................... 22–23

*Epperson v. Arkansas*, 393 U.S. 97 (1968) ............................................ 23

*Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680 (7th Cir. 1994) ..................................................................................................... 26

*Hardwick v. Heyward*, 711 F.3d 426 (4th Cir. 2013) ............................. 22

*Harris v. Quinn*, 573 U.S. 616 (2014) ................................................ 21–22

*Herndon v. Chapel Hill–Carrboro City Bd. of Educ.*, 89 F.3d 174 (4th Cir. 1996) .................................................................................... 26

*Grimm v. Gloucester County Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) ..................................................................................................... 16

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ........................................... 4–5

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ..................... 11

*Lee v. Weisman*, 505 U.S. 577 (1992) ..................................................... 11

*Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003) ............................ 26

*Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038 (2021) ........................ 5

*McCollum v. Bd. of Educ.*, 333 U.S. 203 (1948) ..................................... 27

*Missouri v. Jenkins*, 515 U.S. 70 (1995) ................................................ 23

*Mozert v. Hawkins County Bd. of Educ.*, 827 F.2d 1058 (6th Cir. 1987) ................................................................................................ 26–27

*Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008) ....................................... 10

*State v. Webber*, 8 N.E. 708, 709 (Ind. 1886) ........................................ 27

*Wisconsin v. Yoder*, 406 U.S. 205 (1972)) .............................................. 23

## Statutes, Rules, and Regulations

Code of Md. Admin. Regs. § 13A.04.18.01 ............................................. 19
Fed. R. App. P. 29 .............................................................................. 1
Md. Code, Educ. § 7–424 .............................................................. 16–17
Md. Code, Educ. § 26-704 .................................................................. 16

## Other Authorities

Bd. on Children, Youth & Families, Nat'l Acad of Sci., Eng'g &
   Med., *Report in Brief: Preventing Bullying Through Science,*
   *Policy and Practice* (2016) ............................................................. 20
Taylor Bowie, *State Board of Education pushes back on campaign*
   *against "rogue sex ed,"* MICHIGAN NPR, (Feb. 17, 2023) .................... 20
Caitlin M. Clark et al., *The 2021 National School Climate Survey:*
   *The Experiences of Lesbian, Gay, Bisexual, Transgender, and*
   *Queer Youth in Our Nation's Schools* (2022) ..................................... 15
Adina C. Cooper, et al., *Examining the Relationship Between*
   *LGBTQ-Supportive School Health Policies and Practices and*
   *Psychosocial Health Outcomes of Lesbian, Gay, Bisexual, and*
   *Heterosexual Students*, 9 LGBT HEALTH 43 (2022) ............................ 12
Stacy B. Davids, ANNIE'S PLAID SHIRT (2015) ....................................... 13
Rev. Susan Fredrick-Gray, *Transphobic and Anti-Abortion*
   *Policies are a Direct Threat to My Religious Freedom*, RELIGION
   DISPATCHES (June 6, 2022) ............................................................... 17
Laura Gehl & Joshua Heinsz, EXCEPT WHEN THEY DON'T (2019) ... 13–14
Phoebe Godfrey, *Bayonets, Brainwashing, and Bathrooms: The*
   *Discourse of Race, Gender, and Sexuality in the Desegregation*
   *of Little Rock's Central High*, 62 ARK. HIST. Q. 42 (2003) ............. 9–10
Michael Hall, RED: A CRAYON'S STORY (2015) ....................................... 13
Sarah Hoffman et al., JACOB'S NEW DRESS (2014) ................................. 13
Troy Hutchings, *"All" Means All—It Really is that Simple*, ETHICS
   AND EDUCATORS BLOG (Sept. 13, 2022) .............................................. 18
Chelsea Johnson et al., INTERSECTION ALLIES: WE MAKE ROOM FOR
   ALL (2019) ..................................................................................... 14

**Other Authorities—cont'd**

Law Firm Anti-Racism Alliance & Nat'l Educ. Ass'n, *The Very Foundation of Good Citizenship: The Legal and Pedagogical Case for Culturally Responsive and Racially Inclusive Public Education for All Students* (Sept. 29, 2022) ..................................... 13

Jessica Love, JULIÁN IS A MERMAID (2018) .............................................. 13

Md. State Dep't of Educ., *Maryland College and Career Ready Standards for English Language Arts Grades 1–2* (Nov. 2022) ........ 14

Mich. State Bd. of Educ., *Resolution: Sex Education* (Feb. 14, 2023) ............................................................................................. 20

Montgomery County Bd. of Educ., *Policy ACA: Nondiscrimination, Equity, and Cultural Proficiency* (2021) ............................................... 6

Beatrice Mount & Alyssa Tirrell, *A non-exhaustive list of everything and everyone the right accused of grooming*, MEDIA MATTERS FOR AMERICA (Jan. 23, 2023) .............................................. 20

Nat'l Ass'n of State Dir. of Teacher Educ. & Certification, *Model Code of Ethics for Educators* (2021) ....................................................... 18

Nat'l Educ. Ass'n, *Code of Ethics for Educators* (1975) ..................... 17–18

DeShanna Neal & Trinity Neal, MY RAINBOW (2020) .............................. 8

Anthony Niedwiecki, *Save Our Children: Overcoming the Narrative that Gays and Lesbians are Harmful to Children*, 21 DUKE J. GENDER L. & POL'Y 125 (2013) ................................................... 9

Robb Pearlman & Eda Kaban PINK IS FOR BOYS (2018) ......................... 13

Sharon Purtill & Sujata Saha, IT'S OKAY TO BE DIFFERENT (2009) ....... 13

Ruth Thompson-Miller et al., JIM CROW'S LEGACY: THE LASTING IMPACT OF SEGREGATION (2014) .............................................................. 9

The Trevor Project, *2022 National Survey on LGBTQ Youth Mental Health* (2022) ................................................................... 15–16

U.S. Ctr. for Disease Control & Prevention, *LGBTQ-Supportive School Policies and Practices Help All Students Thrive*, (June 2022) ....................................................................................... 12

U.S. Ctr. for Disease Control & Prevention, *Youth Risk Behavior Survey Data Summary & Trends Report: 2009–2019* (2020) ............ 15

## STATEMENT OF AMICI CURIAE

This amicus brief is submitted on behalf of the National Education Association ("NEA"), the Maryland State Education Association ("MSEA"), and the Montgomery County Education Association ("MCEA").[1]

NEA is the nation's largest professional association and union representing approximately three million members, the vast majority of whom serve as educators, counselors, and education support professionals in our nation's public schools. NEA is committed to fulfilling the promise of public education to prepare every student to succeed in a diverse and interdependent world.

MSEA is NEA's Maryland affiliate and represents 75,000 educators and school employees who work in Maryland's public schools, teaching and preparing our almost 900,000 students both for career jobs of the future and as citizens in a diverse society.

---

[1] Amici submit this brief with the consent of all the parties. *See* Fed. R. App. P. 29(a)(2). Amici state that no party's counsel authored the brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person— other than Amici, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

MCEA represents 14,000 educators who work in Montgomery County Public Schools, which is Maryland's largest school district. MCEA is an affiliate of MSEA and NEA. MCEA and its members are committed to teaching the students in the school system and encouraging each of them to understand, analyze, and appreciate the diversity of our society, thereby cultivating good citizens. At the same time, consistent with its mission of improving working conditions for educators, MCEA is also focused on eliminating administrative barriers to effective teaching.

Since its founding over a century and a half ago, NEA and its affiliates have worked to create, expand, and strengthen the quality of public education available to all children. Amici NEA, MSEA, and MCEA believe that public education is the cornerstone of our social, economic, and democratic structures, and that students of all backgrounds have the right to excellent public schools. Amici therefore all have a strong interest in ensuring that public schools create safe, inclusive, and welcoming school environments for all students. Montgomery County's school community—which values inclusivity, equity, tolerance, and cooperation—is a shining example of such an

environment which fosters learning that prepares students to thrive in a richly diverse society. Amici have interviewed MCEA members, who are the classroom teachers responsible for educating the students of Montgomery County and implementing the policies of Montgomery County Public Schools. Amici write to share the voices of these educators who embody the values behind, and witness the impact of, these MCPS policies and practices every day in their classrooms, on the playground, and in their relationships with families and caregivers in their school communities.

## ARGUMENT

Amici support the leadership of Maryland County Public Schools ("MCPS") in taking the position that inclusivity and tolerance are not optional in its schools, but rather, that its curricula must provide students with exposure to, and a basis on which to understand, the diverse backgrounds and identities of the families that make up their community and the broader world in which they will become citizens, parents, neighbors, workers, and entrepreneurs.

Amici offer three points in support of MCPS's policies of inclusivity. First, those policies, including the district's curricular choice

to include representation of LGBTQ+ people, is integral to the role of public schools in preparing students for good citizenship. Second, a requirement that schools allow individual opt-outs from inclusivity undermines MCPS's educational goals and the safety of the school environment for all students. And third, substituting the judgment of federal courts on individual curriculum opt-outs over the expertise of education professionals is unworkable not only as a judicial matter, but in daily classroom management and school supervision.

A.    **MCPS's policies and practices of inclusivity are integral to its role in preparing students for good citizenship.**

The Supreme Court has long recognized that education is "the very foundation of good citizenship." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). In our democratic society, public schools are charged with being the "principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Id.*

Crucial to that educational task is a school's ability to instill in young minds the universal values of inclusivity, tolerance, and pluralism. These values will prepare students for eventual success in the workforce. *See Grutter v. Bollinger*, 539 U.S. 306, 330 (2003)

(recognizing that "the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints"). They will also prepare students to discharge their civil duties as citizens. *See Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021) (characterizing America's public schools as "the nurseries of democracy"); *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986) (explaining that "fundamental values . . . essential to a democratic society must, of course, include tolerance of divergent political and religious views").

The Nation's public schools are therefore put to their highest and best use when they work as an "'assimilative force' by which diverse and conflicting elements in our society are brought together on a broad but common ground," and they "inculcate fundamental values necessary to the maintenance of a democratic political system." *Ambach v. Norwick*, 441 U.S. 68, 77 (1979). After all, "[p]eople are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001) (Posner, J.).

MCPS—like school districts across the country—takes these obligations seriously and believes that promoting tolerance and understanding of our diverse identities and experiences by including in the curriculum the representation of historically marginalized people, including sexual minorities, is important preparation for the development of students into citizens. This is articulated in the Montgomery County School Board's adopted policies, which support "proactive steps to identify and redress implicit biases and structural and institutional barriers" that have resulted in underrepresentation and discrimination against particular groups of people. Montgomery County Bd. of Educ., *Policy ACA: Nondiscrimination, Equity, and Cultural Proficiency* at 2 (2021). These policies commit the School Board to providing "a culturally responsive . . . curriculum that promotes equity, respect, and civility" and prepares students to "[c]onfront and eliminate stereotypes related to individuals' actual or perceived characteristics," including gender identity and sexual orientation. *Id.* at 5. Through the representation of diverse identities in its curriculum and instructional materials, the School Board "supports a student's ability

to empathize, connect, and collaborate with diverse peers and encourages respect for all." Dist. Ct. ECF No. 43 at ¶ 22.

MCPS educators interviewed for this brief described how their instruction in line with these MCPS policies creates an environment that allows young students to break down barriers and learn inclusivity:

> ➢ Danillya Wilson, a first grade teacher with 11 years of experience, stated:
>
> > In my classroom, the students are taught that all humans are valuable and deserve to be seen for their authentic selves. A diverse and inclusive curriculum, including books with LGBTQ+ characters, communicates a commitment to fairness, understanding, and respect for all individuals.
>
> ➢ Ms. Wilson also described texts used in the social studies curriculum where the main character has two moms or two dads:
>
> > It's important for our kids to see families that reflect both their own familial structure and other make-ups so that they can build empathy and understanding. We want children to recognize there are familial structures different from their own and that they are one part of a larger community.

➢ A second grade teacher with 21 years in MCPS described reading DeShanna Neal & Trinity Neal, MY RAINBOW (2020) to her class, as part of teaching character point of view and responding to challenges:

> This story is not only a wonderful book to use to teach ELA standards, but it also teaches compassion and appreciation of differences. The main character is the book, Trinity, is not only transgender, but also has autism.
>
> While I read the book to the class, upon hearing the words, "I'm a transgender girl," one of the children in my class called out, "That's like my sister!" This child felt seen. This child saw his family reflected in the pages of a story, and it was safe to hear the experiences of the character in the book as well as identify with that character and share that with his classmates. That moment was so tender. We need to support our students and validate their tender truths.

➢ Another MCPS teacher offered this explanation of her approach to teaching to a diverse group of students with different backgrounds and beliefs:

> I have always worked to teach my students that families can look many different ways. We read texts about families with different beliefs (Jewish, Christian, Muslim, Atheist, etc.), families that come from different cultures (Indigenous, Hispanic, African, European, Asian, etc.), and families with different make-ups (single

parents, children being raised by grandparents, nuclear families, two same-sex parents, etc.).

These stories of educators promoting inclusion and tolerance under MCPS's policies and curricular choices stand in stark contrast to the unfortunate reality that, at this particular moment in history, the recognition of LGBTQ+ people in public life and the rights of transgender and gender nonconforming people to live authentically has been politicized in harmful and destructive ways. This is a sadly familiar repetition of our nation's shameful history of labeling certain minority groups as dangerous in order to justify their oppression.[2]

---

[2] *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 449 (1985) (holding that "vague, undifferentiated fears" of people with disabilities could not justify discrimination against them); Ruth Thompson-Miller et al., JIM CROW'S LEGACY: THE LASTING IMPACT OF SEGREGATION 22–23, 89 (2014) (discussing that scores of black men were lynched for crimes ranging from looking at a white woman to alleged rape of a white woman during the Jim Crow era, pursuant to a still-present stereotype that black men are particularly criminal and dangerous for white women); Anthony Niedwiecki, *Save Our Children: Overcoming the Narrative that Gays and Lesbians are Harmful to Children*, 21 DUKE J. GENDER L. & POL'Y 125, 142–52, 161–63 (2013) (discussing how gay rights opponents have historically used a narrative equating homosexuality with pedophilia to defeat proposed anti-discrimination laws, ban gay couples from adopting, attempt to ban gays and lesbians from teaching in public schools, and argue against allowing gay Boy Scout troop leaders); Phoebe Godfrey, *Bayonets, Brainwashing, and Bathrooms: The Discourse of Race, Gender, and*

(*continued . . .*)

However, the unfortunate fact of this politicization does not somehow transform an LGBTQ+ inclusive curriculum into a violation of anyone's rights. Even to the extent that the inclusion of stories with LGBTQ+ characters and themes in the ELA curriculum can be characterized as intending to influence students to accept others who are different from themselves—and assuming that there is some "continuum along which an intent to influence could become an attempt to indoctrinate" that would be objectionable—the MCPS curriculum is "firmly on the influence-toward-tolerance end." *Parker v. Hurley*, 514 F.3d 87, 106 (1st Cir. 2008). After all, there is no principled difference between teaching students to treat others equally and with respect, no matter their sexual orientation or gender identity, and the likewise essential and non-objectionable teaching that others should be treated equally and respectfully, no matter their race, religion, or national origin.

To be sure, it can sometimes be uncomfortable and challenging to live in an interdependent world, or to work and learn alongside people

---

*Sexuality in the Desegregation of Little Rock's Central High*, 62 ARK. HIST. Q. 42, 43–46, 51–52 (2003) (discussing how white parents' fears that black boys and girls would harm their daughters was a driving force in the fight against school integration).

of different identities, backgrounds, beliefs, and values. But as the Supreme Court recently observed, even though "some will take offense to certain forms of speech or [expression] they are sure to encounter in a society where those activities enjoy such robust constitutional protection," that feeling of offense does not outweigh a "long constitutional tradition in which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2430–31 (2022) (quoting *Lee v. Weisman*, 505 U.S. 577, 590 (1992)).

**B.    Requiring schools and educators to honor individual opt-outs undermines the educational and safety benefits of inclusive curricula.**

MCPS is committed to addressing historical and structural inequities that impact the ability of students to achieve their goals and thrive in a multiracial and multicultural democracy. To this end, its curriculum is designed to be inclusive of the diversity of identities and experiences within the school community and more broadly in our society, including those of LGBTQ+ people.

MCPS's inclusive curriculum, not only helps prepare students for citizenship, it helps them thrive both emotionally and academically

while they remain in school. Multiple studies demonstrate that inclusive policies that recognize the equality and dignity of all students benefit LGBTQ+ students, as well as their cisgender, heterosexual peers. School climates that are safe and inclusive for LGBTQ+ students are good for *all* students.[3]

These studies are consistent with research that confirms the benefits of inclusive and culturally responsive curriculum that highlights the lived experiences of people of color and those from a variety of ethnic backgrounds. This large body of research identifies improvements in students' critical thinking skills, as well as increases in direct measures of academic success such as GPA, school attendance,

---

[3] *See* U.S. Ctr. for Disease Control & Prevention, *LGBTQ-Supportive School Policies and Practices Help All Students Thrive* (June 2022) ("All young people do better in LGBTQ-inclusive schools."); Adina C. Cooper, et al., *Examining the Relationship Between LGBTQ-Supportive School Health Policies and Practices and Psychosocial Health Outcomes of Lesbian, Gay, Bisexual, and Heterosexual Students*, 9 LGBT HEALTH 43, 43–53 (2022) (finding that "LGBTQ-supportive policies and practices are significantly associated with improved psychosocial health outcomes among both LGB and heterosexual students").

standardized test performance and graduation rates—not just for students of color, but for *all* students.[4]

The stories of MCPS educators also confirm some of the ways in which all students benefit and draw lessons from materials that may center LGBTQ+ characters and experience:

> ➢ Ms. Wilson explains that she reads Sarah Hoffman et al., JACOB'S NEW DRESS (2014), Stacy B. Davids, ANNIE'S PLAID SHIRT (2015), and Jessica Love, JULIÁN IS A MERMAID (2018) to show that kids are allowed to wear whatever clothes make them comfortable; she reads Michael Hall, RED: A CRAYON'S STORY (2015) and Sharon Purtill & Sujata Saha, IT'S OKAY TO BE DIFFERENT (2009) to teach that we should accept people for who they are on the inside; and Robb Pearlman & Eda Kaban PINK IS FOR BOYS (2018) and Laura Gehl & Joshua

---

[4] Law Firm Anti-Racism Alliance & Nat'l Educ. Ass'n, *The Very Foundation of Good Citizenship: The Legal and Pedagogical Case for Culturally Responsive and Racially Inclusive Public Education for All Students* at 14–15 (Sept. 29, 2022).

Heinsz, EXCEPT WHEN THEY DON'T (2019) to tell kids that they can like whatever makes them happy.

➢ Ms. Wilson also relies on storybooks with LGBTQ+ characters to meet specific state educational standards. She explained that she uses the book Chelsea Johnson et al., INTERSECTION ALLIES: WE MAKE ROOM FOR ALL (2019) in first grade to highlight the state standards requiring students to "[a]sk and answer questions about key details in a text" and to "[d]escribe characters, details, and major events in a story using key details." Md. State Dep't of Educ., *Maryland College and Career Ready Standards for English Language Arts Grades 1–2* §§ R.1.1, R.1.3 (Nov. 2022).

In setting curricular goals related to tolerance and inclusion, schools can also enhance student safety. It is well documented that LGBTQ+ individuals have historically suffered ostracization and discrimination, and that LGBTQ+ students suffer disproportionately high rates of bullying and harassment. That being so, there is a particular need to affirmatively welcome and encourage acceptance of LGBTQ+ students and families. An overwhelming majority (83%) of

LGBTQ+ youth report being harassed or assaulted during the 2021-2022 academic year, and more than four out of five (81.8%) LGBTQ+ students reported feeling unsafe in school because of their actual or perceived personal characteristics.[5] The impact of this harassment and discrimination is devastating. LGBTQ+ youth report high levels of depression and suicidal ideation—multitudes of times higher than their cisgender, heterosexual peers. The Trevor Project found that 45% of LGBTQ youth (ages 13–24) seriously considered attempting suicide in the past year, including half (50%) of LGBTQ children age 13-17 seriously considering and 18% attempting suicide.[6] Experiencing discrimination is a significant factor in this increased risk of harm: 19%

---

[5] Caitlin M. Clark et al., *The 2021 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* at 10-11, 19 (2022).

[6] *See* The Trevor Project, *2022 National Survey on LGBTQ Youth Mental Health* at 5 (2022). The Centers for Disease Control and Prevention found even higher rates: 23.4% of lesbian, gay and bisexual high school students attempted suicide one or more times during 2019, compared with only 6.4% of their heterosexual peers. *See* U.S. Ctr. for Disease Control & Prevention, *Youth Risk Behavior Survey Data Summary & Trends Report: 2009–2019* at 100 (2020). Lesbian, gay and bisexual high school students were more than three times as likely to have made a suicide plan as their heterosexual peers (40% compared to 12%). *Id.* at 99.

of youth who had experienced discrimination based on sexual orientation or gender identity attempted suicide in the past year, whereas 7% of LGBTQ+ youth who did not report experiencing discrimination attempted suicide.[7]

One important means of reducing the discriminatory treatment and harassment of LGBTQ+ students is by including books and stories in the school curriculum and instructional materials that represent the lives, culture, history, and experiences of LGBTQ+ people. MCPS's curriculum is thus also consistent with the obligations of schools and educators to maintain an environment that is free from discrimination on the basis of sexual orientation or gender identity. Those obligations are rooted in both federal law, which prohibits discrimination and harassment of students in schools on the basis of sexual orientation and general identity, *see Grimm v. Gloucester County Sch. Bd.*, 972 F.3d 586, 616–17 (4th Cir. 2020), and in state law, *see* Md. Code, Educ. § 26-704(b)(1) (prohibiting public schools from discriminating against students on the basis of, among other things, "sex," "sexual orientation," or "gender identity"); *id.* § 7–424 (requiring public schools to report

---

[7] The Trevor Project, *supra* note 7, at 18.

incidents of "bullying, harassment, or intimidation"—including those "[m]otivated by an actual or a perceived personal characteristic including . . . sex, sexual orientation, [or] gender identity"—and to disclose the "corrective action taken by the appropriate school authorities"). To exclude LGBTQ+ stories and representation from the curriculum and instructional material would violate these basic civil right mandates.

And beyond these legal requirements, most educators believe they have an ethical and professional obligation to treat all students with dignity and acceptance for who they are and to foster learning environments based on respect and inclusion.[8] For example, NEA's *Code of Ethics*, adopted by its highest governing body in 1975, provides that educators accept "the responsibility to adhere to the highest ethical standards," including "the guarantee of equal educational opportunity

_____

[8] For some, it is also a matter of religious conviction. *See* Rev. Susan Fredrick-Gray, *Transphobic and Anti-Abortion Policies are a Direct Threat to My Religious Freedom*, RELIGION DISPATCHES (June 6, 2022) (describing tenets of Unitarian Universalism that compel acceptance and affirmation of LGBTQ+ individuals and citing research indicating that 97% of Unitarian Universalists support nondiscrimination protections for LGBTQ+ people).

for all."[9] Likewise, the *Model Code of Ethics for Educators* requires "[r]especting the dignity, worth and uniqueness of each individual student including, but not limited to, actual and perceived gender, gender expression, gender identity, sexual orientation."[10]

By contrast, when books that feature people who are lesbian, gay, bisexual, transgender, or gender nonconforming are singled out for opt-out, the message to students and the school community is that the mere existence of LGBTQ+ people is somehow objectionable. Thus, it is not only that permitting opt-outs from essential elements of an inclusive curriculum denies learning to those students who are opted-out, but the very act of carving out the stories of a certain group as "opt-out-able" violates antidiscrimination norms, places educators in an ethical bind, and undermines the school's mission to "teach by example the shared values of a civilized social order." *Fraser*, 478 U.S. at 683. As one MCPS educator put it: "If these texts are opted-out, children who are LGBTQ+

---

[9] Nat'l Educ. Ass'n, *Code of Ethics for Educators* (1975).

[10] Nat'l Ass'n of State Dir. of Teacher Educ. & Certification, *Model Code of Ethics for Educators* § III.B.2 (2021); *see also*, Troy Hutchings, *"All" Means All—It Really is that Simple*, ETHICS AND EDUCATORS BLOG (Sept. 13, 2022) (explaining that the Model Code of Ethics "ratifies ethical standards that are innate to the teaching profession").

or have family members that are LGBTQ+ may feel that their identities and experiences are being marginalized or ignored. Students will miss the educational benefits of understanding and empathizing with different experiences." As another MCPS educator explained, allowing such opt-outs creates the "false narrative" that there is "something harmful" about the materials.

The Plaintiffs-Appellants' own arguments to this Court illustrate the harmful presumptions that underlie their request for targeted opt-outs. Plaintiffs-Appellants equate the mere inclusion of stories that include LGBTQ+ people as part of a broad ELA curriculum with health education on sexual activity and reducing health risks from sexually transmitted diseases, arguing that regulation allowing opt-out for the latter implies that there should be an opt-out for the former. *See* Pltfs.-Appellants' Br. 15–18, 38–39 (citing Code of Md. Admin. Regs. § 13A.04.18.01). Sadly, this is just one version of a familiar argument—namely, that the very existence of non-heterosexual or non-cisgender people is necessarily sexualized, and that LGBTQ+ people are somehow sexually dangerous—which has long been used as a trope to

marginalize the LGBTQ+ community and justify discrimination against LGBTQ+ people.[11]

School climates where some students are targeted for unequal treatment impacts all students. For example, research on bullying shows that LGBTQ+ youth and those with disabilities are particularly vulnerable to bullying, and that this impacts not only the victims but also the perpetrators.[12] "Children and youths who bully others are more likely to be depressed, engage in high-risk activities such as theft and

---

[11] *See.*, *e.g.*, Beatrice Mount & Alyssa Tirrell, *A non-exhaustive list of everything and everyone the right accused of grooming*, MEDIA MATTERS FOR AMERICA (Jan. 23, 2023). For example, earlier this year, a group in Michigan called the "Great Schools Initiative" launched a coordinated campaign to encourage parents to use an "opt-out" form it created, inaccurately citing Michigan's sex-ed opt-out law as the basis for parents to remove their children from exposure to any LGBTQ+ content in classrooms, including books. *See* Taylor Bowie, *State Board of Education pushes back on campaign against "rogue sex ed,"* MICHIGAN NPR, (Feb. 17, 2023). In response, the Michigan State Board of Education issued a resolution recommending school boards "reject any third party opt-out forms as invalid, irrelevant, and inconsequential." Mich. State Bd. of Educ., *Resolution: Sex Education* (Feb. 14, 2023) (describing the specific process for parental opt-outs from sex education classes, and recognizing that "any deviation from a district's standard and established procedures for opting out of approved classes may disrupt the school, its operations, and the education of its students.").

[12] *See* Bd. on Children, Youth & Families, Nat'l Acad of Sci., Eng'g & Med., *Report in Brief: Preventing Bullying Through Science, Policy and Practice* (2016).

vandalism, and have adverse outcomes later in life compared to those who do not bully."[13] Just as the harms that flow from outright bullying impact both the perpetrator and the victim, even the more subtle treatment of particular students' identities as objectionable has a negative impact on all students.

Educators understand this intuitively and know that their classrooms cannot embrace diversity, tolerance, and mutual respect in some ways, but deny it in others and still obtain the benefits of inclusive classrooms. Students who see their LGBTQ+ peers or family being treated as objectionable justifiably fear that they too will one day be treated as unwelcome or "less than" their peers. As a result, requiring teachers to honor individual opt-outs from the curriculum hampers their ability to teach crucial material and to provide for the safety of their students.

---

[13] *See id.*

**C.    Requiring schools and educators to honor individual opt-outs would embroil federal courts in the day-to-day operations of public schools and prove unworkable in practice.**

Plaintiffs-Appellants ask this Court for an order requiring public schools to give advance notice and an opportunity to individually opt out of any lessons to which parents may have a religious objection. But, if this Court were to grant that request, it is difficult to imagine a scenario that would generate more litigation, uncertainty, and administrative confusion. *Cf. Harris v. Quinn*, 573 U.S. 616, 636–37 (2014) (explaining the dangers of adopting constitutional rules that will be fraught with "conceptual difficulty" and "practical administrative problems").

This Court has recognized that, because "school officials are far more intimately involved with running schools than federal courts are, it is axiomatic that federal courts should not lightly interfere with the day-to-day operation of schools." *Hardwick v. Heyward*, 711 F.3d 426, 440 (4th Cir. 2013) (cleaned up). Similarly stark warnings against federal judicial interference in local school matters can be found throughout the U.S. Reports. *See, e.g., Endrew F. v. Douglas County Sch. Dist. RE-1*, 580 U.S. 386, 404 (2017) (cautioning that courts do not

have "an invitation . . . to substitute their own notions of sound educational policy for those of the school authorities which they review"); *Christian Legal Soc'y Chapter v. Martinez*, 561 U.S. 661, 686 (2010) (reminding courts to be "[c]ognizant that [they] lack the on-the-ground expertise and experience of school administrators"); *Missouri v. Jenkins*, 515 U.S. 70, 131–33 (1995) (explaining that "school officials not only bear the responsibility for educational decisions, they also are better equipped than a single federal judge to make the day-to-day policy, curricular, and funding choices necessary to bring a school district into compliance with the Constitution" and that when "federal judges undertake such local, day-to-day tasks, they detract from the independence and dignity of the federal courts and intrude into areas in which they have little expertise"); *Wisconsin v. Yoder*, 406 U.S. 205, 235 (1972) (recognizing "the obvious fact that courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education"); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint.").

Plaintiffs-Appellants' requested relief, by contrast, would effectively insert the district court below—and, for that matter, every district court in this Circuit—into the day-to-day curricular, lesson-planning, and teaching decisions of the public schools. Worse yet, courts, parents, educators, and administrators would be left to guess at the answers to dozens of questions that would predictably arise from a ruling in Plaintiffs-Appellants' favor.

To begin with, what kinds of lessons and topics would trigger a school's obligations to provide advance notice and a mechanism for parental opt-out? Plaintiffs-Appellants' requested relief is limited to materials involving "family life and sexuality," but school materials often contain references to family and, if only indirectly, to sexuality. Is a reference in a book to a character's mother and father sufficiently related to "family life and sexuality" to warrant parental notification?

Furthermore, what kind of notice and opt-out mechanism would be considered constitutionally sufficient? Must the notice contain detailed information about potentially objectionable material? What are acceptable methods for delivering a notice? How far in advance must

the notice be delivered? All of these are questions that would only be resolved through extensive litigation.

As it is, federal judges already labor under heavy caseloads. And MCPS educators are likewise under enormous pressure to provide for the academic and social emotional needs of their students. Some of those educators described the burdensome nature of allowing opt-outs from parts of the curriculum to which parents may have religious objections, including:

- o Advance planning of when to present particular books;
- o Communication to families about when lessons are taking place;
- o Waiting for families to respond or not respond to whether their students will participate, which creates division in the class;
- o Students missing additional, unrelated instruction, because families generally pull their students out for the entire day rather than picking them up from school and returning them after the one ELA lesson; and
- o Impact of absenteeism on ELA and other academic areas.

Moreover, a school's obligation to provide advance notice and an opt-out mechanism surely cannot be cabined to one type of religious objection. Schools would instead have to predict an entire array of topics to which parents have—or could have—an objection. *See, e.g., Bob Jones Univ. v. United States*, 461 U.S. 574, 580 (1983) (objections to interracial dating and marriage); *Leebaert v. Harrington*, 332 F.3d 134, 136 (2d Cir. 2003) (objections to "instruction on health and safety, alcohol, tobacco and drugs, and family life"); *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 57–63 (2d Cir. 2001) (objections to lessons on drug-abuse prevention, world religions, yoga, and Earth Day); *Herndon v. Chapel Hill–Carrboro City Bd. of Educ.*, 89 F.3d 174, 176 (4th Cir. 1996) (objections to student performing community service); *Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 683, 690 (7th Cir. 1994) (objections to materials that contain "wizards, sorcerers, giants," other "creatures with supernatural powers," or that could be said to teach "tricks, despair, deceit" or "parental disrespect"); *Mozert v. Hawkins County Bd. of Educ.*, 827 F.2d 1058, 1062–70 (6th Cir. 1987) (objections to lessons involving "evolution," "false supernaturalism," "feminism," "telepathy," "magic," "pacifism," "rebellion against parents,"

"secular humanism," "political issues," "other forms of religion," "feelings, attitudes and values of other students that contradict the plaintiffs' religious views," and "biographical material about women who have been recognized for achievements outside their homes"); *C.H. v. Sch. Dist. of the Chathams*, No. 18-cv-966, 2023 WL 6806177, at *6 (D.N.J. Oct. 16, 2023) (objections to lessons about the Islamic religion); *State v. Webber*, 8 N.E. 708, 709 (Ind. 1886) (objections to music class).

As these examples illustrate, in a society of people with diverse backgrounds and beliefs, anticipating religious objections and opting students out of parts of the curriculum quickly becomes unworkable. "If we are to eliminate everything that is objectionable to any [religious group] or inconsistent with any of their doctrines, we will leave public schools in shreds. Nothing but educational confusion and a discrediting of the public school system can result from subjecting it to constant law suits." *McCollum v. Bd. of Educ.*, 333 U.S. 203, 235 (1948) (Jackson, J., concurring). What is called for instead is the tolerance for—and ideally, appreciation of—the rich diversity of identities, backgrounds, beliefs, and religious practices that make up a pluralistic society.

## CONCLUSION

For the foregoing reasons, Amici respectfully request that the district court's denial of a preliminary injunction be affirmed.

*/s/ Alice O'Brien*
Alice O'Brien
Jason Walta
Keira McNett
NATIONAL EDUCATION
ASSOCIATION
1201 16th Street, N.W.
Washington, DC 20036
(202) 822-7035
aobrien@nea.org

Kristy K. Anderson
MARYLAND STATE EDUCATION
ASSOCIATION
140 Main Street
Annapolis, Maryland 21401
(443) 758-8395

*Counsel for Amici Curiae*

October 30, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 5,290, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally space typeface using Microsoft Word with Century Schoolbook 14-point font.

*/s/ Jason Walta*
Jason Walta

October 30, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2023, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

*/s/ Jason Walta*
Jason Walta

October 30, 2023