No. 23-1890

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

TAMER MAHMOUD; ENAS BARAKAT; JEFF ROMAN; SVITLANA ROMAN; CHRIS PERSAK; MELISSA PERSAK, in their individual capacities and ex rel. their minor children; KIDS FIRST, an unincorporated association,

*Plaintiffs-Appellants*,

v.

MONIFA B. MCKNIGHT; SHEBRA EVANS; LYNNE HARRIS; GRACE RIVERA-OVEN; KARLA SILVESTRE; REBECCA SMONDROWSKI; BRENDA WOLFF; JULIE YANG; MONTGOMERY COUNTY BOARD OF EDUCATION,

*Defendants-Appellees*.

---

On Appeal from The United States District Court for the District of Maryland, Southern Division
Case No. 8:23-cv-1380 – Hon. Deborah L. Boardman

---

## BRIEF OF PROFESSORS LAWRENCE G. SAGER AND NELSON TEBBE AS AMICI CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

---

Rachel M. Schiff
Phillip H.C. Wilkinson
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California  94105-2907
(415) 512-4000
Rachel.Schiff@mto.com
Phillip.Wilkinson@mto.com

Rachel G. Miller-Ziegler
Helen E. White
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Rachel.Miller-Ziegler@mto.com
Helen.White@mto.com

*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

**Page**

INTEREST OF *AMICI CURIAE* ..................................................................1

INTRODUCTION ........................................................................................2

ARGUMENT ...............................................................................................5

I.    The Free Exercise Clause Requires Heightened Scrutiny When the Government Devalues Religion Relative to Other Interests. ..........5

    A.    Free Exercise Decisions Leading Up to *Tandon* Laid the Groundwork for a Focus on Whether Uneven Treatment Demonstrated Religion Was Being Devalued. ..........................5

    B.    The Supreme Court Has Now Expressly Adopted an Equal-Value Approach. ..............................................................11

II.    MCPS's Opt-Out Policies Do Not Reflect a Devaluing of Religious Beliefs or Practice and Therefore Do Not Trigger Strict Scrutiny Under *Tandon*. ........................................................15

    A.    MCPS Does Not Devalue Plaintiffs' Religious Beliefs or Practice by Allowing Plaintiffs to Opt Out of Health Instruction for Religious Reasons. .............................................15

    B.    A Language and Reading Skills Curriculum Is Not Comparable to a Health Curriculum. .......................................19

CONCLUSION ..........................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Blackhawk v. Pennsylvania*,
  381 F.3d 202 (3d Cir. 2004) .......................................................................*passim*

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993)........................................................................................6, 7, 9

*Employment Division v. Smith*,
  494 U.S. 872 (1990)...........................................................................................5, 6

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*,
  170 F.3d 359 (3d Cir. 1999) ...................................................................7, 8, 9, 13

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) ..........................................................................11, 12, 16, 18

*Tandon v. Newsom*,
  141 S. Ct. 1294 (2021)..................................................................................*passim*

**FEDERAL RULE**

Federal Rule of Appellate Procedure 29(a)(4)(E)......................................................1

**STATE STATUTES**

Md. Code Regs. § 13A.01.06.01...............................................................................20

Md. Code Regs. § 13A.01.06.03(B)(2)......................................................................20

Md. Code Regs. § 13A.01.06.03(B)(5)......................................................................20

**OTHER AUTHORITIES**

Christopher L. Eisgruber & Lawrence G. Sager, *Congressional Power
  and Religious Liberty After* City of Boerne v. Flores, 1997 Sup. Ct.
  Review 79 (1997).................................................................................................2

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Christopher L. Eisgruber & Lawrence G. Sager, *Equal Regard*, *in* Law and Religion: A Critical Anthology (Stephen M. Feldman, ed. 2001) ....................................................................................................2

Christopher L. Eisgruber & Lawrence G. Sager, *Religious Freedom and the Constitution* (2006) ....................................................................1

Emergency Application, *Tandon v. Newsom*, No. 20A151 (Apr. 2, 2021) ...............................................................13

Lawrence G. Sager, *Why Churches (and, Possibly, the Tarpon Bay Women's Blue Water Fishing Club) Can Discriminate*, *in* The Rise of Corporate Religious Liberty (Micah Schwartzman, Chad Flanders & Zoë Robinson, eds. 2016) .................................................1

Nelson Tebbe, *The Principle and Politics of Equal Value*, 121 Colum. L. Rev. 2397 (2021) ...............................................................2

Nelson Tebbe, *The Principle and Politics of Liberty of Conscience*, 135 Harv. L. Rev. 267 (2021) ...........................................................2

Nelson Tebbe, *Religious Freedom in an Egalitarian Age* (2017) ............................1

## INTEREST OF *AMICI CURIAE*[1]

Professor Lawrence G. Sager and Professor Nelson Tebbe are preeminent constitutional theorists and scholars who teach, write on, and study the history and scope of the First Amendment's Free Exercise and Establishment Clauses. *Amici* have focused significant scholarly attention on the Free Exercise Clause requirement that governments treat religious people, beliefs, and practices with appropriate respect. Through that work, *amici* have developed a deep understanding of the doctrine and principles relevant to Plaintiffs' argument under *Tandon v. Newsom*, 141 S. Ct. 1294 (2021).

Professor Sager holds the Alice Jane Drysdale Sheffield Regents Chair at the University of Texas at Austin School of Law.[2] Professor Sager has written extensively on religious freedom and the First Amendment. Professor Sager is the co-author of *Religious Freedom and the Constitution* (2006) (with C. Eisgruber), and has written numerous articles and book chapters about religious freedom, including *Why Churches (and, Possibly, the Tarpon Bay Women's Blue Water*

---

[1] Counsel for all parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici affirm that no counsel for a party authored this brief in whole or in part and that no person or entity other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

[2] Institutional affiliations are provided for identification purposes only. This brief reflects the signatories' personal views only and not the views, if any, of these institutions.

*Fishing Club) Can Discriminate*, *in* The Rise of Corporate Religious Liberty (Micah Schwartzman, Chad Flanders & Zoë Robinson, eds. 2016); *Equal Regard*, *in* Law and Religion: A Critical Anthology (Stephen M. Feldman, ed. 2001) (with C. Eisgruber); and *Congressional Power and Religious Liberty After* City of Boerne v. Flores, 1997 Supreme Court Review (with C. Eisgruber).

Professor Tebbe is the Jane M.G. Foster Professor of Law at Cornell Law School. His work focuses on freedom of religion, freedom of speech, and other topics in constitutional law. He is the author of *Religious Freedom in an Egalitarian Age* (2017), which examines the contemporary conflict between free exercise and equality law. His recent scholarship on religious liberty includes *The Principle and Politics of Liberty of Conscience*, 135 Harv. L. Rev. 267 (2021), and *The Principle and Politics of Equal Value*, 121 Colum. L. Rev. 2397 (2021).

**INTRODUCTION**

Running through free exercise doctrine is a deep concern that religious belief and practice be treated fairly. When the government seems to offer better treatment to secular activity than to religious activity, there is reason to worry that the unevenness of regulation may be because the government is devaluing religious interests relative to secular ones. Similar unease arises when the practice of one religious group, particularly a minority religion, is treated less favorably than that of another faith; the unequal treatment may indicate a lack of respect. Mindful of the

threat that sort of disfavoring would pose to free exercise, the Supreme Court announced in *Tandon v. Newsom*, 141 S. Ct. 1294 (2021), that a regulation that "treat[s] *any* comparable secular activity more favorably than religious exercise" is subject to strict scrutiny. *Id.* at 1296.

Plaintiffs contend that Montgomery County Public Schools ("MCPS") runs afoul of *Tandon* in MCPS's approach to books featuring LGBTQ characters and stories (the "Storybooks"). Specifically, Plaintiffs note that MCPS permits families to pull their children out of the family life and human sexuality portions of health class ("Health Instruction"), which includes instruction on topics such as sexual orientation and gender identity. But, Plaintiffs complain, MCPS does not permit families with religious objections to the Storybooks to remove their children from the classroom when those books, which may involve some broadly similar topics (albeit in a very different context and format), are read or taught. Plaintiffs somehow believe that MCPS has thus set up a system under which religious activity (taking children out of classrooms when the Storybooks are read) is treated worse than comparable activity (removing children from Health Instruction).

In addition to obfuscating the facts of this case, that argument fundamentally misunderstands *Tandon* and the cases from which it developed. The inquiry at the heart of those cases is whether the government's regulatory approach demonstrates that it has failed to treat religious activities with the same respect as the government

accords to other activities. The cases use a comparability test as a heuristic for detecting that devaluing of religion. But, as this case demonstrates, that doctrinal device must be understood with regard to its equal-value goal. Without that objective in mind, it is all too easy to expand out what activities are "comparable," making every regulatory asymmetry presumptively unconstitutional.

Properly applied, *Tandon* does not support Plaintiffs here. First, while MCPS does not permit anyone to opt their children out of the Storybooks, MCPS allows *anyone* to opt their children out of Health Instruction for *any reason*, including for religious reasons. Plaintiffs' effort to leverage favorable treatment for religion in one context to extract favorable treatment for the same religion in another context turns *Tandon* on its head. Second, Plaintiffs have done nothing to show (and have certainly not established a likelihood of success of proving) that the Storybooks are comparable to Health Instruction in the relevant sense. Their theory—that both types of instruction were adopted to serve the state's interest in promoting equity and that they are therefore comparable under *Tandon*—conceives of comparability in a manner that is entirely unmoored from *Tandon*'s equal-value concern. MCPS's generous accommodation in the context of Health Instruction undercuts any contention that it disfavors Plaintiffs' faiths. MCPS treats Storybooks differently from Health Instruction because they are different curricula, not because MCPS does

not see the value in Plaintiffs' religion.  The Court should reject Plaintiffs' argument under *Tandon*.

## ARGUMENT

### I. The Free Exercise Clause Requires Heightened Scrutiny When the Government Devalues Religion Relative to Other Interests.

*Tandon*'s equal-value principle has developed in the case law over several decades.  In the 1990s, the Supreme Court first planted the seeds of that approach, which Justice Alito cultivated while on the Third Circuit.  Then, when the Court was confronted with challenges to COVID-19 regulations on religious gatherings, it resolved those claims by requiring that religious activities and commitments be treated as fully equal in value with "comparable" secular activities.  Examining those cases demonstrates that the doctrinal rules that the Court has adopted in this context are fundamentally aimed at identifying instances where religion is devalued. Ignoring that equal-value concern in interpreting those rules would distort and misapply *Tandon* and the cases that led to it.

### A. Free Exercise Decisions Leading Up to *Tandon* Laid the Groundwork for a Focus on Whether Uneven Treatment Demonstrated Religion Was Being Devalued.

1. The Supreme Court first laid the groundwork for an equal-value approach in *Employment Division v. Smith*, 494 U.S. 872 (1990).  Prior cases ostensibly had required laws to pass strict scrutiny where they "substantially burden[ed] a religious practice," *id.* at 883, though courts usually upheld substantial burdens in practice.

*Smith* resolved the tension between doctrine and practice, holding that no heightened scrutiny was appropriate where laws were "neutral" and "generally applicable." *Id.* at 881, 883.  Under *Smith*, laws that targeted religious beliefs or practice—such as laws banning the creation of "statutes that are to be used for worship purposes" or prohibiting "bowing down before a golden calf"—"would doubtless be unconstitutional." *Id.* at 877-78.  So too, "where the State has in place a system of individual exemptions," *Smith* held that "it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.* at 884 (citation omitted).  However, laws that neither formally disfavored religion, nor informally exposed it to disfavor, but instead had merely an "incidental effect" of interfering with religious practice, would not provoke constitutional concern. *Id.* at 878.  In short, the *Smith* Court foreshadowed *Tandon* by focusing constitutional concern on situations where the state is disfavoring religion.

Three years later, in *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the Court moved closer to an express embrace of equal value in striking down laws that demonstrated a devaluing of religion.  In *Lukumi*, the City of Hialeah had adopted ordinances that generally prohibited the slaughter of animals, but that contained numerous carveouts for nonritual (*i.e.*, nonreligious) killings as well as exemptions for kosher slaughter. *Id.* at 535-37.  The patchwork of exemptions, the Court held, was an unconstitutional "religious gerrymander" under

which "almost the only conduct" banned was "the religious exercise of Santeria church members." *Id.* at 535 (citation omitted).

In reaching that conclusion, the Court invoked the language of equal value. The Court observed that the City of Hialeah's purported interests in "protecting the public health and preventing cruelty to animals" were used to block Santeria ritual sacrifice, but gave way as to most nonreligious conduct and to the religious practices of other religious groups. *Id.* at 543. The City had thus "devalue[d] religious reasons for killing by judging them to be of lesser import than nonreligious reasons." *Id.* at 538. The Court reasoned that "inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id.* at 542-43. The City permitted killing for a variety of secular reasons, and even permitted killing for some religious purposes. *Id.* at 535-37. But killing for sacrifice—for primarily symbolic religious purposes— was banned. *Id.* at 536-37. This, the Court unanimously felt, unconstitutionally disfavored Santeria belief and practice. *See id.* at 538, 546-47; *id.* at 577 (Blackmun, J., concurring in the judgment).

2. Following *Lukumi*, Justice Alito sketched out an equal-value principle in two important decisions he authored while still on the Third Circuit. First, in *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999), two Muslim police officers challenged the Newark police

department's policy prohibiting officers from growing beards, arguing that they were "under a religious obligation to grow their beards" and that the department's policy violated their free exercise rights. *Id.* at 360-61. The department justified its policy by pointing to an interest in a "monolithic" and "readily identifiable" police force that presented a "uniformity of appearance." *Id.* at 366 (citation omitted and alterations accepted). The department was willing to make an exception for officers who could not shave for medical reasons, but not for officers who, like the *Fraternal Order* plaintiffs, could not shave for religious reasons. *See id.* at 365-67. The Third Circuit agreed that this inequality triggered heightened scrutiny, explaining that the department had "made a value judgment that secular (*i.e.*, medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not." *Id.* at 366.

Significantly, the Third Circuit noted that a separate exception to the no-beard policy, one for undercover officers, would not trigger heightened scrutiny because beards on undercover officers did "not undermine the Department's interest in uniformity." *Id.* That makes sense as an equal-value matter: The department was treating secular activity (beard growth by undercover officers) better than religious activity (beard growth by religious officers). But that distinct treatment did not indicate that the government was making a "value judgment" that favored undercover officers, *id.* at 366; the department was treating the activities differently

8

because only the religious activity implicated the department's interest in a uniform police force.

Justice Alito's second Third Circuit equal-value decision came in *Blackhawk v. Pennsylvania*, 381 F.3d 202 (3d Cir. 2004). Dennis Blackhawk, who subscribed to the religious traditions of the Lakota people, applied for an exemption from Pennsylvania's wildlife permit fee so he could steward black bears freely on his property as part of his religious practice. *See id.* at 204-05. When the state denied him the exemption, he challenged the denial on free exercise grounds, focusing, *inter alia*, on the fact that the state *did* grant a permit fee exemption to zoos and circuses. *See id*. at 204-06.

Writing for the court, then-Judge Alito read *Lukumi* and *Fraternal Order* to announce a rule that a "law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated." *Id.* at 209. The state justified its permit fee as serving "two main interests": "bring[ing] in money" and "tend[ing] to discourage the keeping of wild animals in captivity . . . except where doing so provides a 'tangible' benefit for Pennsylvania's wildlife." *Id.* at 211. Charging zoos and circuses a permit fee would "bring in money" just as much as charging religious individuals. *Id.* And neither

9

circuses nor zoos in most instances provided any "tangible benefits for animals living in the wild in Pennsylvania." *Id.* (explaining that only under "special circumstances" such as participation in a research project would captivity in a zoo provide relevant benefits). The court thus concluded that the exemptions that the state did allow "undermine[d] the interests served by the fee provision to at least the same degree as would an exemption for a person like Blackhawk," triggering strict scrutiny that the law could not survive. *Id.* at 211-14.

Again, that decision is best explained with reference to equal value. The Third Circuit asked not just whether there were other exemptions or even whether there were other exemptions that implicated the same interests as a religious exemption would. Instead, it found the law constitutionally suspect only after concluding that the exemptions that the law did allow undermined the state's interests "to at least the same degree" as a religious exemption. *Id.* at 211. If religious exemptions interfered with governmental interests far more than secular exemptions, then allowing secular exemptions but not religious ones would not necessarily indicate the government was devaluing religious conduct—only that the government was focused on advancing its interests. But because the state's purported justifications for the law were equally, if not more, undermined by the secular exemptions, the only way to explain the uneven treatment was that the government did not put the importance of

Indigenous people's religious interests on equal footing with secular entities' business practices—a result the Constitution did not permit.

**B.    The Supreme Court Has Now Expressly Adopted an Equal-Value Approach.**

Sixteen years after *Blackhawk*, Justice Alito's approach became the law of the Court in decisions addressing COVID-19 regulations that limited the number of people who could gather for religious worship.  First, in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (*Brooklyn Diocese*), the Court enjoined the portion of Governor Cuomo's executive order that imposed restrictions on attendance at New York religious services on the basis that the order "single[d] out houses of worship for especially harsh treatment."  *Id.* at 66 (per curiam).  The order set out operation and capacity restrictions based on the category of building—*e.g.*, schools, restaurants, and houses of worship—and on the COVID-19 case count in geographic areas, designated as "red," "orange," and "yellow" zones.  *See id.*; *id.* at 76 (Breyer, J., dissenting).  In red zones, houses of worship were limited to gatherings of the lesser of 25% capacity or 10 people, while essential businesses did not have any capacity restrictions.  *See id.* at 66-67 (per curiam); *id.* at 76 (Breyer, J., dissenting).  The Court held that those restrictions, among others, led to "troubling results."  *Id.* at 66 (per curiam).  For example, "a large store . . . could . . . have hundreds of people shopping there on any given day" while a "nearby church or synagogue"—perhaps even an equally large one—"would be prohibited from

11

allowing more than 10 . . . people inside for a worship service." *Id.* at 66-67 (quotation marks and citation omitted). The Court concluded that the order's "especially harsh treatment" of places of worship triggered strict scrutiny, ultimately leading the Court to enjoin that portion of the order. *Id.* at 66.

The decision is best understood as aiming to effectuate an equal-value concern. New York undoubtedly had an interest in preventing transmission of COVID-19. But, in the Supreme Court's view, the order also reflected the governor's judgment that certain activities were so important that their ability to continue overrode that public-health interest. By declining to allow religious worship to continue to the same degree as essential businesses, the regulation raised a concern that the less favorable treatment reflected a judgment that religious activities were not as important as certain secular ones. And, not finding any non-discriminatory rationale for barring religious worship from continuing to the same degree, the Court apparently viewed the order's "disparate treatment" of religion to reflect such a constitutionally suspect value judgment. *Id.* at 66. Or, as Justice Gorsuch put it in his concurrence, "[t]he only explanation for treating religious places differently seems to be a judgment that what happens there just isn't as 'essential.'" *Id.* at 69 (Gorsuch, J., concurring).

In *Tandon*, the Court finally elevated an equal-value approach to an express holding of the Court. California had adopted a rule limiting at-home gatherings—

including gatherings for religious worship—to three households, but the state had no such limit on gatherings outside of the home. *Tandon*, 141 S. Ct. at 1297. A minister and congregant who wished to hold larger in-home religious gatherings challenged the restrictions, alleging that California, like New York, had impermissibly imposed harsher restrictions on religious practice than it had on comparable secular activities. *See* Emergency Application 8, *Tandon v. Newsom*, No. 20A151 (Apr. 2, 2021).

Considering that challenge, the Supreme Court began by setting out four points—the first two of which reflect a clear embrace of the equal-value principle. First, the Court held, "government regulations are not neutral and generally applicable . . . whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296. This was the first time the Court made explicit the proposition that asymmetric regulation under circumstances signaling devaluation of religion would trigger heightened scrutiny. Second, the Court explained that the key question of "whether two activities are comparable" was to "be judged against the asserted government interest that justifies the regulation at issue." *Id.* Without citing Justice Alito's prior opinions, the Court thus adopted the approach of *Fraternal Order* and *Blackhawk*, each of which had turned on a finding of religious devaluation and each of which had evaluated comparability

by examining the extent to which exemptions interfered with the government interest cited as justification for a rule.

Applying these principles, the *Tandon* Court enjoined the California restriction on in-home worship. First, the Court found there were secular activities—gatherings in places like "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants"—that were treated "more favorably than at-home religious exercise." *Id.* at 1297. Second, those activities were "comparable" because the court of appeals had not concluded that the secular activities "pose a lesser risk of transmission than applicants' proposed religious exercise at home," *id.*—that is, the forbidden religious activity did not, in the Court's view, undermine the government interest behind the restrictions more than the permitted secular activity did. Without a transmission-based rationale for allowing larger secular gatherings than religious ones, the Court viewed the difference in regulation as explainable only by the government's failure to assign religious practice the same importance as it had to secular activities. *See id.* at 1297. In short, it was the perceived devaluing of religious practice that triggered strict scrutiny and doomed California's COVID-19 policy. *See id* at 1297-98.

14

## II.    MCPS's Opt-Out Policies Do Not Reflect a Devaluing of Religious Beliefs or Practice and Therefore Do Not Trigger Strict Scrutiny Under *Tandon*.

Plaintiffs' *Tandon* argument charges that "[o]pt-outs are banned for the Pride Storybooks but permitted for comparable instruction in the sex-ed portion of health class." Plaintiffs' Br. 38. Plaintiffs argue that because MCPS permits them to remove their children from the sex-ed portion of health class, MCPS is required to permit them to remove their children from the Storybook language skills and reading program on religious grounds as well. That argument fails for two reasons. First, MCPS does not treat any group of parents—secular or religious—differently from Plaintiffs. What Plaintiffs are objecting to is the difference in how they themselves are treated as between Health Instruction, where they are permitted to remove their children, and Storybooks, where they are not. This is a constitutional non sequitur, and the inquiry could stop right there. But second, even as to Health Instruction and Storybooks, Plaintiffs ignore the fundamental difference between the educational objectives of the two curricula, and make no plausible showing that they are comparable. All this completely misunderstands the point of *Tandon*, ripping it from its equal-value roots.

### A.    MCPS Does Not Devalue Plaintiffs' Religious Beliefs or Practice by Allowing Plaintiffs to Opt Out of Health Instruction for Religious Reasons.

*Tandon* and its antecedent cases sought to protect religion and religious commitments from government disregard. They all involved situations in which the

government—without any apparent justification—betrayed a lack of concern for religious claimants relative to others seeking relief from the same government policy.  In each of those cases, "[t]he only explanation for treating religious [activity] differently" was "a judgment" that the religious activity was just not "as 'essential'" or valuable as analogous secular or religious activity.  *Brooklyn Diocese*, 141 S. Ct. at 69 (Gorsuch, J., concurring).  What mattered was that the government's regulation demonstrated that it valued someone's conduct more than the challenger's religious practice.  Strict scrutiny followed, in the name of free exercise.

That simply does not describe the facts of this case.  Here, no one's conduct is being valued over Plaintiffs'.  To see why, imagine that two school districts, District A and District B, use the same Storybooks and Health Instruction as MCPS.  The only difference between them is that District A does not permit opt outs from either the Storybooks or Health Instruction, while District B (like MCPS) permits parents to opt out of Health Instruction, including for religious reasons.  District B's willingness to permit religious (and other) opt outs from Health Instruction does not provide any reason to worry that religion is being disfavored; to the contrary, District B has shown a greater willingness to accommodate religious concerns than District A.[3]  Yet, under Plaintiffs' reading of *Tandon*, District B would be constitutionally

---

[3] In this case, state law requires MCPS to permit opt outs from Health Instruction, MCPS Br. 11 (citing JA544), but Plaintiffs' argument would remain the

required to permit opt outs from the Storybooks, while District A's more restrictive approach would be immune from a *Tandon* challenge. That reading of *Tandon* makes no sense. And, perversely, it would create a great disincentive for a school district to make religious accommodations for any curriculum, since doing so would oblige the district to permit opt outs for *all* curricula.

Critically, MCPS has not carved out any conduct from its allowance for Health Instruction opt outs. Instead, MCPS has allowed *anyone* for *any* reason—secular or religious—to excuse their children from Health Instruction. Plaintiffs' contention that they are entitled to an exemption from the Storybooks therefore boils down to a claim that because they are free from governmental burdens on their religion in one way, they must also be free from governmental burdens on their religion in another way.

Plaintiffs thus ask this Court not to apply *Tandon*, but to extend it to a markedly different circumstance—an extension that is not warranted by the underlying rationale of the cases. As explained, *Tandon* and the preceding cases rest on a concern that when religion receives "especially harsh treatment," that may reflect a constitutionally suspect failure to accord appropriate value to religious

---

same even where a district made an independent decision to grant such opt outs, *cf.* JA558 (Plaintiffs' district court filing, discussing state-law requirement for Health Instruction opt outs).

practice. *Brooklyn Diocese*, 141 S. Ct. at 66. But when the government *grants* an exemption for religious exercise, it shows that it is *valuing* that exercise. It makes no sense to treat MCPS's decision to allow parents with religious objections to Health Instruction to exclude their children from that instruction as evidence that MCPS is disfavoring the exact same religion in declining to allow opt outs from the Storybooks. Indeed, far from advancing religious practice, Plaintiffs' in-for-a-penny,-in-for-a-pound conception of the Free Exercise Clause could, if accepted, lead to *fewer* exemptions for religious practice: if every such exemption opened the door for an argument that the government must enact carveouts from other regulations for that same practice, governments might respond by being less charitable to religion in their regulatory approach.

An equal-value approach also explains why Plaintiffs' only attempt to deal with the existence of religious opt outs to Health Instruction fails. *Tandon* explained that where the government treats "comparable secular activity more favorably than religious exercise," it cannot cure that unequal treatment by "treat[ing] [other] comparable secular businesses . . . as poorly as . . . the religious exercise at issue." *Tandon*, 141 S. Ct. at 1296.[4] Plaintiffs invoke that statement to argue that it does

---

[4] That is a sensible application of equal value: Treating certain secular activity better than religious activity, and treating other secular activity equivalently to religious activity, would show only that the government values certain secular activity as little as it values religious activity. Because the government would still

18

not matter "that the Storybook opt-out ban applies to both 'religious and secular' requests, while opt-outs from sex-ed are available for both."  Plaintiffs' Br. 40.  That argument ignores the first, triggering part of *Tandon*'s framework.  MCPS has not treated "comparable secular activity more favorably than religious exercise," *Tandon*, 141 S. Ct. at 1296:  it has treated *religious activity* in one context (Health Instruction) more favorably than *the same religious activity* in another context (Storybooks).  Unlike in *Tandon*, all religious activity is treated exactly the same as the directly analogous secular activity.  That meticulous parity does not offend the Free Exercise Clause.  Neither, surely, does MPCS's willingness to allow opt outs from Health Instruction.

### B.     A Language and Reading Skills Curriculum Is Not Comparable to a Health Curriculum.

The fact that Plaintiffs' beliefs have not been devalued is enough to dispose of their *Tandon* argument.  But the argument also fails because, in fact, Storybooks, part of the language and reading skills curriculum, implicate dramatically different educational concerns than Health Instruction and they are thus not "comparable" under *Tandon*.  *See Tandon*, 141 S. Ct. at 1296 ("[W]hether two activities are comparable . . . must be judged against the asserted government interest that justifies

---

treat some secular activity better than religious activity, it would still devalue religious activity relative to *that* secular activity.

the regulation at issue."). That might seem obvious. But Plaintiffs' analysis of the governmental interest here falls short in two ways.

1. Plaintiffs' only argument for why the Storybooks constitute "comparable instruction" to Health Instruction is that MCPS implemented both the Storybooks and Health Instruction "to comply with Maryland's 2019 'Equity Regulation.'" Plaintiffs' Br. 38; *see also id.* at 39 (arguing that Storybooks and Health Instruction are "justified by the same interest"). The Equity Regulation requires schools to, among other things, give "every student . . . access to the opportunities, resources, and educational rigor they need . . . to maximize academic success and social/emotional well-being and to view each student's individual characteristics"— including gender identity and expression and sexual orientation—"as valuable." Md. Code Regs. §§ 13A.01.06.01, 13A.01.06.03(B)(2), (5); *see also* Plaintiffs' Br. 38.

It may well be that Maryland's Equity Regulation prompted content in both of these curricula, including some material on sexuality and gender identity. But of course the content of each of these courses and its importance to student development—including, but by no means limited to, their promotion of inclusionary perspectives—is dramatically different. Storybooks and Health Instruction teach fundamentally different subject matter, with different learning goals and objectives, to different age groups. *See* MCPS Br. 6-9, 11. Specifically,

Health Instruction constitutes one unit in a discrete class aimed at teaching students about sexuality and family planning. *See id.* at 11. Storybook opt outs, by contrast, implicate books that are integrated sporadically in instruction with the primary purpose of teaching students reading and language skills. *See*, *e.g.*, JA503-505 (describing curricular goals of English Language Arts instruction). In this curriculum, discussion of LGBTQ people is incidental to the language acquisition and reading skills on which the curriculum focuses; children learn to read by reading stories and, because of the Storybooks, sometimes those stories will be about LGBTQ people and sometimes they will be about straight and/or cisgender people. *See* JA541 (explaining how the Storybooks are used). Given the myriad ways that Health Instruction serves different instructional goals than the Storybooks, MCPS's adoption of different approaches to opt outs for these two contexts does not show that MCPS is disfavoring religion.

2. Even if Plaintiffs were right that the relevant governmental interest here was advancing the state's Equity Regulation, they would still have failed to show comparability. In determining comparability, *Tandon* inquired into whether the permitted secular activities and the restricted religious activities created different COVID-19 transmission risks. *See Tandon*, 141 S. Ct. at 1296-97. If permitted secular activities posed less of a COVID-19 risk than prohibited religious ones, then the difference in treatment would reflect a legitimate scientific judgment, not any

devaluing of religion. *Id.* at 1297; *see also Blackhawk*, 381 F.3d at 209 (examining comparability by looking to whether permitted secular activity "undermines the purposes of the law *to at least the same degree* as the covered conduct that is religiously motivated" (emphasis added)). Plaintiffs have made no effort to show that opt outs from Health Instruction upset MCPS's focus on equity to the same degree as opt outs from the Storybooks. In fact, there is every reason to think that early exposure to the existence of diverse family structures, gender expressions, and sexual orientations does far more to advance the State's interest in promoting equity than a discrete unit covering gender and sexuality in the clinical context of a health class. *See, e.g.*, MCPS Br. 4-5 (discussing importance of representation in curriculum). Even accepting Plaintiffs' framing of the relevant governmental interest as promoting inclusivity, Plaintiffs have not even alleged—much less demonstrated a likelihood of success of proving—that exemptions from the Storybooks undermine that interest no less than exemptions from Health Instruction. Their claim under *Tandon* accordingly fails for that additional reason.

Again, it is important to remember that the point of looking to the governmental interest behind a regulation is to see whether the government's non-uniform pursuit of a particular interest suggests that religion has been disregarded. *Tandon*'s approach is intended to reveal a devaluation of religious commitments.

22

And nothing about the differential treatment of health classes and reading classes supports any worry on that score.

## CONCLUSION

For the foregoing reasons, the Court should reject Plaintiffs' argument that MCPS's policy is subject to strict scrutiny under *Tandon*.


Dated: October 30, 2023                  Respectfully submitted,

                                         */s/ Rachel G. Miller-Ziegler*
Rachel M. Schiff                         Rachel G. Miller-Ziegler
Phillip H.C. Wilkinson                   Helen E. White
MUNGER, TOLLES & OLSON LLP               MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor           601 Massachusetts Avenue NW
San Francisco, California 94105          Suite 500E
(415) 512-4000                           Washington, DC 20001
Rachel.Schiff@mto.com                    (202) 220-1100
Phillip.Wilkinson@mto.com                Rachel.Miller-Ziegler@mto.com
                                         Helen.White@mto.com

                    *Counsel for Amici Curiae*

23

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(4)(G), because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), the document contains 5,208 words.

2.      This document complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 29(a)(4), 32(a)(5), and 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman.

Dated:  October 30, 2023                          */s/ Rachel G. Miller-Ziegler*
                                                                        Rachel G. Miller-Ziegler

## CERTIFICATE OF SERVICE

I certify that on October 30, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.  All participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  October 30, 2023          */s/ Rachel G. Miller-Ziegler*
                                         Rachel G. Miller-Ziegler