No. 23-1890

# In the United States Court of Appeals for the Fourth Circuit

───────────────

TAMER MAHMOUD, et al.,
*Plaintiffs-Appellants,*

v.

MONIFA B. MCKNIGHT, et al.,
*Defendants-Appellee*s.

───────────────

On Appeal from the United States District Court for the
District of Maryland, Southern Division
(No. 8:23-cv-1380) (The Hon. Deborah L. Boardman)

───────────────

**BRIEF OF AMICUS CURIAE PROFESSOR JUSTIN DRIVER**

───────────────

AMANDA FLUG DAVIDOFF
DANIEL J. RICHARDSON
CASON J.B. REILY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC  20006
(202) 956-7500
davidoffa@sullcrom.com

# TABLE OF CONTENTS

Page

Interest of the *Amicus Curiae*.................................................................1

Introduction and Summary of Argument.............................................2

Argument.......................................................................................................5

I.   Appellants' Free Exercise Theory Would Destabilize Existing
     Doctrine and Prove Unworkable in Practice ...............................5

     A.   Supreme Court Precedent Interpreting the Religion
          Clauses Has Established a Stable Framework That
          Accommodates Competing Interests.................................5

     B.   Allowing Free Exercise Challenges to Public-School
          Curricular Choices Would Unwind the Existing
          Framework and Harm Public Education.......................15

II.  Appellants' Free Exercise Theory Would Allow Private Parties to
     Impermissibly Regulate Government Speech ............................20

Conclusion..................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agostini* v. *Felton*,
  521 U.S. 203 (1997)............................................................................7, 9

*Bauchman* v. *West High Sch.*,
  132 F.3d 542 (10th Cir. 1997)...............................................................14

*Board of Educ. of Westside Cmty. Schs.* v. *Mergens*,
  496 U.S. 226 (1990)............................................................................8, 12

*Bowen* v. *Roy*,
  476 U.S. 693 (1986)...........................................................................13, 15

*California Parents for Equalization of Educ. Materials* v.
  *Torlakson*, 973 F.3d 1010 (9th Cir. 2020)...........................17, 24, 25

*Carson* v. *Makin*,
  596 U.S. ___ (2022) .............................................................................10

*Engel* v. *Vitale*,
  370 U.S. 421 (1962)...............................................................................6, 7

*Espinoza* v. *Montana Dept. of Revenue*,
  591 U.S. ___ (2020) ..............................................................................11

*Fellowship of Christian Athletes* v. *San Jose Unified*
  *Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023) .....................8

*Fleischfresser* v. *Directors of Sch. Dist. 200*,
  15 F.3d 680 (7th Cir. 1994)...............................................................14, 17

*Florey* v. *Sioux Falls Sch. Dist. 49-5*,
  619 F.2d 1311 (8th Cir. 1980)................................................................16

*Grove* v. *Mead Sch. Dist. No. 354*,
  753 F.2d 1528 (9th Cir. 1985)................................................................14

*Hazelwood Sch. Dist.* v. *Kuhlmeier,*
    484 U.S. 260 (1988)................................................................22

*A.H. ex rel. Hernandez* v. *Northside Independent Sch. Dist.,*
    916 F. Supp. 2d 757 (W.D. Tex. 2013)............................................17

*Johanns* v. *Livestock Marketing Ass'n,*
    544 U.S. 550 (2005)................................................................21

*Keller* v. *State Bar of Cal.,*
    496 U.S. 1 (1990)..................................................................25

*Kennedy* v. *Bremerton Sch. Dist.,*
    597 U.S. ___ (2022) ...............................................................19

*Lee* v. *Weisman,*
    505 U.S. 577 (1992)..............................................................6, 7

*Loving* v. *Virginia,*
    388 U.S. 1 (1967)..................................................................23

*Mahanoy Area Sch. Dist.* v. *B.L.,*
    594 U.S. ___ (2021) ...............................................................25

*Meyer* v. *Nebraska,*
    262 US. 390 (1923)..................................................................9

*Milliken* v. *Bradley,*
    418 U.S. 717 (1974)................................................................11

*Mitchell* v. *Helms,*
    530 U.S. 793 (2000)..............................................................7, 9

*Morrison ex rel. Morrison* v. *Board of Educ. of Boyd Cnty., Ky.,*
    419 F. Supp. 2d 937 (E.D. Ky. 2006)............................................17

*Morse* v. *Frederick,*
    551 U.S. 393 (2007) ...............................................................22

*Mozert* v. *Hawkins Cnty. Bd. of Educ.,*
    827 F.2d 1058 (6th Cir. 1987)................................................14, 16

*Parker* v. *Hurley*,
    514 F.3d 87 (1st Cir. 2008) .................................................................14

*Pierce* v. *Society of the Sisters of the Holy Names of*
    *Jesus and Mary*, 268 U.S. 510 (1925) .............................................10

*Pleasant Grove City, Utah* v. *Summun*,
    555 U.S. 460 (2009) ................................................................20, 21

*Rust* v. *Sullivan*,
    500 U.S. 173 (1991) ...........................................................................21

*San Antonio Indep. Sch. Dist.* v. *Rodriguez*,
    411 U.S. 1 (1973) ...............................................................................12

*Santa Fe Indep. Sch. Dist.* v. *Doe*,
    530 U.S. 290 (2000) .............................................................................7

*School Dist. of Abington Twp., Pa.* v. *Schempp*,
    374 U.S. 203 (1963) .............................................................................7

*Stone* v. *Graham*,
    449 U.S. 39 (1980) ...............................................................................7

*Swanson* v. *Guthrie Indep. Sch. Dist. No. I-L*,
    135 F.3d 694 (10th Cir. 1998) ..........................................................14

*Trinity Lutheran Church of Columbia, Inc.* v. *Comer*,
    582 U.S. 449 (2017) .............................................................................6

*Turner* v. *City Council of City of Fredericksburg, Va.*,
    534 F.3d 352 (4th Cir. 2008) ...........................................................21

*United States* v. *Lee*,
    455 U.S. 252 (1982) ....................................................................13, 18

*Wallace* v. *Jaffree*,
    472 U.S. 38 (1984) .......................................................................8, 10

*Wisconsin* v. *Yoder*,
    406 U.S. 205 (1972) ...............................................10, 13, 14, 15

*Zelman* v. *Simmons-Harris*,
536 U.S. 639 (2002)............................................................5, 9, 11

**Constitutional Provision**

U.S. Const. amend. I...............................................................5

**Other Authorities**

Ian Dooley, *Banned Books Week 2019: And Tango Makes Three*,
Cotsen Children's Library (Sept. 23, 2019) ...............................18, 24

Justin Driver, *The Schoolhouse Gate: Public Education,*
*the Supreme Court, and the Battle for the*
*American Mind* (2018) ...........................................................*passim*

Justin Driver, *Three Hail Marys:* Carson*,* Kennedy*, and the*
*Fractured Détente over Religion and Education*,
136 Harv. L. Rev. 208 (2017) ..............................................9

EdChoice, *The ABCs of School Choice* (2021) ....................................11

Cynthia Greenlee, *Banned Bunnies*, N.Y. Times (Apr. 26, 2023) ..................24

Maryland Department of Education,
*High School United States History Framework* (Sept. 2020)....................23

National Center for Education Statistics,
*Private School Enrollment*, (May 2022) .........................................11

Pew Research Center, *For a Lot of American Teens, Religion*
*Is a Regular Part of the Public School Day* (Oct. 3, 2019) .........................11

Brian D. Ray, *Research Facts on Homeschooling*
Nat'l Home Educ. Rsch. Inst., (July 20, 2023) ................................11

J. Harvie Wilkinson III, Goss *v.* Lopez*: The Supreme Court as*
*School Superintendent*, 1975 Sup. Ct. Rev. 25 (1975)............................12, 19

Mary Zawadzki, *Banned Book Week 2019: Strega Nona*,
Cotsen Children's Library (Sept. 27, 2019) ....................................18

## INTEREST OF THE *AMICUS CURIAE*

Justin Driver is the Robert R. Slaughter Professor of Law at Yale Law School. An elected fellow of the American Law Institute and the American Academy of Arts and Sciences, he teaches and writes on constitutional law and public education. Driver is the author of *The Schoolhouse Gate: Public Education, the Supreme Court, and the Battle for the American Mind* (2018), which received the Steven S. Goldberg Award for Distinguished Scholarship in Education Law, and was selected as a *Washington Post* notable book of the year. Professor Driver submits this brief to inform the Court of the broader constitutional context that supports the district court's decision in this case. Professor Driver has no personal interest in the outcome of this case.[1]

---

[1] Amicus affirms that no party or counsel for any party authored this brief in whole or in part and that no one other than Amicus or its counsel contributed any money that was intended to fund the preparation or submission of this brief. The parties have consented to this filing.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Appellants claim that Montgomery County Public Schools ("MCPS") violated their rights under the Free Exercise Clause by "compel[ling] them and their children to participate in instruction prohibited by their faith." Appellants' Br. 24.  The district court rejected that claim, reasoning that "[e]very court that has addressed the question has concluded that the mere exposure in public school to ideas that contradict religious beliefs does not burden the religious exercise of students or parents."  J.A. 755–756 (collecting cases).

That decision was correct.  As Appellees explain, there is "uniform judicial consensus that mere exposure in public school to ideas that contradict religious beliefs does not burden religious exercise."  Appellees' Br. 16.  But more than that, the district court's decision adhered to a longstanding body of law at the intersection of constitutional law and public education in the United States.  In recent decades, the Supreme Court has decided a number of cases that accommodate the needs of religious communities in the educational system.  These decisions have permitted students to engage in religious expression in public schools and upheld state and local programs that make public funds available to parents who wish to enroll their children in private

religious institutions. But the Court has also repeatedly emphasized the importance of local control over education, and has never endorsed Free Exercise theories that would shift that control from democratically elected officials to federal courts or inhibit constitutionally protected government speech. Taken together, the Court's decisions have struck a careful balance, one that aligns the values of the First Amendment with the central importance of public education in American life.

A decision in Appellants' favor would disturb that balance. Although Appellants claim to seek only "modest relief" in this case, Appellants' Br. 25, their theory of the First Amendment is anything but modest. To the contrary, their extravagant theory would routinely require MCPS and every other public school system across the country to offer student-specific instruction when parents suspect that an idea or message expressed as part of a public-school curriculum conflicts with the tenets of their faith. The result is both unworkable and undemocratic. Schools would be unable to function effectively, as parents would have the right to flyspeck curricula in a wide range of academic subjects, including English, history, science, and civics education. And schools would be discouraged from providing the education

they believe to be most valuable, in favor of making choices that—they hope, but can never know—would provoke the fewest parents to opt out.

That chilling effect holds implications beyond the Free Exercise Clause. The Supreme Court's Free Speech cases have recognized that it does not violate the Constitution for the government itself to engage in speech that addresses particular content or espouses a specific viewpoint. That principle—known as the government speech doctrine—plays an important role in a democratic society, allowing the government to remain responsive to the local community and to raise topics—like the importance of respect and responsibility—that enjoy community support. And it is vital in public schools, which are entrusted with the responsibility of instilling civic values. But if individual parents are able to successfully challenge curricular decisions under the Free Exercise Clause, public schools would be chilled from addressing important topics.

In rejecting Appellants' claims, the district court adhered to precedent and refused to adopt a theory that would conflict with the Supreme Court's Free Exercise and Free Speech jurisprudence. Its judgment should be affirmed.

## ARGUMENT

### I.    Appellants' Free Exercise Theory Would Destabilize Existing Doctrine and Prove Unworkable in Practice.

The Supreme Court has made clear that the Religion Clauses do not bar all religious expression in public schools, nor do they prevent communities from providing financial aid to parents wishing to pursue religious education outside the public school system.  But at the same time, the Court's decisions have never endorsed a constitutional right for parents to dictate that public schools provide their children with a curriculum tailored to their faith.  Such a right would undermine the Court's decisions recognizing the importance of local control over public schools and would prove entirely unworkable in practice.

#### A.    Supreme Court Precedent Interpreting the Religion Clauses Has Established a Stable Framework That Accommodates Competing Interests.

1.    The First Amendment of the Constitution provides that "Congress shall make no law [1] respecting an establishment of religion, or [2] prohibiting the free exercise thereof."  U.S. Const. amend. I.  Those Religion Clauses prevent "a State from enacting laws that have the 'purpose' or 'effect' of advancing or inhibiting religion," *Zelman* v. *Simmons-Harris*, 536 U.S. 639, 648–649 (2002) (citation omitted), while also "protect[ing]

religious observers against unequal treatment" by the government, *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U.S. 449, 458 (2017) (citation omitted). The Religion Clauses ensure that families who enroll their children in public schools remain free from religious coercion, but do not require students to shed their religious identity at the schoolhouse gate. The Supreme Court's interpretation of the clauses recognizes the unique role that public schools play in American life.

a.    The Court's Establishment Clause precedent ensures that children will not be exposed to state-sponsored *religious* expression as a condition of attending public school. Those decisions recognize the coercive effect of the government's endorsement of particular faiths and "demonstrate awareness" that "this religiously diverse nation must take special steps to forestall any notion that simply receiving an education subjects students to proselytization." Justin Driver, *The Schoolhouse Gate* 362–363 (2018).

Since *Engel* v. *Vitale*, 370 U.S. 421 (1962), the Court has time and again held that the Establishment Clause protects public-school students from anything approaching "an attempt to employ the machinery of the State to enforce a religious orthodoxy." *Lee* v. *Weisman*, 505 U.S. 577, 592 (1992). Applying that principle, the Court has struck down various forms of state-

sponsored religious expression, including prayer in the classroom or at other school-sponsored events. *See id.* (clergy-led prayer at public-school graduation ceremonies); *Engel*, 370 U.S. at 421 (recitation of official state prayer); *School Dist. of Abington Twp., Pa.* v. *Schempp*, 374 U.S. 203 (1963) (daily Bible readings in public schools); *Stone* v. *Graham*, 449 U.S. 39 (1980) (mandatory posting of Ten Commandments in public-school classrooms); *Santa Fe Indep. Sch. Dist.* v. *Doe*, 530 U.S. 290 (2000) (state-backed prayer at public school football games). It has also barred state and local governments from providing "direct aid to religious schools" through various public funding programs. *Mitchell* v. *Helms*, 530 U.S. 793, 842–844 (2000) (O'Connor, J., concurring in the judgment) (controlling opinion); *see also Agostini* v. *Felton*, 521 U.S. 203, 225–226 (1997).

b. At the same time, the Court has not barred religion from the public school system or erected an impermeable barrier between public funds and religious education. *Santa Fe*, 530 U.S. at 302 ("[T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." (citation omitted) (emphasis in orginal)). Instead, its decisions emphatically reject "the notion

that religion and education must remain wholly separate," and make clear that students may "attend[] public schools" without "abandoning their religious identities." *The Schoolhouse Gate* at 393–395.

*First*, the Court's decisions allow students to engage in individual religious expression while in public schools. *See id.* at 394–399. In *Wallace* v. *Jaffree*, 472 U.S. 38 (1984), the Court struck down an Alabama statute authorizing moments of silence in public school "for meditation or voluntary prayer." *The Schoolhouse Gate* at 396. But in so doing, the Court issued a decision that was broadly supportive of other "moment-of-silence statutes," which do not refer to prayer and "provide students who wish to pray with an opportunity to do so." *Id.* at 397 (explaining that *Wallace* was hailed as a "victory" for religious expression at the time). Similarly, the Court has held that schools may provide "equal access" to school facilities for religious student organizations without violating the Establishment Clause. *Board of Educ. of Westside Cmty. Schs.* v. *Mergens*, 496 U.S. 226, 247–253 (1990); *see also Fellowship of Christian Athletes* v. *San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 672, 685–693 (9th Cir. 2023) (en banc) (holding that a school district violated the Free Exercise Clause by "penaliz[ing]" a student group "based on its religious beliefs").

*Second*, the Court has held that the Establishment Clause does not prevent state and local governments from providing indirect, neutral financial support for families who wish to enroll their children in religious schools. *Zelman*, 536 U.S. at 644–645 (upholding school-choice program that provided tuition aid for students attending religious schools); *see also Mitchell*, 530 U.S. at 843 (upholding program by which "government aid supports a school's religious mission only because of independent decisions made by numerous individuals") (O'Connor, J., concurring in the judgment); *Agostini*, 521 U.S. at 225–226 (holding government may make tuition aid "available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited") (citation omitted).  As a result of these decisions, communities can use tax dollars to support religious education, so long as religious schools are treated on the same terms as other private schools.

*Third*, the Court's decisions under both the Free Exercise Clause and the Due Process Clause provide religious parents with broad rights to instruct their children outside of the public school system.  A century ago, the Court recognized the right of Nebraska's Zion Parochial School to provide Biblical instruction to the children of German families in their native tongue.  *See Meyer* v. *Nebraska*, 262 U.S. 390 (1923); *see also* Justin Driver, *Three Hail*

*Marys:* Carson, Kennedy, *and the Fractured Détente over Religion and Education*, 136 Harv. L. Rev. 208, 234 (2022).  Just two years later, the Supreme Court emphatically rejected Oregon's effort to mandate public-school attendance and prevent parents from providing "[s]ystematic religious instruction and moral training according to the tenets of the Roman Catholic Church." *Pierce* v. *Soc'y of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 532 (1925).  The Court's more recent Free Exercise decisions chart a similar course, ensuring that States do not discriminate against parents who wish to educate their children in *private* religious schools, *Carson* v. *Makin*, 596 U.S. ___ (2022), and do not compel public-school attendance when doing so would pose a "danger to the continued existence of an ancient religious faith." *Wisconsin* v. *Yoder*, 406 U.S. 205, 218 n.9 (1972).

The facts on the ground demonstrate the importance of these decisions for religious expression.  Thirty-four states have enacted statutes authorizing or requiring moments of silence consistent with the decision in *Wallace*.  *See The Schoolhouse Gate* at 397.  Many families across the country take advantage of private-school voucher programs, including programs like the

one upheld in *Zelman*,[2] and three million American children are homeschooled.[3] And private religious expression remains commonplace in public education, as students routinely wear religious clothing or jewelry, engage in prayer, and organize on-campus religious clubs.[4]

2. Although the Court's decisions have supported various forms of religious expression in education, the Court has never embraced theories that would allow individual parents or students to dictate public school curricula that reinforce their religious beliefs every step of the way.

The Supreme Court has recognized that "local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process." *Milliken* v.

---

[2] 250,000 children use public vouchers to attend private school. *See* EdChoice, *The ABCs of School Choice* 25 (2021), https://www.edchoice.org/wp-content/uploads/2021/03/2021-ABCs-of-School-Choice-WEB-2-24.pdf. Some of these students are among the 3.5 million children nationwide that attend private religious schools (of the 4.7 million attending all private schools). *See Private School Enrollment*, Nat'l Ctr. for Educ. Stats., (May 2022) https://nces.ed.gov/programs/coe/indicator/cgc/private-school-enrollment.

[3] Brian D. Ray, *Research Facts on Homeschooling*, Nat'l Home Educ. Rsch. Inst., (July 20, 2023), https://www.nheri.org/research-facts-on-homeschooling/.

[4] *For a Lot of American Teens, Religion Is a Regular Part of the Public School Day*, Pew Rsch. Ctr. (Oct. 3, 2019), https://www.pewresearch.org/religion/2019/10/03/for-a-lot-of-american-teens-religion-is-a-regular-part-of-the-public-school-day/.

*Bradley*, 418 U.S. 717, 741–742 (1974).  For that reason, the Court has been wary of endorsing constitutional theories that would require courts to second-guess public schools' curricular decisions or saddle judges with the burden of overseeing the day-to-day operations of a public school system.  *See San Antonio Indep. Sch. Dist.* v. *Rodriguez*, 411 U.S. 1, 41 (1973) (noting that courts lack "the expertise and the familiarity with local problems" necessary to manage public education); J. Harvie Wilkinson III, Goss *v.* Lopez*: The Supreme Court as School Superintendent*, 1975 Sup. Ct. Rev. 25, 73–74 (1975) (criticizing the effect of "load[ing] upon the public school system . . . constitutional baggage," which hampers local communities' "capacity to influence" public schools).

The Court's Religion Clause precedents are consistent with those decisions.  Although the Court has recognized a right for students who wish to engage in religious expression to be treated on the same terms as other students, *see Mergens*, 496 U.S. at 247–253, it has not required schools to make benefits available for certain religious groups that are not available to others.  *See Espinoza* v. *Montana Dept. of Revenue*, 591 U.S. ___, ___ (2020) (slip op., at 20) (holding that, although a State "need not subsidize" religious education, "once a State decides to" offer a benefit, it cannot condition provision of that

-12-

benefit on religion). Similarly, the Court's decision in *Yoder* permitted Old Order Amish parents to opt out of the public school system altogether where public school education threatened the faith's very existence. But as the Court recognized in another context, "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Bowen* v. *Roy*, 476 U.S. 693, 699 (1986).

Appellants hang much of their argument on *Yoder*, which they claim requires schools to "shield their children from any teaching that would harm their formation . . . in accordance with the Parents' religious beliefs." Appellants' Br. 20. But *Yoder* in no way supports judicial intrusion into the daily operation of public schools, which would, of course, interfere with the education of other students. *See United States* v. *Lee*, 455 U.S. 252, 261 (1982) (rejecting a Free Exercise claim that would "operate[] to impose the employer's religious faith on the employees"). The Court in *Yoder* relied on the "lengthy and successful track record of the Old Order Amish as a stand-alone society"—and the relationship of faith to the society's "entire mode of life"—to "support the claim that enforcement of the State's requirement of compulsory formal education after the eighth grade would gravely endanger

if not destroy the free exercise of respondents' religious beliefs." *The Schoolhouse Gate* at 406; *Yoder*, 406 U.S. at 219. It hardly follows that the state must afford students who can and do attend public school an individually tailored curriculum to conform to every potential religious objection. "[P]arents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Swanson* v. *Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998).

Lower courts, looking to the Supreme Court's guidance on Free Exercise claims implicating the public school system, have uniformly rejected claims that parents' religious freedoms were burdened by ideas or messages included in public school curricula. *Parker* v. *Hurley*, 514 F.3d 87, 107 (1st Cir. 2008); *Bauchman* v. *West High Sch.*, 132 F.3d 542, 556–558 (10th Cir. 1997); *Fleischfresser* v. *Directors of Sch. Dist. 200*, 15 F.3d 680, 689–690 (7th Cir. 1994); *Mozert* v. *Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1065 (6th Cir. 1987); *Grove* v. *Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1533–1534 (9th Cir. 1985). The district court followed the same course here, J.A. 770–775, and its decision was correct.

**B.    Allowing Free Exercise Challenges to Public-School Curricular Choices Would Unwind the Existing Framework and Harm Public Education.**

The Free Exercise Clause has never been held to require the government to take affirmative steps to advance any individual's religious beliefs. *See Bowen*, 476 U.S. at 699. But that is exactly what Appellants are asking for here. Their claim—that the Free Exercise Clause requires schools to serve parents a curricular buffet in order to avoid any possibility of religious offense—is neither warranted by precedent nor workable in practice. And it would transfer local control over education from democratically elected school boards to the loudest subset of individual parents and the courts hearing their claims.

According to Appellants, the Constitution requires MCPS to indulge "their religious practice of shielding their elementary school children from ideology . . . that violates their religious beliefs," and to provide opt-outs for any portion of the curriculum that conflicts with parents' religious views. Appellants' Br. 33. Although they claim that relief is "more modest" than the right to opt out of the public school system recognized in *Yoder*, *id.* at 25, Appellants severely misread *Yoder*. The relief in *Yoder* permitted parents to exit the public school system altogether. By contrast, a decision in Appellants'

favor would empower parents to flyspeck every aspect of a public school's curricular decisions, and would force schools to either provide bespoke lesson plans for each student in accordance with his or her parents' particular religious views or "sift out of their teaching everything inconsistent with [the] doctrines" of America's multitudinous religious sects. *Florey* v. *Sioux Falls Sch. Dist. 49-5*, 619 F.2d 1311, 1318 (8th Cir. 1980) (citation omitted).

That concern is hardly hypothetical. In *Mozert*, the plaintiffs raised religious objections to the entire textbook series adopted by Hawkins County, Tennessee. 827 F.2d at 1059–1061. One of the plaintiffs, Mr. Mozert, took issue with a story for beginning readers in which Pat, a girl, and Jim, a boy, prepare a meal: "Pat has a big book. Pat reads the big book. Jim reads the big book. Pat reads to Jim. Jim cooks." *The Schoolhouse Gate* at 402 (citation omitted). "In Mozert's view, this seemingly innocuous tale unconstitutionally impeded his ability to guide his child's religious development because it communicated the idea 'that there are no God-given roles for the different sexes.'" *Id.* Another plaintiff took issue with a story called "A Visit from Mars" because, she argued, it exposed children to "thought transfer and telepathy." *Id.*; *see Mozert*, 827 F.2d at 1062.

Other Free Exercise cases underscore the breadth of curricular interference encouraged by Appellants' theory.  In the last few decades, courts have time and again applied settled law to reject religious challenges to public-school instructional choices on a wide array of subjects ranging from fantasy books to civics education:

- Instructional reading books about "wizards, sorcerers, and giants" for allegedly "foster[ing] a religious belief in the existence of superior beings" and teaching children anti-Christian values such as "tricks" and "despair." *Fleischfresser*, 15 F.3d at 683.

- A social studies curriculum that did not "describe the divine origins of Hinduism or discuss the sacred texts of their religion," "describe[d] Hinduism as consisting of 'beliefs and practices,'" and taught that the caste system "was a social and cultural structure as well as a religious belief" because parents saw it as "derogatory" to their religion.  *California Parents for Equalization of Educ. Materials* v. *Torlakson*, 973 F.3d 1010, 1014–1015 (9th Cir. 2020).

- Mandatory diversity training with "positive statements regarding homosexuality" because of the plaintiffs' "religious beliefs that homosexuality is harmful to those who practice it and harmful to society as a whole."  *Morrison ex rel. Morrison* v. *Board of Educ. of Boyd Cnty., Ky.*, 419 F. Supp. 2d 937, 940, 942 (E.D. Ky. 2006), *aff'd sub nom. Morrison* v. *Board of Educ. of Boyd Cnty.*, 521 F.3d 602 (6th Cir. 2008).

- Use of school "Smart ID" badges with RFID chips since the plaintiff's father "felt the chip in the badge was 'the mark of the beast.'"  *A.H. ex rel. Hernandez* v. *Northside Independent Sch. Dist.*, 916 F. Supp. 2d 757, 768 (W.D. Tex. 2013).

-17-

If courts were to recognize these sorts of claims, interference with local public schools would become only more intrusive and pervasive.

Because of the scope of classroom instruction that could conflict with any given religious belief, schools would face the impossible choice of substantially narrowing their curricula (and sacrificing legitimate pedagogical goals) or implementing onerous and impracticable systems for giving notice and opting out individual students. Such a regime would harm other students, allowing certain parents to exercise a veto over valuable educational opportunities. *See Lee*, 455 U.S. at 261 (noting that the limits imposed by individual religious beliefs should not be "superimposed" on the resources the government makes available to others). For example, schools considering using frequently challenged books like *And Tango Makes Three* (a picture book based on a true story about a pair of male penguins who together raised a chick) or *Strega Nona* (a folktale about a magic pasta pot that makes so much pasta it almost floods a town) would have to determine whether they could bear the classroom disruption and implementation costs that a book-by-book opt-out program would entail.[5] In cash-strapped and administratively overburdened public

---

[5] Ian Dooley, *Banned Books Week 2019: And Tango Makes Three*, Cotsen Children's Library (Sept. 23, 2019) https://blogs.princeton.edu/cotsen/2019/09/banned-books-week-and-tango-

school systems, the path of least resistance would be to substantially narrow the curricula, thereby diminishing the quality of education for all students. Moreover, the result would "undermine a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been part of learning how to live in a pluralistic society." *Kennedy* v. *Bremerton Sch. Dist.*, 597 U.S. ___, ___ (2022) (slip op., at 29) (citation omitted).

That system would also erode local control over education. Facing a deluge of Free Exercise challenges across a wide range of academic subjects, schools would be forced into a defensive crouch, avoiding topics or ideas altogether even when elected officials and school administrators believe they are valuable. And federal courts would be forced to resolve unrelenting curricular disputes, determining when and how schools must tailor lesson plans to respond to objections from an endless parade of individual plaintiffs.

This case vividly illustrates the harm of "inflat[ing]" the courts' "supervision of our public schools." Wilkinson, *supra*, at 28. The materials challenged in this case have been the subject of active debate in Montgomery

---

makes-three/;  Mary Zawadzki, *Banned Book Week 2019: Strega Nona*, Cotsen       Children's       Library       (Sept.       27,       2019) https://blogs.princeton.edu/cotsen/2019/09/banned-book-week-2019-strega-nona/.

County.  Advocates and detractors have made their voices heard at public fora, and democratically accountable officials have faced scrutiny requiring them to defend their decisions.  J.A. 743–747; Appellants' Br. 14–15.  This Court need not endorse the wisdom of MCPS's curricular choices to recognize that local elected officials, rather than unelected judges, are best positioned to make them.

## II.  Appellants' Free Exercise Theory Would Allow Private Parties to Impermissibly Regulate Government Speech.

A constitutional right to opt out of public school curricula would also destabilize another protection of the First Amendment:  the freedom of speech.  According to Appellants, the instructional materials at issue in this case "require[] teachers to emphasize ideological viewpoints."  Appellants' Br. 10.  That contention is not supported by the record.  *See* Appellees' Br. 6–9.  And if Appellants are permitted to wield a Free Exercise claim to limit the government's expression in this case—where the storybooks were included in the curriculum only to "teach[] mutual respect," *id.* at 2—that decision would hold staggering implications for the ability of public schools to speak on matters of public concern.

1.    The Supreme Court has long recognized that "[a] government entity has a right to speak for itself." *Pleasant Grove City, Utah* v. *Summun,*

555 U.S. 460, 467 (2009) (citation omitted). As a result, the government is permitted to engage in speech that addresses particular content or adopts a particular view, even if the government would not be permitted to regulate similar speech by private parties. But if Appellants' claim succeeds here, public schools would be chilled from engaging in speech they believe to be important. Here again, the result would be less effective public schools and a loss of local control over public education.

Viewpoint-discriminatory speech by the government "does not alone raise First Amendment concerns" if it does not compel private speech. *Johanns* v. *Livestock Marketing Ass'n*, 544 U.S. 550, 559 (2005). That principle, known as the "government speech doctrine," allows the state to encourage certain activities it believes to be in the public interest. *Rust* v. *Sullivan*, 500 U.S. 173, 192–200 (1991); *see also Turner* v. *City Council of City of Fredericksburg, Va.*, 534 F.3d 352, 355 (4th Cir. 2008) (O'Connor, J.) (applying government speech doctrine to uphold legislative prayer against Free Exercise Clause claim). And it is an essential feature of government itself. "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Pleasant Grove*, 555 U.S. at 468.

The government speech doctrine undoubtedly applies to public schools. The Supreme Court has repeatedly affirmed that school boards and administrators may regulate not only the speech of the school itself, but also "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Hazelwood Sch. Dist.* v. *Kuhlmeier*, 484 U.S. 260, 271 (1988); *see also Morse* v. *Frederick*, 551 U.S. 393, 422–423 (2007) (Alito, J., concurring) (explaining that *Kuhlmeier* "allows a school to regulate what is in essence the school's own speech"). Simply put, "[t]he government, through the public school, may say what it wishes through its official house organ." *The Schoolhouse Gate* at 110.

That authority over expressive content in schools is at its apex when it comes to public-school curricula. *See id.* at 45. Whereas school-sponsored publications and other expressive activities are ancillary to a school's core pedagogical interests, the curriculum is the tool through which public schools advance their primary educational mission. "[S]tudents assigned to write a paper about the American Revolution—who would prefer to tackle the Cuban Revolution—[do not] have a legitimate claim to their preferred topic under the First Amendment[.]" *Id.* at 19.

2.     Every day, school districts across the United States make vital choices about their learning goals for public school students and the educational materials they will use to meet those objectives.  Those decisions will invariably conflict with the religious views of at least some families in the community.  But to label every dispute between the government's educational speech and private religious beliefs as "coercion" would—by effectively handing each individual member of the school community a constitutional veto power over core government speech—undermine the government's longstanding ability to express certain viewpoints.

Real world examples illustrate the point.  Maryland's high-school social studies curriculum includes learning goals that ask students to assess how 1920s trends "perpetuated racism and discrimination," and look favorably upon the civil rights movement and the importance of "[]equal access to economic opportunity, public accommodations, and political participation." *High School United States History Framework*, Md. Dept. of Educ. (Sept. 2020) https://www.marylandpublicschools.org/about/Documents/DCAA/ SocialStudies/HSUS.pdf.    Those choices express racially egalitarian viewpoints that could be challenged—and have been challenged—as incompatible with private religious belief.  *See, e.g.*, *Loving* v. *Virginia*, 388

U.S. 1, 3 (1967) (quoting trial judge's opinion that "[t]he fact that [God] separated the races shows that he did not intend for the races to mix").[6]

Or consider the facts of *Torlakson*, 973 F.3d 1010. In 1998, California adopted a curriculum that "outline[d] the history of the world's first major civilizations and religions, and invite[d] sixth grade students to engage in critical analyis of the geographic, political, economic, religious, and social structures of each civilization, including Ancient India." *Id.* at 1013–1014 (quotation marks omitted). Hindu parents objected to the curriculum's content on Ancient India, arguing that it interfered with their religious exercise. *Id.* at 1015. In rejecting the claim, the Ninth Circuit noted that the suit would disrupt the State's ability to present a "balanced portrayal of different world religions." *Id.* at 1022. Judge Bress emphasized this point in his concurrence, explaining that the plaintiffs' suit "would paralyze educators in their lawful objective of treating religion as a topic relevant to world history." *Id.* (Bress, J., concurring).

---

[6] There is a long lineage of parental objection to school speech describing interracial or same-sex unions. *See* Cynthia Greenlee, *Banned Bunnies*, N.Y. Times (Apr. 26, 2023) https://www.nytimes.com/2023/04/26/books/review/garth-williams-the-rabbits-wedding-banned-books.html (describing parental revolt over a storybook involving "a male black rabbit and his white female playmate"); Dooley, *supra* note 5.

This Court should not carve into the government speech doctrine a school-shaped hole. What Appellants frame as a "modest" opt-out remedy would radically reshape our nation's public school system. *Supra* § II.B. If Appellants prevail, school boards seeking to promote a learning objective or community value would be hamstrung: faced with Appellants' logistically untenable proposal to shuttle individual students in and out of class according to their religious beliefs, they would likely excise any potentially offensive elements from their curricula. This sea change would severely chill schools' ability to set learning goals that address issues of community concern or to carry out their responsibility as "nurseries of democracy" that instruct students how to engage in public discourse. *Mahanoy Area Sch. Dist.* v. *B.L.*, 594 U.S. ___, ___ (2021) (slip op., at 7). As Chief Justice Rehnquist put it in *Keller* v. *State Bar of Cal.*: "If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed." 496 U.S. 1, 12–13 (1990).

## CONCLUSION

The district court correctly held that Appellants do not have a constitutional right to compel public schools to furnish students with a curriculum tailored to their particular religious beliefs.  This Court should affirm the district court's judgment.

Respectfully submitted,

/s/ *Amanda Flug Davidoff*

AMANDA FLUG DAVIDOFF
DANIEL J. RICHARDSON
CASON J.B. REILY
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW
Washington, DC  20006-5215
(202) 956-7500
davidoffa@sullcrom.com

OCTOBER 30, 2023

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD COUNT LIMITATIONS

I, Amanda Flug Davidoff, counsel for *amicus curiae* Professor Justin Driver and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief is proportionately spaced, has a typeface of 14 points or more, and contains 5,184 words.

/s/ *Amanda Flug Davidoff*
AMANDA FLUG DAVIDOFF

OCTOBER 30, 2023

## CERTIFICATE OF SERVICE

I, Amanda Flug Davidoff, counsel for *amicus curiae* Professor Justin Driver and a member of the Bar of this Court, certify that, on October 30, 2023, a copy of the attached Brief was filed electronically through the CM/ECF system with the Clerk of this Court. The participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

 s/ *Amanda Flug Davidoff*
AMANDA FLUG DAVIDOFF

OCTOBER 30, 2023