No. 23-1890

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

TAMER MAHMOUD ET AL.,

*Plaintiffs-Appellants*,

v.

MONIFA B. MCKNIGHT, IN HER OFFICIAL CAPACITY AS SUPERINTENDENT OF THE MONTGOMERY COUNTY BOARD OF EDUCATION, ET AL.,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Maryland
Case No. 8:23-cv-01380-DLB– Judge Deborah L. Boardman

---

### BRIEF OF *AMICI CURIAE*
### THE AMERICAN CIVIL LIBERTIES UNION AND
### THE AMERICAN CIVIL LIBERTIES UNION OF MARYLAND
### IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMATION

---

DAVID ROCAH
DEBORAH JEON
American Civil Liberties Union
Foundation of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
Tel: (410) 889-8555

ADITI FRUITWALA
*Counsel of Record*
HEATHER WEAVER
DANIEL MACH
American Civil Liberties Union
Foundation
915 15th St NW
Washington, DC 20005
Tel: (202) 457-0800

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1890__          Caption: __Tamer Mahmoud et al. v. Monifa B. McKnight et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__American Civil Liberties Union (ACLU)__
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑NO

2.      Does party/amicus have any parent corporations?      ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation?                    ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
       If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
       party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
       caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
       corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
       If yes, the United States, absent good cause shown, must list (1) each organizational
       victim of the criminal activity and (2) if an organizational victim is a corporation, the
       parent corporation and any publicly held corporation that owns 10% or more of the stock
       of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Aditi Fruitwala                    Date:    October 25, 2023

Counsel for: ACLU

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 23-1890        Caption: Tamer Mahmoud et al. v. Monifa B. McKnight et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

American Civil Liberties Union (ACLU) of Maryland
(name of party/amicus)


who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:




12/01/2019 SCC                    - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David Rocah    Date:    October 25, 2023

Counsel for: ACLU of Maryland

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

Page(s)

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................................ iii

INTERESTS OF THE *AMICI CURIAE* ..............................................................1

BACKGROUND .................................................................................................2

SUMMARY OF ARGUMENT ...........................................................................6

ARGUMENT ......................................................................................................8

    I. *Yoder* Does Not Require Courts to Apply Strict Scrutiny to Every Curricular Requirement or Educational Rule to Which Parents Object on Religious Grounds .........................................................................9

    II. Strict Scrutiny is Not Triggered Under *Tandon* Because MCPS's "No Opt-Out" Policy Does Not Favor Secular Conduct Over Religious Conduct. ........................................................................................11

    III. Strict Scrutiny Does Not Apply Under *Fulton* Because MCPS's Policy Prohibiting Opt-Outs Does Not Permit Any Exemptions. .................17

    IV. *Masterpiece* Does Not Apply Here Because MCPS's "No Opt-Out" Policy Was Not Enacted Out of Religious Hostility. ................................................20

CONCLUSION ....................................................................................................22

CERTIFICATE OF COMPLIANCE....................................................................24

CERTIFICATE OF FILING AND SERVICE .......................................................25

## TABLE OF AUTHORITIES

*Bauchman v. West High Sch.*,
  132 F.3d 542 (10th Cir. 1997) ....................................................................5

*Blau v. Fort Thomas Pub. Sch. Dist.*
  401 F.3d 381 (6th Cir. 2005) ....................................................................10

*Canaan Christian Church v. Montgomery Cnty.*,
  29 F.4th 182, 198 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 566 (2023) ...... passim

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ................................................................ 6, 12, 20

*Combs v. Homer-Ctr. Sch. Dist.*,
  540 F.3d 231 (3d Cir. 2008)......................................................................10

*CompassCare v. Hochul*,
  No. 22-951 (2d Cir. filed Apr. 29, 2022) ...............................................1

*D.L. ex rel. K.L. v. Baltimore Bd. of Sch. Comm'rs*,
  706 F.3d 256 (4th Cir. 2013)......................................................................10

*Doe v. San Diego Unified School District*,
  19 F.4th 1173 (9th Cir. 2021)................................................................ 15, 16

*Does 1-11 v. Bd of Regents of Univ of Colo.*,
  No. 21-cv-02637, 2022 WL 252320, at *5 (D. Colo, Jan. 27, 2022)..................17

*Does 1-3 v. Mills*,
  142 S. Ct. 1112 (2022) (mem.) ................................................................13

iii

*Does 1-6 v. Mills*,
  16 F.4th 20 (1st Cir. 2021), *cert. denied sub nom* ...............................................13

*Employment Div. v. Smith*,
  494 U.S. 872 (1990) ...................................................................... 6, 19

*Firszt v. Bresnahan*,
  No. 21-CV-6798, 2022 WL 138141, at *3 (N.D. Ill. Jan. 14, 2022)...................18

*Fitzgerald v. Roncalli High Sch., Inc.*,
  73 F.4th 529 (7th Cir. 2023) ...............................................................1

*Fleischfresser v. Dirs. of School Dist. 200*,
  15 F.3d 680 (7th Cir. 1994)...............................................................5

*Fulton v. City of Philadelphia*,
  141 S. Ct. 1868 (2021) ............................................................... passim

*Kane v. De Blasio*,
  19 F.4th 152 (2d Cir. 2021)........................................................ 14, 15

*Leone v. Essex Cnty. Prosecutor's Off.*,
  No. 21-12786, 2021 WL 4317240, at *6 (D. N.J. Sept. 23, 2021).....................18

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
  138 S. Ct. 1719 (2018) ................................................. 1, 7, 20, 21, 22

*Mozert v. Hawkins Cnty. Bd. of Educ.*,
  827 F.2d 1058 (6th Cir. 1987)...............................................................5

*Parker v. Hurley*,
  514 F.3d 87 (1st Cir. 2008) ...................................................5, 9, 10, 11

*Swanson v. Guthrie Indep. Sch. Dist.*
   *No. I-L*, 135 F.3d 694 (10th Cir. 1998) ................................................................11

*Swartz v. Sylvester*,
   53 F.4th 693 (1st Cir. 2022) ................................................................18

*Tandon v. Newsom,*
   141 S. Ct. 1294 (2021) ........................................................7, 11, 12, 13, 14, 17

*Thai Meditation Ass'n of Alab, Inc. v. City of Mobile*,
   83 F.4th 922 (11th Cir. 2023) ................................................................19

*Tingley v. Ferguson*,
   47 F.4th 1055 (9th Cir. 2022) ................................................................18

*Tranchita v. Callahan*,
   No. 20-C-5956, 2022 WL 392893, at *6 (N.D. Ill. Feb. 9, 2022) ......................19

*We The Patriots USA, Inc. v. Hochul*,
   17 F.4th 266 (2d Cir. 2021), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021), *cert.*
   *denied sub nom. Dr. A. v. Hochul*, 142 S. Ct. 2569 (2022). .................... 12, 16, 19

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972) ................................................................ 6, 7, 9, 10

*Workman v. Mingo Cty. Bd. of Educ.*,
   419 F. App'x 348, (4th Cir. 2011) ................................................................10

## INTERESTS OF THE *AMICI CURIAE*[1]

The American Civil Liberties Union Foundation (ACLU) is a nationwide, nonprofit, nonpartisan organization with nearly two million members and supporters dedicated to advancing the principles of liberty and equality embodied in the Constitution. The ACLU of Maryland is one of the ACLU's statewide affiliates with more than 30,000 members.

As organizations that advocate for First Amendment liberties, including religious-freedom rights, as well as equal rights for lesbian, gay, bisexual, transgender, and queer (LGBTQ) people, the ACLU, the ACLU of Maryland, and their members have a strong interest in the application of proper standards when evaluating constitutional challenges to civil rights laws. The ACLU and ACLU of Maryland have appeared as counsel-of-record or *amici* in many cases nationwide involving religious liberties and LGBTQ inclusion. *See, e.g.*, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) (counsel); *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719 (2018) (counsel); *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529 (7th Cir. 2023) (amicus); *CompassCare v. Hochul*, No. 22-951 (2d Cir. filed Apr. 29, 2022) (amicus).

---

[1] Amici affirm that no counsel for any party authored this brief in whole or in part and that no person other than amici, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. The parties have consented to the filing of this brief.

## BACKGROUND

In 2022, Montgomery County Public Schools (MCPS) added storybooks featuring LGBTQ characters to its elementary school English Language Arts (ELA) curriculum to further "diversity, equity, and nondiscrimination." JA727. Among the new books were titles such as *Uncle Bobby's Wedding*, in which a niece struggles with the fear of losing her favorite uncle after he marries his partner, JA107-135, and *Pride Puppy*, in which a family attends an LGBTQ Pride parade with a mischievous puppy, JA081-099. These and other newly added books explore themes of family, belonging, adventure, and love—themes that are archetypal and familiar in children's storybooks.

The LGBTQ-inclusive books are "a small subset of many books used in the MCPS [ELA] curriculum." JA767. Teachers have latitude in how to incorporate the books into their instruction. They can "put [the books] on [a] shelf for students to find on their own; to recommend a book to a student who would enjoy it; to offer the books as an option for literature circles, book clubs, or paired reading groups; or to use them as a read aloud." JA735. The curriculum does not include "instruction on gender identity and sexual orientation." JA736. Rather, the books are used in the same manner as many other books in the English curriculum: "to assist students with mastering reading concepts like answering questions about

characters, retelling key events" and "drawing inferences about story characters based on their actions." JA736.

After the introduction of the LGBTQ-inclusive books, some parents requested that their children be excused from class when the books were used. JA740. Some of the requests were based on religious objections to LGBTQ-related content, but many were not. *Id*. Some parents, for example, viewed any mention of sexual orientation or gender identity as inappropriate for their children's age. *Id*. Teachers and principals initially attempted to accommodate these objections by allowing the students to be excused from classroom instruction using the storybooks. *Id*.[2]

By March of 2023, however, the growing number of opt-out requests created several problems. First, it led to high percentages of student absenteeism, not only in ELA classes, but in other courses as well, as some parents kept their children home for the entire school day if an LGBTQ storybook would be read as part of the ELA course. JA741-742. Second, managing the numerous opt-out requests across classrooms and schools became infeasible. *Id*. Finally, permitting students to leave when stories involving LGBTQ people were read in class created a

---

[2] In 2022, MCPS promulgated Religious Diversity Guidelines that permit a school to create an opt-out policy "when possible." JA729. "If such requests become too frequent or too burdensome, the school may refuse to accommodate the[m]." JA729.

stigmatizing environment for students who are LGBTQ or who have LGBTQ

family members. *Id*. Ultimately, principals and teachers expressed that they "could

not accommodate the growing number of opt out requests without causing

significant disruptions to the classroom environment and undermining MCPS's

educational mission." JA741. As one example, after receiving notice that a

storybook featuring LGBTQ characters would be read during class, the parents of

"dozens of students in a single elementary school" requested that their children be

excused from the class, JA741, which would require the school to assign the

students alternate teachers to provide alternate assignments, *see e.g*., JA397. After

attempting for months to accommodate the number of opt-out requests, MCPS

determined that the opt-outs were not workable and that they defeated the

curriculum's goals of ensuring a classroom environment that fosters "social

integration of all students and families," JA465, "promotes equity, respect, and

civility," JA496, and "is safe and conducive to learning for all students," JA741.

On March 23, 2023, MCPS informed parents, teachers, and principals that

opt-outs to the ELA curriculum would not be permitted in the new school year,

stating: "Students and families may not choose to opt out of engaging with any

instructional materials, other than 'Family Life and Human Sexuality Unit of

Instruction' which is specifically permitted by Maryland law.[3] As such, teachers will not send home letters to inform families when inclusive books are read in the future." JA740.

Some parents of MCPS students filed the lawsuit at issue here, claiming the elimination of opt-outs violated their free-speech, free-exercise, and substantive-due-process rights under the U.S. Constitution and Maryland law. JA046. They sought a preliminary injunction based on their free exercise and substantive due process claims. The district court denied their motion, holding that the Plaintiffs could not establish a burden on their religious exercise. The district court's decision reflects the conclusion reached by every court to consider the issue: "mere exposure in public school to ideas that contradict religious beliefs does not burden the religious exercise of students or parents." JA755 (citing, among others, *Parker v. Hurley*, 514 F.3d 87, 107 (1st Cir. 2008); *Bauchman v. West High Sch.*, 132 F.3d 542, 557 (10th Cir. 1997); *Fleischfresser v. Dirs. of School Dist. 200*, 15 F.3d 680, 690 (7th Cir. 1994); *Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1065

---

[3] Maryland law requires schools to provide "a comprehensive health education" that includes instruction on "family life and human sexuality" that represents students "regardless of ability, sexual orientation, and gender expression." JA 728-29. The statute mandates that parents be provided with an opportunity "to review instructional materials" used in the health class and that schools develop "policies, guidance, and/or procedures for student opt-out." JA728-29.

(6th Cir. 1987)). Finding no burden, the district court correctly concluded that it need not reach Plaintiffs' arguments for applying strict scrutiny. JA755.

## SUMMARY OF ARGUMENT

*Amici* agree with the district court's conclusion that Plaintiffs-Appellants have not established a cognizable burden on their religious exercise. But *amici* write separately here to explain that, regardless of any burden, MCPS's policy prohibiting opt-outs from the ELA curriculum should be subject to rational-basis review, not strict scrutiny.

A "neutral law of general applicability" is subject to rational-basis review under the Free Exercise Clause of the First Amendment, even if it incidentally burdens a particular religious practice or belief. *Employment Div. v. Smith*, 494 U.S. 872, 878-79 (1990); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). The MCPS policy against opt-outs from the ELA curriculum fits comfortably within this longstanding precedent: It covers all students and families across the board, regardless of the reason for their objection to any portion of ELA instruction. None of the four grounds identified by the Plaintiffs-Appellants seeking to justify strict scrutiny requires this Court to depart from the *Smith* standard.

First, Plaintiffs-Appellants argue that the Supreme Court's ruling in *Wisconsin v. Yoder,* 406 U.S. 205 (1972) requires the Court to apply strict scrutiny

6

here. But *Yoder* was about the right to opt out *entirely* of the formal education system. *Id*. at 207. It did not confer on parents who decide to participate in a public school system the right to subject to strict scrutiny every legal, curricular, or school requirement to which they may have religious objections.

Second, Plaintiffs-Appellants contend MCPS's policy is subject to strict scrutiny because it runs afoul of the Supreme Court's edict in *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) against treating "comparable secular activity more favorably than religious exercise." *Id*. at 1296. Like *Yoder, Tandon* is inapposite here: The policy prohibiting opt-outs from the ELA curriculum does not treat secularly motivated conduct and religiously motivated conduct differently; rather, they are treated exactly alike, and the rule makes no distinction between them.

Third, Plaintiffs-Appellants assert that strict scrutiny applies under *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021). But strict scrutiny is triggered under *Fulton* only where a policy provides for a formal framework of purely discretionary, individualized exemptions. *Id*. at 1878. Here, there are no exemptions authorized under the policy.

Finally, Plaintiffs-Appellants allege that MCPS's prohibition on ELA curriculum opt-outs is "hostile to . . . religious beliefs" and thus warrants strict scrutiny under *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719,

7

1731 (2018) (citation omitted). Not so. As the evidence below demonstrates, the sheer number of ELA opt-out requests proved to be utterly unworkable, created a harmful environment for LGTBQ students, and undermined MCPS's educational mission. This was true regardless of the reason behind the opt-out request (whether religious or not). The decision to prohibit opt-outs going forward was not rooted in animus toward religion, but rather in a desire to resolve the problems created by the previous opt-out allowances.

Under the governing precedent, MCPS easily overcomes rational-basis review and is not required to offer exceptions to its "facially neutral and generally applicable" policy. *See Canaan Christian Church v. Montgomery Cnty*., 29 F.4th 182, 198 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 566 (2023) (failure to create a religious exception to a policy restricting land use was generally applicable and subject to rational-basis review). Accordingly, *amici* respectfully suggest that this Court affirm the district court's judgment.[4]

## ARGUMENT

---

[4] While beyond the scope of this brief, the MCPS "No Opt-Out" Policy would also easily overcome strict scrutiny. MCPS has compelling interests in carrying out its educational mission and avoiding a hostile environment for LGBTQ students. MCPS's rule against opt-outs is narrowly tailored, as illustrated by the previous harms imposed by allowing exemptions.

8

### I. *Yoder* Does Not Require Courts to Apply Strict Scrutiny to Every Curricular Requirement or Educational Rule to Which Parents Object on Religious Grounds.

Plaintiffs-Appellants argue that the Supreme Court's ruling in *Yoder* requires the Court to apply strict scrutiny here. Opening Br. 24-33, ECF No. 56. In *Yoder*, the Supreme Court held that the state could not compel Amish children to attend traditional public or private schools for formal education after eighth grade, against their and their parents' wishes—where doing so would not only violate core Amish religious precepts but would also threaten the existence of the entire Amish community's way of life. *Yoder,* 406 U.S. at 235. *Yoder* was about the right to opt out *entirely* of the formal education system. *Id*. at 208. Consequently, the ruling is "essentially sui generis, as few sects could make a similar showing of a unique and demanding religious way of life that is fundamentally incompatible with *any* schooling system." *Parker*, 514 F.3d at 100.

Unlike *Yoder*, Plaintiffs-Appellants do not request to withdraw their children from the formal education system, or even public school entirely, but rather to dictate—based on their religious beliefs—the curriculum that their children will be taught. *Yoder* does not confer on parents this broad right, and Plaintiffs-Appellants' suggestion that it does would completely hamstring the operation of public schools.

*Yoder* itself cautions that its holding "in no way alter[ed] [the Court's] recognition of the obvious fact that courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education." 406 U.S. at 234-35. Parents can decide which school their child attends, but parents have no constitutional right to "direct how a public school teaches their child." *Parker*, 514 F.3d at 102 (*quoting Blau v. Fort Thomas Pub. Sch. Dist.* 401 F.3d 381, 395 (6th Cir. 2005)). Indeed, as this Court has recognized, "[t]he right to a religious education does not extend to a right to demand that public schools accommodate [parents'] educational preferences." *D.L. ex rel. K.L. v. Baltimore Bd. of Sch. Comm'rs*, 706 F.3d 256, 264 (4th Cir. 2013). "The school board need not serve up its publicly funded services like a buffet from which Appellants can pick and choose." *Id*. To find otherwise would result in an unworkable school system—one in which students could opt out of anything they find objectionable, from English literature to evolution to slavery.

Finally, Plaintiffs-Appellants suggest that struct scrutiny applies because their parental rights implicate their free-exercise claim. Opening Br. 25, ECF No. 56. Simultaneously invoking religious interests, however, does not somehow radically expand the basic boundaries of other rights. This Court has never recognized the hybrid-rights doctrine cited by Plaintiffs-Appellants. *See Workman v. Mingo Cty. Bd. of Educ.*, 419 F. App'x 348, 353 (4th Cir. 2011) (citing *Combs v.*

*Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 244-47 (3d Cir. 2008)). As the district court correctly observed, "[n]o published circuit court opinion . . . ha[d] ever applied strict scrutiny to a case in which plaintiffs argued they had presented a hybrid claim." JA781 (citing *Parker*, 514 F.3d at 98). It "cannot be true that a plaintiff can simply invoke the parental rights doctrine, combine it with a claimed free exercise right, and thereby force the government to demonstrate the presence of a compelling state interest." *Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 700 (10th Cir. 1998).

## II. Strict Scrutiny is Not Triggered Under *Tandon* Because MCPS's "No Opt-Out" Policy Does Not Favor Secular Conduct Over Religious Conduct.

Under *Tandon*, a government regulation is not neutral or generally applicable—and will be subject to strict scrutiny review—only if it treats "comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296-97 (applying strict scrutiny to pandemic restrictions that "treat[ed] some comparable secular activities," such as patronizing hair salons and restaurants, "more favorably than" religious activities, such as "at-home religious exercise"). Comparability is judged "against the asserted government interest that justifies the regulation at issue." *Id*. at 1296 (internal citations omitted). For example, "if religious and secular activities 'both . . . pose[] a similar hazard'" to the governmental interest in a policy, restricting only the former is a "'form[] of

underinclusiveness'" that means that a law is "'not generally applicable.'" *Fulton,*
141 S. Ct. at 1878 (citing *Lukumi,* 508 U.S. at 544-46).

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993),
illustrates the point. There, the city adopted several ordinances prohibiting animal
sacrifice, a practice of the Santeria faith. *Id*. at 524-28. The city claimed that the
ordinances were necessary, in part, to protect public health, which was "threatened
by the disposal of animal carcasses in open public places." *Id*. at 544. But the
ordinances did not regulate comparable conduct, such as hunters' disposal of their
kills or improper garbage disposal by restaurants, both of which posed a similar
hazard. *Id*. at 544-45. The Court concluded that this and other forms of
underinclusiveness meant that the ordinances were not generally applicable. *Id*. at
545-46.

Notably, even when there is an exception for certain non-religious reasons,
the "absence of a religious exception to a law does not, on its own, establish non-
neutrality such that a religious exception is constitutionally required" under the
reasoning of *Lukumi* and *Tandon*. *See We The Patriots USA, Inc. v. Hochul*, 17
F.4th 266, 282 (2d Cir. 2021), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021), *cert.
denied sub nom. Dr. A. v. Hochul*, 142 S. Ct. 2569 (2022). In *We the Patriots*, the
New York Department of Health required certain state employees to be vaccinated
against COVID-19, exempting those with a medical contraindication to

12

vaccination. *Id*. at 281. The court held that the ordinance "contains a medical exemption not because it determined that 'the governmental interest it seeks to advance are worthy of being pursued only against conduct with religious motivation,' but because applying the vaccination requirement to individuals with medical contraindications and precautions would not effectively advance those interests." *Id*. at 285 (internal citations omitted). Other courts have arrived at the same conclusion. *See*, *e.g.*, *Does 1-6 v. Mills*, 16 F.4th 20, 30 (1st Cir. 2021), *cert. denied sub nom, Does 1-3 v. Mills*, 142 S. Ct. 1112 (2022) (mem.) (a rule permitting a medical exemption to the COVID-19 vaccine but not a religious exemption was neutral and generally applicable).

Here, MCPS's current policy does not treat religious exemptions and secular exemptions differently because it offers no exemptions at all. *All* students must be present for the approved ELA curriculum. There is no differential treatment, and Plaintiff-Appellants have introduced no evidence to the contrary. Where religious and secular activity are not treated differently, strict scrutiny is not required under *Tandon*.

Instead of comparing the availability of religious opt-outs and secular opt-outs (as in *Tandon* and its progeny) in the policy at issue here (MCPS's prohibition on opt-outs from the ELA curriculum), Plaintiffs-Appellants urge the Court to compare the existence of any opt-outs in the health curriculum to the lack of any

opt-outs in the ELA curriculum. But the ELA and health curricula are two entirely separate and unrelated areas of instruction. *See Canaan Christian Church,* 29 F.4th at 198.

Plaintiffs-Appellants' arguments closely resemble those already rejected by this Court in *Canaan Christian Church*. There, this Court considered whether Montgomery County violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the Free Exercise Clause by denying water and sewer category change requests (WSCCRs) submitted by the church. *Id.* at 185. The church argued that the denial of a WSCCR category change request treated comparable religious activity less favorably because a secular organization, the Glenstone Museum, had applied for and received a WSCCR. The Court was not persuaded, explaining that Glenstone made its request for property in a different part of the county that was subject to a different property plan. *Id*. at 197. This Court found that the county had consistently denied all WSCCRs for both religious and secular developments *on the property at issue*. *Id*. at 198. The fact that the county had granted a request for an entirely separate property did not create a comparator under *Tandon* for the church's religion claims.

In another analogous case, *Kane v. De Blasio,* 19 F.4th 152 (2d Cir. 2021)*,* teachers and school administrators challenged a vaccine mandate that applied to employees of the New York City Department of Education (DOE) but not to

14

employees of other city departments, alleging that a mandate singling out DOE employees was not generally applicable. *Id*. at 166. The U.S. Court of Appeals for the Second Circuit disagreed, explaining that a law need not "apply to all people, everywhere, at all times, to be 'generally applicable.'" *Id*. Rather, a government measure can be generally applicable when it "applies to an entire *class* of people." *Id.* A city vaccine mandate covering the whole class of DOE employees, while not applying to employees in some other city departments was still generally applicable. *Id.* The Ninth Circuit has likewise rejected the argument that "the inclusion of a religious accommodation procedure in [a school district]'s *employee* vaccination mandate as evidence that [a] *student* vaccination mandate is not generally applicable." *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1180 (9th Cir. 2021).

As in *Canaan*, *Kane*, and *Doe*, Plaintiffs-Appellants are attempting to compare apples with oranges. The ELA curriculum and health curriculum are entirely separate and "tailored to different grade levels, cover different topics, and serve different educational objectives." JA479. MCPS permits opt-outs for the health curriculum in accordance with the requirements of Maryland law. JA479. There is no such requirement for the ELA curriculum. MCPS does not permit opt-outs for the ELA curriculum because of high student absenteeism, the infeasibility of accommodating opt-out requests, and the risk of exposing vulnerable young

15

students to social stigma and isolation. JA741-42. Allowing opt-outs to the health

curriculum does not carry the same risks; nor have Plaintiffs-Appellants alleged

that it does. Indeed, the health curriculum is a "hermetically sealed off curriculum"

that is scheduled in one 90-minute window or two 45-minute windows. JA680 ¶¶

7-13. Teachers and principals can adequately manage "a small set of" opt-outs to

the health curriculum, as opposed to "a much greater number of permanent

religious exemptions" to the ELA curriculum. *See We The Patriots*, 17 F.4th at

286.[5] The purposes of each curriculum are different, and the policies guiding the

opt-outs for each reflect those differences. Plaintiffs-Appellants do not offer any

evidence establishing that the interests achieved by ending the opt-outs for the

ELA curriculum undermine the government interest in permitting opt-outs for the

---

[5] In determining whether granting exemptions undermines the government's
interests, appellate courts have allowed for consideration of the total numbers of
people seeking exemptions for religious and secular activities. *Doe*, 19 F.4th at
1178; *We The Patriots*, 17 F.4th at 286. In *Doe*, the Ninth Circuit noted that, "if that
number [of students likely to seek medical exemptions to a vaccine mandate] is
very small and the number of students likely to seek a religious exemption is large,
then the medical exemption would not qualify as 'comparable' to the religious
exemption in terms of the 'risk' each exemption poses to the government's asserted
interests." *Doe*, 19 F.4th at 1178; *Does 1-11 v. Bd. of Regents of Univ. of Colo.,* No.
21-cv-02637, 2022 WL 252320, at *5 (D. Colo., Jan. 27, 2022) (risks posed by
medical and religious exemptions to a university's COVID-19 vaccination policy
were not comparable where the university received twice as many requests for
religious exemptions as for medical exemptions).

health curriculum. The two curricula are simply not comparable, and, therefore, *Tandon* does not apply here.

### III.    Strict Scrutiny Does Not Apply Under *Fulton* Because MCPS's Policy Prohibiting Opt-Outs Does Not Permit Any Exemptions.

*Fulton* is a narrow decision holding that a regulation allowing for a "formal" system of "entirely discretionary exceptions" on an individualized basis is not generally applicable. 141 S. Ct. at 1878. *Fulton* arose after the City of Philadelphia learned that an agency it had hired to provide foster-care services refused to certify same-sex married couples as prospective foster parents on the ground that doing so would contravene its religious beliefs. *Id*. at 1875. This conduct violated an antidiscrimination provision in the agency's contract with the city, which prohibited sexual orientation discrimination. *Id*. However, the contract between the agency and the city also included a provision that permitted the Commissioner to grant an exception to the antidiscrimination provision "in his/her sole discretion." *Id*. at 1878. Pointing to this provision, the Court concluded that it "render[ed] the contractual non-discrimination requirement not generally applicable." *Id*.

Here, not only does MCPS's "no opt-out" policy offer no individualized, discretionary exemptions—but it has *no exemptions at all*. Every court confronted with a law that applies across the board, without exception, has held that the law did not trigger strict scrutiny under *Fulton* because, by definition, it had no

individualized exemption of any sort. For example, in *Canaan Christian Church,* this Court rejected the church's contention that its request to change a property's water and sewer designations was reviewed under a discretionary system, explaining that "the decision was based on [a policy that] expressly prohibited the extension of the sewer service to the Property 'for any use' without exception." 29 F.4th at 199. That exemptions were permitted for a different property under a different system had no relevance; the property at issue did not permit any exemptions; and "[c]onsequently, *Fulton* [was] inapplicable." *Id*.; *accord Tingley v. Ferguson*, 47 F.4th 1055, 1064, 1088 (9th Cir. 2022) (law prohibiting *all* licensed providers from practicing conversion therapy, with no exceptions, was generally applicable); *Swartz v. Sylvester*, 53 F.4th 693, 696, 702 (1st Cir. 2022) (fire department policy of sitting for photographs was generally applicable because it applied to *all* firefighters and exempted no one); *Tranchita v. Callahan*, No. 20-C-5956, 2022 WL 392893, at *6 (N.D. Ill. Feb. 9, 2022) (state law requiring a permit to raise coyotes, regardless of the reason and without exception, was generally applicable); *Firszt v. Bresnahan*, No. 21-CV-6798, 2022 WL 138141, at *3 (N.D. Ill. Jan. 14, 2022) (school mask mandate was generally applicable because it applied to all school-aged children); *Leone v. Essex Cnty. Prosecutor's Off.*, No. 21-12786, 2021 WL 4317240, at *6 (D. N.J. Sept. 23, 2021) (prosecutor's office

policy requiring all employees to work in-person, without exception, was generally

applicable).[6]

The Plaintiffs-Appellants make no allegations that MCPS's "no opt-out

policy" has applied discriminatorily by asserting, for example, that religious

students' requests are denied while non-religious students' requests are granted.[7]

The Court in *Fulton* was clear that it was concerned with a decision-maker

inquiring into the reasons behind the request and subjectively and discriminatorily

weighing the offered rationale against the religious applicant. 141 S. Ct. at 1879.

---

[6] Indeed, even where some exemptions exist, unless the exemptions are purely discretionary, they do not implicate *Fulton*. *See, e.g.*, *Thai Meditation Ass'n of Alab, Inc. v. City of Mobile*, 83 F.4th 922, 929 (11th Cir. 2023) (although city's zoning "approval process necessarily require[d] individual assessment" of applications, it did not "allow for the kind of blanket discretionary mechanism that historically fails *Smith*'s general applicability requirement" (citing *Fulton*, 141 S. Ct. at 1878)); *We the Patriots*, 17 F.4th at 288-89 (rejecting argument that medical exemption for vaccine mandate implicated *Fulton* because, in part, the exemption "afford[ed] no meaningful discretion to the State or employers" and thus did not "'invite' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id.* (quoting *Fulton*, 141 S. Ct. at 1879)).

[7] Plaintiffs-Appellants' suggestion that strict scrutiny applies under *Fulton* because MCPS's Religious Diversity Guidelines contemplate opt-outs from the ELA curriculum, Opening Br. 55, ECF No. 56, likewise fails. The Religious Diversity Guidelines policy allows schools generally to make religious accommodations "[w]hen possible," specifying that, "if such requests become too frequent or too burdensome, the school may refuse to accommodate the requests." JA 067-68. With respect to the ELA curriculum, the opt-out requests did indeed become too frequent and burdensome for several reasons, and MCPS accordingly created a policy disallowing *all* opt-outs. No one at MCPS has the discretion to grant opt-outs to the ELA curriculum, and all requested opt-outs will be rejected.

Application of such a policy can "devalue[] religious reasons" for noncompliance "by judging them to be of lesser import than nonreligious reasons," and thus expose religious practice to discriminatory treatment. *Lukumi*, 508 U.S. at 537. Such is not the case here. Whatever the basis for parents' requests to opt their children out of ELA instruction, all requests are denied.

## IV. *Masterpiece* **Does Not Apply Here Because MCPS's "No Opt-Out" Policy Was Not Enacted Out of Religious Hostility.**

Plaintiffs-Appellants argue that certain statements made by school board members were hostile to religion and resemble the type of religious animosity found in *Masterpiece*, 138 S. Ct. 1719. JA389. In *Masterpiece,* the Supreme Court set aside a judgment of the Colorado Civil Rights Commission requiring a bakery not to discriminate on the basis of LGBTQ status in its sale of wedding cakes. 138 S. Ct. at 1732. The Court cited remarks by a commissioner that disparaged religion as evidence of religious hostility.[8] According to the Court, these comments "cast doubt on the fairness of the adjudication" and held that the Commission violated the plaintiff's right to a "neutral and respectful consideration of his claims" as required by the First Amendment. *Id*. at 1729.

---

[8] In particular, the Court cited one commissioner's statement describing the plaintiff's "faith as 'one of the most despicable pieces of rhetoric that a person can use'" and another statement comparing the plaintiff's "invocation of his sincerely held religious beliefs to defenses of slavery and the Holocaust" as evidence of religious hostility. *Masterpiece*, 138 S. Ct. at 1729.

Contrary to Plaintiffs-Appellants' arguments, the School Board's statements differ from the statements contemplated in *Masterpiece* in two ways. First, unlike the commissioners in *Masterpiece*, the School Board officials expressed sentiments about a policy—not a religious belief. Plaintiffs-Appellants point to four statements made by school board members as alleged evidence of hostility towards religion. JA744-47. However, the majority of these statements do not even mention religion. Rather, each statement expressed general opposition to bigotry or hate, whether rooted in religion or secular family values and beliefs. Second, the school board neither targeted nor attacked Plaintiffs-Appellants for their religious beliefs. Unlike the commissioners in *Masterpiece*, the school board officials did not cast aspersions on Plaintiffs-Appellants' religious beliefs. They did not question the invocation of Plaintiff-Appellants' "sincerely held religious beliefs." *Masterpiece*, 138 S. Ct. at 1729. Nor did they characterize Plaintiffs-Appellants' beliefs as an immoral defense to discrimination. *Id.* Rather, School Board officials merely reiterated their commitment to creating an inclusive environment for *all* students. JA743-47. Throughout the hearings, School Board officials expressed a desire to comply with the "no opt-out" policy for the benefit of the students. JA743-47.

Finally, Plaintiffs-Appellants claim that Defendants-Respondents' refusal to disavow school board officials' statements cast doubt on the board's neutrality. JA389. But, as discussed, there was no need to disavow those statements because

they did not invoke anti-religious animus. In short, the board's statements substantially differ from the kind of religious animosity found in *Masterpiece.* The statements were not hostile toward religion and do not require the court to set aside the "no opt-out" policy.

## CONCLUSION

The judgment of the district court should be affirmed. Even if Plaintiffs-Appellants were to establish a cognizable burden on their religious exercise, MCPS's policy prohibiting opt-outs from the ELA curriculum is religiously neutral and generally applicable and thus subject to rational-basis review. The policy easily meets that standard given the documented and extensive difficulties associated with allowing ELA opt-outs.

Dated: October 30, 2023                    Respectfully submitted,

By: */s/ Aditi Fruitwala*

Aditi Fruitwala
Heather Weaver
Daniel Mach
American Civil Liberties Union
Foundation
915 15th Street NW
Washington, DC 20005
Tel: (202) 457-0800

David Rocah
Deborah Jeon

22

American Civil Liberties Union
Foundation of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
Tel: (410) 889-8555

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with type-volume limits in Rules 29(a)(5) and 32(a) of the Federal Rules of Appellate Procedure, and because, excluding the parts of the brief exempted by Rule 32(f), it contains 5,067 words.

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

October 30, 2023                                     <u>/s/ Aditi Fruitwala</u>

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 30th day of October 2023, I caused this Brief of *Amici Curiae* American Civil Liberties Union (ACLU) and the ACLU of Maryland to be filed with the Clerk of the Court using the CM/ECF System. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.


October 30, 2023                                             <u>/s/ Aditi Fruitwala</u>

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## APPEARANCE OF COUNSEL FORM

**BAR ADMISSION & ECF REGISTRATION:** If you have not been admitted to practice before the Fourth Circuit, you must complete and return an Application for Admission before filing this form. If you were admitted to practice under a different name than you are now using, you must include your former name when completing this form so that we can locate you on the attorney roll. Electronic filing by counsel is required in all Fourth Circuit cases. If you have not registered as a Fourth Circuit ECF Filer, please complete the required steps at Register for eFiling.

**THE CLERK WILL ENTER MY APPEARANCE IN APPEAL NO.** 23-1890 _____ as

☐ Retained ☐ Court-appointed(CJA) ☐ CJA associate ☐ Court-assigned(non-CJA) ☐ Federal Defender

☑ Pro Bono ☐ Government

COUNSEL FOR: American Civil Liberties Union (ACLU) and ACLU of Maryland

_____ as the
(party name)

☐ appellant(s) ☐ appellee(s) ☐ petitioner(s) ☐ respondent(s) ☑ amicus curiae ☐ intervenor(s) ☐ movant(s)

/s/ Aditi Fruitwala
_____
(signature)

**Please compare your information below with your information on PACER. Any updates or changes must be made through PACER's Manage My Account.**

Aditi Fruitwala                                    (332) 204-2768
Name (printed or typed)                            Voice Phone

American Civil Liberties Union                     _____
Firm Name (if applicable)                          Fax Number

915 15th Street NW

Washington, DC 20005                               afruitwala@aclu.org
Address                                            E-mail address (print or type)

**CERTIFICATE OF SERVICE** *(required for parties served outside CM/ECF)*: I certify that this document was served on _____ by ☐ personal delivery; ☐ mail; ☐ third-party commercial carrier; or ☐ email (with written consent) on the following persons at the addresses or email addresses shown:

_____              _____
Signature                          Date

1/28/2020  SCC