No. 23-1890

———————————

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

———————————

TAMER MAHMOUD, et al.,

*Plaintiff-Appellants*,

v.

MONIFA B. MCKNIGHT, et al.,

*Defendants-Appellees*.

———————————

On Appeal from the United States District Court for the District of Maryland
(Hon. Deborah L. Boardman, District Judge)

———————————

## BRIEF OF MARYLAND, MASSACHUSETTS, CALIFORNIA, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAIʻI, ILLINOIS, MAINE, MICHIGAN, MINNESOTA, NEVADA, NEW YORK, NEW JERSEY, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND WASHINGTON AS AMICI CURIAE SUPPORTING DEFENDANTS-APPELLEES

———————————

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

ADAM M. CAMBIER
Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2278
adam.cambier@mass.gov

Counsel for the Commonwealth of
  Massachusetts

ANTHONY G. BROWN
Attorney General of Maryland

JOSHUA M. SEGAL
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7446
jsegal@oag.state.md.us

Counsel for the State of Maryland

October 31, 2023
*(Additional counsel listed on signature page)*

## TABLE OF CONTENTS

Page

INTERESTS OF AMICI CURIAE ................................................................. 1

ARGUMENT .............................................................................................. 2

I.   ALL STUDENTS BENEFIT FROM SAFE AND SUPPORTIVE SCHOOLS THAT FOSTER AN INCLUSIVE ENVIRONMENT. ................................................. 2

    A.   All Students Benefit from Supportive and Inclusive Schools ........... 3

    B.   LGBTQ+ Youth Face Unique Struggles That Can Be Addressed Through a Supportive and Inclusive School Environment. ................................................................................ 7

II.  THE COUNTY'S USE OF THE BOOKS AT ISSUE PERMISSIBLY FOSTERS TOLERANCE AND PREPARES CHILDREN FOR A DIVERSE WORLD. .......................... 11

    A.   States Possess Broad Discretion to Shape School Policies to Promote Tolerance and Respect for Others. ................................... 12

    B.   States' and Schools' Broad Educational Discretion Encompasses Policies Like the County's ......................................... 15

    C.   The County's Efforts Here Do Not Burden Religious Exercise or Violate Maryland Law. .............................................................. 18

CONCLUSION ......................................................................................... 22

CERTIFICATE OF COMPLIANCE ............................................................... 24

CERTIFICATE OF SERVICE ...................................................................... 25

# TABLE OF AUTHORITIES

Page

## Cases

*Ambach v. Norwick*, 441 U.S. 68 (1979) ................................................................... 12, 16

*Bailey v. Virginia High Sch. League, Inc.*, 488 F. App'x 714 (4th Cir. 2012) ................. 15

*Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986) ....................................... 13

*Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381 (6th Cir. 2005) ................................ 15

*Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) ........................................................................................... 14, 18

*Brown v. Board of Education*, 347 U.S. 483 (1954) ............................................... 1, 12, 22

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) ....................... 20

*Edwards v. Aguillard*, 482 U.S. 578 (1987) ..................................................................... 14

*Epperson v. Arkansas*, 393 U.S. 97 (1968) ...................................................................... 14

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) .................................................... 20

*Herndon v. Chapel Hill-Carrboro City Board*, 89 F.3d 174 (4th Cir. 1996) ................... 15

*Hugger v. Rutherford Inst.*, 94 F. App'x 162 (4th Cir. 2004). .......................................... 14

*Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454 (2d Cir. 1996) ........................................ 15

*Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275 (5th Cir. 2001) .............................. 15

*Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038 (2021) .................................................. 3

*McCollum v. Board of Ed. of Sch. Dist. No. 71*, 333 U.S. 203 (1948) ............................. 13

*Mozert v. Hawkins County Bd. of Educ.*, 827 F.2d 1058 (6th Cir. 1987) ........................ 18

*Parker v. Hurley*, 514 U.S. 87 (1st Cir. 2008) ........................................................... 18, 19

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ....................................... 12

*School Dist. of Abington Township v. Schempp*, 374 U.S. 203 (1963) ............................ 13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ................................. 14

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ................................................................. 14

## Statutes

Mass. Gen. Laws ch. 69, § 1P ........................................................................ 4

Mass. Gen. Laws ch. 76, § 5 ........................................................................ 16

Md. Code Ann., Educ. § 2-205(e) (LexisNexis 2022) ......................................... 18

Md. Code Ann., Educ. § 4-205(c)(2) (LexisNexis 2022) ..................................... 18

Md. Code Ann., Educ. § 4-205(c)(3) (LexisNexis 2022) ..................................... 18

Md. Code Ann., Educ. § 7-424 (LexisNexis 2022) ............................................ 17

Md. Code Ann., Educ. § 7-424.1 (LexisNexis 2022) ......................................... 17

Md. Code Ann., Educ. § 26-704 (LexisNexis 2022) .......................................... 17

## Regulations

COMAR 13A.01.05.11 ................................................................................ 18

COMAR 13A.04.18.01A-C .......................................................................... 21

COMAR 13A.04.18.01B .............................................................................. 21

COMAR 13A.04.18.01D(2)(e)(ii) ................................................................... 21

## Miscellaneous

Am. Psychological Ass'n, *Safe and Supportive Schools Project* (2014),
    https://www.apa.org/pi/lgbt/programs/safe-supportive ................................... 3

Amy L. Masko et al., *Teaching for Equity in the Milieu of White Fragility: Can Children's Literature Build Empathy and Break Down Resistance?*, 19(1-2) Curriculum and Teaching Dialogue 55 (2017), https://www.proquest.com/openview/dffc7a68bd1431ffa4dcc1847720fe14..............................................................7

Movement Advancement Project, *Equality Maps: Safe Schools Law* (2022), https://www.lgbtmap.org/equality-maps/safe_school_laws ........................................16

Hannah Clingan, *Utilizing Mirrors and Windows in Elementary Literacy to Build Identity and Empathy*, 1(1) Innovations and Critical Issues in Teaching and Learning 23 (2020), https://cornerstone.lib.mnsu.edu/icitl/vol1/iss1/2 ................................................................................................................5

Jack K. Day et al., *Safe and Supportive Schools for LGBT Youth: Addressing Educational Inequities Through Inclusive Policies and Practices*, 74 Journal of School Psychology 29 (June 2019), https://doi.org/10.1016/j.jsp.2019.05.007 ..........................................................................................................11

Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemporary Sch. Psychology 327 (Aug. 2020), https://www.researchgate.net/publication/343619376_Conceptualizing_and_Measuring_Safe_and_Supportive_Schools.............................................................3

Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf...............................................................................7, 8, 9, 10

Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Developmental Sci. 97 (Feb. 17, 2019), https://doi.org/10.1080/10888691.2018.1537791. ............................4

M. D. Resnick et al., *Protecting Adolescents from Harm. Findings from the National Longitudinal Study on Adolescent Health*, 278 J. Am. Med. Ass'n 823 (Sept. 10, 1997), https://pubmed.ncbi.nlm.nih.gov/9293990 ...........................5, 6

Marina Feijo et al., *Improving School Outcomes for Transgender and Gender-Diverse Youth: A Rapid Review*, 9(1) Policy Insights from the Behavioral and Brain Sciences 27 (2022), https://journals.sagepub.com/doi/abs/ 10.1177/23727322211068021.......................................................................5

Mary Ellen Flannery, *Why We Need Diverse Books*, NEA Today (Oct. 26, 2020), https://www.nea.org/nea-today/all-news-articles/why-we-need-diverse-books........5, 6

Maryland State Department of Education, *Model Policy: Bullying, Harassment, or Intimidation* (2021), https://marylandpublicschools.org/about/Documents/DSFSS/SSSP/Bullying/MarylandsModelPolicyBullying Harassment Intimidation.pdf..................................................................................................17

Nat'l Ctr. on Safe Supportive Learning Environments, *About* (2022), https://safesupportivelearning.ed.gov/about. ......................................................3

Nhan L. Truong et al., GLSEN, *Erasure and Resilience: The Experiences of LGBTQ Students of Color—Black LGBTQ Youth in U.S. Schools* (2020), https://www.glsen.org/research/black-lgbtq-students.....................................8

Office of Elementary and Secondary Education, U. S. Dep't of Education, *Safe & Supportive Schools*, (2023), https://oese.ed.gov/offices/office-of-formula-grants/safe-supportive-schools/.................................................3

Riley J. Steiner et al., *Adolescent Connectedness and Adult Health Outcomes*, 144(1) Pediatrics 1 (Jul. 1, 2019), https://doi.org/10.1542/peds.2018-3766 ...............6

Russell M. Viner et al., *Adolescence and the Social Determinants of Health*, 379(9826) Adolescent Health 1641 (Apr. 28, 2012), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(12)60149-4/fulltext..........................................................................................5

Stephanie M. Jones et al., *Promoting Social and Emotional Competencies in Elementary School*, 27(1) The Future of Children 49 (Spring 2017), https://files.eric.ed.gov/fulltext/EJ1144815.pdf...........................................7

The Trevor Project, *2023 National Survey on the Mental Health of LGBTQ Young People* (2023), https://www.thetrevorproject.org/survey-2023/.......................8

Timothy V. Rasinski et al., *Multicultural Learning Through Children's Literature*, 67 Language Arts 576 (1990), https://www.proquest.com/docview/196891107 .........................................................................6

Tyler Hatchel et al., *Peer Victimization and Suicidality Among LGBTQ Youth: The Roles of School Belonging, Self-Compassion, and Parental Support*, 16(2) Journal of LGBT Youth 134 (2019), https://doi.org/10.1080/19361653.2018.1543036...........................................................................9

Wojciech Kaczkowski et al., *Examining the Relationship Between LGBTQ-Supportive School Health Policies and Practices and Psychosocial Health Outcomes of Lesbian, Gay, Bisexual, and Heterosexual Students*, 9(1) LGBT Health 43 (Jan. 2022), https://doi.org/10.1089/lgbt.2021.0133...............11

v

## INTERESTS OF AMICI CURIAE

Amici States—Maryland, Massachusetts, California, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington—file this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) because we share sovereign and compelling interests in making schools safe and inclusive places for all students. Defendants-Appellees the Montgomery County Board of Education ("the County") and its members, like other school authorities around the country, are charged with one of government's most important functions: nurturing successive generations of children into capable citizens of a diverse but unified nation. Recognizing the importance of this responsibility, courts (including this Court) have long afforded state and local governments significant discretion to craft school policies in order to best serve this goal, so long as they act within the constraints of state and federal law.

Amici States respectfully submit this brief to provide factual and legal context for the County's incorporation of LGBTQ+-inclusive books into its language arts curriculum. Efforts such as this are supported by social science research demonstrating that supportive and inclusive school environments are critically important for all students, and for LGBTQ+ students in particular. Far from constituting "sex education," the County's use of the books enables LGBTQ+

students to see people like them in books read in school, and accustoms other students to people, family structures, and relationships to which they might not otherwise be exposed. These efforts fall well within states' and schools' broad discretion to shape their curricula, and they raise no constitutional concerns.

## ARGUMENT

### I.   ALL STUDENTS BENEFIT FROM SAFE AND SUPPORTIVE SCHOOLS THAT FOSTER AN INCLUSIVE ENVIRONMENT.

States have a strong interest in fostering safe and supportive schools for all children to learn, thrive, and grow into contributing members of our society. Safe and supportive school environments that nurture the whole student and promote a sense of belonging are a crucial component of student success, in terms of both academic outcomes and student well-being. Safe, supportive, and inclusive school environments are particularly important for LGBTQ+ youth. These youth often experience discrimination, harassment, and stigma, causing tangible mental and physical harm and restricting their ability to realize their potential. Conversely, robust data confirm that LGBTQ+ students who feel supported and included at school are happier, healthier, and more academically successful. The experiences of Amici States and other jurisdictions show that policies and practices that support all facets of students' identities are beneficial for all students, including and especially LGBTQ+ youth.

## A.     All Students Benefit from Supportive and Inclusive Schools.

Courts have recognized that states' responsibility to provide public education encompasses the duty to "protect" students from harm.  *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021).  In light of the vast influence that education has over the trajectory of an individual's life, it is essential that states provide students with a safe and inclusive educational environment that allows them to succeed and thrive.

Amici States and other governmental institutions,[1] as well as medical and educational organizations,[2] have recognized that physically and psychologically safe schools are indispensable to obtaining optimal health and educational outcomes for all students.  While there is no exhaustive list of elements constituting a safe and supportive educational environment, research has emphasized both physical safety and security alongside emotional well-being, connectedness of staff and students, and norms and policies.[3]  This framework is heavily supported by extensive

---

[1] *See, e.g.*, Office of Elementary and Secondary Education, U. S. Dep't of Education, *Safe & Supportive Schools*, (2023), https://oese.ed.gov/offices/office-of-formula-grants/safe-supportive-schools/; Nat'l Ctr. on Safe Supportive Learning Environments, *About* (2022), https://safesupportivelearning.ed.gov/about.

[2] *See, e.g.*, Am. Psychological Ass'n, *Safe and Supportive Schools Project* (2014), https://www.apa.org/pi/lgbt/programs/safe-supportive.

[3] Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemporary Sch. Psychology 327, 327-29 (Aug. 2020), https://www.researchgate.net/publication/343619376_Conceptualizing_ and_Measuring_Safe_and_Supportive_Schools.

developmental science and neuroscience research affirming that educational environment and school culture influence many facets of a child's development, including social-emotional and academic learning.[4] In contrast, the experience of fear or anxiety weakens a child's cognitive capacity and disrupts the learning process. In essence, evidence shows that without physical and psychological safety, students' ability to learn is impeded at a physiological level.[5] Accordingly, safe and supportive school environments allow students to develop positive relationships, regulate their emotions and behavior, and maintain physical and psychological well-being—which, in turn, contribute to academic and non-academic success.[6]

Allowing students to see diverse perspectives and ways of life reflected in the curriculum is an important part of establishing this well-being and attaining educational objectives for all students. Critically, literature can serve as a "mirror" for students belonging to various minority groups. If students do not see themselves reflected on the page, they may believe their experience does not matter compared to those of their better-represented peers. By contrast, reading stories about people

---

[4] *See* Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Developmental Sci. 97, 97-98 (Feb. 17, 2019), https://doi.org/10.1080/10888691.2018.1537791.

[5] *Id.* at 102.

[6] Mass. Gen. Laws ch., 69 § 1P.

like themselves is both personally validating and academically engaging.[7]  Students who are able to read "mirroring" literature at school tend to become better readers and achieve higher proficiency across all school subjects; conversely, when "mirror" literature is lacking, students who do not see themselves may feel a diminished sense of belonging and connectedness in their school community and may see their academic outcomes suffer as a result.[8]

The sense of connectedness to their school that students get from seeing themselves reflected in books and the academic curriculum affects much more than just academic achievement.[9]  More than two decades of research has demonstrated that school connectedness directly promotes positive outcomes and buffers the negative effects of risk factors related to mental health, violence, sexual behavior,

---

[7] Mary Ellen Flannery, *Why We Need Diverse Books*, NEA Today (Oct. 26, 2020), https://www.nea.org/nea-today/all-news-articles/why-we-need-diverse-books.

[8] Hannah Clingan, *Utilizing Mirrors and Windows in Elementary Literacy to Build Identity and Empathy*, 1(1) Innovations and Critical Issues in Teaching and Learning 23, 27-28 (2020), https://cornerstone.lib.mnsu.edu/icitl/vol1/iss1/2 (collecting additional studies).

[9] Russell M. Viner et al., *Adolescence and the Social Determinants of Health*, 379(9826) Adolescent Health 1641, 1641-52 (Apr. 28, 2012), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(12)60149-4/fulltext; M. D. Resnick et al., *Protecting Adolescents from Harm. Findings from the National Longitudinal Study on Adolescent Health*, 278 J. Am. Med. Ass'n 823, 823-32 (Sept. 10, 1997), https://pubmed.ncbi.nlm.nih.gov/9293990; Marina Feijo et al., *Improving School Outcomes for Transgender and Gender-Diverse Youth: A Rapid Review*, 9(1) Policy Insights from the Behavioral and Brain Sciences 27, 27-34 (2022), https://journals.sagepub.com/doi/abs/10.1177/23727322211068021.

and substance use.[10]  Recent work has demonstrated that the influence of school connectedness experienced as an adolescent continues to impact students as they become adults, resulting in reduced emotional distress and suicidal ideation, a lower likelihood of physical violence victimization and perpetration, and less prescription or illicit drug use in adulthood.[11]

The benefits of using inclusive books in school curricula also reach more broadly.  Just as books can serve as "mirrors" for students belonging to minority groups, they can serve as "windows" for those students' peers, giving them insight into the experiences of other people and teaching them lessons about empathy, compassion, and community.[12]  Beyond merely portraying the contributions or cultures of minority groups, stories told from the perspective of members of those groups help children better understand connections between everyone in society and set them up to become caring individuals who are better able to act on their values.[13] Indeed, cognitive science and neuroscience studies suggest that reading fiction about

---

[10] Riley J. Steiner et al., *Adolescent Connectedness and Adult Health Outcomes*, 144(1) Pediatrics 1, 1-11 (Jul. 1, 2019), https://doi.org/10.1542/peds. 2018-3766; M. D. Resnick et al., *supra* note 9, at 831-32.

[11] *Id.*

[12] Flannery, *supra* note 7.

[13] Timothy V. Rasinski et al., *Multicultural Learning Through Children's Literature*, 67 Language Arts 576, 576-80 (1990), https://www.proquest.com/docview/196891107.

the experiences of diverse people boosts readers' brain capacity to put themselves in the shoes of others.[14] And students who are able to develop social and emotional skills such as these reap meaningful benefits throughout their lives; as children, they are better able to manage negative emotions and conflict and achieve better grades and higher test scores, and as adults, they may experience better job and financial security and improved overall physical and mental health.[15]

### B.    LGBTQ+ Youth Face Unique Struggles That Can Be Addressed Through a Supportive and Inclusive School Environment.

Providing a safe, supportive, and inclusive school environment is especially important to LGBTQ+ youth, who experience levels of discrimination and violence higher than their peers.[16] In one 2022 study, 68% of LGBTQ+ students reported feeling unsafe at school because of their sexual orientation or gender identity, and close to 90% reported hearing homophobic language used by their peers. [17]

---

[14] Amy L. Masko et al., *Teaching for Equity in the Milieu of White Fragility: Can Children's Literature Build Empathy and Break Down Resistance?*, 19(1-2) Curriculum and Teaching Dialogue 55, 59-60 (2017), https://www.proquest.com/openview/dffc7a68bd1431ffa4dcc1847720fe14.

[15] Stephanie M. Jones et al., *Promoting Social and Emotional Competencies in Elementary School*, 27(1) The Future of Children 49, 50 (Spring 2017), https://files.eric.ed.gov/fulltext/EJ1144815.pdf.

[16] Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* xv-xvii, 83, 93 (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf.

[17] *Id.* at xv-xvi.

According to a 2023 mental health survey, 60% of LGBTQ+ youth respondents reported being discriminated against because of their sexual orientation or gender identity. [18]    Indeed, a majority of LGBTQ+ youth in this survey reported experiencing verbal harassment, while significant fractions reported being disciplined for standing up to bullies or being subjected to unwanted sexual contact because of their LGBTQ+ status.[19]   Additionally, LGBTQ+ students of color and students with disabilities face compounded levels of discrimination based on their intersecting identities.[20]   This discrimination, violence, and harassment has been shown to reduce LGBTQ+ students' sense of connection to their schools and their own sense of belonging as compared to other students.[21]

Negative treatment based on sexual orientation or gender identity and expression in educational settings can result in severe health consequences for LGBTQ+ youth.  As a result of societal stigma and mistreatment, majorities of LGBTQ+ youth report experiencing depression and anxiety.[22]  Moreover, 41% of

---

[18] The Trevor Project, *2023 National Survey on the Mental Health of LGBTQ Young People* (2023), https://www.thetrevorproject.org/survey-2023/.

[19] *Id.*

[20] *See, e.g.,* Nhan L. Truong et al., GLSEN, *Erasure and Resilience: The Experiences of LGBTQ Students of Color—Black LGBTQ Youth in U.S. Schools* (2020), https://www.glsen.org/research/black-lgbtq-students.

[21] Kosciw et al., *supra* note 16, at xix-xx.

[22] The Trevor Project, *supra* note 18.

LGBTQ+ youth have seriously considered suicide in the past year, with 14% actually attempting suicide—and these figures rise for transgender or nonbinary youth and for LGBTQ+ youth of color.[23] Negative school environments exacerbate these problems, as LGBTQ+ students who report experiencing victimization or discrimination at school are likelier to have low self-esteem or to suffer from depression.[24] Indeed, longitudinal studies establish direct connections between victimization of LGBTQ+ youth at school and the development of depressive symptoms and other significant mental health issues.[25] And studies have also connected peer victimization and lower levels of school belonging to increased suicidality among LGBTQ+ youth.[26]

Discrimination, harassment, and stigma based on sexual orientation or gender identity also detrimentally impact LGBTQ+ students' academic outcomes. LGBTQ+ students who experience high levels of victimization or who experience

---

[23] *Id.*

[24] Kosciw et al., *supra* note 16, at xviii-xx.

[25] Tyler Hatchel et al., *Sexual Harassment Victimization, School Belonging, and Depressive Symptoms Among LGBTQ Adolescents: Temporal Insights*, 88(4) American Journal of Orthopsychiatry 422, 426-27 (2018), http://dx.doi.org/10.1037/ort0000279.

[26] Tyler Hatchel et al., *Peer Victimization and Suicidality Among LGBTQ Youth: The Roles of School Belonging, Self-Compassion, and Parental Support*, 16(2) Journal of LGBT Youth 134, 147-48 (2019), https://doi.org/10.1080/19361653.2018.1543036.

discrimination are significantly more likely to miss school, have lower GPAs, and report feeling less connected to their school communities.[27]  Close to 80% of LGBTQ+ youth report avoiding school functions or extracurricular activities because they feel unsafe or uncomfortable at school.[28]  These negative outcomes echo throughout students' lives; LGBTQ+ students who experience high levels of victimization because of their sexual orientation or gender identity are only half as likely to report plans to pursue post-secondary education like college or trade school.[29]

Conversely, LGBTQ+ students who experience increased affirmation, acceptance, and inclusion at school enjoy significantly improved mental health and academic outcomes.  One survey found that LGBTQ+ students who have access to supportive school staff, gay-straight alliances, inclusive school policies, and (as especially relevant here) curricula that included LGBTQ+ topics heard fewer homophobic remarks at school, experienced less discrimination, were less likely to miss school, reported a better sense of belonging and connection and school, and had more plans to pursue post-secondary education.[30]  Moreover, these students also

---

[27] Kosciw et al., *supra* note 16, at xviii-xx.

[28] *Id.* at xv.

[29] *Id.* at xix.

[30] *Id.* at xx-xxiv.

enjoyed better psychological well-being, reporting higher self-esteem and lower rates of depression or suicidality.[31]  Analyses of differences in policies and outcomes across various school systems have similarly revealed that LGBTQ+ students at schools with supportive policies concerning sexual orientation and gender identity had more positive experiences, better perceptions of the school environment, and reduced truancy.[32]

## II.    THE COUNTY'S USE OF THE BOOKS AT ISSUE PERMISSIBLY FOSTERS TOLERANCE AND PREPARES CHILDREN FOR A DIVERSE WORLD.

As explained above, all students benefit when schools are safe and inclusive for LGBTQ+ students.  Especially in that light, efforts like the County's do not raise constitutional or other concerns.  States' discretion in how they educate students is broad; the County's incorporation of LGBTQ+-inclusive books into its language arts curriculum falls well within that discretion; and its policy of not allowing opt-outs does not violate the Constitution or Maryland law.

---

[31] *Id.*; *see also, e.g.*, Wojciech Kaczkowski et al., *Examining the Relationship Between LGBTQ-Supportive School Health Policies and Practices and Psychosocial Health Outcomes of Lesbian, Gay, Bisexual, and Heterosexual Students*, 9(1) LGBT Health 43, 43-53 (Jan. 2022), https://doi.org/10.1089/lgbt.2021.0133.

[32] Jack K. Day et al., *Safe and Supportive Schools for LGBT Youth: Addressing Educational Inequities Through Inclusive Policies and Practices*, 74 Journal of School Psychology 29, 29-43 (June 2019), https://doi.org/10.1016/j.jsp.2019.05.007.

**A.     States Possess Broad Discretion to Shape School Policies to Promote Tolerance and Respect for Others.**

Public schools play a foundational role in society.  For decades, courts have recognized that these institutions serve as states' primary tool in raising successive generations of citizens, providing them with the tools they need to lead fulfilled lives and creating the building blocks of broader societal cohesion.  In *Brown v. Board of Education*, for instance, the Supreme Court observed that public schools are "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment."  347 U.S. 483, 493 (1954).  Indeed, *Brown* noted, the public school system is "the very foundation of good citizenship" and of central "importance to our democratic society."  *Id.*

Since *Brown*, the Court has repeatedly "express[ed] an abiding respect for the vital role of education in a free society" and recognized "the grave significance of education both to the individual and to our society."  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 30 (1973) (collecting cases).  In *Ambach v. Norwick*, for example, the Court emphasized "[t]he importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests."  441 U.S. 68, 76 (1979).  Common education, the Court observed, serves as an "'assimilative force' by which diverse and conflicting elements in our society are brought together on a broad but common

12

ground" and "inculcat[es] fundamental values necessary to the maintenance of a democratic political system." *Id.* at 77. Society is diverse, in other words, and schools' mission includes fostering tolerance and respect for others.

The Court has also made clear that public education benefits both individuals and the fabric of society. In *Bethel School District No. 403 v. Fraser*, the Court observed that public schools "prepare pupils for citizenship in the Republic" by "inculcat[ing] the habits and manners of civility as values in themselves conducive to happiness" while also recognizing that such values are "indispensable to the practice of self-government in the community and the nation." 478 U.S. 675, 681 (1986). Oft-cited concurrences have emphasized this same principle. *See McCollum v. Board of Ed. of Sch. Dist. No. 71*, 333 U.S. 203, 216, 231 (1948) (Frankfurter, J., concurring) (observing that public schools are "perhaps the most powerful agency for promoting cohesion among a heterogenous democratic people" and are "at once the symbol of our democracy and the most pervasive means for promoting our common destiny"); *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 241-42 (1963) (Brennan, J., concurring) (stating that "public schools serve a uniquely public function: the training of American citizens" and observing that a "public secular education" serves "uniquely democratic values"). Similarly, this Court has recognized the "obvious importance of . . . schools in shaping the character of our future citizens." *Hugger v. Rutherford Inst.*, 94 F. App'x 162, 167

(4th Cir. 2004). Public schools thus lie at the heart of states' obligation to provide people with the skills they need as citizens, as well as states' opportunity to contribute to the orderly functioning of a democratic society.

So that public schools can fulfill their critical educational mission, state and local governments possess broad latitude to shape the school environment (subject, of course, to constitutional and other federal and state law constraints). The Supreme Court has repeatedly underscored that "States and local school boards are generally afforded considerable discretion in operating public schools." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987); *see also, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) ("[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials . . . to prescribe and control conduct in the schools."); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities."). And the Court has firmly grounded this discretion in the States' paramount interest in providing their citizens with an education. *See, e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972) ("There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education."); *Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863-64 (1982) (noting that "local school boards have broad discretion in the management of

school affairs" and that "local school boards must be permitted to establish and apply their curriculum in such a way as to transmit community values" (internal quotation marks omitted)).

Schools' discretion, moreover, goes beyond questions of instruction or subject matter. In *Herndon v. Chapel Hill-Carrboro City Board*, for example, this Court upheld a school district's requirement that students complete 50 hours of community service in order to graduate. 89 F.3d 174, 176 (4th Cir. 1996). This Court has also rejected a claim by parents that a school rule concerning eligibility for interscholastic athletics interfered with their fundamental right to control their child's education. *Bailey v. Virginia High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012). Other courts have similarly rejected parental liberty claims touching on a wide array of non-curricular issues. *See, e.g.*, *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 462 (2d Cir. 1996) (community service requirement); *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005) (dress code); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 291 (5th Cir. 2001) (dress code); *Kite v. Marshall*, 661 F.2d 1027, 1029-30 (5th Cir. 1981) (attendance at summer athletic training camps).

## B.    States' and Schools' Broad Educational Discretion Encompasses Policies Like the County's.

Particularly given the need to create safe and inclusive environments for LGBTQ+ students, *see* discussion above at pages 2-11, policies like the County's fall well within states' and schools' discretion to adopt and implement.

Incorporating LGBTQ+-inclusive books into the language arts curriculum ensures that LGBTQ+ students can see people with whom they identify in books read in the classroom, and helps other students develop respect and tolerance for students who are LGBTQ+. And declining to allow opt-outs reflects a determination that, whatever one's views about whether being LGBTQ+ is "right" or "wrong," it is vital for students to learn to treat LGBTQ+ people with respect and dignity—consistent with public education's role in bringing together "diverse and conflicting elements in our society" and thus furthering "fundamental values necessary to the maintenance of a democratic political system." *Ambach*, 441 U.S. at 77.

Indeed, efforts to foster inclusion, such as those at issue here, often reflect policies of nondiscrimination enshrined in state law. Cognizant of the importance of education to all our communities' youth, as well as the broad negative effects of discrimination, many of our states (as well as other jurisdictions) have protected LGBTQ+ students by codifying prohibitions against discrimination on the basis of sexual orientation or gender identity.[33] In Maryland, for instance, local school systems are required to have policies and regulations designed to create and maintain environments that are equitable, fair, safe, diverse, and inclusive. COMAR

---

[33] *See, e.g.*, Mass. Gen. Laws ch. 76, § 5; Movement Advancement Project, *Equality Maps: Safe Schools Laws* (2022), https://www.lgbtmap.org/equality-maps/safe_school_laws ("nondiscrimination" tab) (compiling laws of all states).

13A.01.06.04.  Further, public prekindergarten, primary, and secondary schools, as well as nonpublic schools that receive funds from the State, are prohibited from discriminating against current or prospective students on the basis of, among other things, sexual orientation or gender identity.  Md. Code Ann., Educ. § 26-704 (LexisNexis 2022).  Efforts like the County's help foster a safe, supportive, and inclusive environment that benefits all students, including LGBTQ+ youth, consistent with our states' commitment to nondiscrimination and inclusion.

Endeavors like the County's are consistent with our states' efforts to address bullying, too.  Maryland law, for instance, requires each school system to establish a policy prohibiting bullying, harassment, or intimidation based on a statewide model policy.  *Id.* § 7-424.1.[34]  "Bullying, harassment, or intimidation" is defined to include certain conduct motivated by, among other things, a student's sexual orientation or gender identity.  *Id.* § 7-424.  As this definition reflects, bullying can be rooted in animus towards people who are different from the bully.  By fostering respect for, and familiarity with, LGBTQ+ people, LGBTQ+-inclusive books can help prevent bullying from occurring at all.

---

[34] *See also* Maryland State Department of Education, *Model Policy: Bullying, Harassment, or Intimidation* (2021), https://marylandpublicschools.org/about/Documents/DSFSS/SSSP/Bullying/MarylandsModelPolicyBullyingHarassmentIntimidation.pdf.

17

Parents who disagree with a school's approach to any of this have ample recourse. In Maryland, beyond attending school board meetings, they are free to raise their concerns with the county school superintendent, whose decision can then be appealed to the county school board. *Id.* § 4-205(c)(2). The county school board's decision, in turn, can be appealed to the State Board of Education, *id.* §§ 2-205(e), 4-205(c)(3), whose decision is subject to judicial review in the same manner as any other agency decision, COMAR 13A.01.05.11. Parents may not always agree with the outcome, of course, but the availability of processes such as these helps ensure that school boards can "transmit community values." *Board of Educ., Island Trees Union Free Sch. Dist. No. 26*, 457 U.S. at 864.

### C. The County's Efforts Here Do Not Burden Religious Exercise or Violate Maryland Law.

Appellate courts have repeatedly held that merely exposing students to ideas that contradict their religious beliefs (or those of their parents) does not burden religious exercise, absent coercion to do an act that violates their religious beliefs or a colorable claim of indoctrination. *See, e.g.*, *Parker v. Hurley*, 514 F.3d 87, 107 (1st Cir. 2008); *Mozert v. Hawkins County Bd. of Educ.*, 827 F.2d 1058, 1065 (6th Cir. 1987). Against that background, the County's policy of not allowing opt-outs does not burden students' or their parents' free exercise of religion. In integrating LGBTQ+-inclusive books into its language arts curriculum, Montgomery County is not engaging in religious coercion. Students are not required to undertake or refrain

18

from any religious practice. Nor are they (or their parents) required to affirm or profess adherence to any view. Indeed, if a student expresses the view that being gay is wrong, teachers are encouraged to respond that "I understand that is what you believe, but not everyone believes that," and that "[w]e don't have to understand or support a person's identity to treat them with respect and kindness." (J.A. 738.) And the County does nothing to prevent parents from conveying whatever messages they want to their children—including, for instance, messages that particular relationships or family structures contravene their religious beliefs.

For similar reasons, the County's decision not to allow opt-outs does not amount to indoctrination running counter to any religious beliefs. In integrating LGBTQ+-inclusive books into its language arts curriculum, the County is not telling students to embrace any specific judgment regarding the identities or relationships they depict. It also is not telling students that their (or their families') religious beliefs are wrong. It is simply exposing them to people, ways of life, and relationships that may be different from what they are familiar with.

More broadly, the County is exposing students to ideas, in service of its goals of fostering tolerance and respect for others. And exposing children to ideas, even when those ideas contradict the children's or their parents' religious beliefs, does not burden the free exercise of religion. *See Parker*, 514 F.3d at 10 ("Public schools are not obliged to shield individual students from ideas which potentially are religiously

offensive, particularly when the school imposes no requirement that the student agree with or affirm those ideas, or even participate in discussions about them."). Whatever religious beliefs students or their families may hold, it cannot be constitutionally problematic to familiarize students with LGBTQ+ people, who exist and are an integral part of communities in every part of the country.

In any event, even if the County's policy burdened plaintiffs' exercise of their religious beliefs, it would be subject to only rational-basis review—a bar that it readily clears. "[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021). The County's policy is neutral because it does not "target[] religious conduct for distinctive treatment," *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533-34 (1993), and it is generally applicable because it does not allow opt-outs for *any* reason, whether secular or religious, *see Fulton*, 141 S. Ct. at 1877. And as explained above, the myriad benefits of exposing all students to LGBTQ+-inclusive material easily supply a rational basis for the County's policy.

Virginia and other state amici, for their part, are wrong to contend that the County's policy is unconstitutional because the County purportedly has failed to follow the common practice of allowing students to opt out of sex education classes. *See* Va. Br. 7-12. That argument founders on its premise: the County's integration

of LGBTQ+-inclusive books into its language arts curriculum is not sex education. In Maryland, "Family Life and Human Sexuality" is a discrete component of the health curriculum, alongside mental and emotional health, substance abuse prevention, safety and violence prevention, healthy eating, and disease prevention control. COMAR 13A.04.18.01B. That curriculum's principal objective is to help students adopt and maintain behaviors that protect and promote health and avoid or reduce health risks. *Id.* The books here, by contrast, are simply meant to foster tolerance and inclusion and are integrated into the language arts curriculum. Indeed, treating them as a form of sex education would imply that books featuring heterosexual romantic or family relationships fall in the same category and likewise trigger opt-out rights.

Nor, for similar reasons, is there any merit to the assertion of Virginia and other state amici that the County's decision not to allow opt-outs violates Maryland law. *See* Va. Br. 11-12. Maryland's regulations require school systems to establish procedures allowing students to opt out of "instruction regarding family life and human sexuality objectives." COMAR 13A.04.18.01D(2)(e)(ii). But that requirement refers specifically to the Family Life and Human Sexuality component of Maryland's comprehensive health education curriculum outlined in the same regulatory section. COMAR 13A.04.18.01A-C; *see* COMAR 13A.04.18.01B(1) (program's objective is to "help students adopt and maintain healthy behaviors and

skills that contribute directly to a student's ability to successfully practice behaviors that protect and promote health and avoid or reduce health risks").  The County's use of books featuring LGBTQ+ characters in its language arts curriculum is not "instruction regarding family life and human sexuality objectives"; it is an effort to underscore for all students that LGBTQ+ people exist and deserve to be treated with dignity and respect.

## CONCLUSION

The district court's decision should be affirmed.

October 31, 2023

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

ADAM M. CAMBIER
Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2278
adam.cambier@mass.gov


ROBERT BONTA
Attorney General of California
1300 I Street
Sacramento, CA 95814


KATHLEEN JENNINGS
Attorney General of Delaware
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Joshua M. Segal
JOSHUA M. SEGAL
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7446
jsegal@oag.state.md.us


WILLIAM TONG
Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106


BRIAN L. SCHWALB
Attorney General for the District of
 Columbia
400 6th Street, NW, Suite 8100
Washington, DC 20001

ANNE E. LOPEZ
Attorney General of Hawaiʻi
425 Queen Street
Honolulu, HI 96813

AARON M. FREY
Attorney General of Maine
6 State House Station
Augusta, ME 04333-0006

KEITH ELLISON
Attorney General of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
Attorney General of New Jersey
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

ELLEN F. ROSENBLUM
Attorney General of Oregon
1162 Court Street N.E.
Salem, OR 97301

PETER NERONHA
Attorney General of Rhode Island
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
Attorney General of Washington
P. O. Box 40100
Olympia, WA 98504

KWAME RAOUL
Attorney General of Illinois
100 West Randolph Street, 12th Floor
Chicago, IL 60601

DANA NESSEL
Attorney General of Michigan
P.O. Box 30212
Lansing, MI 48909

AARON D. FORD
Attorney General of Nevada
100 North Carson Street
Carson City, NV 89701

LETITIA JAMES
Attorney General of New York
28 Liberty Street
New York, NY 10005

MICHELLE A. HENRY
Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120

CHARITY R. CLARK
Attorney General of Vermont
109 State Street
Montpelier, VT 05609

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this brief contains 4,819 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen point, Times New Roman.

/s/ Joshua M. Segal
Joshua M. Segal

**CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Joshua M. Segal
Joshua M. Segal