No. 23-1890

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TAMER MAHMOUD; ENAS BARAKAT; JEFF ROMAN; SVITLANA ROMAN; CHRIS PERSAK, IN HIS INDIVIDUAL CAPACITY AND EX REL. HIS MINOR CHILDREN; MELISSA PERSAK, IN HER INDIVIDUAL CAPACITY AND EX REL. HER MINOR CHILDREN; KIDS FIRST, AN UNINCORPORATED ASSOCIATION,

*Plaintiffs-Appellants,*

v.

MONIFA B. MCKNIGHT; SHEBRA EVANS; LYNNE HARRIS; GRACE RIVERA-OVEN; KARLA SILVESTRE; REBECCA SMONDROWSKI; BRENDA WOLFF; JULIE YANG; MONTGOMERY COUNTY BOARD OF EDUCATION,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Maryland, Southern Division
Case No. 8:23-cv-1380 – Hon. Deborah L. Boardman

## APPELLANTS' REPLY BRIEF

Eric S. Baxter
William J. Haun
Michael J. O'Brien*
Colten L. Stanberry
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. N.W., Ste. 400
Washington, DC 20006
(202) 955-0095
ebaxter@becketlaw.org

*Counsel for Plaintiffs-Appellants*

*Not a member of the DC Bar; admitted in Louisiana. Practice limited to cases in federal court.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... iv

INTRODUCTION ...................................................................... 1

ARGUMENT ...................................................................... 2

I. The Parents are likely to succeed on the merits. ............................ 2

   A. The Storybook Mandate violates *Yoder*. ................................ 2

      1. The burden here is the same as in *Yoder*. .............................. 2

      2. *Yoder* cannot be limited to its facts. ..................................... 5

      3. Marginalizing *Yoder* creates Free Exercise conflicts. ............ 9

   B. Strict scrutiny is also triggered by the Supreme Court's
      government benefit cases. ........................................... 13

   C. Lack of either neutrality or general applicability
      independently triggers strict scrutiny. ............................... 16

      1. The health curriculum opt-outs trigger
         strict scrutiny under *Tandon*. ................................... 16

      2. The Board's discretion triggers strict scrutiny
         under *Fulton*. ..................................................... 19

      3. The Board's religious targeting
         triggers strict scrutiny. ............................................ 20

   D. The Parents' hybrid claim under the Due
      Process Clause triggers strict scrutiny. ............................... 21

   E. Banning notice and opt-outs fails strict scrutiny. ..................... 22

      1. There is no compelling interest in excluding
         the Parents from what their children must
         read and discuss. .................................................. 22

2. Excluding the Parents is not the least restrictive means. ....................................... 27

II. The remaining injunctive relief factors are satisfied. .................. 28

CONCLUSION ............................................................... 29

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION ............................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative v. Elenis,*
600 U.S. 570 (2023) .................................................................. 24

*C.N. v. Ridgewood Bd. of Educ.,*
430 F.3d 159 (3d. Cir. 2005) ...................................................... 8

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ....................................................... 18, 19, 20-21

*Danville Christian Acad., Inc. v. Beshear,*
141 S.Ct. 527 (2020) ................................................................ 22

*Donahoe v. Richards,*
38 Me. 379 (1854) .............................................................. 10, 11

*Edwards v. Aguillard,*
482 U.S. 578 (1987) ................................................................ 3, 13

*Emp. Div. v. Smith,*
494 U.S. 872 (1990) ................................................................ 21

*Espinoza v. Montana Dep't of Revenue,*
140 S.Ct. 2246 (2020) ......................................................... 11, 12, 14

*Fellowship of Christian Athletes v. San Jose
Unified Sch. Dist.,*
82 F.4th 664 (9th Cir. 2023) ............................................. 16, 17, 18, 19

*Florey v. Sioux Falls Sch. Dist. 49-5,*
619 F.2d 1311 (8th Cir. 1980) ...................................................... 8

*Fulton v. City of Philadelphia,*
141 S.Ct. 1868 (2021) ........................................................... *passim*

*Hardwick v. Bd. of Sch. Trs.,*
205 P. 49 (Cal. Dist. App. Ct. 1921) ................................................ 12

*Holt v. Hobbs*,
    574 U.S. 352 (2015) ............................................................. 27

*Iowa v. Minzer*,
    50 Iowa 145 (1878) .............................................................. 11

*D.L. ex rel. K.L. v. Balt. Bd. of Sch. Comm'rs*,
    706 F.3d 256 (4th Cir. 2013) ............................................... 3-4

*State ex rel. Kelley v. Ferguson*,
    144 N.W. 1039 (Neb. 1914) ................................................. 13

*Kidder v. Chellis*,
    59 N.H. 473 (1879) ............................................................. 11

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) ...................................... 2, 28, 29

*Lee v. Weisman*,
    505 U.S. 577 (1992) .......................................................... 7, 15

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
    485 U.S. 439 (1988) ......................................................... 14-15

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
    138 S.Ct. 1719 (2018) ........................................................ 21

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ........................................................... 27

*Monclova Christian Acad. v. Toledo-Lucas Cnty.
    Health Dep't*,
    984 F.3d 477, 481 (6th Cir. 2020) ..................................... 18-19

*Mozert v. Hawkins Cnty. Bd. of Educ.*,
    827 F.2d 1058 (6th Cir. 1987) ............................................. 6

*Mozert v. Hawkins Cnty. Pub. Schs.*,
    647 F.Supp. 1194 (E.D. Tenn. 1986) .................................... 6

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*,
    83 F.4th 658 (8th Cir. 2023) ............................................. 23-24

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
     551 U.S. 701 (2007) .............................................................. 25

*Parker v. Hurley*,
     514 F.3d 87 (1st Cir. 2008) ............................................... 6-7

*Ramirez v. Collier*,
     595 U.S. 411 (2022) .............................................................. 25

*Redeemed Christian Church of God v. Prince George's*
     *County*,
     17 F.4th 497 (4th Cir. 2021) ............................................. 27

*Reich v. Shiloh True Light Church of Christ*,
     No. 95-2765, 1996 WL 228802 (4th Cir. May 7, 1996) ...... 22

*Roe v. Dep't of Defense*,
     947 F.3d 207 (4th Cir. 2020) ................................................ 3

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
     141 S.Ct. 63 (2020) .............................................................. 28

*Saxe v. State Coll. Area Sch. Dist.*,
     240 F.3d 200 (3d Cir. 2001) ........................................... 24-25

*SFFA v. President and Fellows of Harvard Coll.*,
     600 U.S. 181 (2023) .............................................................. 23

*Sherbert v. Verner*,
     374 U.S. 398 (1963) ....................................................... 14, 28

*Tandon v. Newsom*,
     141 S.Ct. 1294 (2021) .................................................... 16, 17

*Tatel v. Mt. Lebanon Sch. Dist.*,
     No. 22-837, 2023 WL 3740822 (W.D. Pa. May 31, 2023) ......... 7-8

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
     309 F.3d 144 (3d Cir. 2002) ............................................... 16

*Thomas v. Rev. Bd.*,
     450 U.S. 707 (1981) .............................................................. 14

*People ex rel. Vollmar v. Stanley*,
    255 P. 610 (Colo. 1927) ................................................................. 12, 13

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ..................................................................... *passim*

*Workman v. Mingo Cnty. Bd. of Educ.*,
    419 F.App'x 348 (4th Cir. 2011) ......................................................... 22

**Statutes**

Ala. Code §16-40A-5 ........................................................................ 26

Ala. Code §16-41-6 ......................................................................... 26

Ark. Code §6-16-1006 ...................................................................... 26

Fla. Stat. §1001.42 ........................................................................ 26

Fla. Stat. §1003.42 ........................................................................ 26

Haw. Dep't of Educ., Bd. of Educ. Policy 101-13 ........................................... 26

Haw. Dep't of Educ. Reg. No. 2210.1 ...................................................... 26

Ind. Code §20-30-5-17 ..................................................................... 26

Ind. Code §20-30-17-2 ..................................................................... 26

Iowa Code §256.11 ......................................................................... 26

Iowa Code §279.80 ......................................................................... 26

Ky. Rev. Stat. §158.1415 .................................................................. 26

Md. Code Educ. §7-301 ...................................................................... 3

Minn. Stat. §120B.20 ...................................................................... 26

Mont. Code §20-7-120 ...................................................................... 26

Ore. Dep't of Educ. Admin. R. 581-021-0009 ............................................... 26

Tenn. Code §49-6-1305 ..................................................................... 26

Tenn. Code §49-6-1307 ..........................................................................26

Tenn. Code §49-6-1308 ..........................................................................26

Utah Admin. R. 277-474-3, 5 ................................................................26

Utah Code §53G-10-205 .........................................................................26

Utah Code §53G-10-403 .........................................................................26

## Other Authorities

Helen M. Alvaré, *Families, Schools, and Religious Freedom*,
   54 Loy. U. Chi. L.J. 579 (2022)....................................................4-5, 10

Otto T. Hamilton, *The Courts and The Curriculum* (1927)............11, 13

Keith T. Hayashi, Superintendent, Haw. Dep't of Educ.,
   Annual Memorandum: Notice on Board of Education
   Policy 101-13 Controversial Issues (June 23, 2023)..........................26

Pope Francis, Apostolic Exhortation, *Amoris Laetitia* (2016) .................3

Bernard C. Steiner, *History of Education in Maryland* (1894)..............12

## INTRODUCTION

The Board is wrong on the facts and the law. On the facts, its lawyers reframe the Pride Storybooks as "books with LGBTQ characters" that "impart critical reading skills through engaging, age-appropriate stories." But the Board admitted choosing the Pride Storybooks to "disrupt [students'] either/or thinking" on sexuality and gender transitioning. And it ignores the principals' undisputed statements that the Storybooks are "not appropriate" and "dismissive" of religion. Nor can the Board dispute that subjecting children to these books is "specifically prohibited" by the Parents' religions and violates their "most sacred duty."

On the law, the Board does no better. It says that forcing children—on threat of criminal fines or cost of private education—to participate in instruction against their faith imposes no religious burden. That violates every relevant Supreme Court ruling. Compulsion against faith, pressure to abandon faith to access government benefits, differential treatment of religion, and religious targeting all impose Free Exercise burdens. All are present here.

The Board's final trick is to pine that ruling for the Parents will entangle courts in the public schools. This is as fictional as the Storybooks. The Parents seek only to restore the opt-out rights already required by Maryland law and Board policy—rights still permitted for all

1

instruction except the Pride Storybooks. The Parents' pre-existing notice and opt-out rights should be restored.

## ARGUMENT

## I. The Parents are likely to succeed on the merits.

The Board wants "deferential" review based on the district court's factual "findings," Resp.3, 17, but the facts here are undisputed. The district court's ruling turned on the Parents suffering no religious burden under the Free Exercise Clause. That is a legal error, reviewed *de novo*. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021).

### A. The Storybook Mandate violates *Yoder*.

As explained, Br.24-33, the Storybook Mandate violates *Yoder* because it puts Parents to a choice: subject their children to instruction that risks "undermining the[ir] … religious practice," *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972), or face criminal penalties or the costs of alternative education. The Board claims this imposes no cognizable burden. Resp.19. But coercing children to attend instruction in violation of their religious faith is burdensome and prohibited by *Yoder*.

#### 1. The burden here is the same as in *Yoder*.

The Board says *Yoder* does not apply. Resp.26. But it does not dispute that, as in *Yoder*, there is forced instruction that undermines the "mode of life [that] is inseparable from and a part of the basic tenets of the [Parents'] religion." *Yoder*, 406 U.S. at 219. Nor does the Board dispute

that discussions on the Pride Storybooks are "specifically prohibit[ed]" for Tamer Mahmoud and his family, JA404 ¶17, and "endanger their status as believers," Br.12-13. Nor does it dispute that, for the Romans and Persaks, subjecting their children to the Storybooks violates their "most serious duty" to ensure their children "accept their own bodies" and to reject the "ideology of gender" in "educational programmes." Pope Francis, Apostolic Exhortation, *Amoris Laetitia*, ¶¶56, 84, 285 (2016), https://perma.cc/7PJY-QSAE; *see also* Br.13-14. Members of Kids First are co-plaintiffs, "similarly situated," and part of the Parents' injunction request. *Roe v. Dep't of Defense*, 947 F.3d 207, 217, 232 (4th Cir. 2020) (injunction applied to "similarly situated" parties because "categorical policies … call for categorical relief"). The Board doesn't dispute their religious objections, JA013-014 ¶¶32-33; JA017-018 ¶¶72-75.

Moreover, the Board does not dispute that, as in *Yoder*, the Parents must act under threat of criminal penalty. Md. Code Educ. §§7-301(a-1)(1), (e)(1)-(2)); *Yoder*, 406 U.S. 207-208. "The State exerts great authority and coercive power through mandatory attendance requirements." *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987). If the Parents withdraw their children even partially to avoid the Pride Storybooks, they risk criminal penalties. They must abandon their religious practice or incur the costs of private education. *See Yoder*, 406 U.S. at 207; *see also D.L. ex rel. K.L. v. Balt. Bd. of Sch. Comm'rs*, 706 F.3d 256, 263 (4th Cir. 2013) ("critical distinction is that *Pierce* and *Yoder*

3

addressed laws requiring that students attend public schools or face criminal repercussions"). Despite these undisputed facts, the Board never acknowledges that such coercion is present here. Under *Yoder*, it triggers strict scrutiny. Br.25-27.

The record is replete with Board admissions reinforcing the religious burdens. In promulgating the Storybook Mandate, the Board announced that the Storybooks were meant to "disrupt[]" "heteronormativity" and "either/or thinking" on gender and sexuality, beginning at age four. JA578; JA597. The Board never disputes its own elementary school principals' warning that mandating the Storybooks would be "dismissive of religious beliefs" and "shaming" to dissenting children. JA576. In the district court, the Board "d[id]n't dispute" that the Storybooks are required reading and that "there will be discussion that ensues." JA665:10-11. And it agreed that "part of the discussion" may include, for instance, "teachers ... instructing children that gender is anyone's guess at birth." JA668:9-14. The Board's own briefing explains that denying opt-outs was meant to teach every child how to "[c]onfront and eliminate" what the Board deems "stereotypes" around "gender identity and sexual orientation." JA726-727. Instead, the Board has "new concepts and perspectives" for the Parent's children, from which none can opt out. Resp.2. These concepts "undermine[] the very architecture of the[] [Parents'] faith"—"an important predictor of a breakdown in the

transmission of faith." Helen M. Alvaré, *Families, Schools, and Religious Freedom*, 54 Loy. U. Chi. L.J. 579, 629-30 (2022).

The Board's response is to spin a reframing. Now, the Pride Storybooks are "everyday tales," Resp.7, "books on shelves for students to find," Resp.8, like "Snow White, Cinderella, and Peter Pan," Resp.7, adopted to "create[] literate, thoughtful communicators." Resp.5. But happy talk doesn't change the undisputed facts. As in *Yoder*, the Board's mandate to "confront and eliminate" what it regards as "stereotypes," JA726, "interposes a serious barrier to the integration of the [Parents'] child into the [their] religious community." 406 U.S. at 211-12. As in *Yoder*, that burden triggers strict scrutiny.

### 2. *Yoder* cannot be limited to its facts.

This case, like *Yoder*, is about religious-based opt-outs to specific instruction. Instead of engaging the Parents' request or *Yoder*, the Board depends on out-of-circuit decisions that limit *Yoder* and conflate religious opt-out requests with full curricular challenges.[1] *See* Resp.20-26. But those cases are misguided. Br.28 n.6; Laycock Br.12-15. The Board says that's "irrelevant and wrong," Resp.24, but the cases distinguish themselves.

For instance, the Board is wrong to claim that *Mozert* equates curricular challenges and opt-outs. Resp.24. The *Mozert* plaintiffs sought

---

[1] None of the Fourth Circuit decisions in the Board's brief involves religious-based opt-outs to specific instruction.

"an order requiring the school system to … provid[e] alternative reading instruction," a different curriculum "tailored" to students' various religious views. *Mozert v. Hawkins Cnty. Pub. Schs.*, 647 F.Supp. 1194, 1195, 1202-03 (E.D. Tenn. 1986). Instead, the district court—on its own—held that students could "opt out of the school district's reading program," as was allowed by the state's "home schooling statute." *Id.* at 1203. Contra the Board, Resp.24, the Sixth Circuit "d[id] not reach" the opt-out remedy because "[t]here was no evidence that the conduct … was forbidden by [the students'] religion." *Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1070 (6th Cir. 1987). Thus, besides "deviat[ing] from recent precedent," Laycock Br.13, *Mozert* did not conflate curriculum challenges and religious opt-outs.

Next, the Board retreats to *Parker*. Resp.24-25. But *Parker's* holding that there is "no … direct coercion" in public school instruction, *Parker v. Hurley*, 514 F.3d 87, 105 (1st Cir. 2008), is inconsistent with *Yoder's* discussion of mandatory attendance laws enforced by criminal fines, 406 U.S. at 218, 230-31. Moreover, the Supreme Court has long recognized claims based on indirect coercion. Br.33. The Board recasts *Parker*'s dicta on "indoctrination" to say that *Parker* rejects indirect coercion too. Resp.24-25. But *Parker* never says "indirect coercion," much less analyze the relevant cases. And *Parker* disclaims "address[ing] whether or not an indoctrination theory under the Free Exercise Clause is sound." *Parker*,

514 F.3d at 105. The Parents are unaware of *any* cases holding that some undefined level of indoctrination is the standard for religious opt-outs.

The Board's factual analogies to *Parker*, Resp.25, also fail. The fact that one *Parker* student was forced to read a book gave him "a more significant claim," even if the court concluded the book was more an "intent to influence" than "indoctrinate." 514 F.3d at 106. Here, the Board intended the Pride Storybooks to "disrupt[]" "heteronormativity" and "either/or thinking" on gender and sexuality. JA578; JA597. And unlike *Parker*, students *are* pressured to agree with the Pride Storybooks. That's why the principals warned that the Storybooks and teachers' guides are "dismissive" and "shaming" of dissenters. JA576. That's also clear from the Storybooks' content, JA259 ("Not everything *needs* to make sense. *This is about love*."), and the teachers' guides, JA595 ("hurtful" to say someone "can't be a boy if … born a girl"). This is problematic for impressionable children susceptible to pressure from peers and authority figures. *Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools"). Persuasive authority must at least be persuasive. *Parker* is not. The same goes for the other cases the Board relies on. Br.27-28 & n.6.

The Board's effort to distinguish the Parents' cases is also unavailing. *Tatel* explains why the Board's discussion of Third Circuit precedent, Resp.29, is wrong. *Tatel v. Mt. Lebanon Sch. Dist.*, No. 22-837, 2023 WL

3740822, at *5-8 (W.D. Pa. May 31, 2023). In short, the Third Circuit rejects the Board's preferred theory that parental rights terminate with the decision to "send their child to public school." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 n.26 (3d. Cir. 2005). Nor can *Tatel* be distinguished as applying only to "a teacher's *noncurricular* transgender agenda," Resp.34, because the school board there "adopted a de facto policy that [the teacher's] conduct could continue … without parental notice or opt out rights." *Tatel*, 2023 WL 3740822, at *8. As here, that "rises to constitutional importance." *Id.*

Meanwhile, the Board selectively quotes the Eighth Circuit's ruling in *Florey,* because it rejects the Board's conflation of religious opt-outs and curricular challenges. The Board tries to lump *Florey* in with its conflation, quoting only *Florey*'s acknowledgment that "public schools are not required to delete from the curriculum all materials that may offend any religious sensibility." *Florey v. Sioux Falls Sch. Dist. 49-5*, 619 F.2d 1311, 1318 (8th Cir. 1980); Resp.29. But the Parents have never said otherwise—maintaining from the beginning that they "can prevail, and the Pride Storybooks can still be taught." Br.29. But, the Board ignores *Florey's* holding that "*[o]n the other hand*, forcing any person to participate in an activity that offends his religious or nonreligious beliefs will generally contravene the Free Exercise Clause[.]" *Florey*, 619 F.2d at 1318-19 (citing *Yoder*) (emphasis added). By conflating these distinct claims, it is the Board, not the Parents, that seeks to "overhaul

8

longstanding law," Resp.3, and "climb[] up the level of generality to a perch," Resp.29.

By misreading Supreme Court and out-of-circuit decisions, the Board asks this Court to adopt a rule antithetical to *Yoder*. *Compare* Resp.24 ("exposure in public school to ideas that contradict religious beliefs does not burden the religious exercise of students or parents"), *with Yoder*, 406 U.S. at 218 ("exposing Amish children to worldly influences … contravenes the basic religious tenets and practice of the Amish faith, both as to the parent and the child"). This Court should follow the Supreme Court, not the Board's anti-universe.

### 3. Marginalizing *Yoder* creates Free Exercise conflicts.

Sidelining *Yoder* raises significant Free Exercise problems. By limiting protection to instruction that "gravely endanger[s]" or "destroy[s]" a religious way of life, Resp.26, 28, the Board's stinting Free Exercise Clause invites forbidden inquiry into the "central[ity]" of religious beliefs, with the accompanying entanglement and denominational discrimination. Br.30-33. In practice, it ends parental religious liberty at the schoolhouse door.

The Board claims that *Yoder*'s "own language" requires these extreme results. Resp.28. It gets there by confusing necessary and sufficient conditions. Amish separateness and self-sufficiency mattered in *Yoder* because they provided "persuasive evidence undermining the arguments [Wisconsin] advanced to support its claims in terms of the welfare of the

9

child and society as a whole." *Yoder*, 406 U.S. at 234. But the Supreme Court never said that this evidence dictates what parents *must* show when courts are faced "with religious claims for exemption from generally applicable education requirements" against another "legitimate social concern." *See id.* at 235; *see also* Alvaré, *Families*, 54 Loy. U. Chi. L.J. at 627. What matters to all cases is *Yoder*'s holding, which denies the state power to compel particular "education to children regardless of the wishes of their parents." *Yoder*, 406 U.S. at 229. That "parens patriae claim of such all-encompassing scope" is inconsistent with "the central values underlying the Religion Clauses." *Id.* at 234. This holding dooms the Board's claim of unlimited power here.

It is the Board that defies *Yoder*'s words. *Yoder* expressly relied on an "enduring American tradition," 406 U.S. at 232, one "reluctant to directly force instruction of children 'in opposition to the will of the parent,'" *id.* at 226 n.14 (quoting Thomas Jefferson). But when the Board addresses the historical record, Resp.35-37, it's a wonder that *Yoder* exists. The Board claims that courts "have routinely approved public schools' denial of opt-out requests." Resp.35. That's wrong. Br.31-32; DeGroff Br.3-9. The Board's citations show it.

The Board's flawed history begins with a Maine case where "the conscientious religious views of the [parent]" were "not involved." *Donahoe v. Richards*, 38 Me. 379, 408 (1854); Resp.35. When addressing the child's religious objection, the court presumed that public schooling,

provided with "magnanimous liberality and Christian kindness," was essential to make *true* "citizens" from the "large" and "weak" "masses of foreign population [that] are among us." *Donahoe*, 38 Me. at 413. This drew on the anti-Catholic bigotry "of the 19th century," which has since been expressly disavowed by the Supreme Court. *Espinoza v. Montana Dep't of Revenue*, 140 S.Ct. 2246, 2259 (2020). That "hardly evince[s] a tradition that should inform our understanding of the Free Exercise Clause." *Id.* Yet, by suggesting the Pride Storybooks are "essential to good citizenship," Resp.37, the Board draws on an equally prejudiced presumption.

The rest of the Board's anti-canon ranges from irrelevant to extreme. *Iowa v. Minzer*, decided before compulsory education took hold, was "unwilling to sanction the rule that a teacher may punish a pupil … for not doing something the parent has requested the pupil to be excused from doing." 50 Iowa 145, 152 (1878). And nothing in *Kidder v. Chellis* suggests that the "ample remedies" in law "for any misgovernment, or maladministration in prescribing studies or requiring educational exercises" exclude religious opt-outs. 59 N.H. 473, 476 (1879). Rounding out the Board's cases is *Webber*, Resp.35, a case "much criticized by other courts … as an example of the most extreme position which a court has assumed." Otto T. Hamilton, *The Courts and The Curriculum* 54 (1927).

The Board also cites a book purportedly showing that Maryland "extinguished" "any … parental opt-out right" when it statutorily

adopted a public-school system in 1865. Resp.37. But the delegation of "what 'shall be taught,'" *id.*, was an assignment of authority to the "State board of education" over "colleges and schools" and "county school boards" to ensure "uniform" textbook selection—not a refutation of all parental opt-outs. Bernard C. Steiner, *History of Education in Maryland* 66-67 (1894).

*Yoder*'s "[d]rawing on 'enduring American tradition,'" *Espinoza*, 140 S.Ct. at 2261, is reinforced by many early cases, Br.30-32—but the Board suggests that "none" involved the Free Exercise Clause. Resp.37. That's incorrect. *Hardwick* relied on the First Amendment. *See Hardwick v. Bd. of Sch. Trs.*, 205 P. 49, 52 (Cal. Dist. App. Ct. 1921). And counter to what the Board claims, Resp.36, *Hardwick* did not regard its holding as the only "one" or limited to physical activities. *See* 205 P.49 at 55 ("The views expressed in this opinion are sustained by many authorities. We do not deem it necessary to name them all herein.").

Like *Hardwick*, the Parents' other historical cases were decided before the Free Exercise Clause's incorporation against the states. The Clause's infrequent appearance is thus unsurprising. But even before incorporation in 1940, "the right of the parents to select, within limits, what their children shall learn, [wa]s one of the liberties guaranteed by the Fourteenth Amendment to the national Constitution." *People ex rel. Vollmar v. Stanley*, 255 P. 610, 613-14 (Colo. 1927). Indeed, *Vollmar* rejected the Board's logic root and branch, holding that a provision giving

12

the school board "'control of instruction' should have a reasonable interpretation." *Id*. at 614. It also rejected the argument that parents could just "send [their] child[ren] to a private school," because "a great majority of children everywhere are, for one reason or another, dependent on the public schools." *Id*. Thus, even before incorporation, the right of parents to opt their children out of religiously burdensome instruction was reflected in "[t]he weight of the decisions" from English common law through the early 20th century. *See* Hamilton, *The Courts and the Curriculum*, 69, Summary at II; DeGroff Br.3-9. And for good reason: "the prime factor in our scheme of government is the American home." *State ex rel. Kelley v. Ferguson*, 144 N.W. 1039, 1044 (Neb. 1914). The Court should rely on the tradition *Yoder* continued, not the Board's bigotry-laced revisionism.

* * *

"Families entrust public schools with the education of their children … on the understanding that the classroom will not purposely be used to advance religious [or ideological] views that may conflict with the[ir] private beliefs[.]" *Edwards*, 482 U.S. at 584. Affirming the district court breaks that trust. The Court should apply *Yoder* and reverse.

## B. Strict scrutiny is also triggered by the Supreme Court's government benefit cases.

Strict scrutiny also applies to government action pressuring individuals to forgo religious exercise as a condition of accessing a public

13

benefit. Br.33-36. The Board does not dispute that free schooling is a valuable public benefit and that—for most parents—private-school tuition and homeschooling are illusory. Still, the Board insists the Parents must give up their religious convictions to use the public schools. Resp.27 (leave "religion at home"). That imposes the same unlawful pressure as denying unemployment benefits (*Sherbert* and *Thomas*), withholding tuition (*Carson*), and foster-care contracts (*Fulton*). Such "indirect 'discouragement[],'" *Sherbert v. Verner*, 374 U.S. 398, 404 n.5 (1963), "inevitably deters or discourages the exercise of First Amendment rights," *Espinoza*, 140 S.Ct. at 2256.

The Board's only response is to again try cabining cases to their facts. Resp.33. But the nature of the benefit is irrelevant. It is the "pressure" to "modify … behavior" or "violate … beliefs" that counts. *Thomas v. Rev. Bd.*, 450 U.S. 707, 718 (1981). Such pressure can exist even when the government "disagrees" it is doing anything but requiring the claimant to "satisfy the statutory criteria." *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1876 (2021) ("But CSS believes that certification is tantamount to endorsement"). And it can exist even if the Parents can "teach their religious beliefs at home." Br.35-36 (discussing *Sherbert*, *Thomas*, *Hobbie*, *Carson*, *Espinoza*, and *Trinity Lutheran*). So *Lyng v. Northwest Indian Cemetery Protective Association* does not help the Board. Resp.34. *Lyng* only excused government programs that "have no tendency to

coerce individuals into acting contrary to their religious beliefs." 485 U.S. 439, 450 (1988). But "tendency to coerce" is what's happening here.

The Board does not dispute that the Parents have a religious obligation to shield their children from "educational programs" that "promote a personal identity and emotional intimacy radically separated from the biological difference between male and female," JA410-411 ¶¶13-15, or that directly address sexuality and gender in non-family settings, JA404 ¶¶17-18. Nor is there any dispute that some Parents have already been coerced to leave the public schools and begin homeschooling at significant financial costs. *See* ECF No. 49 Ex. A. Others are pressured to stay in violation of their religious convictions because they lack feasible alternatives and are not being told when the Pride Storybooks will be read. *Lyng* is inapplicable.

*Barnette* supports the Parents. The Pride Storybooks do not merely "acquaint[]" students with new ideas, Resp.34, but are intended to "disrupt[]" their religious thinking, JA578, at an impressionable age and on complex and sensitive religious questions. The Board relies on *Lee* to say that "exposing [students] to ideas they find distasteful or immoral or absurd" is a positive. Resp.23. But the Board did not read far enough. At the end of the same paragraph (and later), *Lee* rejects that approach. *Lee* concludes that, under the Religion Clauses, "[t]his argument cannot prevail" because it "puts at grave risk" the "freedom of belief and conscience." 505 U.S. at 591, 592.

The Board cannot distinguish the government benefits cases. They apply, and so does strict scrutiny.

## C. Lack of either neutrality or general applicability independently triggers strict scrutiny.

The Board insists that, even when a law is not neutral and generally applicable, there must still be a distinct religious burden. Resp.38-39. As discussed above, the undisputed facts demonstrate that burden. But there is also an inherent burden whenever the government treats religious exercise worse than comparable secular conduct under *Tandon*, or has discretion to do so under *Fulton*, or when the government targets religious exercise under *Masterpiece* and *Lukumi*. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 686 (2023) (en banc) ("bedrock" principles); *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002); Laycock Br.8-9. The Storybook Mandate does it all, triggering strict scrutiny three times over.

### 1. The health curriculum opt-outs trigger strict scrutiny under *Tandon*.

Under *Tandon v. Newsom*, favoring "*any*" secular activity over comparable religious activity triggers strict scrutiny. 141 S.Ct. 1294, 1296 (2021). The Board admits that elementary students can opt out of instruction on LGBTQ-inclusivity during health class for secular reasons, but not during story hour for religious reasons. Resp.42. That triggers strict scrutiny.

16

In response, the Board claims it "never" honors opt-outs "for ELA" instruction like the Pride Storybooks. Resp.42, 11. But the Board's Religious Diversity Guidelines still require schools to "make reasonable and feasible adjustments" to accommodate religious objections, including to "a particular reading assignment." JA067-068. Even if true that *"all* opt-outs" are now "prohibited from the ELA Curriculum," Resp.42, that provides "no answer" because secular opt-outs are still allowed from the same instruction in the health curriculum. *Tandon*, 141 S.Ct. at 1296; Br.40. The law in *Tandon* barred *all* in-home gatherings of more than three families, "religious and secular alike." 141 S.Ct. at 1298 (Kagan, J., dissenting). But that didn't make the law generally applicable. It was subject to strict scrutiny because it "provid[ed] more favorable treatment to comparable secular activities." *FCA*, 82 F.4th at 688.

What was true for salons and movie theaters (but not in-home gatherings) in *Tandon* is true here for opt-outs for health class (but not story time). The Board says "Plaintiffs are wrong" and have "adduced no evidence" that both forms of instruction have the same underlying government interest. Resp.42. But that ignores the "educational equity" interest on sexual orientation and gender identity via Maryland's 2019 Equity Regulation, which led to the addition of both the Pride Storybooks and comparable changes to the health curriculum. Br.38-39 The Board has no response, except to claim that *Tandon*'s analysis somehow

17

requires "target[ing] religious practice." Resp.16. "Targeting is not required." *FCA*, 82 F.4th at 686.

The Board does not dispute the common LGBTQ equity interests underlying the Pride Storybooks and health curriculum. Resp.43. Instead, it argues *additional* interests in barring opt-outs from the Pride Storybooks because they lead to "high student absenteeism" and "infeasibility [in] accommodating." Resp.43. Regardless of whether that's a true distinction, there is still differential treatment—secular opt-outs from health class are okay; religious opt-outs from story time are not. Thus, the Board's feasibility concerns are themselves subject to strict scrutiny.

Nor is it relevant that the Board's opt-out ban is absolute within the universe of the Pride Storybooks. In *Lukumi*, the Court did not look for exceptions only within the challenged city ordinances. Rather, exceptions anywhere that undermined the ordinances' underlying purposes, including in state law, triggered strict scrutiny. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 536-40 (1993); *see also FCA*, 82 F.4th at 689 (rejecting "distinction between school-operated and student-operated programs" because of common "equal access" interest); *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 481 (6th Cir. 2020) (rejecting a "myopic focus solely on the provision that regulates religious conduct" as "evasi[ve] of the Free Exercise

guarantee"). The Board's complaint that opt-outs from health are mandated by "Maryland law," Resp.43, is thus irrelevant.

### 2. The Board's discretion triggers strict scrutiny under *Fulton.*

"[T]he mere existence of government discretion is enough to render a policy not generally applicable." *FCA*, 82 F.4th at 685 (citing *Fulton*, 141 S.Ct. at 1879). The Board's Religious Diversity Guidelines give schools broad discretion to craft opt-outs. Resp.41; JA067 ("When possible, schools should try to make reasonable and feasible adjustments to the instructional program to accommodate [religious] requests"); JA068 (including "objections … to a particular reading assignment"). That alone triggers strict scrutiny, "regardless whether any exceptions have been given" (though, here, they were). *Fulton*, 141 S.Ct. at 1877-78; Br.41 (opt-outs permitted "almost the entire last school year"). The Board's yo-yo approach to opt-outs last year only further underscores that discretion. Br.40-42.

The Board tries to dodge by pretending the opt-out ban is wholly independent of the Guidelines. Resp.44-45. Philadelphia tried the same narrowing gambit in *Fulton*—and lost. 141 S.Ct. at 1878-79. The Defendants in *Lukumi* tried it too—and lost. *Lukumi*, 508 U.S. at 544-45.

Alternatively, the Board tries to parse away the discretion in its Guidelines. For example, the Board claims the Guidelines don't include

opt-outs for instruction "about religion." Resp.46. It's not clear why that's relevant, and the cited provision provides discretion anyway. JA068 (schools "may excuse" students). The Board says opt-outs aren't considered "on a case-by-case basis." Resp.46. But saying schools "should try" to make "reasonable" accommodations is case-by-case discretion. JA067. Further, regarding the Parent's argument that the Guidelines inherently "'reserv[e] … [Board] authority," Resp.46, the Board responds that the Guidelines "nowhere suggested that *schools* could override the blanket no-opt-out policy." Resp.46 (emphasis added). But the Board, not "schools," is the policymaker with discretion. It can, and on March 23 did, change its mind in its "sole discretion." *Fulton*, 141 S.Ct. at 1879. That requires strict scrutiny.

The Board expresses concern that scrutinizing its discretion "to end *all* [Storybook] exemptions" "would disincentivize" it "from accommodating religious practice in the first place." Resp.47. Setting aside the problems in wholesale refusing to accommodate religious practice, the Supreme Court has been clear that, where a government can accommodate and has discretion, it must justify why it isn't using that discretion to accommodate religion. *Fulton*, 141 S.Ct. at 1877. The Board failed to do so here.

### 3. The Board's religious targeting triggers strict scrutiny.

Carving out the Pride Storybooks from every other form of instruction—to avoid accommodating objectors—"target[ed] religious

20

conduct for distinctive treatment." *Lukumi*, 508 U.S. at 546. That's not neutral and triggers strict scrutiny. *See* Br.42-44. The Board responds there is no evidence that the opt-out ban "target[ed] [religious] requests," because at least some requests "were not religious." Resp.48; JA542 ¶34. But Board members' accusations that the Parents were "white supremacists" and "xenophobes" looking for "another reason to hate," promoting "erasure," and "parroting … dogma" Br.43-44, are more than sufficient. The Board tries to explain away each statement, Resp.48-49, but irrefutable proof of exclusively religious bias is not required. Even "subtle departures from neutrality" trigger strict scrutiny. *Lukumi*, 508 U.S. at 534.

If the Board believed its religious animosity was a misunderstanding, any one of its members could have "object[ed]" to Ms. Harris's and others' derogatory comments or "disavowed" them "in the briefs filed in this Court." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,* 138 S.Ct. 1719, 1729-30 (2018). Having done neither, there is ample evidence of religious animosity to either warrant strict scrutiny or set the policy aside.

### D. The Parents' hybrid claim under the Due Process Clause triggers strict scrutiny.

*Smith* left untouched the due process "right of parents … to direct the education of their children," recognizing that these claims still receive heightened scrutiny when combined with a free exercise interest. *Emp. Div. v. Smith,* 494 U.S. 872, 881 (1990) (citing *Pierce* and *Yoder*). In the

three decades since, the Supreme Court has not disturbed that formulation. *See Danville Christian Acad., Inc. v. Beshear*, 141 S.Ct. 527, 528 (2020) (calling this an "alternative *Smith* argument" for "requir[ing] strict scrutiny").

This Court has embraced this same rule in at least one unpublished decision. *Reich v. Shiloh True Light Church of Christ*, No. 95-2765, 1996 WL 228802, at *3 (4th Cir. May 7, 1996) ("[H]ybrid" claims "involving both free exercise rights and other fundamental rights … must be analyzed under the compelling interest test."). It stood by it in *Herndon* and, just months ago, in *John and Jane Parents 1*. Br.44-45. *Workman*— the lone, unpublished case cited by the Board, Resp.57—observed "there is a circuit split" on the issue, and then assumed strict scrutiny applied. *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F.App'x 348, 353 (4th Cir. 2011).

The Board's remaining authorities, Resp.56, continue to conflate religious opt-outs and curricular challenges (*Leebaert*) or don't involve a religious claim (*Bailey*). Strict scrutiny applies.

### E. Banning notice and opt-outs fails strict scrutiny.

#### 1. There is no compelling interest in excluding the Parents from what their children must read and discuss.

The Board acknowledges that strict scrutiny requires "interests of the highest order that are particular to the specific case." Resp.50 (cleaned up). Yet it never defends its policy of no parental notice. And it forgoes

the "more precise analysis" of the allegedly compelling need to deny opt-outs to the "particular religious claimants" in this case. *Fulton*, 141 S.Ct. at 1881.

The Board relies on abstractions like "a classroom environment that is safe and conducive to learning," Resp.50, but ignores that the Supreme Court rejected such interests as "imponderable." Br.46-47 (discussing *SFFA*); *see also SFFA v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023) (rejecting interests in "enhancing appreciation, respect, and empathy" for minorities, imparting "new knowledge," and having a "robust" "exchange of ideas" as non-compelling). The Board proceeds as if *SFFA* never happened, and as if *Fulton* had not unanimously "demand[ed]" government proof as to the "particular religious claimants." 141 S.Ct. at 1881. The Board still allows opt-outs from sex ed, allowed opt-outs from this very program until March 23, and diverges from many other school districts that somehow have safe environments without forcing unwilling parents to subject their children to an innocence-depriving religious violation. This is not compelling.

Resisting this, the Board loads the dice: "safety" includes "the risk of exposing students to social stigma" they might perceive if others are "allow[ed] … to leave class" when the Pride Storybooks are taught. Resp.43, 51. But stigma cuts both ways, and "[a] school district cannot avoid the strictures of the First Amendment simply by defining certain speech as 'bullying' or 'harassment.'" *Parents Defending Educ. v. Linn*

*Mar Cmty. Sch. Dist.*, 83 F.4th 658, 667 (8th Cir. 2023). As the Board's principals explained, social stigma also attaches to the religious child whose "wrong" views on sex and gender will be called out by the teacher. *See* JA576 ("dismissive," "shaming"). The Supreme Court has recently and repeatedly rejected such general and one-sided stigma claims as uncompelling in the First Amendment context. *See Fulton*, 141 S.Ct. at 1882 (unanimously finding "this interest cannot justify denying" religious exemption); *303 Creative v. Elenis*, 600 U.S. 570, 602 (2023) ("A commitment to speech for only *some* messages and *some* persons is no commitment at all."). There is no compelling interest in addressing social stigma by forcing religious dissenters to remain in class and be stigmatized by their teachers and classmates.

The Board's cases (Resp.50-51) don't help. In several, speech was punished because it substantially disrupted school operations: invidious online bullying campaigns (*Kowalski*); distribution of thousands of dolls causing mayhem (*Taylor*); organization of a "concerted effort" to get a coach fired (*Lowery*); or protests so loud they violate anti-noise ordinances (*Grayned*). In others, schools instituted uniform dress codes (*Frudden*). But "undifferentiated fear or apprehension of disturbance is not enough to justify" First Amendment incursions. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (Alito, J.) (cleaned up). That decision *invalidated* a school policy claiming a "safe" educational environment aimed at speech that "offends," partly because its censorial

reach "could include much 'core' political and religious speech." *Id.* at 215-17; *see also* Br.49 (citing *303 Creative* and *Barnette*).

The Board's next claimed interest in "complying with anti-discrimination laws," Resp.15, is illusory. "[A] governmental agency's interest in remedying 'societal' discrimination, that is, discrimination not traceable to its own actions, cannot be deemed sufficiently compelling to pass constitutional muster." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 731-32 (2007). "[S]peculation" about what an amalgam of nondiscrimination laws require "is insufficient to satisfy strict scrutiny." *Fulton*, 141 S.Ct. at 1882. The Board has not even identified a single applicable law. And that is no surprise given the Board's own conduct.

Nationwide practice belies the Board's asserted interests. "[T]here [is no] basis for deference" when a government asserts a compelling interest in categorically banning a practice it—and most of the nation—"has 'historically and routinely allowed.'" *Ramirez v. Collier*, 595 U.S. 411, 429 (2022); *see also id.* at 444 (Kavanaugh, J., concurring) ("experience matters in assessing whether less restrictive alternatives could still satisfy the State's compelling interest."). In response, the Board ignores *Ramirez* and concedes that "nearly all States" provide opt-out or opt-in protections related to human sexuality instruction. Resp.53. Then it (1) asserts that this consensus "makes no difference" (*but see* Br.16-18, 48-49; States Br.7-10); (2) reinvokes its own "history" of denying opt-outs

(*supra* at 10-12); and (3) suggests there is "no evidence" that opt-outs in other jurisdictions extend to human sexuality instruction occurring in language arts class, Resp.53. Wrong again. In varied ways, at least a dozen states have made it *explicit* that protections against forced instruction on human sexuality, sexual orientation, and gender identity extend outside sex ed.[2]

It is no answer to say that Baltimore keeps its sex ed in sex ed. Resp.11-12. The point is that if there were a compelling safety/stigma/inclusivity/compliance interest, no one would allow those opt-outs from this material, no matter where it is taught. And the Board has no answer for its own policies, which allow religious opt-outs everywhere else in the curriculum. Simply put, Maryland law, the Board's own policies, and the widespread allowance of opt-outs confirm the Board lacks a compelling interest applied to the Parents.

---

[2] *See* Ala. Code §16-41-6; Ala. Code §16-40A-5; Ark. Code §6-16-1006(c); Fla. Stat. §§1001.42(8)(c)(3), 1003.42(5); Haw. Dep't of Educ., Bd. of Educ. Policy 101-13; Haw. Dep't of Educ. Reg. No. 2210.1, https://perma.cc/6QAT-B6EL; Keith T. Hayashi, Superintendent, Haw. Dep't of Educ., Annual Memorandum: Notice on Board of Education Policy 101-13 Controversial Issues (June 23, 2023), https://perma.cc/T6DS-XSWP; Ind. Code §§20-30-17-2, 20-30-5-17(c), (d); Iowa Code §§256.11(6)(a), 279.80; Ky. Rev. Stat. §158.1415(1)(d)(1)-(2), (e); Minn. Stat. §120B.20; Mont. Code §20-7-120; Ore. Dep't of Educ. Admin. R. 581-021-0009; Tenn. Code §§49-6-1305, 49-6-1307, 49-6-1308; Utah Code §§53G-10-205, 53G-10-403; Utah Admin. R. 277-474-3, 5.

**2. Excluding the Parents is not the least restrictive means.**

"The least-restrictive-means standard is exceptionally demanding." *Holt v. Hobbs*, 574 U.S. 352, 364-65 (2015). The Board doesn't come close, instead resting on the circular logic that a ban on opt-outs targets "the problem that opt-outs pose." Resp.55. But the relevant question is whether the government has proven that it cannot achieve its stated safety and compliance goals in a less restrictive way. Here, exploring alternatives is a prerequisite, Br.50-51, and the Board has again failed to show its work. This "absence … of any evidence showing that the [Board] considered other ways of achieving its interest … underscores the [Board's] lack of consideration of alternatives." *Redeemed Christian Church of God v. Prince George's County*, 17 F.4th 497, 511 (4th Cir. 2021). At most, the Board asserts that its "chosen route is easier"—which is not enough. *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

Nor has the Board even met its "obligat[ion]" to show that its stated interests were "the actual reason for its challenged action." *Redeemed Christian Church*, 17 F.4th at 510. Citing a declaration about the "one instance" of "dozens" of opt-out requests at one school—in a school district of "160,000 students of many different backgrounds"—doesn't suffice. Resp.4, 10; JA543 ¶37. The Board does not deny that through March 22, 2023, it publicly reassured families that opt-outs would continue, JA741. Then—the very next day—it announced that "no opt-outs from instruction using the Storybooks would be granted," Resp.10. The Board

has never explained what changed overnight. Without that explanation, and without proof that it needs to coerce the presence of these children for lessons from these books in a way that other school districts don't, it has not "demonstrate[d] that no alternative forms of regulation would combat such abuses without infringing First Amendment rights." *Sherbert*, 374 U.S. at 407.

## II. The remaining injunctive relief factors are satisfied.

Parents are presented with a Hobson's choice: either (1) send their child to public school and give up their religious duty to shield their children from instruction that violates their faith or (2) pull their kids out and incur financial penalties that "many families cannot afford." JA772. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67 (2020). With "a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle,* 2 F.4th at 346.

Nor is there any harm to the public interest in entering the Parents' requested injunction. For years, the School Board has accommodated opt-outs according to its own Religious Diversity Guidelines. JA750-751. The opt-out ban for the Pride Storybooks took effect just this school year, while opt-outs continue for every other instruction. The Parents here ask for nothing more than the restoration of a right they had until March 23,

2023. The public interest always "favors protecting constitutional rights." *Leaders of a Beautiful Struggle,* 2 F.4th at 346.

## CONCLUSION

This Court should reverse the district court and order it to preliminary enjoin the Board's opt-out ban.

Dated: October 31, 2023

Respectfully submitted,

/s/ Eric S. Baxter
Eric S. Baxter
William J. Haun
Michael J. O'Brien*
Colten L. Stanberry
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. N.W., Ste. 400
Washington, DC 20006
(202) 955-0095
ebaxter@becketlaw.org

*Counsel for Plaintiffs-Appellants*

*Not a member of the DC Bar; admitted in Louisiana. Practice limited to cases in federal court.

29

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

This document complies with type-volume limits because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,475 words.

This document complies with the typeface requirements because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: October 31, 2023          /s/ Eric S. Baxter
                                 Eric S. Baxter