Certiorari granted by Supreme Court, January 21, 2025
Reversed and remanded by Supreme Court, June 27, 2025

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-1890**

———————

TAMER MAHMOUD; ENAS BARAKAT; JEFF ROMAN; SVITLANA ROMAN; CHRIS PERSAK; MELISSA PERSAK, in their individual capacities and ex rel. their minor children; KIDS FIRST, an unincorporated association,

  Plaintiffs – Appellants,

  v.

MONIFA B. MCKNIGHT; SHEBRA EVANS; LYNNE HARRIS; GRACE RIVERA-OVEN; KARLA SILVESTRE; REBECCA SMONDROWSKI; BRENDA WOLFF; JULIE YANG; MONTGOMERY COUNTY BOARD OF EDUCATION,

  Defendants – Appellees.

--------------------------------

DOUGLAS LAYCOCK, Professor; RICHARD W. GARNETT, Professor; HELEN M. ALVARE, Professor; THOMAS C. BERG, Professor; MICHAEL W. MCCONNELL, Professor; NICHOLAS BROWN; ZEINA EL DEBS; TIMOTHY JANSS; DAGMAR JANSS; STEPHANIE PATE; JEWISH COALITION FOR RELIGIOUS LIBERTY; COALITION OF VIRTUE; ISLAM AND RELIGIOUS FREEDOM ACTION TEAM; COALITION FOR JEWISH VALUES; COMMONWEALTH OF VIRGINIA AND 17 OTHER STATES; ETHICS AND PUBLIC POLICY CENTER; ERIC DEGROFF, Professor; COMMONWEALTH OF VIRGINIA AND 22 OTHER STATES; ADVANCING AMERICAN FREEDOM, INC.; PAUL TELLER; ALASKA FAMILY COUNCIL; AMERICAN FAMILY ASSOCIATION ACTION; AMERICAN VALUES; CATHOLIC VOTE; CENTER FOR POLITICAL RENEWAL; CHRISTIAN LAW ASSOCIATION; CHRISTIANS ENGAGED; EAGLE FORUM; FRONTLINE POLICY COUNCIL; IDAHO FAMILY POLICY CENTER; INTERNATIONAL CONFERENCE OF EVANGELICAL CHAPLAIN ENDORSERS; MISSOURI CENTER-RIGHT COALITION; MINNESOTA FAMILY COUNCIL; MOMS FOR LIBERTY; NATIONAL ASSOCIATION OF

PARENTS d/b/a PARENTSUSA; NEW JERSEY FAMILY FOUNDATION; NEW MEXICO FAMILY ACTION MOVEMENT; SETTING THINGS RIGHT; THE FAMILY FOUNDATION; THE JUSTICE FOUNDATION,

             Amici Supporting Appellants.

NATIONAL EDUCATION ASSOCIATION; MARYLAND STATE EDUCATION ASSOCIATION; MONTGOMERY COUNTY EDUCATION ASSOCIATION; PROFESSOR LAWRENCE G. SAGER; PROFESSOR NELSON TEBBE; PROFESSOR JUSTIN DRIVER; AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES UNION OF MARYLAND; LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.; GLBTQ LEGAL ADVOCATES & DEFENDERS; NATIONAL CENTER FOR LESBIAN RIGHTS; HUMAN RIGHTS; CAMPAIGN FOUNDATION; THE TREVOR PROJECT, INC; GLSEN, INC.; PFLAG, INC.; PFLAG REGIONAL CHAPTERS; EQUALITY NORTH CAROLINA; SOUTH CAROLINA EQUALITY, INC.; MOCO PRIDE CENTER; FCPS PRIDE; RAINBOW YOUTH ALLIANCE; SUPPORTING AND MENTORING YOUTH ADVOCATES AND LEADERS; WHITMAN-WALKER HEALTH; WHITMAN-WALKER INSTITUTE; MARYLAND; MASSACHUSETTS, CALIFORNIA, CONNECTICUT; DELAWARE; THE DISTRICT OF COLUMBIA; HAWAII; ILLINOIS; MAINE; MICHIGAN; MINNESOTA; NEVADA; NEW YORK; NEW JERSEY; OREGON; PENNSYLVANIA; RHODE ISLAND; VERMONT; WASHINGTON,

             Amici Supporting Appellees.

———————————

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Deborah Lynn Boardman, District Judge. (8:23-cv-01380-DLB)

———————————

Argued: December 5, 2023           Decided: May 15, 2024

———————————

Before AGEE, QUATTLEBAUM and BENJAMIN, Circuit Judges.

———————————

Affirmed by published opinion. Judge Agee wrote the opinion in which Judge Benjamin joined. Judge Quattlebaum wrote a dissenting opinion.

———————————

2

**ARGUED:** Eric S. Baxter, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., for Appellants. Alan E. Schoenfeld, WILMERHALE LLP, New York, New York, for Appellees. **ON BRIEF:** William J. Haun, Michael J. O'Brien, Colten L. Stanberry, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., for Appellants. Bruce M. Berman, Joseph M. Meyer, Jeremy W. Brinster, Washington, D.C., Emily Barnet, WILMERHALE LLP, New York, New York, for Appellees. Christopher Mills, SPERO LAW LLC, Charleston, South Carolina, for Amici Professors Douglas Laycock, Richard W. Garnett, Helen M. Alvaré, Thomas C. Berg, Michael W. McConnell, and Eric DeGroff. Paul R. Rivera, Rockville, Maryland; Steven W. Fitschen, James A. Davids, NATIONAL LEGAL FOUNDATION, Chesapeake, Virginia; Frederick W. Claybrook, Jr., CLAYBROOK LLC, Washington, D.C., for Amici for Parents Nicholas Brown, Zeina El Debs, Timothy Janss, Dagmar Janss, and Stephanie Pate. Howard Slugh, Washington, D.C., for Amici Jewish Coalition for Religious Liberty, Coalition of Virtue, Islam and Religious Freedom Action Team, and Coalition for Jewish Values. Jason S. Miyares, Attorney General, Andrew N. Ferguson, Solicitor General, Kevin M. Gallagher, Deputy Solicitor General, Annie Chiang, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia. Steve Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama. Tim Griffin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas. Brenna Bird, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IOWA, Des Moines, Iowa, for Amicus State of Iowa. Lynn Fitch, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSISSIPPI, Jackson, Mississippi, for Amicus State of Mississippi. Austin Knudsen, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MONTANA, Helena, Montana, for Amicus State of Montana. Drew Wrigley, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NORTH DAKOTA, Bismarck, North Dakota, for Amicus State of North Dakota. Gentner F. Drummond, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma, for Amicus State of Oklahoma. Angela Colmenero, Provisional Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amicus State of Texas. Patrick Morrisey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amicus State of West Virginia. Treg Taylor, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALASKA, Anchorage, Alaska, for Amicus State of Alaska. Christopher M. Carr, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF GEORGIA, Atlanta, Georgia, for Amicus State of Georgia. Daniel Cameron, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY, Frankfort, Kentucky, for Amicus Commonwealth of Kentucky. Andrew Bailey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSOURI, Jefferson City, Missouri, for Amicus State of Missouri. Michael T. Hilgers, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska. Dave Yost, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Amicus State of Ohio. Alan

3

Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of South Carolina. Sean D. Reyes, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF UTAH, Salt Lake City, Utah, for Amicus State of Utah. Eric N. Kniffin, Mary Rice Hasson, ETHICS & PUBLIC POLICY CENTER, Washington, D.C., for Amicus Ethics and Public Policy Center. J. Marc Wheat, ADVANCING AMERICAN FREEDOM, INC., Washington, D.C., for Amici Advancing American Freedom, Inc.; Paul Teller; Alaska Family Council; American Family Association Action; American Values; Catholic Vote; Center for Political Renewal; Christian Law Association; Christians Engaged; Eagle Forum; Frontline Policy Council; Idaho Family Policy Center; International Conference of Evangelical Chaplain Endorsers; Tim Jones, Missouri Center-Right Coalition; Minnesota Family Council; Moms for Liberty; National Association of Parents; New Jersey Family Foundation; New Mexico Family Action Movement; Setting Things Right; The Family Foundation; and The Justice Foundation. Kristy K. Anderson, MARYLAND STATE EDUCATION ASSOCIATION, Annapolis, Maryland; Alice O'Brien, Jason Walta, Keira McNett, NATIONAL EDUCATION ASSOCIATION, Washington, D.C., for Amici National Education Association, Maryland State Education Association, and Montgomery County Education Association. Rachel M. Schiff, Phillip H.C. Wilkinson, San Francisco, California, Rachel G. Miller-Ziegler, Helen E. White, MUNGER, TOLLES & OLSON LLP, Washington, D.C., for Amici Professors Lawrence G. Sager and Nelson Tebbe. Amanda Flug Davidoff, Daniel J. Richardson, Cason J.B. Reily, SULLIVAN & CROMWELL LLP, Washington, D.C., for Amicus Professor Justin Driver. David Rocah, Deborah Jeon, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MARYLAND, Baltimore, Maryland; Aditi Fruitwala, Heather Weaver, Daniel Mach, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C., for Amici American Civil Liberties Union and American Civil Liberties Union of Maryland. Karen L. Loewy, Washington, D.C., Paul D. Castillo, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Dallas, Texas; Jeffrey M. Gutkin, Reece Trevor, San Francisco, California, Urvashi Malhotra, COOLEY LLP, Palo Alto, California; Mary L. Bonauto, Gary D. Buseck, GLBTQ LEGAL ADVOCATES & DEFENDERS, Boston, Massachusetts; Shannon Minter, Christopher F. Stoll, NATIONAL CENTER FOR LESBIAN RIGHTS, San Francisco, California; for Amici Lambda Legal Defense and Education Fund, Inc.; GLBTQ Legal Advocates & Defenders; National Center for Lesbian Rights; Human Rights Campaign Foundation; The Trevor Project, Inc.; GLSEN, Inc.; PFLAG, Inc. and PFLAG Regional Chapters; Equality North Carolina; South Carolina Equality, Inc.; MOCO Pride Center; FCPS Pride; Rainbow Youth Alliance; Smyal; Whitman-Walker Health; and Whitman-Walker Institute. Andrea Joy Campbell, Attorney General, Adam M. Cambier, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts. Anthony G. Brown, Attorney General, Joshua M. Segal, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Robert Bonta, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Sacramento, California, for Amicus State of California. Kathleen Jennings, Attorney

4

General, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, for Amicus State of Delaware.  William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Brian L. Schwalb, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia.  Anne E. Lopez, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF HAWAI'I, Honolulu, Hawai'i, for Amicus State of Hawai'i.  Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine.  Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota.  Matthew J. Platkin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey.  Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon.  Peter Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island.  Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington.  Kwame Raoul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois.  Dana Nessel, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan.  Aaron D. Ford, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEVADA, Carson City, Nevada, for Amicus State of Nevada.  Letitia James, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York.  Michelle A. Henry, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF PENNSYLVANIA, Harrisburg, Pennsylvania, for Amicus Commonwealth of Pennsylvania.  Charity R. Clark, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont.

---

AGEE, Circuit Judge:

Parents whose children attend Montgomery County Public Schools in Maryland contend that the Montgomery County Board of Education's ("the Board's") refusal to provide notice and an opportunity to opt out from their children's exposure to certain books and related discussions violates federal and state law. At the outset of the litigation, the Parents moved for a preliminary injunction to require the Board to provide such notice and an opt-out option. After the district court denied their motion, the Parents filed this interlocutory appeal. We take no view on whether the Parents will be able to present evidence sufficient to support any of their various theories once they have the opportunity to develop a record as to the circumstances surrounding the Board's decision and how the challenged texts are actually being used in schools. At this early stage, however, given the Parents' broad claims, the very high burden required to obtain a preliminary injunction, and the scant record before us, we are constrained to affirm the district court's order denying a preliminary injunction.

I.

A. The Storybooks & Board Policy

In October 2022, the Board announced that, through its regular curriculum adoption process, it had approved a group of "LGBTQ-Inclusive Books as part of the English Language Arts Curriculum" for use in Montgomery County Public Schools. J.A. 540. These texts, which we will refer to as "the Storybooks," are ostensibly "used to assist students with mastering reading concepts like answering questions about characters,

retelling key events about characters in a story, and drawing inferences about story characters based on their actions." J.A. 541. While their individual contents vary, the Storybooks as a whole express their authors' views on sexual orientation and gender identity by portraying homosexual, transgender, and non-binary characters in various situations. For example, the alphabet primer *Pride Puppy!*, which is the sole text expressly approved for use in pre-Kindergarten and Head Start classrooms, depicts a family whose puppy gets lost amidst a LGBTQ-pride parade, with each page focused on a letter of the alphabet. The three- and four-year-old audience is invited to look for items such as "[drag] king," "leather," "lip ring," "[drag] queen," and "underwear." J.A. 98 (brackets in original); *see* J.A. 82–99 (reproducing Robin Stevenson, *Pride Puppy!* (2021)).[1]

The record provides little explanation of how the Storybooks have been, or will be, integrated into the larger array of books offered as part of the Language Arts curriculum. But when opposing the motion for a preliminary injunction, the Board submitted a declaration from the Associate Superintendent of Curriculum and Instructional Programs for Montgomery County Public Schools that addressed the school system's purpose in adopting and its intended use of the Storybooks. Her declaration states that to "prepare[] principals and teachers for the introduction of" the Storybooks into the curriculum, the

---

[1] In another book, *Born Ready: The True Story of a Boy Named Penelope*, approved for use in Kindergarten through Grade 5 and targeted for use in Grade 5, the main character is a biological girl who becomes upset when others say, "you look like your sister," J.A. 244, because "[i]nside I'm a boy. When I close my eyes and dream, I'm a boy," J.A. 248. Penelope's family is supportive, and "make[s] a plan to tell everyone" that Penelope is a boy even if it "doesn't make sense" to them because "[n]ot everything *needs* to make sense. *This is about love.*" J.A. 255, 259; *see* J.A. 242–76 (reproducing Jodie Patterson, *Born Ready: The True Story of a Boy Named Penelope* (2021)).

school system provided guidance and training opportunities, including statements that the Storybooks were not "planned" to be part of "explicit instruction on gender identity and sexual orientation in elementary school, and that no student or adult is asked to change how they feel about these issues." J.A. 540–41. Teachers were instead expected to "incorporate the [Storybooks] into the curriculum in the same way that other books are used, namely, to put them on a shelf for students to find on their own; to recommend a book to a student who would enjoy it; to offer the books as an option for literature circles, book clubs, or paired reading groups; or to use them as a read aloud" for all students in the class. J.A. 540–41. Although the adoption of the Storybooks came with the expectation that teachers would incorporate them into the classroom environment in some way, the Associate Superintendent represented that the decision about which books to use and how they'd be used in an individual classroom is left to each teacher's discretion. J.A. 541 ("Teachers have a choice regarding which [of the Storybooks] to use and when to use them throughout each unit. . . . Teachers cannot, however, elect not to use the [Storybooks] at all.").

As part of the Storybooks' rollout, Montgomery County teachers and administrators were provided access to additional materials "to support" them in responding to inquiries about the Storybooks' contents. J.A. 600. These materials, which are not part of the student-facing texts, include a number of potential questions that the Storybooks may generate from students and their caregivers, along with sample answers and conversation points to justify the Storybooks. For example, if a student says "Being _____ (gay, lesbian, queer, etc) is wrong and not allowed in my religion," teachers "can respond," "I understand that is what you believe, but not everyone believes that. We don't have to understand or support a

person's identity to treat them with respect and kindness." J.A. 595. The guidance also counsels that if a student says that "a girl . . . can only like boys because she's a girl," the teacher can "*[d]isrupt* the either/or thinking by saying something like: actually, people of any gender can like whoever they like. . . . How do you think it would make __(character's name)__ to hear you say that? Do you think it's fair for people to decide for us who we can and can't like?" J.A. 595 (emphasis added). If a student asks what it means to be transgender, the teacher could explain, "When we're born, people make a guess about our gender and label us 'boy' or 'girl' based on our body parts. Sometimes they're right and sometimes they're wrong. . . . Our body parts do not decide our gender. Our gender comes from our inside[.]" J.A. 596.

In terms of responding to queries from parents or caregivers, the additional materials include such recommendations as disagreeing with concerns that elementary-age children are "too young to be learning about gender and sexual[] identity." J.A. 600. It prompts that teachers could respond to such concerns by observing that "[c]hildren are already learning about it" because "[m]essages about gender are everywhere," and that "[b]eginning these conversations in elementary school will help young people develop empathy for a diverse group of people and learn about identities that might relate to their families or even themselves." J.A. 600. In response to a caregiver's concern that values in the books "go against the values we are instilling . . . at home," the guidance suggests reiterating that "[t]he purpose of learning about gender and sexual[] identity diversity is to demonstrate that children are unique and that there is no single way to be a boy, girl, or any other gender.

9

If a child does not agree with or understand another student's . . . identity . . . , they do not have to change how they feel about it." J.A. 601.

Almost as soon as the Storybooks were first adopted and integrated into Montgomery County schools during the 2022–2023 academic year, numerous teachers, administrators, and parents began voicing concerns about their efficacy and age appropriateness. Some complaints were based on religious grounds, but many were not. For instance, several elementary school principals signed onto a document that identified numerous instances in the Storybooks of age-inappropriate content such as words being used without definitions; inherent problems with depicting young children "falling in love" with another individual regardless of orientation; and the overall difficulty of some of the concepts presented. J.A. 574. Many parents, including the eventual plaintiffs in this case, expressed concerns about having their children exposed to content at odds with their religious faith or that they deemed to be inappropriate for their children's age and development. In short, the Storybooks' rollout was contentious and many caregivers sought—for religious and secular reasons—to have their children exempted from the Storybooks.

During the first year of the Storybooks' inclusion in the Language Arts curriculum, parents were provided notice and the opportunity to opt out of their use through agreements with individual principals and teachers. This accommodation appeared to be in line with the County's 2022-2023 Guidelines for Respecting Religious Diversity, which encouraged schools "to make reasonable and feasible adjustments to the instructional program to accommodate requests . . . to be excused from specific classroom discussions or activities

10

that [parents or students] believe would impose a substantial burden on their religious beliefs," subject to alternative assignments. J.A. 67. As alleged in the amended complaint, on March 22, 2023, the Board publicly reiterated that when a teacher chose to use one of the Storybooks in their classrooms, "a notification goes out to parents about the book," and, if a caregiver chooses to opt their child out, the teacher would "find a substitute text for that student that supports" the same language arts standards and objectives. J.A. 31.

The following day, without explanation, the Board announced in a complete about-face that a notice and opt-out option would no longer be permitted. Although the revised policy became effective immediately, old requests for accommodations were grandfathered in through the end of the 2022–2023 academic year, making the current 2023–2024 academic year the first year for which no students or their parents are provided notice or the opportunity to opt out from the Storybooks.[2]

_____

[2] Although not directly cited in the amended complaint or filings to date, we note that according to the Board's website, its 2023-2024 Guidelines have since been amended considerably, permitting students to be "excused from noncurricular activities . . . that involve materials or practices in conflict with a family's religious, and/or other, practices," but prohibiting *all* "requests for exemptions from required curricular instruction or the use of curricular instructional materials based on religious, and/or other, objections" and eliminating the language encouraging accommodations when the instruction substantially burdens a parent or child's free-exercise rights. *2023-2024 Guidelines for Respecting Religious Diversity*, 3–4, https://perma.cc/SB9Z-SJSC.

Because we conclude that the Parents have not yet come forward with evidence that would establish a burden for purposes of obtaining a preliminary injunction on their claim as it's been formulated thus far, we do not delve into the constitutionality of the Guidelines in their current form. Any impact this revised written language has on the Parents' claims or arguments would need to be fleshed out in the first instance in the district court if raised by the Parents.

What motivated the policy change is largely unknown, but the Associate Superintendent's declaration asserts several after-the-fact explanations. First, it claims that the original notice-and-opt-out policy had led to "high student absenteeism," J.A. 543, and it cited concerns from principals and teachers regarding the feasibility of "accommodat[ing] the growing number of opt out requests without causing significant disruptions to the classroom environment and undermining [the school system's] educational mission," J.A. 542. It also represented that allowing notice and an opt-out option placed too great a burden on school staff charged with (1) remembering which students could be present during lessons involving the Storybooks or otherwise be permitted access to those books, and (2) developing alternative plans for those students who could not be present across a range of language-arts activities. Lastly, the declaration recounts the Board's concern about stigmatizing and isolating individuals whose circumstances were reflected in the Storybooks.

## B. The Litigation

Two months after the Board changed its policy and prohibited notice and an opt-out option, the Parents filed a complaint in the United States District Court for the District of

12

Maryland.[3] They subsequently amended the complaint to add a plaintiff.[4] The amended complaint alleges six claims, which can be grouped into four bases for asserting the Board's decision violates the Parents' and their children's rights: (1) free exercise; (2) free speech; (3) due process; and (4) Maryland state law.

The Parents do not challenge the Board's adoption of the Storybooks or seek to ban their use in Montgomery County Public Schools. Instead, the Parents contend that the cited legal bases require that they have notice and the opportunity to opt out "of classroom instruction on such sensitive religious and ideological issues." J.A. 13. Their overarching assertion is broad, contending that it violates the Free Exercise Clause not to allow individualized opt-outs from all potential uses of the Storybooks within the Language Arts curriculum as well as all discussions that may arise related to their use. Consistent with those arguments, the amended complaint seeks a declaratory judgment that the revised

---

[3] The named individual plaintiffs are Tamer Mahmoud and Enas Barakat, who are Muslim; Jeff and Svitlana Roman, who are Roman Catholic and Ukrainian Orthodox, respectively; and Chris and Melissa Persak, who are Catholic. Each of these families have one or more elementary-school-age children attending Montgomery County Public Schools. They've sued in their individual capacities and *ex relatione* their children.

The named defendants are the Board and its individual members, sued in their official capacities.

[4] The added plaintiff is Kids First, "an unincorporated association of parents and teachers" advocating "for the return of parental notice and opt-out rights" in Montgomery County Public Schools. J.A. 13–14. Kids First did not join in the Parents' motion for a preliminary injunction. Although the district court expressed concern about the Parents' arguments in support of the motion that relied on one member of Kids First's declaration, it nonetheless considered those arguments in denying a preliminary injunction.

Because Kids First did not join the motion for a preliminary injunction and given the strict standards by which such a motion is considered, we will not consider these arguments in this appeal. We express no view on arguments Kids First may raise in the district court and that court is free to consider and assess the merits or barriers to reaching the merits of any of those claims as the litigation proceeds.

13

policy violates the cited federal and state constitutional provisions; requests injunctive relief prohibiting forced exposure to the Storybooks and requiring notice and an opportunity for opt-outs; and asks for nominal and actual damages.

While the specifics vary, the Parents all cite their religious views as spurring their desire to opt their children out of the Storybooks. Broadly speaking, they believe they have a religious duty to train their children in accord with their faiths on what it means to be male and female; the institution of marriage; human sexuality; and related themes. Their respective religious faiths direct and inform their views about these issues, and they want to maintain control over what, how, and when these matters are introduced to their children. Because the Parents believe that the "ideological view[s] of family life and sexuality" portrayed in the Storybooks conflict with their views on these and related topics, they object to their children being exposed to them. J.A. 18. Accordingly, they assert that the Board's refusal to permit notice and an opportunity to opt out from use or discussions relating to the Storybooks violates the free exercise of their religion and their due process right to direct their children's education.[5]

Shortly after filing their complaint, the Parents moved for a preliminary injunction based only on the alleged violations of the Free Exercise and Due Process Clauses of the

---

[5] The Parents' challenge stretches beyond their children reading (or being read) the Storybooks to *any* classroom conversations about the themes and issues presented in the Storybooks. Opening Br. 34 ("[T]he Parents object to their children's *presence* in situations that prematurely expose them to ideas about sexuality and gender in conflict with their religious beliefs.").

14

federal Constitution.[6] They argued that they had shown a likelihood of succeeding on the merits of their free exercise and due process claims because the Board's refusal to provide notice and an opt-out opportunity was subject to strict scrutiny and could not withstand that review.

The Parents relied on four lines of Supreme Court cases in advocating why strict scrutiny should apply to their free exercise claims: (1) *Wisconsin v. Yoder*, 406 U.S. 205 (1972), demands strict scrutiny of any policy that interferes with a parent's right to direct the religious upbringing of his or her children; (2) *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), provides for strict scrutiny of any policy that permits discretionary, individualized exemptions; (3) *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (per curiam), states that any policy treating religious exemptions worse than secular exemptions triggers strict scrutiny; and (4) *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), and *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018), call for strict scrutiny when official action occurs under circumstances demonstrating governmental hostility toward religion.

The Parents argued that strict scrutiny also applied to their due process claim because it was being asserted in conjunction with a free exercise claim, and thus presented a so-called "hybrid rights" claim.[7] But the crux of their claim is that they have a

---

[6] The Parents' motion did not rely on the First Amendment free speech or Maryland state law claims. As such, arguments related to them are not before us and it remains for the district court to consider them in the first instance.

[7] Under a hybrid-rights theory, a claim alleging a violation of the U.S. Constitution that would ordinarily be subject to rational basis review should instead be subjected to strict (Continued)

fundamental right to direct the religious and educational upbringing of their children, which the Board has violated by denying them a right to notice and an opt-out opportunity. From this view that strict scrutiny applied to their claims, the Parents argued that the Board's refusal to allow notice and an opportunity to opt out of the Storybooks could not withstand that review given that the Board lacked a compelling interest for its policy and the policy was not the least restrictive means for achieving any asserted interest.[8]

After briefing and a hearing, the district court declined to issue a preliminary injunction. In the court's view, the Parents had failed to demonstrate a cognizable burden to the free exercise of their religion. And without that showing, there was no reason to consider the Parents' arguments as to the other aspects of a free exercise claim because they could not show a likelihood of success on the merits. The district court also denied a preliminary injunction based on the Parents' due process claim. It expressed some skepticism as to whether this Court would recognize the hybrid-rights theory that the Parents advanced given that we have not yet done so and other circuit courts of appeals are divided on the issue. Regardless, the district court observed that, even in jurisdictions that

---

scrutiny because it is intertwined with an alleged violation of another provision of the U.S. Constitution. *See, e.g., Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 243–47 (3d Cir. 2008) (explaining the hybrid-rights theory). Applied here, the Parents maintained that their due process claim alleging a right to direct the education of their children, which is normally subject to rational basis review, should be subjected to strict scrutiny because it relates to their free exercise claim and thus asserts a violation of their right to direct the *religious education* of their children.

[8] The parties also briefed the other requirements to obtaining a preliminary injunction, but the focus has been on the likelihood of success on the merits. Because we agree that this issue resolves our review of the district court's denial of relief, we similarly focus our discussion.

16

have accepted a hybrid-rights argument, the plaintiff's free exercise claim must be colorable for strict scrutiny to apply, and the Parents' claim was not. Accordingly, the court applied rational basis review to this claim, observed the Parents did not contest that the revised policy would survive such review, and agreed with that conclusion.

The Parents noted a timely interlocutory appeal, and we have jurisdiction under 28 U.S.C. § 1292(a)(1). In conjunction with filing their notice of appeal, the Parents filed an emergency motion for preliminary injunctive relief pending resolution of the appeal. We denied that request, but accelerated briefing and expedited oral argument. In the interim, the district court granted the parties' joint motion to stay further proceedings in that court pending this appeal.

## II.

A party seeking a preliminary injunction faces an exceedingly high burden. As the Supreme Court has recognized, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Each request requires courts to "balance the competing claims of injury," "consider the effect on each party," and "pay particular regard for the public consequences" of issuing a preliminary injunction. *Id.* (citations omitted).

To be eligible for a preliminary injunction, plaintiffs must show that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of the equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023)

17

(citation omitted). A failure on any factor is a basis for denying a preliminary injunction, regardless of the remaining factors. *Id.*

"A party . . . is not required to prove his case in full at a preliminary-injunction hearing," and the process ordinarily entails procedures "that are less formal and [considered upon] evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Despite considering the case at the early stages of the proceedings, to make the requisite showings, a plaintiff seeking a preliminary injunction generally cannot rely on mere allegations in the complaint but must come forward with some evidence showing a likelihood of success on the merits. *See Winter*, 555 U.S. at 20–21.

Plaintiffs appealing the denial of a preliminary injunction face an even higher burden as they must show that the district court abused its discretion in denying relief. *Id.* Under that familiar standard, however, the Court reviews de novo the district court's legal conclusions, as a district court abuses its discretion "when it misapprehends the law with respect to the underlying issues in litigation." *Id.* at 362 (cleaned up). But "[o]ur mere disagreement with the district court does not make its finding clearly erroneous" and we are not concerned with "whether we would have granted or denied the" Parents' request. *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 210 (4th Cir. 2024) (cleaned up).

III.

A.

Religious liberty is indelibly embedded in American history and the U.S. Constitution. *Sch. Dist. v. Schempp*, 374 U.S. 203, 212–14 (1963). The Free Exercise Clause of the First Amendment to the Constitution, which is made applicable to States under the Fourteenth Amendment, *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022), provides that governments "shall make no law . . . prohibiting the free exercise" of religion, U.S. Const. amend. I. This protection "requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). And in considering the claims of religious adherents, the Supreme Court has reiterated that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Rev. Bd.*, 450 U.S. 707, 714 (1981).[9]

Many matters fall under the ambit of the Free Exercise Clause, encompassing both direct and indirect coercion of religion. Perhaps most obviously, the Clause applies to

---

[9] With limited exceptions not at issue here, courts do not question the sincerity of a plaintiff's religious beliefs when assessing a free-exercise claim. *See Thomas*, 450 U.S. at 715–16 ("One can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause; but . . . the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. . . . [And] [c]ourts are not arbiters of scriptural interpretation.").

And we do not question the sincerity of the Parents' religious views. The question presented here is distinct—whether they have come forward with sufficient evidence at this stage to suggest a likelihood of success on the merits of their claim that their and their children's free-exercise rights have been infringed by the Board's policy not providing notice and an opt-out option when the Storybooks are used.

19

government action compelling "religious beliefs as such." *Emp. Div. v. Smith*, 494 U.S. 872, 877 (1990) (emphasis omitted). As the Supreme Court has explained, "[t]he government may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma." *Id.* (internal citations omitted).

But the Clause does more than protect "the right to harbor religious beliefs inwardly and secretly." *Kennedy*, 142 S. Ct. at 2421. It also safeguards "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Id.* (quoting *Smith*, 494 U.S. at 877). Such "physical acts" include "assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, [and] abstaining from certain foods or certain modes of transportation." *Smith*, 494 U.S. at 877.

In addition to safeguarding against such types of direct coercion, the Clause also protects against "indirect coercion or penalties on the free exercise of religion." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988). Thus, for example, the Free Exercise Clause is implicated when government action treats religious adherents "unequal[ly]" or "impose[s] special disabilities on the basis of religious status." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019, 2021 (2017) (cleaned up). Indirect coercion can also occur when the government "disqualif[ies] otherwise eligible recipients from a public benefit solely because of their religious character." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2255 (2020) (cleaned up).

While the Free Exercise Clause casts a wide net of protection, it does so in a particular direction, being "written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government." *Bowen v. Roy*, 476 U.S. 693, 700 (1986) (quoting *Sherbert v. Verner*, 374 U.S. 398, 412 (1963) (Douglas, J., concurring)). This dividing line "between unconstitutional prohibitions on the free exercise of religion," on the one hand, "and the legitimate conduct by government of its own affairs," on the other, can be imprecise. *Lyng*, 485 U.S. at 451. But the Supreme Court has consistently reaffirmed the line's existence: "Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family." *Bowen*, 476 U.S. at 699; *accord Lyng*, 485 U.S. at 450–51. Thus, as the Supreme Court has said in another context, "the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 303 (1985).

These principles mean that regardless of the specific nature of the government action at issue, a plaintiff alleging a free exercise claim bears the burden of "demonstrat[ing] an infringement of his rights under the Free Exercise . . . Clause[]." *Kennedy*, 142 S. Ct. at 2421. "If the plaintiff carries [that] burden[], the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of [governing] case law." *Id.* Put another way, *if* the plaintiff has established that a government action has burdened his religious exercise, *then* the analysis

21

shifts to whether the government can justify the limitation or intrusion under the applicable level of scrutiny. *See Christ Coll., Inc. v. Bd. of Supervisors*, No. 90-2406, 1991 WL 179102, *4 (4th Cir. Sept. 13, 1991) (declining to resolve which level of scrutiny applied to appellants' claim because they "failed to establish the first element in any free exercise claim[:] they have not proved that the [challenged laws] burden their exercise of religion").

Many times, the burden that a particular government action places on a plaintiff's exercise of religion will be obvious and require little comment. When a school district disciplines a public school football coach for personally praying after a game, there is no dispute that the government action "burdened" the coach's religious practice of praying. *Kennedy*, 142 S. Ct. at 2422. Similarly, when a government excludes certain entities from participating in a public benefit based on those entities' religious beliefs, it impermissibly, even if indirectly, penalizes them for their religious views. *Trinity Lutheran*, 137 S. Ct. at 2022. Regardless, the self-evident nature of proving the existence of a burden to religious practice in some cases does not excuse a plaintiff from satisfying that obligation in each case.

The Court's free exercise analysis does not end with proving the existence of a burden on religious exercise, however, because "[n]ot all burdens on religion are unconstitutional." *United States v. Lee*, 455 U.S. 252, 257 (1982). Governments may infringe on an individual's religious practice under certain circumstances. *Id.*

Over time, the Supreme Court has changed its articulation of what level of scrutiny applies to various types of laws. Under the currently applicable standard set out in *Employment Division v. Smith*, the Supreme Court held that "laws incidentally burdening

22

religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable."[10] *Fulton*, 141 S. Ct. at 1876 (citing *Smith*, 494 U.S. at 878–82); *see Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 (2014) (reiterating that, under *Smith*'s articulation of the free exercise standard, "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest" (quoting *City of Boerne v. Flores*, 521 U.S. 507, 514 (1997)); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) ("In [*Smith*], this Court held that the Free Exercise Clause . . . does not prohibit governments from burdening religious practices through generally applicable laws.").[11] Laws that fall under *Smith*'s rubric are "subject only to rational basis review," which "requires merely that the law at issue be rationally related to a legitimate governmental interest." *Canaan Christian Church v. Montgomery Cnty.*, 29 F.4th 182, 198–99 (4th Cir. 2022) (cleaned up).

But, as *Smith* recognized, strict scrutiny *does* apply to laws that are not neutral or generally applicable, leaving any number of circumstances in which a particular

---

[10] In 2021, despite being given the opportunity to revisit *Smith*'s approach to free exercise claims, the Supreme Court declined to do so. *Fulton*, 141 S. Ct. at 1876–77.

[11] In *Smith*, two individuals "were fired from their jobs . . . because they ingested peyote for sacramental purposes at a ceremony of the Native American Church, of which both [were] members." 494 U.S. at 874. They applied for unemployment compensation from the State of Oregon, but "were determined to be ineligible for benefits because they had been discharged for work-related 'misconduct,'" *i.e.*, consuming peyote in violation of Oregon criminal law. *Id.* at 874–75. The upshot of the Supreme Court's holding was that Oregon's criminal law did not violate the Free Exercise Clause because it was a neutral, generally applicable prohibition of the ingestion of substances (including peyote) for *any* purpose, *id.* at 878–79, so the State could deny individuals "unemployment compensation when their dismissal results from use of the drug," *id.* at 890.

government action would still be subject to this heightened level of review. 494 U.S. at 877–90. For example, government action might not be "neutral" because it intentionally discriminates or targets religious practice, *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 532, or proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature," *Fulton*, 141 S. Ct. at 1877; *see Masterpiece Cakeshop*, 138 S. Ct. at 1730–32. Or it might not be "generally applicable" because it "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions" or "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877 (cleaned up); *see Smith*, 494 U.S. at 884 (distinguishing from its holding instances involving "individualized governmental assessment of the reasons for the relevant conduct"). When strict scrutiny applies, the challenged government action will be upheld "only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881 (cleaned up).

## B.

Although the Parents' briefing correctly recognizes that they must establish the existence of a burden, their analysis largely fuses that showing with their arguments about why the Board's change in policy should be subject to (and fails) strict scrutiny.[12] That

---

[12] The Parents took a somewhat different position in the district court, suggesting during the motions hearing that, under recent free-exercise case law, they did not need to show that the Board's decision burdened their rights as part of a free exercise claim. *Mahmoud v. McKnight*, Civ. No. DLB-23-1380, 2023 WL 5487218, at *15 n.8 (D. Md. Aug. 24, 2023). The Parents have not taken that position on appeal, though they do assert (Continued)

said, they generally assert that the Board's failure to provide notice and an opportunity to opt out of the Storybooks coerces, directly or indirectly, their own and their children's religious beliefs and practices by exposing them to viewpoints at odds with their religious beliefs. To demonstrate this coercion, the Parents principally rely on *Yoder*, equating their objections to their children being "compel[led] . . . to participate in instruction prohibited by their faith," Opening Br. 24, to the Amish parents' successful objections to Wisconsin's compulsory secondary education laws in that case. They also maintain that the Board's

---

that some recent Supreme Court cases state that some laws impose an "inherent burden" on religious exercise. Reply Br. 16.

We have not seen any indication that the Supreme Court has reversed course on requiring a showing of *a* burden, so we continue to look for this threshold showing in a free exercise claim. What *has* changed over time is how the Supreme Court has articulated its free exercise analysis. Before *Smith*, courts required plaintiffs to show that a challenged government action "substantial[ly] burden[ed]" religious exercise, at which point the analysis shifted to whether the government showed a compelling interest. *Burwell*, 573 U.S. at 693. The Supreme Court applied this earlier framework in cases such as *Yoder*. 406 U.S. at 219–21. *Smith*, however, "largely repudiated the method of analyzing free-exercise claims that had been used in cases like . . . *Yoder*" by reformulating the relevant inquiry. *Id.* at 693–94; *see also Firewalker-Fields v. Lee*, 58 F.4th 104, 114 n.2 (4th Cir. 2023) (recognizing that free exercise cases (like *Yoder*) relying on a "substantial burden" analysis were "overruled 30 years ago" by the Supreme Court and yet this language continues to be carried forward in contexts such as prisoner-rights cases where it "appears to be out-of-date," but declining to resolve the open question because "the threshold standard [did] not matter" for purposes of deciding the case).

As noted earlier, under *Smith*'s articulation of the free exercise standard, "laws *incidentally* burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton*, 141 S. Ct. at 1876 (emphasis added) (citing *Smith*, 494 U.S. at 878–82). Thus, it is sufficient for our purposes to recognize that even after *Smith*, a plaintiff's failure to show that a challenged government action constitutes *any* burden on his religious conduct makes it unnecessary to proceed further in the analysis by determining or applying the appropriate level of scrutiny. *See Kennedy*, 142 S. Ct. at 2421–22; *cf. Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1076 (9th Cir. 2008) (recognizing "the Supreme Court's repeated practice of concluding a government action 'prohibits' the free exercise of religion by determining whether the action places a 'burden' on the exercise of religion").

decision has coerced them by requiring them to contradict their faith in order to access a public benefit or avoid exposing their children to objectionable views by incurring the costs of alternatives to public school.

To recap briefly, to show a cognizable burden, the Parents must show that the absence of an opt-out opportunity coerces them or their children to *believe* or *act* contrary to their religious views. This coercion can be both direct or indirect, meaning that a burden exists whenever government conduct either "compel[s] a violation of conscience" or "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas*, 450 U.S. at 717–18 (emphasis omitted).

1.

At the outset, we stress that our review is based on a very limited record developed as attachments to the amended complaint or filed in support and opposition to the motion for a preliminary injunction. That record includes declarations from the Parents outlining their religious views and objecting to their children being exposed to ideas and being present during discussions involving viewpoints that contradict their religious views. *E.g.*, J.A. 404–05 ("Intentionally exposing our . . . son to activities and curriculum on sex, sexuality, and gender that undermine Islamic teaching on these subjects would . . . conflict with our religious duty to raise our children in accordance with our faith. . . . [F]orcing our son to participate in reading these books . . . would confuse his religious upbringing."); J.A. 411–12 ("Having [teachers] teach principles about sexuality or gender identity that conflict with our religious beliefs significantly interferes with our ability to form his religious faith and religious outlook on life and is spiritually and emotionally harmful to

26

his well-being."); J.A. 414 ("We believe that exposing our elementary-aged daughters to viewpoints on sex, sexuality, and gender that contradict Catholic teaching on these subjects is inappropriate and conflicts with our religious duty to raise our children in accordance with Catholic teaching.").[13]

In opposition to the motion, the Board submitted a declaration from the Associate Superintendent addressing the adoption of the Storybooks and the evolution of the opt-out policy, which we recounted in part earlier.

Critically, however, *none* of these declarations provides any information about how any teacher or school employee has actually used any of the Storybooks in the Parents' children's classrooms, how often the Storybooks are actually being used, what any child has been taught in conjunction with their use, or what conversations have ensued about their themes.

None of the documentary evidence submitted to the district court does so either. For example, the record contains emails between individual parents and school administrators regarding requests for opt-outs before the Board formally rejected that opportunity. It

---

[13] The Parents also submitted a declaration from a non-party parent who is a member of plaintiff Kids First. But, as noted, Kids First did not join the motion for a preliminary injunction.

In addition, the Parents submitted a declaration from one of their attorneys to which they attached a Montgomery County elementary school newsletter from June 2023 announcing that as part of Pride Month, "'each day in June, classrooms will read an inclusive, LGBTQ+ friendly book' followed by a 'community circle discussion.'" J.A. 416. It's not clear from the record, however, whether any of the Parents' children attend the specific elementary school that published this newsletter. Nor is there information about whether the readings actually took place or the nature of any discussions that followed them.

contains copies of the Storybooks and various Montgomery County Public School guidelines and curriculum goals. And it contains copies of at least some of the additional materials we discussed earlier that provided teachers and administrators with suggested answers for how to respond to caregiver and student questions that might arise related to the Storybooks.

In short, the record is threadbare.

2.

The Parents contend that the lack of an across-the-board notice and an opt-out opportunity relating to the Storybooks, in and of itself, coerces them and their children in the free exercise of their religion.

Considering that broad claim joined with the extremely limited record, we conclude the Parents have not shown a cognizable burden to support their free exercise claim. As such, they have not shown a likelihood of succeeding on the merits. Accordingly, the district court did not err in denying them a preliminary injunction as to the free exercise claim.

a.

As an initial matter, there's no evidence at present that the Board's decision not to permit opt-outs compels the Parents or their children to *change* their religious beliefs or conduct, either at school or elsewhere. *See Hobbie v. Unemp. Appeals Comm'n*, 480 U.S. 136, 140–41 (1987) (recognizing that coercion occurs when the government prescribes or proscribes religiously motivated conduct). Although the Parents allege that the Board's decision not to provide notice and an opt-out option "burdens [their] right to form their

28

children on a matter of core religious exercise and parenting: how to understand who they are," J.A. 35, they do not show anything at this point about the Board's decision that affects what they teach their own children. For example, the Parents' declarations do not suggest, nor does the existing record show, that the Parents or their children have in fact been asked to affirm views contrary to their own views on gender or sexuality, to disavow views on these matters that their religion espouses, or otherwise affirmatively act in violation of their religious beliefs. We have no basis in the current record for concluding that schools have acted inconsistent with the Assistant Superintendent's declaration that "no student or adult is asked to change how they feel about these issues." J.A. 541. Instead, as the district court observed, "[t]he [P]arents still may instruct their children on their religious beliefs regarding sexuality, marriage, and gender, and each family may place contrary views in its religious context." *Mahmoud*, 2023 WL 5487218, at *22. And "[n]o government action prevents the parents from freely discussing the topics raised in the [S]torybooks with their children or teaching their children as they wish." *Id.*

b.

The Parents do not really take issue with the foregoing conclusion; instead, they argue that the Board's decision nonetheless coerces religious exercise by compelling them to expose their children to views that are at odds with their religious faith. *E.g.*, Opening Br. 3 (asserting that they are being coerced into "exposing their children to the . . . Storybooks and related instruction"). Thus, it's the *effect* of the Board's failure to grant an opt-out opportunity—that children must be present when teachers use the Storybooks in their classrooms or have conversations related to their themes—that the Parents oppose.

29

But as previously discussed, Supreme Court precedent requires some sort of direct or indirect pressure to abandon religious beliefs or affirmatively act contrary to those beliefs. *E.g.*, *Lyng*, 485 U.S. at 450. And simply hearing about other views does not necessarily exert pressure to believe or act differently than one's religious faith requires. *E.g.*, *Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020) (finding no cognizable burden to religious exercise because the curriculum the plaintiffs claimed to be "offensive to their religious beliefs" "d[id] not penalize, interfere with, or otherwise burden religious exercise"); *Parker v. Hurley*, 514 F.3d 87, 90, 106 (1st Cir. 2008) (finding no cognizable burden from the lack of notice or the opportunity to opt out from children's "*exposure* to books" that espouse views contrary to their religious faith when there was no evidence the school required "student[s] [to] agree with or affirm those ideas, or even participate in discussions about them" (emphasis added)); *Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1065 (6th Cir. 1987) (finding no cognizable burden from assignments involving reading materials that contradicted the plaintiff-parents and their children's religious views because those assignments did not compel the students to "engage in conduct that violated [their] religious convictions" such as "affirmation or denial or a religious belief, or performance or non-performance of a religious exercise or practice"). In the absence of that coercive effect, a government action does not burden religious exercise.[14]

---

[14] The dissenting opinion distinguishes these cases and others like them by asserting that this case involves "use . . . far beyond mere exposure to objectionable viewpoints," *post*, at 58 & n.2, but the threadbare record developed to date does not support that (Continued)

To contend otherwise the Parents rely extensively on *Yoder*, asserting that their religious rights have been burdened for the same reasons the Supreme Court identified a free exercise violation in that case: their children are being compelled to attend classroom instruction that violates their religious views. This argument that compelled presence or exposure necessarily establishes the existence of a burden relies on too expansive a reading of *Yoder*, a case which has been markedly circumscribed within free exercise precedent in the decades since it was decided.

In *Yoder*, "the Court held that Amish children could not be required to comply with a state law demanding that they remain in school until the age of 16 even though their religion required them to focus on uniquely Amish values and beliefs during their formative adolescent years." *Burwell*, 573 U.S. at 694 (citing *Yoder*, 406 U.S. at 210–11, 234–36). Building on a record that the Supreme Court recognized "probably few other religious groups or sects could" develop, 406 U.S. at 236, the Court concluded that the Amish parents had demonstrated why requiring their children to attend formal secondary education compelled both the parents and their children "to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Id.* at 218. Against that record, the Court observed that the state had not come forward with evidence that would justify overriding the burden imposed on the Amish parents and their children by requiring them

---

conclusion. As discussed, the contents of the books vary considerably as does their potential method of use within classrooms and the nature of any subsequent conversations. Until those dots can be shorn up, there's no reasonable likelihood that the Parents can prevail on their assertion that the inability to opt out of the Storybooks violates their free-exercise rights.

to attend formal secondary education. *Id.* at 236; *accord Lyng*, 485 U.S. at 456–57 (discussing the state's failure of proof in *Yoder* and reiterating that the compulsory attendance law was impermissibly "coercive in nature" because formal secondary education was "contrary to the Amish religion and way of life" (citation omitted)).

As the Supreme Court itself recognized in *Yoder*, its holding was tailored to the specific evidence in that record regarding how Wisconsin's compulsory secondary education law would have "inescapabl[y]" coerced the Amish to act or believe in violation of their religious views. 406 U.S. at 218. In the decades since *Yoder* was decided, other circuit courts of appeals have expressed a similar understanding of its limited holding, connecting its discussion to the unique record established concerning the Amish faith's rejection of formal secondary education as a whole. *Cf. Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 250 (3d Cir. 2008) ("Parents favor a broad reading of *Yoder* and insist that it applies to all citizens. But *Yoder*'s reach is restricted by the Court's limiting language and the facts suggesting an exceptional burden imposed on the plaintiffs."); *Parker*, 514 F.3d at 100 ("Tellingly, *Yoder* emphasized that its holding was essentially sui generis, as few sects could make a similar showing of a unique and demanding religious way of life that is fundamentally incompatible with *any* schooling system."); *Mozert*, 827 F.2d at 1067 ("*Yoder* rested on such a singular set of facts that we do not believe it can be held to

32

announce a general rule that exposure without compulsion to act, believe, affirm or deny creates an unconstitutional burden.").[15]

Based on the Supreme Court's limiting language and confirmed by the views of our sister circuits, we conclude that *Yoder* does not support the Parents' argument that potential use of the Storybooks resulting in exposure to views contrary to one's own religious beliefs necessarily constitutes a cognizable burden on their free exercise of religion. Instead, in *Yoder*, the Supreme Court applied a narrower principle to a singular set of facts. That narrower principle is whether the challenged government action "affirmatively compel[led] them, under threat of criminal sanction, to *perform acts* undeniably at odds with fundamental tenets of their religious beliefs." *Yoder*, 406 U.S. at 218 (emphasis added); *accord United States v. Ali*, 682 F.3d 705, 711 (8th Cir. 2012) ("[A]n order requiring someone either to act affirmatively in violation of a sincerely held religious belief or face criminal penalties substantially burdens the free exercise of religion." (citing *Yoder*, 406 U.S. at 234–36)). And, as already set out, the existing record does not show that mere exposure to the Storybooks is "affirmatively compel[ling]" the Parents or their children "to perform acts undeniably at odds with" their religious views. *Yoder*, 406 U.S. at 218.

Our understanding of *Yoder* and what constitutes a cognizable burden is also consistent with the Supreme Court's recognition that the Free Exercise Clause does not

---

[15] We have previously recognized how dependent *Yoder*'s analysis was on the unique record established in that case, including the unusual degree of separation from modern life that the Amish religious faith compels, though we applied the pre-*Smith* balancing test and decided the case based on the state's overriding interests in enforcing the law. *Duro v. Dist. Att'y*, 712 F.2d 96, 97–99 (4th Cir. 1983) (rejecting a Pentecostal parent's challenge to North Carolina's compulsory attendance law).

33

force "the Government *itself* to behave in ways that [an] individual believes will further his or her spiritual development or that of his or her family." *Bowen*, 476 U.S. at 699. Drawing on this principle, courts of appeals have rejected free exercise challenges to public school curriculum and requests to opt out of materials based on complaints limited to the contention that the materials express views and expose students to content deemed to be religiously objectionable. *E.g.*, *Parker*, 514 F.3d at 105–06 (rejecting parents' request for notice and an opt-out opportunity from occasional readings that offended their religious views); *Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003) (rejecting parent's request to opt out child from portions of a public school's health curriculum that he asserted contradicted his religious values and those he wanted to impart to his child because there's no "fundamental right . . . to tell a public school what his or her child will and will not be taught" "at the public school to which [he] ha[s] chosen to send [his] child" (citation omitted)). All this is to say that exposure to objectionable material alone will not ordinarily pose a burden on an individual's free exercise of religion because it lacks the requisite compulsion or pressure on an individual's religious beliefs or conduct. Instead, claims based on exposure tend to fall outside the scope of the Free Exercise Clause because they seek to "require the Government to conduct its own internal affairs"—here, public school curriculum choices—"in ways that comport with the religious beliefs of particular citizens." *Bowen*, 476 U.S. at 699.

Resisting this conclusion, the Parents point to their children's young ages and impressionability in contending that mere exposure *necessarily* amounts to coercion. In considering that argument, we are mindful that the Storybooks are intended for use with

34

elementary-age children—including children in pre-Kindergarten and Head Start (younger than five years' old).[16] The Supreme Court has recognized that elementary-age students are more likely to be impressionable than teenagers and adults when analyzing Establishment Clause claims in the school context. *See Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools."). It would likewise be a "heightened concern[]" when considering a free exercise claim. *Id.*; *see Parker*, 514 F.3d at 101 ("We see no principled reason why the age of students should be irrelevant in Free Exercise Clause cases."). Upon a proper showing in the district court, it may be that the Parents can come forward with sufficient evidence that an elementary-age child's exposure to the Storybooks and related conversations amounts to coercion.

It is not our station to determine the pedagogical or childhood-development value of the Storybooks or the related topics. Our charge as judges is to ascertain whether the Parents have shown a likelihood of success on their free exercise claim, which would require them to show direct or indirect coercion arising out of the exposure.

At present, however, no evidence in the record connects the requisite dots between the Parents' children's ages or mental capacity and their unknown exposure to the Storybooks to conclude that the Parents have already shown that a cognizable burden

---

[16] We also acknowledge the declaration of one non-party parent (but member of non-movant party Kids First) residing in Montgomery County whose child has been diagnosed with Down Syndrome and Attention Deficit Disorder and thus has vulnerabilities from mere exposure that may be akin to those that could be shown to exist with the particularly young.

exists. Given that such a conclusion would cut against the weight of legal authority and in the absence of a record supporting the Parents' assertions that their children's religious training would be compromised from every exposure to the Storybooks and related discussions, we cannot reach such a conclusion now.

In like manner, the Parents' remaining arguments related to coercion in the classroom all suffer from a lack of proof in the record. They advance several ways in which educators *could* use the Storybooks to indoctrinate their children into espousing views at odds with their religious training at home and elsewhere. For example, one of the Parents' declarations explained that it would burden their children's religious views to "pry[] into others' private lives and [en]courage[] public disclosure of sexual behavior" by "discuss[ing] romantic relationships or sexuality with schoolteachers or classmates." J.A. 404. Another declaration objects to teaching that would "dismiss parental and religious guidance on these issues." J.A. 415. And the Parents' briefs to this Court express their objections to teachers "invit[ing] children to question their gender identity, or to encourage young children to embrace gender transitioning." Opening Br. 12.

We understand the Parents' contention that the Storybooks *could* be used in ways that would confuse or mislead children and, in particular, that discussions relating to their contents could be used to indoctrinate their children into espousing views that are contrary to their religious faith. But none of that is verified by the limited record that is before us. The record does not show how the Storybooks are actually being used in classrooms (and more specifically the Parents' children's classrooms). It does not provide examples of any *required* discussion points or actual conversations that have occurred related to their use.

36

Nor does it reflect whether any of the answers from the additional materials have ever been used.

A more developed record or tailored argument might shift the analysis, as is true in many free exercise cases. Much will depend on how the record develops. Proof that discussions are pressuring students to recast their own religious views—as opposed to merely being exposed to the differing viewpoints of others—could serve as evidence that the Storybooks are being used in a coercive manner. The Parents are concerned that some of the additional materials provided to the schools *could* lead to conversations of this kind. Many teachers and principals had similar objections based on pedagogical concerns about age appropriateness and dismissiveness to religious beliefs. Those materials, for example, suggested that teachers "*[d]isrupt* [a student's] either/or thinking" when responding to their questions or comments about what relationships are proper or how individuals of a particular sex should dress or groom. J.A. 595, 597 (emphasis added). Those sorts of conversations, if occurring, may veer into the sort of pressures that could constitute coercion, particularly to young children.

That said, we cannot simply assume the contents of any conversations that have already or will in the future cross the line and pressure students to change their views or act contrary to their faith. Given the sparse record, we do not know whether these conversations stick to Language Arts purposes, if conversations about the Storybooks' characters and themes simply expose students to viewpoints the Parents find objectionable, or if discussions have diverted into subtle or not-so-subtle indoctrination that pressures students to act or believe contrary to their religious upbringing. These gaps in the record

37

leave considerable room for development between what's been alleged to date and what the Parents may be able to prove after discovery.

Should the Parents in this case or other plaintiffs in other challenges to the Storybooks' use come forward with proof that a teacher or school administrator is using the Storybooks in a manner that directly or indirectly coerces children into changing their religious views or practices, then the analysis would shift in light of that record. *Accord Zorach v. Clauson*, 343 U.S. 306, 311 (1952) (recognizing that although there was no evidence of coercion "in the record before us," "a wholly different case would be presented" upon such a showing). But at this stage in the litigation, we have a very limited record to assess an extremely broad claim. It does not show the existence of a cognizable burden on the Parents' or their children's free exercise rights.

3.

To the extent the Parents rely on cases recognizing the existence of a burden based on the denial of access to public benefits as the basis for showing a cognizable burden, their argument fails. *See, e.g.*, Opening Br. 20 (asserting the lack of notice and an opt-out option "pressure[s] the Parents to violate their religious beliefs as a condition of using the public schools").

The Free Exercise Clause has long been understood to "protect[] religious observers against unequal treatment," meaning that religious adherents cannot be "disqualif[ied] . . . from a public benefit 'solely because of their religious character.'" *Espinoza*, 140 S. Ct. at 2254–55 (quoting *Trinity Lutheran*, 137 S. Ct. at 2021); *Carson ex rel. O.C. v. Makin*, 142 S. Ct. 1987, 1996 (2022) ("[W]e have repeatedly held that a State violates the Free Exercise

Clause when it excludes religious observers from otherwise available public benefits."). Consistent with that understanding, the Supreme Court has repeatedly rejected claims by the government that exclusion from public benefits does not constitute a burden on free exercise. *E.g.*, *Trinity Lutheran*, 137 S. Ct. at 2022 (observing that placing a condition that requires a religious entity "to disavow its religious character" "to participate in a government benefit program" constitutes a burden because it indirectly coerces or impermissibly penalizes "the free exercise of religion").

While public schools are undeniably a "public benefit," the foregoing line of cases involved barriers to access to a public benefit that have not been shown at present in this case. Specifically, the government actors in each of those cases overtly barred religious adherents from eligibility to participate in the benefit *because of* the plaintiff's religious beliefs or *unless* the plaintiff agreed to act in contradiction to his religious beliefs. *See, e.g.*, *Fulton*, 141 S. Ct. at 1875–76 (recognizing that the city's refusal to enter into a full foster care contract with a Catholic agency that would not place children with unmarried couples of any sexual orientation or same-sex married couples "burdened [the agency's] religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs").

In contrast, the Montgomery County Public Schools are open to all students who meet the requirements for enrollment, none of which relate to the religious affiliation or beliefs of students or their parents. The Board is not directly or indirectly penalizing the Parents by requiring them to disavow their religious views before they can send their children to public school. Consequently, any burden on the Parents' or their children's free

39

exercise rights would only occur once the students are enrolled, based on what happens while at school. In sum, this line of cases does not provide a basis for concluding, at this point, that the Board has burdened the Parents' religious exercise rights, and the analysis of whether they are being coerced *once there* falls under the ordinary coercion analysis already undertaken.

The Parents raise the related argument that the Board's conduct is coercive because to avoid exposing their children to the Storybooks and related discussion, they would be forced to incur the additional (and in some cases prohibitive) cost of pursuing an alternative to public schooling. Without question, the Constitution protects the Parents' ability to avoid exposing their children to any religiously objectionable materials by protecting their right to choose alternatives such as a private school. *Runyon v. McCrary*, 427 U.S. 160, 178 (1976) (reiterating that parents and guardians "have a constitutional right to send their children to private schools and a constitutional right to select private schools that offer specialized instruction").[17] And, understandably, the Parents lament that they would have

---

[17] The Supreme Court has recognized that the Constitution protects a parent or guardian's fundamental right not only "to direct the upbringing and education of children under their care," *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925), but also to "give them *religious* training and to encourage them in the practice of religious belief," *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944) (emphasis added).

This principle expressly includes the right to choose private, religious education. *Parents for Priv. v. Barr*, 949 F.3d 1210, 1229 (9th Cir. 2020) (tracing the Supreme Court's cases discussing parents' rights "to make decisions concerning the care, custody, and control of their children," including the right to choose "a specific educational program—whether it be religious instruction at a private school" or something else (citations omitted)). In addition, although the Supreme Court has never expressly so held, these cases also implicitly protect the Parents' constitutional right to homeschool as well. (And, in any (Continued)

to incur additional costs, which may make these alternatives prohibitive. As Justice Alito has put it, "[m]ost parents, realistically, have no choice but to send their children to a public school and little ability to influence what occurs in the school." *Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring). But the Supreme Court and this Court have previously recognized that government coercion does not exist merely because an individual may incur increased costs as a consequence of deciding to exercise their religious faith in a particular way. *See, e.g.*, *Braunfeld v. Brown*, 366 U.S. 599, 605–06 (1961) (rejecting a free exercise challenge to a state's Sunday-closure law because it did not "make a religious practice itself unlawful" or otherwise force the plaintiffs to "forsak[e] their religious practices" even though the law "may well result in some financial sacrifice in order to observe their religious beliefs"); *D.L. ex rel. K.L. v. Balt. City Bd. of Sch. Comm'rs*, 706 F.3d 256, 263 (4th Cir. 2013) (rejecting a free exercise challenge where the plaintiffs "retain[ed] full discretion over which school [their child] attends" even if exercising that right increased the "overall cost" of education because "[t]he Supreme Court has explained that a statute does not violate the Free Exercise Clause merely because it causes economic disadvantage on individuals who choose to practice their religion in a specific manner"); *Goodall ex rel. Goodall v. Stafford Cnty. Sch. Bd.*, 60 F.3d 168, 171 (4th Cir. 1995) (same). Accordingly, such potential additional costs do not create a cognizable burden even if the choice places the Parents in an undesired—but not unconstitutionally coercive—position.

---

event, Maryland law specifically protects that right. *See* Md. Code, Educ. § 7-301(a)(3); Md. Code Regs. 13A.10.01.01.)

41

\* \* \* \*

For the reasons stated, we conclude that the Parents have not come forward at this stage with sufficient evidence of a cognizable burden on their free exercise rights to satisfy the requirements of a free exercise claim. This absence of proof means that they have not shown a likelihood of success on the merits and their free exercise claim cannot serve as a basis for obtaining a preliminary injunction. The Parents, like any litigant, may choose their particular litigation strategy. And here they chose to bring their motion for a preliminary injunction without developing a robust record in pursuit of a broadly articulated free exercise challenge. The Parents are stuck with the consequences of that choice and its effect on their appeal from the denial of a preliminary injunction.

The dissenting opinion raises many good points as it mirrors the Parents' concerns that using the Storybooks will transgress the line between mere exposure, on the one hand, and indirect coercion, on the other hand. But facts and circumstances that *could* lead to a constitutional violation if assembled a particular way are not the same as facts and circumstances that show a *likelihood* of violating the Constitution. And what is missing here is the evidentiary link showing that the Storybooks are being implemented in a way that directly or indirectly coerces the Parents or their children to believe or act contrary to their religious faith. Without such evidence, this case presents only an objection to their children's public school curriculum. Granting a preliminary injunction here would reset the standard, permitting plaintiffs to obtain a preliminary injunction upon a mere showing that they have a religious objection to their children's curriculum. The case law does not support that outcome.

42

Put simply, we cannot conclude that a policy requiring the presence of an individual in the classroom when these materials may be read *ipso facto* creates an impermissibly coercive environment. More specific information about the implementation of the Storybooks would be required to establish a cognizable burden that would shift the analysis to what level of scrutiny applies and whether the Board's decision can withstand that review. We're simply not there now. As such, the Parents have not shown that the Board's failure to provide notice and an opt-out opportunity creates a likelihood of violating their free-exercise rights.[18]

IV.

Lastly, we note that the Parents have not asserted that their due process claim would entitle them to a preliminary injunction independent of their free exercise claim. That's so because their argument is predicated on the assumption that their due process claim should be reviewed under strict scrutiny. But most due process challenges to public school policies are subject only to rational basis review. *See Herndon ex rel. Herndon v. Chapel Hill-*

---

[18] Further factual development would also be necessary as to the factual predicates for some of the Parents' arguments about why strict scrutiny should apply. For example, we cannot ascertain on the record before us whether the Board acted with impermissible hostility to religious views in deciding to no longer permit notice and an opt-out opportunity relating to the Storybooks, so as to fall under the *Church of the Lukumi Babalu Aye* and *Masterpiece Cakeshop* line of analysis. As already discussed, very little is known about that process but as alleged in the amended complaint, it appears to have been a quick about-face with little consideration. In addition, the Parents have bundled together a handful of statements made during and outside of Board meetings, both before and after the decision to disallow opt-outs. Therefore, discovery may also shed more light on those comments and whether religious animus fueled the Board's decision to disallow notice and an opt-out opportunity.

*Carrboro City Bd. of Educ.*, 89 F.3d 174, 177–79 (4th Cir. 1996). Their argument that strict scrutiny applies to their due process claim rests on a hybrid-rights theory where heightened scrutiny may be appropriate when a due process claim involving parents' rights related to the education of their children is "coupled with" a religious-exercise claim. Opening Br. 44; *see Combs*, 540 F.3d at 243–47 (discussing the hybrid-rights theory first discussed in *Smith*, which "has divided our sister circuits" ever since). To date, the validity of the hybrid-rights approach remains an open question in this Court, but we need not provide an answer today. Regardless of the underlying merits of a hybrid-rights due process claim, it could only be the basis for a preliminary injunction if the Parents' free exercise claims were *also* likely to succeed on the merits. *E.g.*, *Parents for Priv.*, 949 F.3d at 1237 ("[A]lleging multiple failing constitutional claims that do not have a likelihood of success on the merits cannot be enough to invoke a hybrid rights exception and require strict scrutiny."). Insomuch as we have concluded that at this time the Parents have not satisfied their burden of showing a likelihood of success as to their free exercise claims, they could not show that their due process claim sets out a hybrid-rights due process claim that would be subject to strict scrutiny. They do not contend that they would be likely to succeed on the merits of a due process claim subject to rational basis review. Accordingly, the district court did not abuse its discretion in denying a preliminary injunction as to the Parents' due process claim.

V.

For the reasons set out above, we agree with the district court that the Parents have not satisfied the extraordinary showing necessary to obtain a preliminary injunction. Therefore, we affirm the district court's order denying the Parents' motion.

*AFFIRMED*

QUATTLEBAUM, Circuit Judge, dissenting:

This case involves the intersection of a school board's decision to deny religious opt outs for instruction involving certain books selected for K-5 children to promote diversity and inclusion—here, as to the LGBTQ+ community—and parents' claims that forcing these books on their children infringes on their religious rights under the Constitution to direct their children's upbringing with respect to sexuality and gender. At this intersection, emotions run high. And make no mistake about it, both sides of the issue advance passionate arguments. Some insist diversity and inclusion should be prioritized over the religious rights of parents and children. Others argue the opposite.

To judges, whether it is a good or bad idea for a board to use these texts in teaching K-5 children is irrelevant. We deal with law, not policy. And the legal question we face is whether the board's actions violate parents' First Amendment free exercise rights. As to that question, generally, courts have recognized a local school board's broad discretion in the management of affairs and curriculum. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863 (1982). But that deference is not absolute. School decisions—even as to curriculum—must comply with the "transcendent imperatives of the First Amendment." *Id.* at 864. The First Amendment's Free Exercise Clause prohibits a government entity from burdening "sincere religious practice[s] pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022).

Here, the parents of certain K-5 children in Montgomery County public schools moved for a preliminary injunction enjoining the Montgomery County Board of

46

Education's decision to deny religious opt-out requests for instruction to K-5 children involving the texts designed to promote diversity and inclusivity as to the LGBTQ+ community. The district court denied the motion, finding the parents failed to establish that the board burdened their First Amendment rights.

I disagree. The parents have shown the board's decision to deny religious opt-outs burdened these parents' right to exercise their religion and direct the religious upbringing of their children by putting them to the choice of either compromising their religious beliefs or foregoing a public education for their children. I also find that the board's actions, at least under this record, were neither neutral nor generally applicable. Finally, I find the parents have established the other requirements for a preliminary injunction. So, I would reverse the district court and enjoin the Montgomery County School Board of Education from denying religious opt-outs for instruction to K-5 children involving the texts.

## I.    **Background**

In the Fall of 2022, in an effort to make its curriculum more representative of and inclusive to students and families in its county, the Montgomery County School Board of Education approved several books it described as "LGBTQ-inclusive texts" for use in pre-Kindergarten through middle school classrooms as part of the English Language Arts Curriculum.  For example, one of these books is *Pride Puppy!*, a story about a Pride Day parade. *Pride Puppy!* invites readers to search for depictions of terms like "[drag] queen," "[drag] king" and "intersex" among other vocabulary words. J.A. 98. The school district approved this book for pre-Kindergarten and Head Start classrooms—in other words, for

47

three- and four-year-olds. Other books include stories about a planned same-sex marriage, a transgender child's rainbow-colored wig and elementary school students deciding to replace girl/boy bathroom signs with non-binary signs.

The school board provided more than these books; it also provided materials for teachers and administrators to use in responding to questions from students. These materials indicate that if a student says "Being _____ (gay, lesbian, queer, etc) is wrong and not allowed in my religion," school officials "can respond" by saying, "I understand that is what you believe, but not everyone believes that. We don't have to understand or support a person's identity to treat them with respect and kindness." J.A. 595. The materials also indicate that if a student says that "a girl . . . can only like boys because she's a girl," the school employee can "[d]isrupt the either/or thinking by saying something like: actually, people of any gender can like whoever they like. . . . How do you think it would make_(character's name)__to hear you say that? Do you think it's fair for people to decide for us who we can and can't like?" J.A. 595. And if a student asks what it means to be transgender, the school board proposed this response: "When we're born, people make a guess about our gender and label us 'boy' or 'girl' based on our body parts. Sometimes they're right and sometimes they're wrong. . . . Our body parts do not decide our gender. Our gender comes from our inside…." J.A. 596.

The school board also provided suggested responses to concerns raised by parents. If parents question whether the texts are age-appropriate, materials provided by the school board suggest that teachers could respond that "[c]hildren are already learning about" gender and sexuality identity because "[m]essages about gender are everywhere" and that

"[b]eginning these conversations in elementary school will help young people develop empathy for a diverse group of people and learn about identities that might relate to their families or even themselves." J.A. 600. And if a parent complains that values in the books "go against the values we are instilling . . . at home," the materials indicate that teachers could respond that "[t]he purpose of learning about gender and sexual[] identity diversity is to demonstrate that children are unique and that there is no single way to be a boy, girl, or any other gender. If a child does not agree with or understand another student's . . . identity . . . , they do not have to change how they feel about it." J.A. 601.

Parents of certain K-5 Montgomery County school children object to their children being instructed with these books. These parents claim their faiths—Islam, Roman Catholicism and Ukrainian Orthodox—dictate that they, and not the Montgomery County schools, teach their children about sex, human sexuality, gender and family life. They also claim the messages from the books conflict with and undermine the sincerely held religious beliefs they seek to convey to their children. So, they sought to opt their children out of reading and discussing the books consistent with Maryland regulations requiring parental notice and opt-outs for family life and human sexuality, and the board's "Guidelines for Respecting Religious Diversity." J.A. 60.

The Guidelines state that "schools should try to make reasonable and feasible adjustments to the instructional program to accommodate requests [] to be excused from specific classroom discussions or activities that [students or parents] believe would impose a substantial burden on their religious beliefs." J.A. 67. Under those Guidelines, throughout the 2022/2023 school year, the board granted the parents' opt-out requests. Then it all

49

changed. For the 2023/2024 school year, the board decided that, despite its Guidelines, opt-outs would no longer be granted for the books the board required be used to promote diversity and inclusivity to the LGBTQ+ community. The board even advised that "teachers will not send home letters to inform families when inclusive books are read in the future." J.A. 32.

In response, the parents sued the board, alleging violations of their right to free exercise under the First Amendment.[1] They do not claim the use of the books is itself unconstitutional. And they do not seek to ban them. Instead, they only want to opt their children out of the instruction involving such texts. More specifically, they challenge the board's decision to cease providing advance notice of the use of such texts and to prohibit religious opt-outs for instruction involving them. The parents also moved for a preliminary injunction to maintain religious opt-outs under the Guidelines.

The district court denied the motion. With respect to the free exercise claims, the court held that the parents had not established a likelihood of success on the merits based on their assertion that the board's refusal to grant their requests to opt their children out of the instruction involving the texts burdened the parents' free exercise rights.

The parents timely appealed, asking us to reverse the district court's denial of their motion and to grant injunctive relief. They insist that they have shown a likelihood of

---

[1] They also asserted claims for violations of their substantive due process rights to direct and control their children's upbringing under the Fourteenth Amendment, for viewpoint discrimination under the First Amendment and for violations of Maryland state law. Because I would conclude that the parents are entitled to a preliminary injunction on their free exercise claim, I do not address these other claims.

50

success on the merits. They claim the board's denial of their opt-out requests burdened their First Amendment free exercise rights in a way that was neither neutral nor generally applicable, and thus, the board's actions were subject to strict scrutiny. And because, according to the parents, such action cannot withstand that level of scrutiny, the board violated their First Amendment right to freely exercise their religion and direct the religious upbringing of their children.

## II.    Analysis

As the majority notes, "[a] preliminary injunction shall be granted only if the moving party clearly establishes entitlement to the relief sought." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)*.* To obtain a preliminary injunction, a plaintiff "'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008)). We review a district court's denial of a motion for preliminary injunction for abuse of discretion. Under that standard, we review factual findings for clear error and legal conclusions de novo. *See Di Biase*, 872 F.3d at 229. But legal error, by definition, is an abuse of discretion. *United States v. Ebersole*, 411 F.3d 517, 526–27 (4th Cir. 2005).

### A. Likelihood of Success

#### 1. Burden

51

Applicable to the states through the Fourteenth Amendment, the First Amendment's Free Exercise Clause prohibits the enactment of laws or policies that prohibit the free exercise of religion. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). The free exercise of religion means "first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990). But that is not all. The Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly." *Kennedy*, 142 S. Ct. at 2421. "It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life though 'the performance of (or abstention from) physical acts.'" *Id*. (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877).

A free exercise claim first requires asking whether the government action "interferes" or burdens the plaintiff's free exercise of religion. *See United States v. Lee*, 455 U.S. 252, 256–57 (1982). Importantly, interfering or burdening the exercise of religion is not limited to direct coercion. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988) (recognizing that the Supreme Court has repeatedly held that indirect coercion, not just outright prohibitions, is subject to strict scrutiny under the First Amendment). When a state "conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717–18 (1981); *see also Sherbert v. Verner,* 374 U.S.

398, 404 (1963) ("The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.").

When identifying whether a burden is imposed on the exercise of religious beliefs, courts must not question the sincerity or judge the significance of the particular belief. *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018); *see also Wilcox v. Brown*, 877 F.3d 161, 168 (4th Cir. 2017) ("But Defendants point to no case in which the court held that a plaintiff is required to plead the theological underpinnings of his religion's requirements."). We must accept the belief as honestly held and significant. That is because it "is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989).

Here, the district court held that the parents had not established that the board's denial of the parents' opt-out requests burdened their free exercise of religion. The court concluded the board's actions did not force any children to agree with the books. Thus, it rejected the parents' "indoctrination" claim. And with respect to indirect coercion, the court reasoned that the board's refusal to grant opt-out requests related to instruction involving the books did not force the parents to forego exercising their religion. The parents could still, the district court explained, teach their children the tenants of their religion outside of school.

I disagree. For decades, the Supreme Court has made clear that "the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Sherbert*, 374 U.S. at 404. Roughly 60 years ago, in *Sherbert*, the Supreme Court held that denying unemployment benefits to a claimant who refused, for religious reasons, to work on Sundays, violated the Free Exercise Clause. The Court explained that such a refusal forced the claimant "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." *Id*. at 404. The Court reiterated this principle about 20 years later in *Thomas*. Then, recently, in *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), it re-stated it again. There, the Court held a city's refusal to grant a full foster care contract to a Catholic agency that would not place children with same-sex couples violated the Free Exercise Clause because it "burdened [the agency's] religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs." *Fulton*, 593 U.S. at 532. To the Court, that was enough. And it ruled any judicial inquiry into the merits of the religious belief out of bounds. "'[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'" *Id.* (quoting *Thomas*, 450 U.S. at 714).

While perhaps not on all fours with the facts here, these decisions provide important guidance to the parents' claim. The parents claim their faith compels that they teach their children about sex, human sexuality, gender and family life. They also claim the messages from the books conflict with and undermine the sincerely held religious beliefs they hold

54

and seek to convey to their children. And while the concerns include the content of the texts, they also include the responses the school board provided to teachers to use when children or parents questioned the texts. According to the parents, the suggested responses make clear that, in addition to using the books, schools will advocate for the themes and values in the texts and against any opposition to them. As a result, they claim that if they cannot opt their children out of the instruction involving the books, they must either forego a public education or violate their deeply held religious beliefs.

In my view, the board's actions put the parents in a very similar position to the unemployment benefits claimant in *Sherbert* and the foster care agency in *Fulton*. The board's refusal to grant the parents' requests for religious opt-outs to instruction with the books the board required be used to promote diversity and inclusivity to the LGBTQ+ community forces the parents to make a choice—either adhere to their faith or receive a free public education for their children. They cannot do both. *Sherbert* and *Fulton* tell us that forcing that type of choice burdens the free exercise of religion.

And I disagree with the majority's conclusion that the parents have not produced enough evidence to establish that their free exercised rights have been burdened. The parents have met their burden. They have produced the books that no one disputes will be used to instruct their K-5 children. They produced declarations explaining in detail why the books conflict with their religious beliefs. They have produced the board's own internal documents that show how it suggests teachers respond to students and parents who question the contents of the books. Recall those documents advise teachers that they can "[d]isrupt the either/or thinking by saying something like: actually, people of any gender can like

55

whoever they like. . . . How do you think it would make_(character's name)__to hear you say that? Do you think it's fair for people to decide for us who we can and can't like?" J.A. 595. And they instruct teachers on how to discuss being transgender to the K-5 children. "When we're born, people make a guess about our gender and label us 'boy' or 'girl' based on our body parts. Sometimes they're right and sometimes they're wrong. . . . Our body parts do not decide our gender. Our gender comes from our inside…." J.A. 596. Based on Supreme Court precedent, the record here tells all we need to know. The standard for a preliminary injunction is not ultimate success, but likelihood of success. *Winter,* 555 U.S. at 32. The parents have established they are likely to succeed in proving the board's decisions burdened their First Amendment rights.

The board makes three primary counter-arguments. None are persuasive.

First, the board argues over and over that the use of the books in instructing K-5 children does not coerce or require the parents or their children to change their religious views. Fair enough. But the First Amendment protects less direct religious burdens. As already discussed, *Sherbert* and *Fulton* make this point. When considering the Free Exercise Clause's protection against indirect coercion, we ask whether the state policy forces citizens to choose between obtaining a public benefit and exercising their religious beliefs. These parents' faith dictates that they—not others—teach their children about sex, human sexuality, gender and family life. Their faiths dictate that they shield their children from teachings that contradict and undermine their religious views on those topics. And no matter how you slice it, the board's decision to deny religious opt-outs prevents the parents

56

from exercising these aspects of their faith if they want their children to obtain a public education.

Second, the board contends the parents did not face a choice between exercising their faith on the one hand and their children receiving a public education on the other because they could still teach their religious beliefs at home. Of course, they can teach their beliefs at home. But free exercise law is not nearly as cramped as this argument suggests. In *Kennedy*, the high school football coach could have prayed at home. But that did not matter to the Supreme Court. What mattered was that the school restricted the coach from exercising his religion after games on the football field. In *Fulton*, the Catholic foster care agency could have, even without the contract with the city, exercised its religious beliefs about marriage. But again, that did not matter to the Supreme Court. What mattered was that the agency had to either compromise its religious beliefs or forego such a contract unless it agreed to certify same-sex couples. *Fulton*, 593 U.S. at 532. Here, the parents face a similar choice. If the ability to exercise one's faith at home shields the impeding of the exercise of one's faith at school from the Free Exercise Clause, we will have indeed eliminated much of the clause's protections.

Third, the board argues that mere exposure to ideas contrary to one's faith is not enough of a burden to implicate the First Amendment. In advancing this position, the board contends that exposure to issues that one disagrees with, even for religious reasons, is part of the compromise parents make when choosing to send their children to public schools. While it is generally true that the First Amendment provides no guarantee that students will

57

not be exposed to views they (or their parents) disagree with in public schools, there are several problems with the use of that principle here.

To begin, as already discussed, the board's use of the texts goes far beyond mere exposure to objectionable viewpoints.[2] And consider the implication of the board's argument. In referencing the compromise parents make when choosing to send their children to public schools, the board seems to be suggesting that to avoid exposure to materials like the inclusive texts, the parents could forego a public education for their children. But that means they would need to either send their children to private schools or homeschool them. Those may be options for some. But what if a parent cannot afford private school or is unable to homeschool due to work? Surely, the reach of the First Amendment extends beyond the bank accounts of those wealthy enough to pay for education alternatives to public schools with policies infringing on the exercise of religion. *See Morse v. Frederick*, 551 U.S. 393, 424 (2007) ("Most parents, realistically, have no choice but to send their children to a public school and little ability to influence what occurs in the school.") (Alito, J., concurring).

Last, when the onion layers of the board's argument are peeled back, the board seems to question the relative importance of the parents' religious beliefs that their children should not be taught with the books the board required be used to promote diversity and

---

[2] This distinguishes this case from *Mozert v. Hawkins County Board of Education*, 827 F.2d 1058 (6th Cir. 1987), and *Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680 (7th Cir. 1994), two of the out-of-circuit cases on which the board relies. The other case the board relies on is *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008). Factually, it is the closest case to the one before us. But it focuses more on indoctrination than indirect coercion.

58

inclusivity to the LGBTQ+ community. To explain, the board only denied opt-outs for instruction involving those books. So, despite disclaiming that it is doing so, the board's arguments, which the district court adopted, really view the parents' religious objections to the texts as less important than the board's goals to improve inclusivity for the LGBTQ+ community. But this is the precisely the sort of value judgment about parents' religious claims that courts must not make. To repeat, it "is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez*, 490 U.S. at 699.

For these reasons, the parents have shown they are likely to succeed on proving board's refusal to grant their opt-out requests burdened their free exercise rights.[3]

---

[3] The majority raises an additional issue. It concludes that that the parents were not actually excluded from the benefit of public schools. In other words, it points out that the board did not require the parents or their children to disavow their beliefs to attend public school. Any burden on their religion results after the students are enrolled. Maj. Op. at 39-40. From a factual standpoint, that is true. But the Supreme Court has never drawn such a fine line. Neither *Thomas*, *Sherbert*, *Fulton* nor any Supreme Court indirect coercion decision holds that a total barrier to the public benefit is required to show a burden on one's right to free exercise. To the contrary, the Court asks a broader question— whether the state policy forces the individual to make a choice to either live out their faith or forego the public benefit. The parents face that choice here.

## 2. Neutrality and General Applicability

Once a party claiming a violation of the First Amendment's free exercise clause establishes a burden—or, in the case of a preliminary injunction, establishes a likelihood of success on burden—the next step is to examine whether the state action that imposed the burden is neutral and generally applicable. If it is, we review it only for a rational relationship to a legitimate government interest. *Fulton*, 593 U.S. at 533. But if it is not, the state action must survive strict scrutiny review. *Id.*

On this issue, as with burden, *Fulton* looms large. *Fulton* provides that state action is "not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Id.* at 533 (quoting *Smith*, 494 U.S. at 884). It then held that city's policy precluding an agency from rejecting adoptive or foster parents based on their sexual orientation unless the city commissioner granted an exception in his or her sole discretion rendered the policy not neutral nor generally applicable. *Id*. In explaining that holding, *Fulton* pointed out that the creation of a system of exemptions available at the city's sole discretion triggered strict scrutiny. *Id*. at 535; *see also Sherbert,* 374 U.S. at 401 (denial of unemployment benefits absent a showing of "good cause" triggered strict scrutiny); *Church of the Lukumi Babalu Aye, v. City of Hialeah*, 508 U.S. 537 (1993) (strict scrutiny applied to the state's determination about whether the killing of certain animals as part of a religious ceremony was necessary). "By allowing room for discretionary exceptions, we no longer have a rule of general application and the First Amendment bristles." *Canaan Christian Church v. Montgomery Cnty.*, 29 F.4th 182, 203 (4th Cir. 2022) (Richardson, J., concurring).

Applying those principles to the parent's claims, the parents have established they are likely to succeed in proving that the board's actions are neither neutral nor generally applicable. Start with the school board's Guidelines, which set forth provisions for excusing students from instructional programs for religious reasons. The Guidelines state that "schools should try to make reasonable and feasible adjustments to the instructional program to accommodate requests [] to be excused from specific classroom discussions or activities that [students or parents] believe would impose a substantial burden on their religious beliefs." J.A. 67. Thus, Montgomery County schools have discretion to grant religious opt-out requests. A school decides on an individual basis if the requested religious accommodation is "reasonable" and "feasible." That discretion triggers strict scrutiny under *Fulton*, *Sherbert* and *Church of the Lukumi Babalu Aye*.

Illustrating that discretion, throughout much of the 2022/2023 school year, the board granted the parents' opt-out requests with respect to the inclusive texts. But then it changed its position. The board decided that, despite the Guidelines, opt-outs would no longer be granted concerning the texts. In fact, it flip-flopped on its policy overnight. On March 22, 2023, the board stated that "[i]f a parent chooses to opt out, a teacher can find a substitute text for that student." J.A. 31. The very next day, however, the board announced a "revised message," in which it made clear that families would no longer be able to "opt out of engaging with any instruction materials," other than the family life and human sexuality unit of instruction. J.A. 31–32. The board also told parents that teachers would not send home letters informing them of when the books were scheduled to be read. Guidelines that permit a school board to decide one day that religious opt-outs are okay and the next day

61

that they are not—because accommodating the request is not reasonable or feasible—is inherently discretionary.

True, unlike *Fulton,* the board's decision applied not to an individual request for an opt-out for the K-5 texts' instruction; instead, it applied to all such requests. But the board was only able to deny the parents' opt-out requests because the Guidelines gave it the discretion to do so. And it would seem odd that a single denial of a discretionary request to opt out of instruction that burdens the free exercise of one's religious rights would not be neutral nor generally applicable, but one that applied pre-emptively to a wider swath would.

Resisting this conclusion, the board makes several arguments. First, it argues that its decision to no longer consider opt-outs for the books does not favor secular over religious conduct. *See Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (policies that expressly favor secular interests over religious interest trigger strict scrutiny). But favoring the secular over the religious is but one way to trigger strict scrutiny. Strict scrutiny is also triggered by a government policy that creates "a formal mechanism for granting exceptions." *Fulton*, 593 U.S. at 537. And that is what we have here.

Second, the board argues *Fulton*'s mechanism-for-granting-exceptions principle only applies if the discretionary exception decisions entail a value judgment on the legitimacy of the religious views. Although such value judgments do offend the Free Exercise Clause, that is not the only state action that does so. *Fulton* makes that clear that mechanisms for granting discretionary exceptions trigger strict scrutiny. 593 U.S. at 533. It did not matter in *Fulton* whether any exceptions were granted or denied based on value

62

judgments about the religious views.   The policy was neither neutral nor generally applicable because it invited the government "to decide which reasons for not complying with the policy are worthy of solicitude" in its sole discretion. *Id.* at 537.

Third, the board insists that whether or not the Guidelines for Respecting Religious Diversity previously permitted no discretion, it has now eliminated any discretion by deciding that the policy will not be applied to the texts for the Montgomery County K-5 students. But that flip-flop was itself a purely discretionary decision. Moreover, the board only eliminated religious opt-outs for the texts for K-5 children. In other words, it carved away only a sliver of those able to request opt-outs—those opposed for religious reasons to the instruction of their K-5 children with the texts. In other words, other religious opt-out requests are still allowed; just not for those opposed to the content of the texts. This slicing and dicing of religious opt-outs is neither neutral nor generally applicable.[4]

---

[4] The board's policy has another problem. Maryland state regulations requires instruction on family life and human sexuality. Md. Code Regs. 13A.04.18.01 And such "family life and human sexuality instruction shall represent all students regardless of ability, sexual orientation, gender identity, and gender expression." Md. Code Regs. 13A.04.18.01(D)(2)(a). But Maryland also requires schools to establish procedures for notice and opt-out procedures for all "family life and human sexuality" instruction regardless of whether they are sought for a religious reason. Md. Code Regs. 13A.04.18.01(D)(2)(e). Even though not taught in a sex-ed class, the books the board required be used with K-5 children to promote diversity and inclusivity to the LGBTQ+ community involve issues of family life and human sexuality. I see nothing in the Maryland regulations that would permit the board to avoid the requirement to permit opt-outs for family life and human sexuality just by adding instruction in that area to other classes.

To sum it up, the parents have established they are likely to succeed in proving that the board's refusal to consider the parents' religious opt outs requests is not neutral; nor is it generally applicable. And for that reason, it must survive strict scrutiny.[5]

### 3. **Strict Scrutiny**

Under strict scrutiny, state action will be sustained only if it is narrowly tailored to serve a compelling state interest. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). "A government policy can survive strict scrutiny [] only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541. The board contends it decided to use the books to reflect the diversity of its community and to foster inclusivity of students in the LGBTQ+ community. And it contends its decision to modify the opt-out policy was to address absenteeism and to reduce stigmatization of students who remained in the classroom for the study and discussion of the inclusive texts.

Regardless of one's views on those interests, they cannot withstand strict scrutiny. In *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023), the Supreme Court questioned how similar interests could be compelling if they cannot be subjected to meaningful review. In finding race-based admissions programs unconstitutional, the Court explained that "Harvard identifies the following educational

---

[5] The parents argue that strict scrutiny also applies because the record shows the board's hostility to religion. And they argue strict scrutiny is required under *Wisconsin v. Yoder*, 406 U.S. 205 (1972). The board responds to these arguments in its briefing, claiming that the policy was not enacted out of religious hostility and that *Yoder* does not support the parents' position. But since I find strict scrutiny applies due to the absence of a neutral and generally applicable policy, I do not address those arguments.

64

benefits that it is pursuing: (1) 'training future leaders in the public and private sectors'; (2) preparing graduates to 'adapt to an increasingly pluralistic society'; (3) 'better educating its students through diversity'; and (4) 'producing new knowledge stemming from diverse outlooks.'" *Id.* at 214. It then held that "although these are commendable goals, they are not sufficiently coherent for purposes of strict scrutiny." *Id*; *see also Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 671–72 (9th Cir. 2023) ("While it cannot be overstated that anti-discrimination policies certainly serve worthy causes—particularly within the context of a school setting where students are often finding themselves—those policies may not themselves be utilized in a manner that transgresses or supersedes the government's constitutional commitment to be steadfastly neutral to religion."). Likewise here, the board's goals, no matter how laudable, are unmeasurable, and thus fail to pass constitutional muster without a "meaningful connection to the means they employ and the goals [it] pursues." *Id.* at 215.

What's more, the board cannot show that the texts or its refusal to allow religious opt outs are narrowly tailored to those interests. The board granted religious opt outs for the texts during the 2022/2023 school year, when it advanced the same interest of making its schools safe and inclusive for those in the LGBTQ+ community. And still today, the board permits opt-outs for family life and human sexuality instruction. How can barring religious opt-outs be narrowly tailored to the board's stated interests when it has permitted less restrictive measures in the past and currently?

The board advances neither a compelling government interest nor a policy narrowly tailored to that interest. Under strict scrutiny, therefore, it is likely to fail constitutional

65

muster. As a result, the parents have shown a likelihood of success as to their First Amendment free exercise claims.

## B. Other Preliminary Injunction Factors

Showing a likelihood of success on the merits goes a long way toward the parents' request for a preliminary injunction. *See Frazier v. Prince George's Cnty.*, 86 F.4th 537, 544 (4th Cir. 2023). But they must still show irreparable harm without preliminary relief, that the balance of equities tips in their favor and that an injunction is in the public interest. *See Musgrave*, 553 F.3d at 298. Here, those remaining issues can be disposed of in short order.

Taking them in turn, "irreparable harm" "is inseparably linked to the likelihood of success on the merits" because a plaintiff not likely to succeed on the merits is not likely to suffer irreparable harm. *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 190 (4th Cir. 2013) (cleaned up). Also, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (finding irreparable harm if COVID-19 restrictions were imposed on houses of worship and concluding that, while some people shut out of services may be able to watch services on television, remote viewing is not the same as personal attendance and would shut out important traditions that require personal attendance); *Tandon*, 593 U.S. at 64 ("Applicants are likely to succeed on the merits of their free exercise claim; they are irreparably harmed by the loss of free exercise rights 'for even minimal periods of time.'"). We have also held that "upholding constitutional rights serves the public interest." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d

66

249, 261 (4th Cir. 2003). And last, based on my determination that the board's actions would likely be found unconstitutional, the balance of the equities favors granting a preliminary injunction given the limited nature of the relief the parents seek. In my view, the record shows that the parents have established all the requirements of obtaining a preliminary injunction.

### III.    Conclusion

Courts rightly defer to schools, as a general matter, for curriculum decisions. But not for decisions that burden the free exercise of religion in a way that is not both neutral and generally applicable. Those decisions are only constitutional if narrowly tailored to a compelling governmental interest. Here, the parents have shown they are likely to succeed in proving the board's decision to deny religious opt-outs for K-5 students with respect to the use of the texts burdens their rights to freely exercise their religion. And they are likely to succeed in showing that decision is neither neutral nor generally applicable. Last, the parents are likely to succeed in establishing that the board's decision cannot withstand strict scrutiny. In addition, the other preliminary injunction factors favor enjoining the board's decision. I would, therefore, reverse the district court and grant the injunctive relief. I respectfully dissent.[6]

---

[6] The parents' appeal involves the board's decision to remove the religious opt-outs available under the Guidelines for K-5 children for instruction involving the LGBTQ+ inclusive texts. It does not present the question of whether opt-outs are required anytime a school's curriculum decisions burden religious freedom. As a result, my opinion should not be construed to address that question.

67